**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| WILMER GARCIA RAMIREZ, SULMA HERNANDEZ ALFARO, on behalf of themselves and others similarly situated, | ) ) ) ) Case No. |
| *Plaintiffs,* | ) ) Class Action |
| v. | ) ) ) |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE); THOMAS HOMAN, Acting Director of ICE; DEPARTMENT OF HOMELAND SECURITY; KIRSTJEN NIELSEN, Secretary of Homeland Security, | ) ) ) ) ) ) ) ) ) |
| *Defendants.* | ) ) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Plaintiffs are immigrant teenagers held in the custody of Defendant U.S. Immigration and Customs Enforcement (ICE). They bring this action on behalf of themselves and other similarly situated immigrant teenagers, because ICE has failed to consider them for placement in "the least restrictive setting available" and to provide them with meaningful alternatives to detention, as required by amendments to the Trafficking Victims Protection Reauthorization Act (TVPRA). *See* 8 U.S.C. § 1232(c)(2)(B).

2.      Congress enacted the TVPRA in 2008 to protect immigrant children who come to the United States without a parent or guardian. *See* Pub. L. 110-457 (codified at 8 U.S.C. § 1232). The TVPRA requires federal officials to screen these unaccompanied children for certain vulnerabilities, including whether they are victims of trafficking and whether they fear persecution in their home countries. *See* 8 U.S.C. § 1232(a)(4). The TVPRA also enacted procedures for

ensuring "safe and secure placements" for these children, *see* § 1232(c)(1), and mandated that the Department of Health and Human Service's Office of Refugee Resettlement (ORR) promptly place them in the "least restrictive setting," such as with a parent or family member. 8 U.S.C. § 1232(c)(2)(A).

3.      In 2013, Congress enacted an amendment to the TVPRA extending many of these same protections to unaccompanied immigrant children who turn 18 and are transferred by ORR into the custody of ICE.  *See* Pub. L. 113-4, § 1261, 127 Stat. 120-122 (Mar. 7, 2013).   That amendment, which is codified as Section 1232(c)(2)(B), requires that ICE "shall consider placement in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight."  Section 1232(c)(2)(B) further requires that such children "shall be eligible to participate in alternative to detention programs, utilizing a continuum of alternatives based on the alien's need for supervision, which may include placement . . . with an   individual   or   an   organizational   sponsor,   or   in   a   supervised   group   home." 8 U.S.C. § 1232(c)(2)(B).

4.      Each of the Plaintiffs recently turned 18 and was transferred by ORR to ICE.  Upon their transfer to ICE, ICE did not comply with the requirements set forth in Section 1232(c)(2)(B). Specifically, it did not "consider placement in the least restrictive setting available" or make any alternative to detention programs available.  Quite the opposite, it automatically placed Plaintiffs in adult detention without considering any alternatives.

5.      On information and belief, ICE is routinely and systematically failing to comply with the requirements of Section 1232(c)(2)(B) with respect to unaccompanied immigrant children transferred into ICE's custody when they turn 18.  Moreover, ICE has failed to establish any policies, programs, or procedures implementing Section 1232(c)(2)(B)'s statutory requirements

that ICE "consider placement in the least restrict[ed] setting available after taking into account the alien's danger to self, danger to the community, and risk of flight," and that ICE provide these immigrants with "alternative to detention programs." 8 U.S.C. § 1232(c)(2)(B). Instead, ICE automatically places unaccompanied immigrants who have turned 18 into adult detention without considering or making available the least restrictive (or other) alternatives.

6.      Accordingly, Plaintiffs seek to represent a class of all unaccompanied immigrant children who have been transferred to the custody of ICE upon turning 18 and as to whom ICE has not considered placement in the least restrictive setting available and/or made alternative to detention programs available, as required by Section 1232(c)(2)(B).

7.      Plaintiffs ask this Court to grant declaratory and injunctive relief to each of them individually and to the class they represent, enjoin ICE from detaining Plaintiffs and other class members without considering placement in the least restrictive setting available after taking into account their danger to themselves and others and risk of flight, and making alternative to detention programs available to them, including release to individual and organizational sponsors and supervised group homes.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the claims alleged in this Complaint pursuant to 28 U.S.C. § 1331, as they arise under federal statutes, including 8 U.S.C. § 1232(c)(2)(B) and 5 U.S.C. § 706(2).

9.      The Administrative Procedure Act, 5 U.S.C. § 706(2), waives the U.S. government's sovereign immunity where, as here, federal agencies have acted in violation of the law.

10.     The Court has authority to issue a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, and Rule 57 of the Federal Rules of Civil Procedure.

11.     The Court has authority to grant injunctive relief pursuant to 5 U.S.C. §§ 702 and 706, and Rule 65 of the Federal Rules of Civil Procedure.

12.     Venue properly lies in the District of Columbia because a substantial part of the events and omissions giving rise to this action occurred in the District. 28 U.S.C. § 1391(e)(1)(B).     Defendants are headquartered in Washington, D.C., and on information and belief, Defendants' decisions regarding the policies and procedures relating to the detention of 18 year-olds who "age out" of ORR custody are being made in the District of Columbia.

PARTIES

13.     Plaintiff Wilmer Garcia Ramirez is an 18 year-old from Guatemala. He entered the United States without inspection on March 26, 2017, at the age of 17. He is currently detained at the Eloy Detention Center in Eloy, Arizona.

14.     Plaintiff Sulma Hernandez Alfaro is an 18 year-old from Honduras. She entered the United States without inspection in December 2016, at the age of 16. She is currently detained at the Port Isabel Service Detention Center in Los Fresnos, Texas.

15.     Defendant Department of Homeland Security (DHS) is a department of the Executive Branch of the United States government. It is located in Washington, D.C. DHS is responsible for enforcing federal laws governing border control, customs, trade, and immigration.

16.     Defendant Kirstjen Nielsen is sued in her official capacity as the Secretary of the DHS. In this capacity, she directs each agency within DHS, including ICE. As a result, in her official capacity, Secretary Nielsen is responsible for the administration and enforcement of the immigration laws.

17.     Defendant ICE is an agency within DHS. It, too, is located in Washington, D.C. It is in charge of the administration and enforcement of federal immigration laws, including

implementing and complying with 8 U.S.C. § 1232(c)(2)(B), and determining whether and where to detain Plaintiffs and other immigrants who are transferred by DHS into the custody of ICE upon turning 18.

18.    Defendant Thomas Homan is sued in his official capacity as the Acting Director of ICE. In that capacity, he is responsible for the administration and enforcement of federal immigration laws, including implementing and complying with 8 U.S.C. § 1232(c)(2)(B), and determining whether and where to detain Plaintiffs and other immigrants who are transferred by DHS into the custody of ICE upon turning 18.

## STATEMENT OF FACTS

### A.    Wilmer's Background and Immigration History

19.    Wilmer Garcia Ramirez was born in 1999, in Caserio Pinalito Matazano, within the department of Chicimula, Guatemala. He is one of six children. His family lived in poverty in Guatemala, sharing a one-room house with dirt walls, a tin roof, and no floors.

20.    Wilmer began working in his family's fields at the age of six. Wilmer walked with his father more than an hour to the fields and worked there five days per week, cutting underbrush with a machete.

21.    When he was approximately 8 years old, Wilmer began working in other people's fields. He worked daily for 9 or more hours. He would often make the 30-minute walk to the fields by himself.

22.    When Wilmer was approximately 9 years old, his father began taking him and his brothers to work at a coffee plantation in Escipulas, Guatemala. From the ages of 9 to 15, Wilmer worked at the coffee plantation in Escipulas for three months each year.

23.    The working conditions in Escipulas were difficult. Wilmer worked from about 6 a.m. to about 5 p.m. with a small break for lunch. The work involved cutting coffee beans by

hand. He was required to stand along the row of plants all day and was not allowed to take breaks, even to use the restroom. Wilmer was required to fill about two and a half barrels of coffee beans every day. In return, he earned approximately $3.40 (25 Quetzales) daily, all of which he gave to his parents.

24. While working in Escipulas, Wilmer's boss provided housing and food. Wilmer worked with 15 other people, with whom he stayed in a bedroom-sized open-air structure. Wilmer slept on the floor.

25. If Wilmer did not complete his work, his boss would not feed him. Even when he was fed, most meals were limited to beans and rice.

26. In 2016, when Wilmer was 16, he went to work at another coffee plantation in Honduras for three months. He traveled there alone.

27. At the coffee plantation in Honduras, Wilmer worked 11 or more hours a day, cutting coffee, cleaning plants, and removing weeds from the fields. He would work for about 20 days, take a six-hour bus ride home to visit for a night, and then return to Honduras.

28. In Honduras, Wilmer had to fill three barrels full of coffee beans each day, and was paid approximately $1.35 (10 Quetzales) for each barrel. Each time he returned home, he gave the money to his parents.

29. The conditions at this plantation were even worse than those in Escipulas. Again, Wilmer slept on the floor with approximately 30 other workers. And while Wilmer's boss provided food, he withheld it whenever he was unsatisfied with a laborer's work. In one instance, Wilmer was not fed for two days. When Wilmer and the other workers were fed, it was only beans and water.

30.     In March 2017, at the age of 17, Wilmer left Guatemala, seeking a better life in the United States.

31.     Wilmer entered the United States near Andrade, California, on or about March 26, 2017.

32.     Wilmer was apprehended by U.S. Customs and Border Protection officers after he crossed the border.   The officers determined that he was an unaccompanied alien child and transferred him to the custody of ORR.

33.     While in ORR custody, Wilmer petitioned the Superior Court of Arizona to declare him a dependent of the State due to his parent's neglect in Guatemala.   The court granted Wilmer's petition on September 19, 2017, finding that it was not in Wilmer's best interest to be returned to Guatemala due to the circumstances described above, including being neglected by his parents and forced to work as a minor in deplorable conditions.

34.     Wilmer then filed a petition for special immigrant juvenile status (SIJS) based on the state court's dependency order.   SIJS is granted to immigrant children who demonstrate that it is not in their best interests to return to their home country and parents because of abuse, abandonment, or neglect.   8 U.S.C. § 1101(a)(27)(J).   If immigrant children meet the criteria for SIJS they are eligible for lawful permanent residency.   *Id.*

35.     U.S. Citizenship and Immigration Services received Wilmer's SIJS application on October 12, 2017.   That application remains pending.   This is despite the fact that Wilmer meets all of the statutory criteria for SIJ status, as evidenced by the state court's dependency order finding he suffered parental neglect in Guatemala and that it would not be in his best interest to return there.

36.     Wilmer has a family friend in Warmister, Pennsylvania, who is willing to act as his sponsor and provide for his care and custody.

37.     ORR transferred Wilmer to the custody of ICE in 2017, on his eighteenth birthday. ICE is currently detaining him at Eloy Detention Center in Eloy, Arizona.

38.     On January 5, 2018, Wilmer's attorney sent a request to ICE asking the agency to release Wilmer to the least restrictive setting available as required by 8 U.S.C. § 1232(c)(2)(B). Wilmer included information about his SIJS application, his life in Guatemala, and his potential sponsor in Pennsylvania.  ICE did not respond to this request.  To date, ICE has failed to consider or make any determination regarding whether Wilmer's detention was "the least restrictive setting available after taking into account [his] danger to self, danger to the community, and risk of flight." It has also failed to make available to Wilmer any alternative to detention programs, as required by Section 1232(c)(2)(B).

**B.      Sulma's Background and Immigration History**

39.     Sulma Hernandez Alfaro was born in 2000, in Corquin, Copan, Honduras.

40.     Sulma is one of ten children.  For the first several years of her life, she, her mother, and her siblings lived with her paternal grandparents. Her father worked in a different town.

41.     Sulma was subjected to multiple forms of abuse by members of her father's family, primarily her uncle.  Although efforts were made to protect Sulma from this abuse, they were not successful.  Sulma also feared for her safety because she was threatened, including with death, by her uncle.

42.     Because of the abuse she suffered and the threats she faced, Sulma left Honduras and traveled to the United States so that should would be safe.  She traveled by bus, train, and car to the United States.  The trip took about a month and a half.

43.     Sulma entered the United States near Eagle Pass, Texas, on or about September 19, 2016. After she arrived, she approached a Border Patrol unit and asked for help. U.S. Customs and Border Patrol agents determined she was an unaccompanied alien child and transferred her to the custody of ORR. ORR placed her in a shelter for unaccompanied immigrant children in San Benito, Texas.

44.     Sulma was housed at the ORR shelter in San Benito for more than a year. She was treated well there, provided good food, and the staff was friendly and kind. She particularly enjoyed the classes she was able to take, especially English and math.

45.     While in ORR custody, Sulma was diagnosed with Post-Traumatic Stress Disorder resulting from the abuse she suffered in Honduras.

46.     Sulma applied for asylum on November 16, 2017, based on the abuse and harm she suffered from her father's family, and particularly her uncle. An asylum officer interviewed her regarding her asylum claim on January 17, 2018. She is currently awaiting a decision on her asylum application.

47.     When Sulma turned 18 in 2018, ORR transferred her to ICE's custody. ICE placed her in the Port Isabel Detention Center in Los Fresnos, Texas.

48.     Sulma has had a difficult time adjusting to ICE detention. She currently sleeps in a large room with up to 67 other detainees. She is not receiving counseling to address her post-traumatic stress disorder, and she is not able to take classes or continue her schooling.

49.     On February 2, 2018, counsel for Sulma sent a letter to ICE requesting that Sulma be released to La Posada Providencia, a shelter home for immigrants and refugees in San Benito, Texas. An ICE deportation officer responded verbally that Sulma would not be released, but did not give any reason for that decision.

50.     ICE has failed to consider or make any determination regarding whether Sulma's detention is "the least restrictive setting available taking into account [her] danger to self, danger to the community, and risk of flight," or to make any alternative to detention programs available to her, as required by Section 1232(c)(2)(B).

## LEGAL BACKGROUND

### A.     Laws And Agreements Governing The Care And Custody Of Unaccompanied Immigrant Children

51.     Three key laws and agreements govern the federal government's treatment and custody of unaccompanied immigrant children:  the 1997 *Flores* Settlement Agreement; the Homeland Security Act of 2002; and the TVPRA.

52.     The *Flores* Settlement Agreement resulted from a lawsuit filed by a group of immigrant children challenging their detention and seeking to be released to family members and/or sponsors within the United States. *See Flores v. Sessions*, 862 F.3d 863, 869 (9th Cir. 2017) (discussing the history of the *Flores* litigation).  In 1997, the plaintiff children entered into a consent decree with the federal government that created a nationwide policy governing the custody and release of immigrant children by immigration authorities. *Flores v. Reno*, No. CV 85-4544, Settlement     Agreement,     *available     at*     https://cliniclegal.org/sites/default/files/attachments /flores_v._reno_settlement_agreement_1.pdf ("*Flores* Settlement Agreement").  Among other things, the agreement requires:  (a) release without unnecessary delay, (b) release to an adult caregiver, with parents and other family members given priority, and (c) placement in the "least restrictive setting." *Flores* Settlement Agreement ¶¶ 11, 14.

53.     At the time of the *Flores* Settlement Agreement, a single agency—the Immigration and Naturalization Service (INS)—administered the custody, detention, and deportation of immigrant children.  In 2002, Congress passed the Homeland Security Act (HSA), which abolished

the INS, created a new Department of Homeland Security, and transferred all functions related to the care and custody of unaccompanied immigrant children to ORR, a sub-department of the Department of Health and Human Services. Pub. L. 107–296, 116 Stat. 2153 (Nov. 25, 2002).

54.     Section 462 of the HSA extended the key terms of the *Flores* Settlement Agreement to all unaccompanied immigrant children, including the requirement that ORR place such children in the least restrictive setting. *Id.*

55.     In 2008, Congress further strengthened protections for unaccompanied children through the TVPRA. *See* Pub. L. 110–457, 122 Stat. 5044 (Dec. 23, 2008). Like the *Flores* Settlement Agreement, the TVPRA mandates that an unaccompanied child "*shall* be promptly placed in the *least restrictive setting* that is in the best interest of the child." *Id.* (emphasis added).

56.     Under the TVPRA, ORR endeavors to place each unaccompanied immigrant child with a suitable sponsor, such as a parent or family member. A sponsor is suitable if he or she is "capable of providing for the child's physical and mental well-being." 8 U.S.C. § 1232(c)(3)(A); *see also* ORR, Children Entering the United States Unaccompanied: Section 2, *available at* https://www.acf.hhs.gov/orr/resource/children-entering-the-united-states-unaccompanied-section -2.

57.     In 2013, Congress enacted a statutory provision to address the placement of unaccompanied immigrant children who have turned 18 and been transferred into ICE custody. *See* Violence Against Women Act in 2013, Pub. L. 113-4, 127 Stat. 156, (codified at 8 U.S.C. § 1232(c)(2)(B) (March 7, 2013). That provision, which was codified as Section 1232(c)(2)(B), requires that ICE "*shall* consider placement" of such 18-year olds "in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight." *Id.* (emphasis added).

58.    Section 1232(c)(2)(B) further requires that such children "*shall* be eligible to participate in alternative to detention programs, utilizing a continuum of alternatives based on the alien's need for supervision, which may include placement . . . with an individual or an organizational sponsor, or in a supervised group home." *Id.* (emphasis added).

**B.    The Requirement That Immigrant Children Be Placed In The "Least Restrictive Setting"**

59.    The term "least restrictive setting" was first used in the *Flores* Settlement Agreement, which required the government to release children to the "least restrictive setting appropriate to the minor's age and special needs . . . ." *Flores* Settlement Agreement ¶ 11.

60.    Congress subsequently codified the term "least restrictive setting" in the TVPRA, requiring that immigrant children "shall be promptly placed in the least restrictive setting that is in the best interest of the child." 8 U.S.C. § 1232(c)(2)(A).

61.    ORR has multiple placement options for unaccompanied children.  First, if a suitable sponsor is available, ORR will release the unaccompanied child to that sponsor.  *See* 8 U.S.C. §§ 1232(b)(2)(A); 1232(c)(3).  If a suitable sponsor is not available, ORR will house the child in one of three types of facilities—shelter care, a staff secure shelter, or a secure shelter, which is "akin to a local juvenile hall."  *Saravia v. Sessions*, No. 17-CV-03615-VC, 2017 WL 5569838, at *3 (N.D. Cal. Nov. 20, 2017), *appeal docketed* No. 18-15114.

62.    The TVPRA requires that a child shall not be placed in a secure facility absent a finding that he or she is a flight risk or dangerous.  8 U.S.C. § 1232(c)(2)(A).  And, when ORR places a child in a secure facility, it is required to review that placement every 30 days.  *Id.*

63.    In 2013, when Congress amended Section 1232, it chose to extend the foregoing protections afforded by the TVPRA to unaccompanied children to those immigrant children who turn 18 and are transferred into ICE's custody.  *See* Pub. L. 113-4, § 1261.  As discussed above,

Section 1232(c)(2)(B) requires that ICE place such 18 year-olds "in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight," and that ICE make available to them "alternative to detention programs, utilizing a continuum of alternatives . . . which may include placement . . . with an individual or an organizational sponsor, or in a supervised group home." 8 U.S.C. § 1232(c)(2)(B).

64.    But unlike ORR, which has multiple non-detention options for placing a child, (*i.e.*, release to a sponsor, foster care, shelter care, staff-secure shelters, or a secure shelter), ICE maintains, and places all immigrant children who turn 18 into, only one type of placement—adult detention.  ICE does not comply with any of the requirements of Section 1232(c)(2)(B).  It does not make a determination as to, or place 18-year olds in, "the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight." *Id.* Nor does it make available to such immigrants "alternative to detention programs, utilizing a continuum of alternatives" that include placement "with an individual or an organizational sponsor, or in a supervised group home." *Id.*

## CLASS ACTION ALLEGATIONS

65.    Plaintiffs seek to represent a class under Federal Rule of Civil Procedure 23(b)(2) consisting of:

> All former unaccompanied alien children who are detained or will be detained by ICE after being transferred by ORR because they have turned 18 years of age and as to whom ICE did not consider placement in the least restrictive setting available, including    alternative    to    detention    programs,    as    required    by 8 U.S.C.§ 1232(c)(2)(B).

66.    The class is so numerous that joinder of all class members is impracticable.  In Fiscal Year 2017, 40,810 children were referred to ORR as unaccompanied alien children.  Of those, 32%, or 13,059 children were age 17.  Plaintiffs estimate that at the present point in time, the class contains approximately 100 18 year-olds.

13

67.     In addition, because class members are routinely being granted immigration relief or removed from the country, the composition of the class changes on a regular basis and the class is inherently transitory.

68.     All members of the class are subject to ICE's failure to comply with, and to establish policies and practices implementing, the requirements of Section 1232(c)(2)(B).

69.     There are questions of law and fact common to the class.  These questions include, but are not limited to:  whether ICE has violated Section 1232(c)(2)(B) by failing to place class members in the least restrictive setting available (considering danger to self and community and flight risk); and whether ICE has violated Section 1232(c)(2)(B) by failing to consider class members for alternative to detention programs, including providing the types of alternative placements described in the statute.

70.     Plaintiffs' claims are typical of the claims of all members of the proposed class. Plaintiffs have no interests separate from those of the class, and seek no relief other than the relief sought on behalf of the class.

71.     Plaintiffs will fairly and adequately represent the interests of the class because (a) they are willing and able to represent the proposed class and have every incentive to pursue this action to a successful conclusion; (b) their interests do not in any way conflict with those of absent members of the class; and (c) they have retained counsel who are competent and experienced in litigating class actions, civil rights, and immigrants' rights litigation.

72.     The named Plaintiffs are adequate representatives.  They have suffered the same injury as all class members—ICE's failure to consider their placement in the least restrictive setting under Section 1232(c)(2)(B), and ICE's failure to make alternatives to detention available utilizing a continuum that includes release to a sponsor or placement in a group home.  Named

Plaintiffs assert the same statutory violations as each member of the class: ICE's failure to comply with Section 1232(c)(2)(B).

73.    Plaintiffs are also adequate representatives based on the relief they seek.  Plaintiffs seek two forms of relief:  first, a declaration that ICE is failing to comply with Section 1232(c)(2)(B) and thereby violating the unambiguous commands in the statute; and second, an injunction barring ICE from continuing to violate Section 1232(c)(2)(B).  If Plaintiffs succeed in obtaining this declaratory and injunctive relief, such relief will adequately ameliorate the harm ICE is causing to each class member.  Accordingly, there is no conflict of interest among named Plaintiffs and the class members they represent.

74.    Plaintiffs' counsel are experienced in class action, civil rights, and immigrants' rights litigation.  Plaintiffs and Plaintiffs' counsel will fairly and adequately represent the interests of the class.

75.    Given the commonality of the questions shared by all class members, prosecuting separate claims as to individual class members would create a risk of inconsistent individual adjudications that would establish different and potentially incompatible rules and standards for ICE to apply when ORR transfers 18 year-old unaccompanied immigrants into ICE's custody.

76.    Defendants have acted, and failed to act, on grounds that apply generally to the class, such that injunctive and declaratory relief are appropriate with respect to the class as a whole.

77.    Plaintiffs and the class they seek to represent have been directly injured by the Defendants' violations of Section 1232(c)(2)(B).  They are at risk of future harm from continuation of ICE's failure to comply with Section 1232(c)(2)(B) and failure to enact policies, programs and practices implementing and effectuating Section 1232(c)(2)(B).

## COUNT I

### Administrative Procedure Act—5 U.S.C. § 706(2)

**Defendants Are Violating 8 U.S.C. § 1232(c)(2)(B)**
**By Failing To Consider The Least Restrictive Setting For Plaintiffs And**
**Failing To Make Alternatives To Detention Available**

78.     Plaintiffs reallege and incorporate the allegations of all preceding paragraphs.

79.     ICE has failed to consider the "least restrictive setting" for each Plaintiff and has failed to consider each Plaintiff for alternatives to detention.

80.     ICE's failure to consider the least restrictive setting for each Plaintiff and to make alternative to detention programs available to Plaintiffs violates § 1232(c)(2)(B), which requires that ICE "*shall* consider placement in the least restrictive setting available" for all immigrants who are transferred into its custody after turning 18, and that these immigrants "*shall* be eligible to participate in alternative to detention programs." *Id.* (emphasis added).

81.     Each Plaintiff specifically asked ICE to place him or her in the least restrictive setting available and to allow him or her to participate in alternative to detention programs.  Their requests have been summarily denied and/or ignored.

82.     ICE has no policy or procedure for placing 18 year-olds who are transferred by ORR into the "least restrictive setting available after taking into account [their] danger to self, danger to the community, and risk of flight," assessing what the least restrictive setting would be, or governing who has authority to make such a decision.

83.     ICE has no policy or procedure for making 18 year-olds eligible to participate in alternatives to detention, including placement with an individual sponsor, an organizational sponsor, or in a supervised group home as an alternative to detention.

84.     ICE's failure to make "least restrictive setting" determinations violates Section 1232(c)(2)(B), which requires that ICE "*shall* consider placement in the least restrictive

setting available after taking into account the alien's danger to self, danger to the community, and risk of flight." *Id.* (emphasis added).

85.    ICE's failure to make alternatives to detention available to 18 year-olds transferred from ORR custody violates Section 1232(c)(2)(B), which requires that such immigrants "*shall* be eligible to participate in alternative to detention programs, utilizing a continuum of alternatives based on the alien's need for supervision, which may include placement . . . with an individual or an organizational sponsor, or in a supervised group home." *Id.* (emphasis added).

86.    ICE's disregard of Section 1232(c)(2)(B)'s requirements violates the APA in that ICE's actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" 5 U.S.C. § 706(2)(A), and "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C).

## COUNT II

### Administrative Procedure Act—5 U.S.C. § 706(1)

### Defendants Are Failing To Take Action They Are Required To Take Under 8 U.S.C. § 1232(c)(2)(B)

87.    Plaintiffs reallege and incorporate the allegations of all the preceding paragraphs.

88.    The Court may "compel agency action unlawfully withheld or unreasonably delayed . . . ."   8 U.S.C. § 706(1).   To make a showing under Section 706(1), Plaintiffs must demonstrate "that an agency failed to take a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis omitted).

89.    Section 1232(c)(2)(B) sets out two discrete, nondiscretionary actions that ICE is required to take with regard to all 18 year-olds transferred into its custody from ORR.   First, ICE must "consider placement in the least restrictive setting." 8 U.S.C. § 1232(c)(2)(B).   Second, ICE "shall" make 18 year-olds "eligible to participate in alternative to detention programs, utilizing a

continuum of alternatives based on the alien's need for supervision, which may include placement . . . with an individual or an organizational sponsor, or in a supervised group home." *Id.*

90.     As explained above, ICE has not taken, and is not taking, either of these statutorily-required actions.

91.     Accordingly, Plaintiffs seek a court order under 5 U.S.C. § 706(1) compelling ICE to take the actions it is required to take pursuant to Section 1232(c)(2)(B).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A.     Assume jurisdiction over this matter;

B.     Certify a class of unaccompanied immigrant children who have been transferred to ICE because they have turned 18, as defined in Paragraph 65 above;

C.     Appoint the undersigned as class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure;

D.     Declare that ICE's failure to place Plaintiffs and members of the class in the "least restrictive setting available" violates 8 U.S.C. § 1232(c)(2)(B) and 5 U.S.C. §§ 706(1) and 706(2);

E.     Declare that ICE's failure to make "alternative to detention programs" available to Plaintiffs and members of the class violates 8 U.S.C. §1232(c)(2)(B) and 5 U.S.C. §§ 706(1) and 706(2);

F.     Order that ICE comply with 8 U.S.C. §1232(c)(2)(B) by considering Plaintiffs and members of the class for, and placing them in, the last restrictive setting available after taking into account each individual's danger to self, danger to community, and risk of flight;

G.     Order that ICE comply with 8 U.S.C. § 1232(c)(2)(B) by allowing Plaintiffs and members of the class to participate in alternative to detention programs utilizing a continuum of

alternatives based on their need for supervision, including placement with an individual or organizational sponsor, or in a supervised group home;

H.    Award Plaintiffs their attorneys' fees and costs; and

I.    Grant such other and further relief as the Court deems equitable, just, and proper.

Dated:  March 5, 2018

Tia T. Trout Perez
D.C. Bar No. 990447
KIRKLAND & ELLIS LLP
655 Fifteenth St., NW
Washington, DC 20005
Tel.:  (202) 879-5000
Fax:  (202) 879-5200
tia.trout-perez@kirkland.com

Stephen R. Patton
Anne K.H. Reser
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel.:  (312) 862-2000
Fax:  (312) 862-2200
stephen.patton@kirkland.com
anne.reser@kirkland.com

Katherine Melloy Goettel
NATIONAL IMMIGRANT JUSTICE CENTER
208 South LaSalle Street, Suite 1300
Chicago, Illinois 60604
Tel: (312) 660-1335
Fax: (312) 660-1505
kgoettel@heartlandalliance.org