# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| WILMER GARCIA RAMIREZ, *et al.*, | : | | |
| | : | | |
| Plaintiffs. | : | Civil Action No.: | 18-508 (RC) |
| | : | | |
| v. | : | Re Document No.: | 2 |
| | : | | |
| U.S. IMMIGRATION AND CUSTOMS | : | | |
| ENFORCEMENT, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## I. INTRODUCTION

Plaintiffs—three immigrant teenagers who entered the United States without inspection as unaccompanied minors—bring this putative class action, alleging that, upon reaching their respective eighteenth birthdays, Defendants transferred them to adult detention facilities without considering less restrictive placements in violation of 8 U.S.C. § 1232(c)(2)(B). Plaintiffs also contend that Defendants routinely and systematically fail to abide by this statutory provision. Presently before the Court is a motion for preliminary injunctive relief, which seeks to compel Defendants to comply with the statutory mandate in placing Plaintiffs Wilmer Garcia Ramirez and Sulma Hernandez Alfaro. For the reasons explained below, the Court grants the motion.

## II. BACKGROUND

### A. Statutory and Regulatory Framework

Most immigration enforcement functions are carried out by the Department of Homeland Security ("DHS"), in which Immigration and Customs Enforcement ("ICE") is housed. *See* 6

U.S.C. §§ 111, 251, 291.  Congress established a different legal framework, however, for the care and custody of "unaccompanied alien children"—defined as children under age eighteen, who have no lawful immigration status in the United States and no parent or legal guardian in the United States available to provide care and physical custody.  6 U.S.C. § 279(g)(2).  Except in exceptional circumstances, unaccompanied minors apprehended by immigration officials are transferred to the custody of the Department of Health and Human Services ("HHS").  8 U.S.C. § 1232(b)(3).  The Office of Refugee Resettlement ("ORR"), a division of HHS, is thereafter responsible for, among other things, "coordinating and implementing the care and placement" of such children.  6 U.S.C. § 279(a)–(b)(1)(A).  Congress has established that these children "shall be promptly placed in the least restrictive setting that is in the best interest of the child" and that "[i]n making such placements, the Secretary [of HHS] may consider danger to self, danger to the community, and risk of flight."  8 U.S.C. § 1232(c)(2)(A).

HHS only has authority over the care and custody of immigrant children, however.  *See* 6 U.S.C. § 279.  And, of course, children do not stay children forever.  Congress accounted for that fact of life, extending certain protections to newly adult immigrants who were formerly in the care and custody of HHS.  Pursuant to 8 U.S.C. § 1232(c)(2)(B):

> If [an unaccompanied alien child in the custody of the Secretary of HHS] reaches 18 years of age and is transferred to the custody of the Secretary of Homeland Security, the Secretary [of DHS] shall consider placement in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight.  Such aliens shall be eligible to participate in alternative to detention programs, utilizing a continuum of alternatives based on the alien's need for supervision, which may include placement of the alien with an individual or an organizational sponsor, or in a supervised group home.

Under this provision, DHS must "tak[e] into account" specified statutory factors and must "consider" placement in the least restrictive setting for those who aged out of HHS's jurisdiction. *See id.* But, unlike unaccompanied minors, these individuals are not promised placement in the least restrictive setting. *Compare* 8 U.S.C. § 1232(c)(2)(A), *with* 8 U.S.C. § 1232(c)(2)(B).

## B. Factual Background and Procedural History

Plaintiffs in this case are three immigrant teenagers who were previously held in ORR custody as unaccompanied alien children. First Am. Compl. ¶¶ 1, 33, 46, 61, ECF No. 21. Upon turning eighteen, they were transferred to the custody of ICE and placed in adult detention facilities, purportedly without receiving statutorily mandated consideration of less restrictive placement options. *See id.* ¶¶ 1, 4, 13–15. They seek to represent a class of similarly situated individuals. *See id.* ¶ 6. Two of the three Plaintiffs—Wilmer Garcia Ramirez and Sulma Mirian Hernandez Alfaro—were the original plaintiffs in this case and are the focus of the motion for preliminary injunctive relief presently before the Court.[1]

According to Plaintiffs' complaint, Wilmer Garcia Ramirez was born into poverty in Guatemala in 1999. *See id.* ¶¶ 20–21. At six years old, he began working in his family's fields, cutting underbrush with a machete. *Id.* ¶ 21. By eight, he was laboring for nine or more hours each day in other people's fields. *Id.* ¶ 22. From ages nine to sixteen, Mr. Garcia Ramirez worked at coffee plantations in Guatemala and Honduras for months at a time, where he endured difficult working and living conditions. *See id.* ¶¶ 23–30. In March 2017, when he was

---

[1] Plaintiffs initially sought a nationwide preliminary injunction, *see* Mem. P. & A. in Supp. of Mot. Temp. Restraining Order & Prelim. Injunction at 3, 18–19 (requesting a nationwide preliminary injunction), ECF No. 2-1, however, the Court limited its consideration of the present motion to Mr. Garcia Ramirez and Ms. Hernandez Alfaro, the only two named plaintiffs at the time that the motion for preliminary injunction was filed. *See* Tr. of Temp. Restraining Order Mot. Hr'g (Mar. 8, 2018) at 37:11–19, ECF No. 19.

seventeen years old, Mr. Garcia Ramirez entered the United States without inspection in search of a better life. *See id.* ¶ 31. After crossing the border, he was apprehended by U.S. Customs and Border Protection officers. *See id.* ¶ 33. Upon learning that he was an unaccompanied alien child, DHS officials transferred Mr. Garcia Ramirez to ORR custody. *Id.* ¶ 33.

While in ORR custody, Mr. Garcia Ramirez petitioned the Superior Court of Arizona to declare him a dependent of the State due to his parent's neglect in Guatemala. *Id.* ¶ 34. The court granted the petition, finding that it was not in Mr. Garcia Ramirez's best interest to be returned to Guatemala. *Id.* ¶ 34; Order Regarding Child's Eligibility for Special Immigrant Juvenile Status as to Mother, Ex. C, ECF No. 2-4. Mr. Garcia Ramirez then filed a petition for special immigration juvenile status ("SIJS"), seeking lawful permanent residency in the United States based on the neglect finding. First Am. Compl. ¶ 35; Ex. B, ECF No. 2-3. That petition remains pending. *See* First Am. Compl. ¶ 36.

The day before Mr. Garcia Ramirez turned eighteen years old, his attorney contacted an ICE deportation officer to request that he be released on his own recognizance, citing the facts that removal proceedings against him had been administratively closed, that he had plans to live with a family friend in Pennsylvania, and that he had pending a SIJS petition. *See* Email from Noriana C. Hermes (Sept. 22, 2017) at 7, Ex. D, ECF No. 20-4. The deportation officer denied the request, asserting only that ICE intended to reopen removal proceedings. *See* Email from Deportation Officer (Sept. 22, 2017) at 9, Ex. D, ECF No. 20-4. The next day, on Mr. Garcia Ramirez's eighteenth birthday, he was transferred from ORR custody to ICE custody. *See* First Am. Compl. ¶ 38.

At an ICE field office in Phoenix, Arizona, officials determined that Mr. Garcia Ramirez should be held without bond. *See* Decl. of Michael Leal ("Leal Decl.") ¶ 6, ECF No. 20-5. The

next day, ICE transferred Mr. Garcia Ramirez to Eloy Detention Center ("EDC"), an adult detention facility in Eloy, Arizona. *Id.* At EDC, detention officers utilized the Risk Classification Assessment—a database tool that assists DHS officials in assessing whether an alien who is not subject to mandatory detention poses a danger to the community or poses a flight risk—to determine Mr. Garcia Ramirez's custody classification level. *Id.* ¶ 7. Based in part on the results of that assessment, officials classified him as a level 1 detainee—the lowest custody level at EDC—and housed him with other level 1 or low level 2 detainees, who have no criminal history or only a minor, non-violent criminal history. *Id.*

Mr. Garcia Ramirez twice initiated processes for requesting reconsideration of his placement in an adult detention facility. First, in November 2017, he requested a custody redetermination hearing before an immigration judge. *See* Mot. for Custody Redetermination Hearing, Ex. E at 9–12, ECF No. 20-5. A bond hearing was scheduled. *See* Notice of Custody Redetermination Hearing in Immigration Proceedings, Ex. E at 13, ECF No. 20-5. Mr. Garcia Ramirez later moved to vacate the hearing, however, explaining that a potential sponsor could no longer assist with his bond. *See* Unopposed Mot. to Vacate Bond Hearing, Ex. E at 15, ECF No. 20-5.

Second, through counsel, Mr. Garcia Ramirez sent a letter to ICE in January 2018, requesting release to the least restrictive setting available pursuant to 8 U.S.C. § 1232(c)(2)(B). Letter from Néstor Allende-Asparó to Justin Laub (Jan. 5, 2018), Ex. E at 20–23, ECF No. 20-5; Decl. of Néstor Allende-Asparó ("Allende-Asparó Decl.") ¶ 6, Ex. A, ECF No. 23-1. Counsel contends that he received no response to that letter. *See* Allende-Asparó Decl. ¶¶ 7–10. In the course of this litigation, however, ICE produced a letter, dated January 23, 2018 and addressed to Mr. Garcia Ramirez's counsel, which purports to respond to counsel's request. *See* Letter from

Albert E. Carter to Néstor Allende-Asparó (Jan. 23, 2018), Ex. E at 24, ECF No. 20-5. Interpreting the request as a bid for "prosecutorial discretion in the form of release from custody," the ICE deputy field office director of the Phoenix Field Office denied the request on the basis that "the totality of circumstances d[id] not support a favorable exercise of discretionary authority in this case." *Id.* According to Mr. Garcia Ramirez's counsel, ICE did not discuss alternatives to detention with him at any time before or after Mr. Garcia Ramirez's eighteenth birthday. Allende-Asparó Decl. ¶ 5. Mr. Garcia Ramirez remains detained at EDC. *See* First Am. Compl. ¶ 38.

The other original plaintiff in this case is Sulma Hernandez Alfaro, who was born in 2000 in Honduras. *Id.* ¶ 41. In Honduras, she was subjected to multiple forms of abuse by members of her father's family, including and especially her uncle, who threatened her with death. *Id.* ¶ 43. Because of the abuse that she suffered and the threats that she faced, Ms. Hernandez Alfaro left Honduras and travelled to the United States, seeking safety. *Id.* ¶ 44. In September 2016, she crossed into the United States without inspection. *Id.* ¶ 45. A Border Patrol unit apprehended her and, after determining that she was an unaccompanied immigrant child, transferred her to the custody of ORR. *Id.* ¶ 45.

ORR placed Ms. Hernandez Alfaro in a shelter for unaccompanied immigrant children in San Benito, Texas. *Id.* ¶ 46. While in ORR custody, she was diagnosed with Post-Traumatic Stress Disorder, which resulted from the abuse she suffered in Honduras. *Id.* ¶ 47. In November 2017, Ms. Hernandez Alfaro applied for asylum based on the abuse and harm she had experienced. *See* Notice of Action, Ex. D, ECF No. 2-5; First Am. Compl. ¶ 48. That application remains pending. *See* First Am. Compl. ¶ 48.

On January 16, 2018, just days before Ms. Hernandez Alfaro's eighteenth birthday, an ICE deportation officer emailed the shelter where she was being housed to confirm that she would soon age out of ORR's jurisdiction and "that there [were] no reunification plans, so [ICE] c[ould] make arrangements to have her placed in the appropriate adult facility." Email (Jan. 15, 2018), Ex. B at 9, ECF No. 20-2. A case manager for the shelter responded, explaining that ORR had attempted several times to reunify Ms. Hernandez Alfaro with relatives, but that each of the potential sponsors did not meet ORR sponsorship requirements. Email (Jan. 16, 2018), Ex. B at 8, ECF No. 20-2; *see also* Decl. of Jose Cortez ("Cortez Decl.") ¶ 20, ECF No. 20-2. The email included a copy of a "Post 18 Plan" crafted for Ms. Hernandez Alfaro, which included information about ORR's unsuccessful reunification attempts. *See* Post 18 Safety Plan, Ex. B at 11, ECF No. 20-2; *see also* Cortez Decl. ¶ 21.

When Ms. Hernandez Alfaro turned eighteen, ORR transferred her to ICE's custody. First Am. Compl. ¶ 49. According to Supervisory Detention and Deportation Officer ("SDDO" or "Officer") Jose A. Cortez, on January 18, 2018, Deportation Officer Anthony Martinez initiated an electronic risk classification assessment to assess whether to release, detain, or consider alternatives to detention for Ms. Hernandez Alfaro. Cortez Decl. ¶ 22. Officer Cortez contends that Ms. Hernandez Alfaro was determined to pose a high risk of absconding due to not having a sponsor or fixed, permanent address in the United States that she had lived with for at least six months. *Id.* Officer Martinez purportedly recommended that Ms. Hernandez Alfaro be detained, a decision with which Mr. Cortez contends he agreed. *Id.* ¶ 23. DHS placed Ms. Hernandez Alfaro at Port Isabel Detention Center ("PIDC"), an adult detention facility in Los Fresnos, Texas. *See* First Am. Compl. ¶ 14.

Like Mr. Garcia Ramirez, Ms. Hernandez Alfaro requested changes in her state of confinement. First, on February 2, 2018, Ms. Hernandez Alfaro's counsel faxed a letter to Deportation Officer Robert Cantu, requesting that she be released on her own recognizance. *See* Letter from Rosemary Gonzalez to Robert Cantu (Feb. 2, 2018) ("2/2/18 Letter"), ECF No. 2-9; Decl. of Rosemary Gonzalez ("Gonzalez Decl.") ¶ 7, ECF No. 23-2. The letter mentioned the special statutory protections afforded unaccompanied immigrant children and contended that Ms. Hernandez Alfaro was neither a flight risk nor a danger to the community. 2/2/18 Letter at 3–4. Counsel also asserted that Ms. Hernandez Alfaro's placement in an adult detention facility had worsened her post-traumatic stress symptoms. *Id.* Counsel presented an alternative to her client's present placement: La Posada Providencia, a transitional shelter that had agreed to take in Ms. Hernandez Alfaro upon her release from the detention facility. *See id.* at 4; Letter from Monica Pena-Rasmussen, Client Coordinator, La Posada Providencia (Jan. 17, 2018), ECF No. 2-10. According to counsel, she followed up with several calls to Ms. Hernandez Alfaro's deportation officer, however, her calls went unanswered. Gonzalez Decl. ¶¶ 8–9.

Five days later, Ms. Hernandez Alfaro's counsel visited PIDC and met briefly with Officer Cantu in the facility lobby. *See* Gonzalez Decl. ¶¶ 10–11; Decl. of Robert Cantu ("Cantu Decl.") ¶ 7, ECF No. 20-1. According to counsel, she mentioned her prior request for her client's release, noting that she had appended a letter of support from La Posada Providencia. Gonzalez Decl. ¶ 11. Counsel also explained, among other things, that Ms. Hernandez Alfaro had been classified as an unaccompanied alien minor upon her arrival, that she had applied for asylum, and that she had already completed an asylum interview. *Id.* According to counsel, during the lobby meeting, Officer Cantu stated that he had not reviewed the materials that she had submitted on behalf of her client. *Id.* ¶ 12. Counsel also recalls that Officer Cantu rejected

La Posada Providencia as a placement option—contending that many individuals released to the shelter abscond—and that Officer Cantu stated that he would not release Ms. Hernandez Alfaro because she had no other family in the United States and he would only consider releasing her to a family member. *Id.* ¶ 14. The Officer purportedly gave counsel no indication that he had independently considered any less restrictive placements than adult detention for Ms. Hernandez Alfaro. *Id.* ¶ 17.

While Officer Cantu agrees that he rejected La Posada Providencia as a placement option, he otherwise depicts the conversation differently. *See* Cantu Decl. ¶¶ 6–7. He contends that he verbally denied counsel's request "after taking all relevant facts into consideration, including [Ms. Hernandez Alfaro's] illegal entry to the United States as an unaccompanied alien minor, her current age, the copy of her birth certificate, her lack of criminal history, her lack of strong family ties in the United States, the lack of a fixed, permanent address, the lack of a dependable sponsor, and her pending application [for asylum]." *Id.* ¶ 8. According to Officer Cantu, he reviewed a file that contained certain information about Ms. Hernandez Alfaro's case, including the letter from La Posada, before speaking with counsel and rejecting the request. *See id.* ¶¶ 10–15.

Ms. Hernandez Alfaro next sought a change in her custody at a bond hearing before an immigration judge in March 2018. *See* Mot. for Custody Redetermination, Ex. A at 8–10, ECF No. 20-1. The immigration judge granted her request, ordering her release from custody under bond of $10,000. *See* Order of the Immigration Judge with Respect to Custody, Ex. A at 32, ECF No. 20-1. Ms. Hernandez Alfaro remains detained at PIDC. *See* First Am. Compl. ¶ 14.

Plaintiffs filed suit in March 2018, and, shortly after, requested a temporary restraining order and preliminary injunction. *See* Compl., ECF No. 1; Mot. Temp. Restraining Order &

Prelim. Injunction, ECF No. 2.  After a hearing held just three days after the motion was filed, this Court denied the motion for a temporary restraining order, explaining that, given the dearth of evidence on record, Plaintiffs had not met their burden of showing a substantial likelihood of prevailing on the merits.  Tr. of Temp. Restraining Order Mot. Hr'g (Mar. 8, 2018) at 37:1–9, ECF No. 19.  The Court also noted that Plaintiffs appeared to request a change in, rather than a preservation of, the status quo, and that the relief Plaintiffs sought in the motion overlapped substantially with the merits of their case.  Tr. of Temp. Restraining Order Mot. Hr'g (Mar. 8, 2018) at 37:1–9.  Subsequently, after being able to gather information about the respective Plaintiffs' claims, the Government has submitted written opposition to the Plaintiffs' request for injunctive relief.  Plaintiffs' motion for preliminary injunction is now ripe for consideration.

## III.  LEGAL STANDARDS

### A.  Administrative Procedure Act

Plaintiffs bring their claims pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 101–913, which governs the conduct of federal administrative agencies.  The APA permits a court to "compel agency action unlawfully withheld or unreasonably delayed," and to "hold unlawful and set aside agency action, findings and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706.  The APA provides for judicial review of all "final agency action for which there is no other adequate remedy in court," *id.* § 704, except when "statutes preclude judicial review" or the "agency action is committed to agency discretion by law," *id.* § 701(a).

### B.  Preliminary Injunction

"[A] preliminary injunction is an injunction to protect [the movant] from irreparable injury and to preserve the court's power to render a meaningful decision after a trial on the

merits." *Select Milk Producers, Inc. v. Johanns*, 400 F.3d 939, 954 (D.C. Cir. 2005) (quoting

11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, Federal Practice and Procedures

§ 2947 (2d ed. 1992)). "[T]he decision to grant injunctive relief is a discretionary exercise of the

district court's equitable powers." *John Doe Co. v. Consumer Fin. Prot. Bureau*, 235 F. Supp.

3d 194, 201 (D.D.C. 2017) (quoting *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1209 (D.C.

Cir. 1989)). A preliminary injunction is an "extraordinary remedy," and one is "never awarded

as of right." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To warrant

preliminary injunctive relief, the moving party "must establish that he is likely to succeed on the

merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

balance of the equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.

Of these factors, likelihood of success on the merits and irreparable harm are particularly crucial.

*See Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011) (reading *Winter* "to suggest if not to

hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary

injunction'" (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1296 (2009)

(concurring opinion))); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297

(D.C. Cir. 2006) ("[A] movant must demonstrate at least some injury for a preliminary injunction

to issue, for the basis of injunctive relief in federal courts has always been irreparable harm."

(internal citations and quotation marks omitted)).

## IV. ANALYSIS

Plaintiffs assert, that when they turned eighteen years old and were transferred from HHS

custody to DHS custody, DHS placed them in adult detention facilities without considering less

restrictive placement options in violation of 8 U.S.C. § 1232(c)(2)(B). They seek preliminary

injunctive relief in the form of an order directing DHS to consider less restrictive placements for

Plaintiffs Wilmer Garcia Ramirez and Sulma Hernandez Alfaro. Defendants argue that Plaintiffs have not shown that they are entitled to preliminary injunctive relief. The Court first considers Defendants' justiciability arguments, then addresses the merits of Plaintiffs' motion. As explained below, the Court finds no barriers to its review of this matter and concludes that Plaintiffs have met their burden of establishing that preliminary injunctive relief is warranted.

## A. Threshold Issues

Defendants lodge three threshold objections to this Court's review of this case. Defendants argue that (1) this suit is moot because Plaintiffs have already received the consideration that they are due under the applicable statutory provision; (2) Plaintiffs cannot point to "final agency action" subject to judicial review under the APA; and (3) Plaintiffs have an adequate remedy in the form of bond hearings through which they may seek release from detention and, thus, the APA provides no cause of action. The Court disagrees on all three counts.

### 1. Mootness

Defendants first assert that Plaintiffs' complaint is moot and that, accordingly, this Court should dismiss the entire putative class action for lack of jurisdiction. *See* Defs.' Opp'n at 13–14, ECF No. 20. Defendants' mootness argument hinges exclusively on their contention that they have already discharged their obligation of "consider[ing]" less restrictive placements for Plaintiffs as required by 8 U.S.C. § 1232(c)(2)(B). *See* Defs.' Opp'n at 13–14. The Court disagrees that the record provides any basis for a finding of mootness.

Article III of the Constitution permits federal courts to adjudicate only "actual, ongoing controversies." *Honig v. Doe*, 484 U.S. 305, 317 (1988). This limitation gives rise to the doctrine of mootness. *See Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016). "A case

is moot when a party has already obtained all the relief that it has sought." *Schnitzler v. United States*, 761 F.3d 33, 37 (D.C. Cir. 2014) (internal citations and quotation marks omitted).  Under such circumstances, "events have so transpired that the decision [of the court] will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627, 631 (D.C. Cir. 2002) (internal citation omitted).  "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Campbell-Ewald Co.*, 136 S. Ct. at 669 (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)); *see also Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) ("A case becomes moot only when it is impossible for a court to grant 'any effectual relief whatever' to the prevailing party." (quoting *Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000))).  The D.C. Circuit has clarified that where "the court has the 'power to effectuate a partial remedy,'" that alone "is sufficient to prevent [a] case from being moot." *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 43 (D.C. Cir. 2015) (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992)).  Furthermore, a "party's prospects of success on a claim are not pertinent to the mootness inquiry." *Looks Filmproduktionen GmbH v. CIA*, 199 F. Supp. 3d 153, 179 (D.D.C. 2016) (alterations and internal quotation marks omitted) (quoting *Schnitzler*, 761 F.3d at 39).

Contrary to Defendants' contentions, the present record provides no basis for a finding of mootness.  Focusing exclusively on the relief sought as to Plaintiffs Ramirez Garcia and Hernandez Alfaro, Plaintiffs' complaint requests that this Court (1) "[d]eclare that ICE's failure to place Plaintiffs . . . in the 'least restrictive setting available' violates 8 U.S.C. § 1232(c)(2)(B) and 5 U.S.C. §§ 706(1) and 706(2)"; (2) "[d]eclare that ICE's failure to make 'alternative to detention programs' available to Plaintiffs . . . violates 8 U.S.C. § 1232(c)(2)(B) and 5 U.S.C. §§

706(1) and 706(2)"; (3) "[o]rder that ICE comply with 8 U.S.C. § 1232(c)(2)(B) by considering

Plaintiffs . . . for, and placing them in, the l[e]ast restrictive setting available after taking into

account each individual's danger to self, danger to community, and risk of flight"; and (4)

"[o]rder that ICE comply with 8 U.S.C. § 1232(c)(2)(B) by allowing Plaintiffs . . . to participate

in alternative to detention programs utilizing a continuum of alternatives based on their need for

supervision, including placement with an individual or organizational sponsor, or in a supervised

group home."[2]  First Am. Compl. at 23; Compl. at 18–19, ECF No. 1.  Defendants focus

narrowly on Plaintiffs' third request in arguing that this case is moot.  They fail to offer,

however, any hint of an argument that Plaintiffs have received any relief as to the other three

requests, and they offer no argument that awarding such relief would "accomplish nothing."

*Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008).  The fact that Plaintiffs have not obtained all

the relief that they seek is alone sufficient to keep this case alive.  *See, e.g.*, *Schnitzler*, 761 F.3d

at 416–17 (reversing a district court's dismissal of a *pro se* complaint because, among other

things, the district court had adopted too narrow a construction of the relief sought and failed to

recognize that plaintiff had not received full relief); *Singh v. Carter*, 185 F. Supp. 3d 11, 19

(D.D.C. 2016) (concluding that an offer of a "long-term religious accommodation" did not

render moot plaintiff's request for a "permanent religious accommodation" because defendant

had not given plaintiff the entire relief sought).

Moreover, Defendants' mootness argument fails as to Plaintiffs' third request, too.  With

regard to this claim, Defendants conflate merits questions about whether they have taken actions

required by 8 U.S.C. § 1232(c)(2)(B)—the subject of this dispute—with mootness questions

---

[2]  Plaintiffs sought this same relief with respect to the putative class of similarly situated
individuals.

about whether this Court can offer meaningful relief that would affect the rights and obligations of the parties. Both the Supreme Court and the D.C. Circuit have cautioned that "prospects of success" on a claim "are not pertinent to the mootness inquiry." *Schnitzler*, 761 F.3d at 39 n.8 (quoting *Chafin*, 568 U.S. at 174 (internal quotation marks omitted)). Indeed, the Circuit has explained that "[i]n considering possible mootness[, courts] assume that the plaintiffs would be successful on the merits." *Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 955 (D.C. Cir. 2016). Here, a decision that this case is moot based on a finding that Defendants have complied with 8 U.S.C. § 1232(c)(2)(B) would run afoul of this principle. *Cf. Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1106 (D.C. Cir. 2008) ("[W]hether a statute has been violated 'is a question that goes to the *merits* . . . and not to constitutional standing.'" (quoting *La. Energy & Power Auth. v. FERC*, 141 F.3d 364, 367–68 (D.C. Cir. 1998)). Defendants' mere assertion that the agency has complied with a statutory mandate cannot suffice to divest this Court of jurisdiction to determine whether it did so. *See, e.g.*, *Schnitzler*, 761 F.3d at 39 (explaining that "whether or not the government's policy explanations are reasonable under the [APA] is a merits question, not a question of the court's jurisdiction").

In any event, as explained in detail below, the Court disagrees that the evidence on record shows that Defendants complied with the statutory provision. Thus, even if this Court could consider the merits Plaintiffs' claims in assessing whether this case is moot, it would not side with Defendants. The record does not show that Defendants "consider[ed] placement in the least restrictive setting available after taking into account . . . danger to self, danger to the community, and risk of flight." 8 U.S.C. § 1232(c)(2)(B). Accordingly, this Court concludes that there is no mootness barrier to Plaintiffs' suit.

## 2. Final Agency Action

Defendants next assert that "[t]he determination . . . in the individual cases of these two Plaintiffs do not constitute 'final agency action' that may be reviewed under the APA." Defs.' Opp'n at 19. Specifically, Defendants contend that (1) Plaintiffs have attacked general agency behavior and not any "agency action" reviewable by a court pursuant to the APA, and (2) Plaintiffs have not identified "final" agency actions.[3] Defs. Opp'n at 18–20. The Court disagrees on both counts.

### a. Agency Action

Defendants contest whether Plaintiffs have identified any "agency action" subject to judicial review pursuant to the APA. They contend that "Plaintiffs' claim[s] constitute[] a generalized complaint that the agency is not properly following the statute in their cases." Defs.' Opp'n at 20. The Court finds that the decisions of where to place Plaintiffs Garcia Ramirez and Hernandez Alfaro after they were transferred to DHS custody constitute agency actions for APA purposes.

The D.C. Circuit has acknowledged that "the term 'agency action' undoubtedly has a broad sweep." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004). The

---

[3] Defendants insist that "[w]hat Plaintiffs complain of—placement in adult detention centers is necessarily a component of immigration enforcement by the political branches of government." Defs.' Opp'n at 25. However, Defendants do not argue that judicial review of the challenged actions is precluded by statute, *see* 5 U.S.C. § 701(a)(1) (withdrawing judicial review under such circumstances), or that the decision whether to comply with 12 U.S.C. § 1232(c)(2)(B) is "committed to agency discretion by law" such that the decision is not subject to judicial review, *see* 5 U.S.C. § 701(a)(2). Accordingly, this Opinion does not reach these questions. It bears mention, though, that any argument on the latter point would be undermined by Defendants' apparent concessions that "[i]n section 1232(c)(2)(B), Congress required ICE to consider [unaccompanied alien children] who have turned eighteen for placement in locations other than adult detention centers" and that "ICE is required to also take into consideration their danger to self, danger to the community, and risk of flight as factors when making that decision." Defs.' Opp'n at 15.

APA defines "agency action" as an "agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act."  5 U.S.C. § 551(13); 5 U.S.C. § 701(b)(2) (explaining that "agency action" for purposes of the judicial review provisions of the APA carries the same meaning given by 5 U.S.C. § 551).  With respect to complaints that an agency failed to act, "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*."  *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 64 (2004).  This condition precludes attacks that seek broad programmatic improvements of agency behavior and also precludes judicial review of "even discrete agency action that is not demanded by law."  *Id.* at 65.  Thus, in *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990), the Supreme Court rejected a challenge to a "land withdrawal review program" based on "rampant" legal violations, explaining that, unless Congress explicitly provides otherwise, courts may not intervene in the work of the administrative state except "when, and to the extent that, a specific 'final agency action' has an actual or immediately threatened effect."  *Id.* at 894.  Likewise, in *SUWA*, the Supreme Court found no "agency action" subject to judicial review where plaintiffs complained that an agency's decision to permit use of off-road vehicles on certain land violated the agency's mandate to "continue to manage [that land] . . . in a manner so as not to impair the suitability of such areas for preservation as wilderness."  542 U.S. at 65 (quoting 43 U.S.C. § 1782(c)).  The Court explained that "compelling compliance with broad statutory mandates," such as the one at issue in that case, would "inject[] the judge into day-to-day agency management."  *Id.* at 66–67.  "The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives is not contemplated by the APA."  *Id.* at 67.

Defendants do not appear to challenge that Plaintiffs' complaint cites actions that the agency was required to take. *See* Defs.' Opp'n at 15. Rather, Defendants contest whether Plaintiffs have identified any "discrete" action subject to judicial review under the APA. *See* Defs.' Opp'n at 20. Contrary to Defendants' contentions, the Court finds that Plaintiffs have identified discrete agency actions subject to review under the APA.

Defendants' argument fails for two reasons. First, Plaintiffs in this case have not lodged a generalized attack, as Defendants assert. Plaintiffs are not seeking wholesale change to an entire federal program like the plaintiffs were in *Lujan*. Nor are they requesting that this Court inject itself into the day-to-day agency management, as the plaintiffs were in *SUWA*. Rather, Plaintiffs in this case seek to compel an agency to take the discrete and concrete action of considering statutorily specified factors in determining where and how to place them—and similarly situated others—now that they have aged out of HHS's care and custody. *Cf. R.I.L.-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015) (finding that "ICE's consideration of an allegedly impermissible factor in making custody determinations" constituted a particularized agency action). Defendants confuse aggregation of similar, discrete purported injuries—claims that many people were injured in similar ways by the same type of agency action—for a broad programmatic attack. The Court sees Plaintiffs' claims differently.

The D.C. Circuit has found challenges to comparable agency conduct actionable under the APA. In *Meina Xie v. Kerry*, 780 F.3d 405 (D.C. Cir. 2015), the Circuit reversed a district court decision that dismissed a complaint that alleged that the Department of State had illegally delayed reviewing visa applications filed by persons in certain immigration categories. *Id.* at 405–06. The district court had found that the plaintiff had not identified any discrete agency action that the agency was required to take. *See id.* at 407. The Circuit disagreed, explaining

that the district court had "vastly overstate[d] the rule articulated in [*SUWA*]." *Id.* at 407–08.

The plaintiff had not "ask[ed] for compliance with a provision that is anywhere near as broad as

the ones listed in [*SUWA*]." *Id.* at 408. Instead, she had "point[ed] to a precise section of [a

statutory provision], establishing a specific principle of temporal priority that clearly reins in the

agency's discretion" and had argued that the agency had failed to act in accordance with that

mandate. *Id.* This is exactly the sort of challenge Plaintiffs lodge in this case. In arguing

otherwise, Defendants make the same mistake that the Circuit identified in *Meina Xie*.

Accordingly, the Court disagrees with Defendants that Plaintiffs' claims constitute an

impermissible programmatic attack.

In any event, Defendants' argument fails for another reason: Defendants seem to ignore

that, in addition to seeking relief for a putative class of former unaccompanied minors, Plaintiffs

Ramirez Garcia and Hernandez Alfaro also seek relief for the agency's purported failure to abide

by 5 U.S.C. § 1232(c)(2)(B) in placing Plaintiffs themselves. *See* First Am. Compl. ¶¶ 88–90,

97. As the Supreme Court explained in *Lujan*, an agency action is reviewable "to the extent that,

specific 'final agency action' has an actual or immediately threatened effect." *Lujan*, 497 U.S. at

894; *cf. Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001) ("While a single step or measure

is reviewable, an on-going program or policy is not, in itself a 'final agency action' under the

APA."). Here, Plaintiffs allege that Defendants did not take specific, discrete agency actions

before placing them and that the agency's failure to take these actions has harmed them. The

placements of Plaintiffs Garcia Ramirez and Hernandez Alfaro in ICE adult detention facilities—

purportedly without mandated consideration of less restrictive placements—are agency actions

that have actual or immediately threatened effects. *Cf. Bark v. U.S. Forest Serv.*, 37 F. Supp. 3d

41, 50–51 (D.D.C. 2014) (rejecting challenge to "a generalized, unwritten administrative

'policy,'" but permitting challenge to five specific purported applications of that alleged policy)[4]; *RCM Techs., Inc. v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 2d 39, 43–45 (D.D.C. 2009) (finding no agency action in a challenge to DHS's purported policy of requiring foreign occupational and physical therapists to have master's degrees in order to obtain H–1B visas, but intimating that the specific denial of a visa application made pursuant to the alleged policy would be justiciable). The Court concludes that the "agency action" condition is met.

### b. Finality

Defendants next assert—without elaboration—that Plaintiffs' APA claims "fail[] the test for finality." Defs.' Opp'n at 18. The Court rejects this argument, too.

Even discrete agency actions are reviewable by a court under the APA only if they are final. *See* 5 U.S.C. § 704 (establishing reviewability of "final agency action"). Courts take a pragmatic approach to finality. *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 136 S. Ct. 1807,

---

[4] Defendants cite *Bark v. U.S. Forest Service*, 37 F. Supp. 3d 41 (D.D.C. 2014), as supporting their argument that Plaintiffs' failure to point to a "regulation, letter, memorandum, or other form of written material that comprises this policy, or lack thereof, that they allege is being applied by Defendants" "alone is fatal to Plaintiffs' claims." Defs.' Opp'n at 19. *Bark* provides no such rule. As another court in this jurisdiction has explained, "[a]gency action . . . need not be in writing to be final and judicially reviewable." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 184 (D.D.C. 2015). In *Bark*, this Court observed that plaintiffs had attacked both a general policy and specific applications of that purported policy. *Bark*, 37 F. Supp. 3d at 50. Plaintiffs sought vacatur of the purported policy. *See id.* The Court merely observed that *Lujan* does not permit plaintiffs to shoehorn generalized attacks on agency behavior into a court under the "policy" label. *See id.* Importantly, though, the Court found "agency action" that is reviewable under the APA in the specific applications of the purported policy. *See id.* at 51.

In this case, Plaintiffs lodge attacks on specific, discrete instances in which Defendants have purportedly placed former unaccompanied alien children without considering less restrictive placements. *See* First Am. Compl. ¶ 85 (defining the putative class as those "as to whom ICE did not consider placement in the least restrictive setting availing, including alternative to detention programs, as required by 8 U.S.C. § 1232(c)(2)(B)"). That Plaintiffs seek to join multiple instances of such alleged agency failure into one class action does not render their complaint an attack on an on-going program or policy of the sort that is not actionable under the APA.

1815 (2016).  As the Supreme Court established in *Bennett v. Spear*, 520 U.S. 154 (1997), a court will find that an agency action is final if two conditions are met: "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature.  And, second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."  *Hawkes Co., Inc.* 136 S. Ct. at 1813.  Where there is no final agency action, a plaintiff has no cause of action under the APA.  *See Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 183–85 (D.C. Cir. 2006) (explaining that the "final agency action" requirement is not jurisdictional, but instead determines whether a plaintiff has a cause of action under the APA).

Here, Plaintiffs Garcia Ramirez and Hernandez Alfaro contend that ICE placed them in adult detention facilities without considering less restrictive placements as required by 12 U.S.C. § 1232(c)(B)(2).  At the time of this writing, Plaintiffs Garcia Ramirez and Hernandez Alfaro have been detained at adult facilities for nearly three months.  Defendants do not dispute that they placed Plaintiffs in these adult detention facilities.  Nor do they contend that Plaintiffs' placements were subject to further consideration by the agency after DHS made its custody determinations.  Indeed, Defendants rejected affirmative requests by counsel for each Plaintiff for changes in their respective placements.  *See* Letter from Albert E. Carter (Jan. 23, 2018), Ex. E at 24, ECF No. 20-5; Cantu Decl. ¶¶ 8–9, ECF No. 20-1.  The Court thus concludes that both finality conditions are met.  The agency had consummated its decisionmaking process, doing so at the latest when it denied Plaintiffs' post-custody-determination requests for a change in placement.[5]  And the agency's placement decisions had immediate and significant legal

---

[5]  That Plaintiffs' placements might have been altered—or might be altered in the future—by immigration judges who could choose to grant Plaintiffs bond does not alter this conclusion.  "Immigration judges are career civil-service employees in the Department of

consequences for Plaintiffs, who must bear detention in more restrictive settings than Defendants might otherwise deem appropriate based on the considerations mandated by 12 U.S.C. § 1232(c)(2)(B).  *Cf. Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects.").  Thus, the Court rejects Defendants' argument that Plaintiffs have failed to identify final agency actions reviewable under the APA.

### 3.  Adequate Remedy

Finally, Defendants assert that Plaintiffs may not bring their APA claims to this court because they have another adequate remedy in the form of the opportunity to request bond hearings before immigration judges.  *See* Defs.' Opp'n at 20–22 (citing 5 U.S.C. § 704 (exempting from judicial review agency action for which there is an "adequate remedy in a court")).  Plaintiffs disagree, contending that the immigration court's review procedures do not permit consideration of whether the agency complied with the statutory mandate at issue in this case, and that, in any event, those review procedures are inadequate because an immigration hearing typically occurs weeks or months after the agency has made its placement determination.  *See* Pls.' Reply at 19–21, ECF No. 24.  The Court finds that Plaintiffs have the better of the argument.

"Section 704 reflects Congress' judgment that 'the general grant of review in the APA' ought not 'duplicate existing procedures for review of agency action' or 'provide additional judicial remedies in situations where Congress has provided special and adequate review

---

Justice's Executive Office of Immigration Review," *Am. Immigration Lawyers Assoc. v. Exec. Office for Immigration Review*, 830 F.3d 667, 670 (D.C. Cir. 2016), and not employees of DHS. What matters for finality purposes is that *the agency* finished its decisionmaking process.

procedures.'" *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice* ("*CREW*"),

846 F.3d 1235, 1244 (D.C. Cir. 2017) (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 903

(1988)). However, the Supreme Court has explained that "[t]he exception that was intended to

avoid such duplication should not be construed to defeat the central purpose of providing a broad

spectrum of judicial review of agency action." *Bowen*, 487 U.S. at 903. "When considering

whether an alternative remedy is 'adequate' and therefore preclusive of APA review, [courts]

look for 'clear and convincing evidence' of 'legislative intent' to create a special, alternative

remedy and thereby bar APA review." *CREW*, 846 F.3d at 1244 (quoting *Garcia v. Vilsack*, 563

F.3d 519, 523 (D.C. Cir. 2009)). Generally, "where a statute affords an opportunity for *de novo*

district-court review [courts] ha[ve] held that APA review [i]s precluded because 'Congress did

not intend to permit a litigant challenging an administrative denial . . . to utilize simultaneously

both [the review provision] and the APA.'" *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v.*

*U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005) (last alteration in

original) (quoting *Envtl. Def. Fund v. Reilly*, 909 F.2d 1497, 1501 (D.C. Cir. 1990)). An

alternative remedy is adequate if it offers relief of "the same genre," even if that remedy does not

provide relief identical to that offered under the APA. *Garcia*, 563 F.3d at 522. By contrast, an

alternative remedy "will not be adequate under § 704 if the remedy offers only 'doubtful and

limited relief.'" *Id.* at 522 (quoting *Bowen*, 487 U.S. at 901).

Defendants assert that Plaintiffs may pursue bond hearings before immigration judges

during which they can seek release from detention and that the availability of such hearings

constitutes an "adequate remedy" that precludes this Court from considering the challenge

presented in this case. *See* Defs.' Opp'n at 20–22. Indeed, Plaintiff Hernandez Alfaro sought

such a hearing, and an immigration judge granted her request and ordered her release from

custody under bond of $10,000.  *See* Order of the Immigration Judge with Respect to Custody, Ex. A at 32, ECF No. 20-1.  The Court agrees with Plaintiffs that review by an immigration court of DHS's custody determination does not constitute an adequate remedy that precludes this Court from reviewing whether the agency complied with 8 U.S.C. § 1232(c)(2)(B) in placing the former unaccompanied minors.

First, the Court finds instructive and persuasive the reasoning of the district court in *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164 (D.D.C. 2015).  In that case, plaintiffs filed a putative class action challenging DHS's purported policy of detaining Central American mothers and children with the aim of deterring potential future immigrants.  *Id.* at 170.  The agency asserted that plaintiffs could not state a claim under the APA because review by an immigration judge of the decisions to detain them constituted an adequate remedy in a court.  *See id.* at 185.  The court disagreed, explaining that "[w]hile it is true that an alien who is denied release by ICE may seek *de novo* review of that denial from an immigration judge, *see* 8 C.F.R. § 1003.19; 8 C.F.R. § 1236.1(d)(1), Defendants' reliance on this potential redetermination ignores the fact that it occurs weeks or months after ICE's initial denial of relief."  *Id.*  Accordingly, the court concluded that the availability of review of the custody determination by an immigration judge "offers no adequate remedy for the period of unlawful detention members of the class suffer *before* receiving this review."  *Id.*

The same is true here.  A non-citizen may quickly receive a bond hearing, but prompt action is not necessarily guaranteed.  And, under the agency's position, a former unaccompanied alien minor now detained in an adult facility has no recourse for the period before such a hearing is scheduled.  In this sense, the relief provided by that remedy is limited.  Section 1232(c)(2)(B) requires that the agency "tak[e] into account the alien's danger to self, danger to community, and

risk of flight" then "consider placement in the least restrictive setting available." 8 U.S.C. §

1232(c)(2)(B). While, as the agency argues, the provision includes no explicit temporal

requirement, it strains credulity to imagine that Congress intended to permit DHS to make these

determinations whenever it pleases. To find that a hearing before an immigration judge—which

may come weeks or months after a former unaccompanied alien child's placement in an adult

detention facility—suffices would undermine Congress's provision of special consideration for

this class of young immigrants. Certainly, Defendants have not pointed to clear and convincing

evidence that Congress intended immigration courts to provide the only source of relief for

Plaintiffs' injuries.

Second, the Court finds it significant that Section 1232(c)(2)(B) requires affirmative

action of DHS in the form of consideration of the least restrictive options available for placement

of former unaccompanied alien children that they now detain, and it imposes no financial

obligation on those individuals. For example, if ICE had concluded that Plaintiff Hernandez

Alfaro could be safely released to her proposed sponsor, she likely would not have to pay

anywhere near the $10,000 required to secure her release based on the immigration judge's

order. In sum, the Court disagrees that review by an immigration court offers an adequate

remedy for Plaintiffs' alleged injuries.

### B.  Merits

Having determined that there are no justiciability barriers to considering Plaintiffs'

motion for preliminary injunctive relief, the Court next assesses the merits of Plaintiffs' request.

As detailed above, a preliminary injunction is "an extraordinary remedy that may only be

awarded upon a clear showing that the [movant] is entitled to such relief." *Winter*, 555 U.S. at

22. The movant "must establish that he is likely to succeed on the merits, that he is likely to

suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20.

Plaintiffs Garcia Ramirez and Hernandez Alfaro seek a preliminary injunction requiring Defendants to comply with 8 U.S.C. § 1232(c)(2)(B) in placing them now that they have aged out of ORR custody and have been transferred to the custody of ICE. *See* Mot. Temp. Restraining Order & Prelim. Injunction at 1, ECF No. 2. Specifically, Plaintiffs ask that this Court order Defendants to "consider" placing them in "the least restrictive setting available after taking into account [their] danger to self, danger to the community, and risk of flight." *Id.* (quoting 8 U.S.C. § 1232(c)(2)(B)). Plaintiffs also ask that Defendants "make available to them alternative to detention programs, 'utilizing a continuum of alternatives based [their] need for supervision', including placement 'with an individual or an organizational sponsor, or in a supervised group home.'" *Id.* (quoting 8 U.S.C. § 1232(c)(2)(B)). Defendants insist that they have already complied with this statutory mandate, primarily arguing that Plaintiffs cannot marshal evidence to show that ICE has systematically failed to abide by 8 U.S.C. § 1232(c)(2)(B) and that Plaintiffs Garcia Ramirez and Hernandez Alfaro cannot show that ICE failed to comply with the mandate with respect to their individual placements. *See* Defs.' Opp'n at 1–5. Finding that Plaintiffs have carried their burden as to all four preliminary injunction factors, the Court grants Plaintiffs' motion for preliminary injunctive relief as to Wilmer Garcia Ramirez and Sulma Hernandez Alfaro.

**1. Likelihood of Success on the Merits**

Plaintiffs assert two causes of action, both under the APA. First, pursuant to 5 U.S.C. § 706(2), Plaintiffs argue that Defendants have acted in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," by failing to consider placements

for each Plaintiff in the "least restrictive setting" available and by failing to make available to Plaintiffs any alternatives to detention.  First Am. Compl. ¶¶ 98–106.  Second, Plaintiffs contend that Defendants have "failed to take a discrete agency action that [the agency] is required to take," in violation of § 706(1) of the APA.  *Id.* ¶¶ 107–111.

The substantive basis for these claims is the same:  Plaintiffs Garcia Ramirez and Hernandez Alfaro contend that Defendants ignored a statutory mandate requiring the agency to "consider" less restrictive placements and alternatives to detention and, instead, automatically placed them into adult detention facilities when they aged out of HHS's jurisdiction.  Defendants dispute this claim, asserting that ICE "has established guidance . . . which advises its officers regarding the obligations imposed by 8 U.S.C. § 1232(c)(2)([B])" and that ICE considered the relevant statutory factors in placing Plaintiffs.  *See* Defs.' Opp'n at 16–20.  The Court finds that Plaintiffs have demonstrated that they are likely to succeed in showing that DHS did not comply with 8 U.S.C § 1232(c)(2)(B) in placing them.

Because the Court limited its consideration of the present motion to Plaintiffs Garcia Ramirez and Hernandez Alfaro, it will focus its attention on record evidence suggesting whether DHS complied with 8 U.S.C. § 1232(c)(2)(B) in these individual cases.  Plaintiffs provide several declarations from immigration lawyers who question ICE's compliance with this provision in placing other former unaccompanied minors.  *See* First Am. Compl., Exs. A–E, ECF Nos. 21-1 to 21-5.  And ICE contrasts this picture with declarations and other guidance documents, asserting that, as a matter of course, ICE complies with the statutory mandate.  *See* Defs.' Opp'n, Ex. C, ECF No. 20-3.  Both sides' filings provide valuable context, but neither parties' submissions put points on the scoreboard with regard to specific questions of whether

Plaintiffs Garcia Ramirez and Hernandez Alfaro likely did or likely did not receive consideration due under § 1232(c)(2)(B).[6]

The Court first considers evidence regarding any consideration offered to Plaintiff Garcia Ramirez. Plaintiffs provide a declaration from Mr. Garcia Ramirez, which states that, on his eighteenth birthday, he was transferred to an adult detention facility. Decl. of Wilmer Garcia Ramirez at 5–6, Ex. E, ECF No. 2-6. Plaintiffs also submit a declaration from Mr. Garcia Ramirez's counsel which states plainly that "ICE did not discuss alternatives to detention with

---

[6] At the hearing on Plaintiffs' motion for preliminary injunction, Government counsel suggested that the documentation of ICE's guidance coupled with the presumption that public officials "have properly discharged their official duties," *Latif v. Obama*, 677 F.3d 1175, 1178 (D.C. Cir. 2012), might suffice to show that Plaintiffs' case is unlikely to succeed on the merits. *See* Tr. of Prelim. Injunction Mot. Hr'g (Apr. 3, 2018) at 37:9–23, ECF No. 25. The Court disagrees. First, the presumption is a rebuttable one. *See Riggs Nat'l Corp. & Subsidiaries v. C.I.R.*, 295 F.3d 16, 20–21 (D.C. Cir. 2002) (clarifying that the presumption can be rebutted through "clear and specific evidence"). And, as explained below, Plaintiffs have marshaled competent evidence showing that they are likely to succeed in demonstrating that Defendants failed to comply with the statutory mandate.

Second, with regard to failure-to-act claims asserted under the APA—especially claims like the ones presented here, that, at least at this stage of the litigation, involve clear information asymmetry—the Court would be remiss to rely heavily on bald assertions not supported by the record. *Cf. Nat'l Resources Def. Council, Inc. v. Daley*, 209 F.3d 747, 755 (D.C. Cir. 2000) ("[Courts] do not hear cases merely to rubber stamp agency actions. To play that role would be 'tantamount to abdicating the judiciary's responsibility under the Administrative Procedure Act.'" (quoting *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1491 (D.C. Cir. 1995)). Courts take a similar approach in the Freedom of Information Act context, where an agency typically supplies affidavits and indices that describe disputed documents and the requester has no access to the underlying documents. Though the "[a]gency affidavits are accorded a presumption of good faith," *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), that presumption alone does not suffice to substantiate the agency's claims. Rather, an agency is entitled to summary judgment on the basis of its affidavits only "if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013) (quoting *Consumer Fed'n of Am. v. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006)). To be sure, there are differences between that context and this one—most notably, that the burden lies with the agency in that context—but, because the same sort of information asymmetry exists, the Court finds instructive the prudence exercised in that context.

[him] at any time before or after Wilmer's 18th birthday," and "ICE never provided [him] with any indication that they made a consideration about Wilmer's placement in the least restrictive setting or any analysis of alternatives to detention."  Allende-Asparó Decl. ¶ 5, Ex. A, ECF No. 23-1.  Plaintiffs also rely heavily on what they identify as deficiencies in Defendants' filings. *See* Pls.' Reply at 1–5.

Defendants contend that they did consider the requisite statutory factors in placing Plaintiff Garcia Ramirez.  They rely primarily on four things: (1) a declaration from Christine Hoopes, a Supervisory Deportation and Detention Officer ("SDDO") with ICE's Phoenix District Office; (2) an undated message from ORR to ICE indicating that Mr. Garcia Ramirez would soon age out of ORR's jurisdiction and advising that ORR had previously considered placing him with a family friend in Alabaster, Alabama; (3) a declaration from SDDO Michael Leal; and (4) communications between Mr. Garcia Ramirez's counsel and ICE officers.  *See* Defs.' Opp'n at 13–20; Exs. D–E, ECF Nos. 20-4, 20-5.  None of this evidence tends to show that Mr. Garcia Ramirez received the consideration he is due, and indeed, much of it supports Mr. Garcia Ramirez's claims that he did not receive consideration of less restrictive placements.

First, Ms. Hoopes's declaration indicates that she "was not on duty the day [Mr. Garcia Ramirez's] custody determination was made as it was a Saturday."  Decl. of Christine Hoopes ("Hoopes Decl.") ¶ 8, Ex. D, ECF No. 20-4.  Ms. Hoopes relies instead on a purported review of DHS databases, asserting that "the on-duty SDDO reviewed the custody determination and concurred with the [deportation officer's] determination to detain [Mr.] Garcia-Ramirez."  *Id.* Ms. Hoopes's own declaration makes clear that she was not a decisionmaker who played any role in the determination of Mr. Garcia Ramirez's placement.  Courts in this jurisdiction have stated that "[a]n agency may not assert *post hoc* reasoning as the basis for its decision."  *Bolden*

*v. Blue Cross & Blue Shield Assoc.*, 848 F.2d 201, 207 (D.C. Cir. 1988). And the D.C. Circuit has further clarified that:

> The "*post hoc* rationalization" rule is not a time barrier which freezes an agency's exercise of its judgment after an initial decision has been made and bars it from further articulation of its reasoning. It is a rule directed at reviewing courts which forbids judges to uphold agency action on the basis of rationales offered by anyone other than the proper decisionmakers.

*Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 337 (D.C. Cir. 2011) (quoting *Local 814, Int'l Brotherhood of Teamsters v. NLRB*, 546 F.2d 989, 992 (D.C. Cir. 1976) (per curiam)). Because Ms. Hoopes, by her own admission, was not a proper decisonmaker with regard to Mr. Garcia Ramirez's placement, the Court will not regard her justifications as competent evidence showing that the agency complied with the statutory mandate.

Second, nothing in the message indicating that Mr. Garcia Ramirez would soon age out of ORR's jurisdiction shows that DHS considered Mr. Garcia Ramirez's danger to self, danger to the community, or risk of flight or that DHS considered placement in an environment less restrictive than an adult detention facility. *See* Ex. D at 13, ECF No. 20-4. The message explains that, according to ORR, Mr. Garcia Ramirez had "no viable sponsor identified preceding aging out." *Id.* This was because "[o]ne prior sponsorship attempt with a family friend . . . was denied in accordance to ORR release requirements." *Id.* In addition, the message provided that Mr. Garcia Ramirez "is anticipated to be released to his family friend . . . in [Pennsylvania]." *Id.* However, the letter provided no further information about the status of this prospective placement. *See id.*

It is not clear to this Court why the mere fact that ORR provided this information to ICE about a past placement that *it* considered for Mr. Garcia Ramirez could suffice to meet *ICE's* obligations. First, the letter makes clear that the reason that one of Mr. Garcia Ramirez's

proposed sponsors was denied was because that sponsorship would not comply with ORR

release requirements.  As ORR sponsorship requirements are presumably more onerous than ICE

sponsorship requirements, *see, e.g.*, Office of Refugee Resettlement, Sponsor Handbook,  (listing

duties for sponsors of unaccompanied alien children, including that they must ensure that the

child has access to education and must protect the child's physical and emotional well-being),

https://www.acf.hhs.gov/sites/default/files/orr/frp_8_sponsor_handbook_english_070716.pdf;

*see also* 8 U.S.C. § 1232 (special statutory protections for unaccompanied minors), it is not clear

why ORR's consideration of sponsors under its standards might show that ICE had complied

with its statutory obligations.  Furthermore, this letter says nothing of ICE's consideration of the

other potential placement that Mr. Garcia Ramirez had identified.  And it likewise reveals no

consideration of Mr. Garcia Ramirez's risk of flight, danger to self, or danger to community.

Third, the agency relies on a declaration of Michael Leal.  *See* Leal Decl., Ex. E, ECF

No. 20-5.  According to Mr. Leal, on September 23, 2017, ORR transferred Mr. Garcia Ramirez

into the custody of ICE.  *Id.* ¶ 6.  At the Phoenix Field Office, ICE purportedly determined that

Mr. Garcia Ramirez should be held without bond.  *Id.*  The next day, ICE transferred Mr. Garcia

Ramirez to EDC where a deportation officer used the Risk Assessment Classification tool to

determine Mr. Garcia Ramirez's custody classification level.  *Id.* ¶¶ 6–7.  Mr. Leal's declaration

tends to support Plaintiffs' contentions, not refute them.  He provides no statement suggesting

that ICE considered anything less restrictive than adult detention at the Phoenix Field Office

before it transferred Mr. Garcia Ramirez to EDC.  Any assertion that the later use of the Risk

Classification Assessment suffices to meet Defendants' statutory obligations ignores the purpose

of that assessment—to determine where to place Mr. Garcia Ramirez within an adult detention

facility, not to determine whether he belonged there in the first place.

Finally, Defendants rely on two sets of communications between ICE deportation officers and Mr. Garcia Ramirez's counsel.  In the first, counsel requested that Mr. Garcia Ramirez be released on his own recognizance.  *See* Email from Noriana C. Hermes (Sept. 22, 2017), Ex. D at 7, ECF No. 20-4.  ICE's response to that letter—which reads in full "Wilmer needs to be taken into custody d[ue] to a motion to re-calendar being submitted.  Wilmer is scheduled to be picked up by ICE on [redacted] in the morning thanks"—surely does not evidence any consideration of less restrictive placements than adult detention.  *See* Email from Deportation Officer (Sept. 22, 2017), Ex. D at 9, ECF No. 20-4.  In the second communication, Mr. Garcia Ramirez's counsel submitted a detailed letter, arguing for Mr. Garcia Ramirez's release pursuant to 8 U.S.C. § 1232(c)(2)(B).  *See* Letter from Néstor Allende-Asparó (Jan. 5, 2018), Ex. E at 20–23, ECF No. 20-5.  In a response letter—which counsel may or may not have received—a Deputy Field Office Director from ICE denied the request.  *See* Letter from Albert E. Carter (Jan. 23, 2018), Ex. E at 24, ECF No. 20-5.  Interpreting counsel's letter as a request for prosecutorial discretion, the Deputy Director contended that "after completing [a] review, . . . the totality of circumstances do not support a favorable exercise of discretionary authority in this case."  *Id.*  But, as Plaintiffs argue, this letter does not show that ICE considered the statutorily specified factors or that ICE considered placement on the continuum of alternatives instead of just regarding the request as one for release.  Indeed, the contention that ICE had denied a request for "favorable exercise of discretionary authority" seems to overlook the fact that ICE's compliance with 8 U.S.C. § 1232(c)(2)(B) is mandated by statute and therefore not discretionary.

In sum, based on a combination of evidence supplied by Plaintiffs tending to show that Defendants did not comply with 8 U.S.C. § 1232(c)(2)(B) and deficiencies in Defendants' submissions, which do not undermine—and in some places support—Plaintiffs' showing, the

Court finds that Plaintiffs have met their burden of showing a likelihood of success with regard to claims about Mr. Garcia Ramirez's placement.

Next, the Court looks to similar evidence supplied by both parties with regard to the placement of Plaintiff Hernandez Alfaro. Plaintiffs again supply declarations, contending that this Plaintiff was transferred from ORR custody to DHS custody on her eighteenth birthday. *See* Decl. of Sulma Hernandez Alfaro ¶ 10, Ex. F, ECF No. 2-7; Decl. of Rosemary Gonzalez ¶ 6, Ex. B, ECF No. 23-2. Plaintiffs also submit requests for release and for consideration of less restrictive placements—including a request for release to an identified sponsor—pursuant to 8 U.S.C. § 1232(c)(2)(B). *See* Gonzalez Decl. ¶¶ 7–19. Defendants contend that the agency did comply with the statutory provision. They rely primarily on (1) a declaration from Deportation Officer Robert Cantu, (2) a declaration of Supervisory Deportation and Detention Officer Jose Cortez, and (3) communications between ORR and ICE shortly before Ms. Hernandez Alfaro aged out of ICE's jurisdiction. *See* Defs.' Opp'n, Exs. A–B, ECF Nos. 20-1, 20-2. The evidence marshaled by Plaintiffs tends to show that they are likely to succeed on the merits of their claims regarding Defendants' failure to comply with 8 U.S.C. § 1232(c)(2)(B). By contrast, evidence supplied by Defendants does not sufficiently rebut this showing, and, indeed, with regard to some submissions, supports Plaintiffs' contentions.

Defendants rely heavily on Officer Cantu's declaration. Officer Cantu asserts that he met briefly with counsel for Ms. Hernandez Alfaro on February 7, 2018. *See* Cantu Decl. ¶¶ 6–8. During that meeting, he denied Ms. Hernandez Alfaro's request for release to La Posada Providencia, primarily on the basis that people often abscond from the shelter[7] and based on the

---

[7] The record includes no factual data supporting this assertion. Plaintiffs have supplied a declaration from Sister Margaret Mertens—who has worked at the shelter for a total of eighteen years and who is a member of the Sisters of Divine Providence, which runs La Posada

fact that Ms. Hernandez Alfaro has no strong family ties in the United States. *See* Cantu Decl. ¶¶ 7–8. Importantly, though, nothing in Officer Cantu's declaration—nor anything in the record— indicates that La Posada Providencia constituted "the least restrictive setting available" such that Defendants' rejection of this single request sufficed to meet Defendants' statutory obligation. Likewise, there is no indication that Defendants considered Ms. Hernandez Alfaro for any alternative to detention programs or that they even mentioned such options to counsel. In sum, while Officer Cantu's declaration evidences some "account[ing]" of Ms. Hernandez Alfaro's "danger to self, danger to the community, and risk of flight," it does not show that ICE "consider[ed] placement in the least restrictive setting available."[8] 8 U.S.C. § 1232(c)(2)(B).

The declaration provided by Officer Cortez is also of limited aid to Defendants. According to Officer Cortez, DHS records show that on January 18, 2018, ICE initiated an electronic risk classification assessment during which Deportation Officer Anthony Martinez utilized an electronic risk classification assessment to determine whether to release, detain, or consider alternatives to detention for Ms. Henandez Alfaro. Cortez Decl. ¶ 22, ECF No. 20-2. Officer Cortez contends that Ms. Hernandez Alfaro was "determined to pose a high risk of absconding due to not having a sponsor or fixed, permanent address in the United States that she had lived in for at least six months." *Id.* ¶ 22. Officer Cortez, Officer Martinez's supervisor, purportedly concurred with the decision. *Id.* ¶ 23.

---

Providencia—contesting Officer Cantu's contentions. *See* Decl. of Sister Margaret Mertens ("Mertens Decl.") ¶¶ 2–8, Ex. H, ECF No. 23-8. Sister Mertens states that the shelter "ha[s] never had an immigrant run away" and that "[i]f any resident leaves the shelter, we confirm that they have a safe place to go to, such as a family member or sponsor." *Id.* ¶ 8. But, Sister Mertens's assertions are hardly any less conclusory than Officer Cantu's.

[8] The Court need not resolve, at this stage, disputes between counsel for Ms. Hernandez Alfaro and Officer Cantu about the substance of their conversation. Neither party requested an evidentiary hearing to resolve these questions, and, even accepting the version of events more favorable to the agency, the Court believes that Plaintiffs have met their burden.

Though Officer Cortez apparently played some role in ICE's decision to detain Ms. Hernandez Alfaro, his explanations also appear to primarily provide bald, *post hoc* justifications for ICE's decision. As Plaintiffs note, Defendants do not provide any explanation from the officer who made the placement decision, any record of the risk classification assessment purportedly performed, or much else other than the bald assertion that Plaintiff did not have a suitable sponsor. *See* Pls.' Reply at 5. To the extent that ICE relied solely on the fact that Plaintiff had no immediate family in the United States and had not resided at a permanent address for more than six months, Defendants have failed to explain how these factors account for all of the required considerations set forth in 8 U.S.C. §1232(c)(2)(B). Furthermore, the Court agrees with Plaintiffs that Defendants "appear to view its [§ 1232(c)(2)(B)] decision-making as a binary choice between detention and release." Pls.' Reply at 6 n.2. Defendants offer no indication that they considered requiring, for example, ankle monitoring or any other option to reduce Ms. Hernandez Alfaro's risk of flight to render her eligible for a placement less restrictive than an adult detention facility.

Finally, just like the records notifying ICE of Mr. Garcia Ramirez's impending transfer to DHS custody, the communications between ICE and ORR indicate only that ORR rejected certain proposed sponsors. ICE does not explain why ORR's consideration of certain proposed sponsors might suffice to meet ICE's statutory mandate. In sum, the Court finds that Ms. Hernandez Alfaro, too, has met her burden of showing a likelihood of success on the merits.

## 2. Irreparable Harm

The Court next considers whether Plaintiffs have met their burden of showing irreparable harm. Plaintiffs argue that "[e]ach day [that they] spend in immigration detention without ICE making a determination as to whether they can be held in a less restrictive setting and/or without

ICE making alternatives to detention available, is a day in which Plaintiffs' freedom and fundamental liberty interests may be unlawfully deprived." Mot. Temp. Restraining Order & Prelim. Injunction at 14, ECF No. 2. According to Plaintiffs, they have also suffered—and will continue to suffer—negative physical and mental effects of detention, subpar medical and psychiatric care, and economic burdens imposed on them and their families as a result of their detentions. *See id.* Defendants disagree, arguing that (1) Plaintiffs seek an injunction that would require the Court to provide the same relief as Plaintiffs' complaint requests, and (2) Plaintiffs waited several months after their placements before filing their lawsuit, thus undercutting the notion that their injuries are sufficiently urgent to warrant a preliminary injunction. *See* Defs.' Opp'n at 22–25. The Court finds that Plaintiffs have met their burden.

Courts in this jurisdiction have recognized that "[t]he concept of irreparable harm does not readily lend itself to definition." *Judicial Watch, Inc. v. Dep't of Homeland Sec.*, 514 F. Supp. 2d 7, 10 (D.D.C. 2007). Nonetheless, the D.C. Circuit has laid out "several well known and indisputable principles" that should underlie a court's analysis. *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). First, the party seeking preliminary injunctive relief must demonstrate that the claimed injury is "both certain and great" and "actual and not theoretical." Second, the movant "must show that '[t]he injury complained of [is] of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm.'" *Id.* (alterations in original) (quoting *Ashland Oil, Inc. v. FTC*, 409 F. Supp. 297, 307 (D.D.C.)). And, finally, the injury must be "beyond remediation." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

The Court finds that Plaintiffs have met their burden of showing irreparable harm. Courts in this and other jurisdictions have found that deprivations of physical liberty are the sort

of actual and imminent injuries that constitute irreparable harm. *See Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37, 53 n.20 (D.D.C. 2002) (collecting cases). Courts have likewise recognized that the "major hardship posed by needless prolonged detention" is a form of irreparable harm. *R.I.L-R*, 80 F. Supp. 3d at 191 (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). And, where a plaintiff requests injunctive relief mandating that an agency comply with a process that, if completed could secure plaintiff's freedom or could alleviate harsh conditions of confinement, the harm from detention surely cannot be remediated after the fact. *See R.I.L-R*, 80 F. Supp. 3d at 191.

Defendants' arguments to the contrary are unavailing. Defendants first complain that Plaintiffs' request for a preliminary injunction overlaps substantially with the complete relief requested in this case. *See* Defs.' Opp'n at 22–23. Defendants do not explain, however, why this might lessen the harm associated with each additional day Plaintiffs endure purportedly inappropriate detention. The Court fails to see why it should deny relief on the basis that Plaintiffs might eventually secure release after this Court addresses all facets of their complaint. As for Defendants' argument that Plaintiffs' delay in filing the motion for a preliminary injunction cuts against their contention that they have suffered irreparable harm, *see* Defs.' Opp'n at 22–24, the Court also finds this ground insufficient to justify denying their motion. The record shows that, through about mid-January 2018, Plaintiffs were engaged in attempts to persuade Defendants to comply with 8 U.S.C. § 1232(c)(2)(B) in their respective cases. Had Defendants done so, Plaintiffs likely would not have had occasion to file this lawsuit, which they brought in early March 2018, only two months after their communications with DHS. Because Plaintiffs were engaged in efforts to secure consideration of the statutory provision at issue in this case, and because they filed suit shortly after those efforts proved unsuccessful, the Court

does not believe that the delay substantially undermines Plaintiffs' contentions that continued detention would harm them.[9]

### 3. Balancing of the Equities and Public Interest

Finally, Plaintiffs contend that irreparable harm to them in the absence of the Court's entry of a preliminary injunction greatly outweighs any claimed harm to the government. Mot. Temp. Restraining Order & Prelim. Injunction at 16. According to Plaintiffs, they have significant liberty interests at stake and continued detention in adult facilities without consideration of less restrictive placements mandated by 8 U.S.C. § 1232(c)(2)(B) would result in mental, emotional, and economic harm. *Id.* Furthermore, Plaintiffs insist that their "requested relief would require only that Defendants comply with Section 1232(c)(2)(B) by determining whether Plaintiffs can be released to a sponsor, group home, or some other type of non-detention." *Id.* The agency disagrees, asserting that the balancing of the equities and the public interest favor it. *See* Defs.' Opp'n at 25–26. Defendants cite the fact that an injunction would alter, rather than preserve, the status quo; the fact that Plaintiffs' motion for preliminary injunctive relief overlaps substantially with its request for relief on the merits; and the public's interest in enforcement of United States immigration laws. *See id.* The Court concludes that the balance of the hardships and public interest considerations favor Plaintiffs.

In determining whether to grant a preliminary injunction "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal quotation marks omitted)

---

[9] To be sure, in denying Plaintiffs' motion for temporary restraining order, the Court noted that Plaintiffs had not requested such relief immediately. *See* Tr. of Temp. Restraining Order Mot. Hr'g (Mar. 8, 2018) at 34:3–6, ECF No. 19 However, that a delay did not justify immediate relief—before the agency could even respond to Plaintiffs' motion—does not justify denying it now that the parties have had a chance to brief and fully argue the motion.

(quoting *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 542 (1987)).  "In exercising their sound discretion, courts . . . should [also] pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).  These considerations merge into one factor when the government is the non-movant.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

The Court agrees with Plaintiffs that the relief requested is very slight—if granted, Defendants must only consider placing Plaintiffs in less restrictive settings, as required by 8 U.S.C. § 1232(c)(2)(B).  Defendants need offer no change in placement, unless warranted by this assessment.  Furthermore, while Defendants are constrained by Congress's mandate, they have quite a bit of discretion in determining how to weigh the factors and whether to provide a less restrictive setting.  By contrast, withholding relief might deny Plaintiffs an avenue through which to secure a means of release that Congress explicitly provided for unaccompanied minors who recently reached the age of eighteen.  The balancing of the equities tip firmly in Plaintiffs' favor.

Defendants' arguments to the contrary are unpersuasive.  First, Defendants contend that Plaintiffs' request should be held to a higher standard because they seek to alter the status quo rather than merely preserve it.  It is true that some district courts in this Circuit apply a rule under which "where an injunction is mandatory—that is, where its terms would alter, rather than preserve the status quo by commanding some positive act—the moving party must meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction."  *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo–Mitsubishi Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C.

1997). Assuming such a rule applies in this Circuit,[10] in this Court's estimation, Plaintiffs have carried their burden. Continued detention, where Plaintiffs might otherwise be eligible for less restrictive placements, constitutes very serious damage that merits a mandatory injunction.

Second, Defendants note that Plaintiffs' requested relief overlaps substantially with the merits of this suit. However, the Court finds that the consequences of delaying relief justifies swift action even in the face of such overlap. Furthermore, the Court limited its consideration of the present motion to Plaintiffs Garcia Ramirez and Hernandez Alfaro and it offered Defendants substantial time to investigate these Plaintiffs' claims. Since filing an opposition to Plaintiffs' motion for preliminary injunctive relief, Defendants have not suggested that they lacked time or resources to thoroughly investigate these two Plaintiffs' claims. Accordingly, the Court disagrees that this overlap might counsel against granting the present motion.

Finally, Defendants argue that the public's interest in enforcement of immigration laws favors denying Plaintiffs' motion. The Court disagrees. While DHS surely has substantial discretion in the area of immigration law, *cf. Arizona v. United States*, 567 U.S. 387, 408 (2012) ("A principal feature of the removal system is the broad discretion exercised by immigration officials."), Plaintiffs have identified a specific statutory provision where the agency's discretion has been clearly constrained by Congress. The public interest surely does not cut in favor of permitting an agency to fail to comply with a statutory mandate. *See Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977) (recognizing that "there is an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate.").

---

[10] Notably, "[t]he D.C. Circuit has not opined on the issue, but application of a heightened standard of review of requests for mandatory preliminary injunctive relief has been adopted in other Circuits." *Singh v. Carter*, 185 F. Supp. 3d 11, 17 n.3 (D.D.C 2016) (collecting cases).

***

In sum, the Court finds that Plaintiffs Wilmer Garcia Ramirez and Sulma Hernandez Alfaro have met their burden of showing that preliminary injunctive relief is warranted ordering Defendants to comply with 8 U.S.C. § 1232(c)(2)(B) in placing them.  Plaintiffs have shown that it is likely that they would succeed on the merits of their claims, as they have supplied evidence tending to show that Defendants have not yet complied with the compulsory provision and Defendants' evidence does not refute, and in some instances, supports Plaintiffs' claims. Plaintiffs have also shown that they would suffer irreparable harm in the absence of a preliminary injunction and that a balancing of the equities and public interest considerations favor granting their requested relief.  Accordingly, the Court orders Defendants to comply with 8 U.S.C. § 1232(c)(2)(B) within two weeks of the date of the order accompanying this Opinion. The Defendants' assessment pursuant to the statute must be memorialized in a document that goes beyond merely parroting the language of the statute, but, instead, allows the Court to determine whether the agency has considered the factors required by the statute.  *See Epsilon Elect., Inc. v. U.S. Dep't of Treas., Office of Foreign Assets Control*, 857 F.3d 913, 928 (D.C. Cir. 2017) (explaining that, under APA review, courts "must uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned" but that courts "may not supply a reasoned basis for the agency's action that the agency itself has not given" (internal citations and quotation marks omitted)).

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Preliminary Injunction as to Plaintiffs Wilmer Garcia Ramirez and Sulma Hernandez Alfaro is **GRANTED**.  Defendants are ordered to

comply with 8 U.S.C. § 1232(c)(2)(B) in placing these Plaintiffs.  An order consistent with this

Memorandum Opinion is separately and contemporaneously issued.

Dated: April 18, 2018                                         RUDOLPH CONTRERAS
                                                             United States District Judge