# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| WILMER GARCIA RAMIREZ, *et al.*, | : | | |
| | : | | |
| Plaintiffs. | : | Civil Action No.: | 18-508 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 6, 36 |
| | : | | |
| U.S. IMMIGRATION AND CUSTOMS | : | | |
| ENFORCEMENT, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### DENYING DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT; GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

## I. INTRODUCTION

Plaintiffs—three immigrants teenagers who entered the United States as unaccompanied alien children—bring this putative class action against Immigration and Customs Enforcement ("ICE"), the Acting Director of ICE, the Department of Homeland Security ("DHS"), and the Secretary of Homeland Security. They allege that upon reaching their respective eighteenth birthdays, Defendants transferred them to adult detention facilities without considering less restrictive placements in violation of 8 U.S.C. § 1232(c)(2)(B). Plaintiffs also contend that Defendants routinely and systematically fail to abide by this statutory provision.

At an earlier stage of this litigation, this Court granted a motion for preliminary injunction filed on behalf of Plaintiffs Wilmer Garcia Ramirez and Sulma Hernandez Alfaro. *See generally Ramirez v. ICE*, 310 F. Supp. 3d 7 (D.D.C. 2018). Finding that Mr. Garcia Ramirez and Ms. Hernandez Alfaro had shown that they were likely to succeed on the merits of their claim that ICE had not complied with 8 U.S.C. § 1232(c)(2)(B) in placing them, that they

would suffer irreparable harm absent injunctive relief, and that both a balancing of the equities and public interest considerations favored Plaintiffs, the Court ordered Defendants to comply with 8 U.S.C. § 1232(c)(2)(B) in placing Mr. Garcia Ramirez and Ms. Hernandez Alfaro. *See id.* at 25–34. Now before the Court are Defendants' motion to dismiss Plaintiffs' complaint—a filing that largely retreads ground tentatively resolved at the preliminary injunction stage—and Plaintiffs' motion for class certification. For the reasons explained below, the Court denies Defendants' motion to dismiss and grants Plaintiffs' motion for class certification.

## II. BACKGROUND

### A. Statutory and Regulatory Framework

Most immigration enforcement functions are carried out by DHS, in which ICE is housed. *See* 6 U.S.C. §§ 111, 251, 291; 8 U.S.C. § 1103(a)(1). Congress established a different legal framework, however, for the care and custody of "unaccompanied alien children"—defined as children under age eighteen, who have no lawful immigration status in the United States and no parent or legal guardian in the United States available to provide care and physical custody. 6 U.S.C. § 279(g)(2). Except in exceptional circumstances, unaccompanied minors apprehended by immigration officials are transferred to the custody of the Department of Health and Human Services ("HHS"). *See* 8 U.S.C. § 1232(b)(3). The Office of Refugee Resettlement ("ORR"), a division of HHS, is thereafter responsible for, among other things, "coordinating and implementing the care and placement" of such children. 6 U.S.C. § 279(a)–(b)(1)(A). Congress has established that these children "shall be promptly placed in the least restrictive setting that is in the best interest of the child" and that "[i]n making such placements, the Secretary [of HHS] may consider danger to self, danger to the community, and risk of flight." 8 U.S.C. § 1232(c)(2)(A).

HHS only has authority over the care and custody of immigrant children, however. *See* 6 U.S.C. § 279. And, of course, children do not stay children forever. Congress accounted for that fact of life, extending certain protections to newly adult immigrants who were formerly in the care and custody of HHS. Pursuant to 8 U.S.C. § 1232(c)(2)(B):

> If [an unaccompanied alien child in the custody of the Secretary of HHS] reaches 18 years of age and is transferred to the custody of the Secretary of Homeland Security, the Secretary [of DHS] shall consider placement in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight. Such aliens shall be eligible to participate in alternative to detention programs, utilizing a continuum of alternatives based on the alien's need for supervision, which may include placement of the alien with an individual or an organizational sponsor, or in a supervised group home.

Under this provision, DHS must "tak[e] into account" specified statutory factors and must "consider" placement in the least restrictive setting for those who aged out of HHS's jurisdiction. *See id.* But, unlike unaccompanied minors, these individuals are not promised placement in the least restrictive setting. *Compare* 8 U.S.C. § 1232(c)(2)(A), *with* 8 U.S.C. § 1232(c)(2)(B).

### B. Factual Background

Plaintiffs in this case are three immigrant teenagers who were previously held in ORR custody as unaccompanied alien children. *See* First Am. Compl. ¶¶ 1, 33, 46, 61, ECF No. 21. Upon turning eighteen, they were transferred to the custody of ICE and placed in adult detention facilities, purportedly without receiving statutorily mandated consideration of less restrictive placement options. *See id.* ¶¶ 1, 4, 13–15. They seek to represent a class defined as:

> All former unaccompanied alien children who are detained or will be detained by ICE after being transferred by ORR because they have turned 18 years of age and as to whom ICE did not consider placement in the least restrictive setting available, including alternative to detention programs, as required by 8 U.S.C. § 1232(c)(2)(B).

Pl.'s Mot. for Class Certification & Supp. Points of L. & Auth. ¶ 3 ("Pls.' Mot. for Class Cert."),
ECF No. 6. This Court's Opinion at the preliminary injunction stage of this litigation described
the circumstances that led Plaintiffs Garcia Ramirez and Hernandez Alfaro to enter the United
States as unaccompanied alien children and detailed the events that led up to this lawsuit. *See*
*Ramirez*, 310 F. Supp. 3d at 12–16. For the sake of completeness, the Court recounts that history
here. The Court also provides background details about the third named Plaintiff, Ana P., who
joined this litigation after the motion for preliminary injunction had been filed and partly briefed.
*See id.* at 12 n.1 (noting that the Court limited its consideration of Plaintiffs' motion for
preliminary injunction to Mr. Garcia Ramirez and Ms. Hernandez Alfaro); *see also* Docket
Sheet, Civ. A. No. 18-cv-508-RC.

### 1.     Wilmer Garcia Ramirez

According to Plaintiffs' complaint, Wilmer Garcia Ramirez was born into poverty in
Guatemala in 1999. *See* First Am. Compl. ¶¶ 20–21. At six years old, he began working in his
family's fields, cutting underbrush with a machete. *Id.* ¶ 21. By eight, he was laboring for nine
or more hours each day in other people's fields. *Id.* ¶ 22. From ages nine to sixteen, Mr. Garcia
Ramirez worked at coffee plantations in Guatemala and Honduras for months at a time, where he
endured difficult working and living conditions. *See id.* ¶¶ 23–30. In March 2017, when he was
seventeen years old, Mr. Garcia Ramirez entered the United States without inspection in search
of a better life. *See id.* ¶ 31. After crossing the border, he was apprehended by U.S. Customs
and Border Protection officers. *See id.* ¶ 33. Upon learning that he was an unaccompanied alien
child, DHS officials transferred Mr. Garcia Ramirez to ORR custody. *Id.* ¶ 33.

While in ORR custody, Mr. Garcia Ramirez petitioned the Superior Court of Arizona to
declare him a dependent of the State due to his parent's neglect in Guatemala. *Id.* ¶ 34. The

court granted the petition, finding that it was not in Mr. Garcia Ramirez's best interest to be returned to Guatemala. *Id.* ¶ 34; Order Regarding Child's Eligibility for Special Immigrant Juvenile Status as to Mother, Ex. C, ECF No. 2-4. Mr. Garcia Ramirez then filed a petition for special immigration juvenile status ("SIJS"), seeking lawful permanent residency in the United States based on the neglect finding. First Am. Compl. ¶ 35; Notice of Action, Ex. B, ECF No. 2-3. That petition remained pending at the time that this lawsuit was filed. *See* First Am. Compl. ¶ 36.

The day before Mr. Garcia Ramirez turned eighteen years old, his attorney contacted an ICE deportation officer to request that he be released on his own recognizance, citing the facts that removal proceedings against him had been administratively closed, that he had plans to live with a family friend in Pennsylvania, and that he had pending an SIJS petition. *See* Email from Noriana C. Hermes (Sept. 22, 2017), Ex. D at 7, ECF No. 20-4. The deportation officer denied the request, asserting only that ICE intended to reopen removal proceedings. *See* Email from Deportation Officer (Sept. 22, 2017), Ex. D at 9, ECF No. 20-4. The next day, on Mr. Garcia Ramirez's eighteenth birthday, he was transferred from ORR custody to ICE custody. *See* First Am. Compl. ¶ 38.

At an ICE field office in Phoenix, Arizona, officials determined that Mr. Garcia Ramirez should be held without bond. *See* Decl. of Michael Leal ("Leal Decl.") ¶ 6, Ex. E, ECF No. 20-5. The next day, ICE transferred Mr. Garcia Ramirez to Eloy Detention Center ("EDC"), an adult detention facility in Eloy, Arizona. *Id.* At EDC, detention officers utilized the Risk Classification Assessment—a database tool that assists DHS officials in assessing whether an alien who is not subject to mandatory detention poses a danger to the community or poses a flight risk—to determine Mr. Garcia Ramirez's custody classification level. *Id.* ¶ 7. Based in

part on the results of that assessment, officials classified him as a level 1 detainee—the lowest custody level at EDC—and housed him with other level 1 or low level 2 detainees, who have no criminal history or only a minor, non-violent criminal history.  *Id.*

Mr. Garcia Ramirez twice initiated processes for requesting reconsideration of his placement in an adult detention facility.  First, in November 2017, he requested a custody redetermination hearing before an immigration judge.  *See* Mot. for Custody Redetermination Hr'g, Ex. E at 9–12, ECF No. 20-5.  A bond hearing was scheduled.  *See* Notice of Custody Redetermination Hr'g in Immigration Proceedings, Ex. E at 13, ECF No. 20-5.  Mr. Garcia Ramirez later moved to vacate the hearing, however, explaining that a potential sponsor could no longer assist with his bond.  *See* Unopposed Mot. to Vacate Bond Hr'g, Ex. E at 15, ECF No. 20-5.

Second, through counsel, Mr. Garcia Ramirez sent a letter to ICE in January 2018, requesting release to the least restrictive setting available pursuant to 8 U.S.C. § 1232(c)(2)(B). Letter from Néstor Allende-Asparó to Justin Laub (Jan. 5, 2018), Ex. E at 20–23, ECF No. 20-5; Decl. of Néstor Allende-Asparó ("Allende-Asparó Decl.") ¶ 6, Ex. A, ECF No. 23-1.  Counsel contends that he received no response to that letter.  *See* Allende-Asparó Decl. ¶¶ 7–10.  During this litigation, however, ICE produced a letter, dated January 23, 2018 and addressed to Mr. Garcia Ramirez's counsel, which purports to respond to counsel's request.  *See* Letter from Albert E. Carter to Néstor Allende-Asparó (Jan. 23, 2018), Ex. E at 24, ECF No. 20-5. Interpreting the request as a bid for "prosecutorial discretion in the form of release from custody," the ICE deputy field office director of the Phoenix Field Office denied the request on the basis that "the totality of circumstances d[id] not support a favorable exercise of discretionary authority in this case."  *Id.*  According to Mr. Garcia Ramirez's counsel, ICE did not discuss

alternatives to detention with him at any time before or after Mr. Garcia Ramirez's eighteenth

birthday. Allende-Asparó Decl. ¶ 5. Mr. Garcia Ramirez remained detained at EDC when this

lawsuit was initiated in March 2018. *See* First Am. Compl. ¶ 38.

### 2. Sulma Hernandez Alfaro

Sulma Hernandez Alfaro was born in 2000 in Honduras. *Id.* ¶ 41. In Honduras, she was

subjected to multiple forms of abuse by members of her father's family, including and especially

her uncle, who threatened her with death. *Id.* ¶ 43. Because of the abuse that she suffered and

the threats that she faced, Ms. Hernandez Alfaro left Honduras and travelled to the United States,

seeking safety. *Id.* ¶ 44. In September 2016, she crossed into the United States without

inspection. *See id.* ¶ 45. A Border Patrol unit apprehended her and, after determining that she

was an unaccompanied immigrant child, transferred her to the custody of ORR. *Id.*

ORR placed Ms. Hernandez Alfaro in a shelter for unaccompanied immigrant children in

San Benito, Texas. *Id.* ¶ 46. While in ORR custody, she was diagnosed with Post-Traumatic

Stress Disorder, which resulted from the abuse she suffered in Honduras. *Id.* ¶ 47. In November

2017, Ms. Hernandez Alfaro applied for asylum based on the abuse and harm she had

experienced. *See* Notice of Action, Ex. D, ECF No. 2-5; First Am. Compl. ¶ 48. That

application remained pending when this lawsuit was filed in March 2018. *See* First Am. Compl.

¶ 48.

On January 16, 2018, just days before Ms. Hernandez Alfaro's eighteenth birthday, an

ICE deportation officer emailed the shelter where she was being housed to confirm that she

would soon age out of ORR's jurisdiction and "that there [were] no reunification plans, so [ICE]

c[ould] make arrangements to have her placed in the appropriate adult facility." Email from

Deportation Officer (Jan. 15, 2018), Ex. B at 9, ECF No. 20-2. A case manager for the shelter

responded, explaining that ORR had attempted several times to reunify Ms. Hernandez Alfaro with relatives, but that each of the potential sponsors did not meet ORR sponsorship requirements. *See* Email (Jan. 16, 2018), Ex. B at 8, ECF No. 20-2; *see also* Decl. of Jose Cortez ("Cortez Decl.") ¶ 20, Ex. B, ECF No. 20-2. The email included a copy of a "Post 18 Plan" crafted for Ms. Hernandez Alfaro, which included information about ORR's unsuccessful reunification attempts. *See* Post 18 Safety Plan, Ex. B at 10–11, ECF No. 20-2; *see also* Cortez Decl. ¶ 21.

When Ms. Hernandez Alfaro turned eighteen, ORR transferred her to ICE's custody. First Am. Compl. ¶ 49. According to Supervisory Detention and Deportation Officer ("SDDO" or "Officer") Jose A. Cortez, on January 18, 2018, Deportation Officer Anthony Martinez initiated an electronic risk classification assessment to determine whether to release, detain, or consider alternatives to detention for Ms. Hernandez Alfaro. Cortez Decl. ¶ 22. Officer Cortez contends that Ms. Hernandez Alfaro was determined to pose a high risk of absconding due to not having a sponsor or fixed, permanent address in the United States at which she had lived for at least six months. *Id.* Officer Martinez purportedly recommended that Ms. Hernandez Alfaro be detained, a decision with which Mr. Cortez contends he agreed. *Id.* ¶ 23. DHS placed Ms. Hernandez Alfaro at Port Isabel Detention Center ("PIDC"), an adult detention facility in Los Fresnos, Texas. *See* First Am. Compl. ¶ 14.

Like Mr. Garcia Ramirez, Ms. Hernandez Alfaro requested changes in her state of confinement. First, on February 2, 2018, Ms. Hernandez Alfaro's counsel faxed a letter to Deportation Officer Robert Cantu, requesting that she be released on her own recognizance. *See* Letter from Rosemary Gonzalez to Robert Cantu (Feb. 2, 2018) ("2/2/18 Letter"), Ex. H at 2–4, ECF No. 2-9; Decl. of Rosemary Gonzalez ("Gonzalez Decl.") ¶ 7, Ex. B, ECF No. 23-2. The

letter mentioned the special statutory protections afforded to unaccompanied immigrant children and contended that Ms. Hernandez Alfaro was neither a flight risk nor a danger to the community.  2/2/18 Letter at 3–4.  Counsel also asserted that Ms. Hernandez Alfaro's placement in an adult detention facility had worsened her post-traumatic stress symptoms.  *Id.*  Counsel presented an alternative to her client's placement:  La Posada Providencia, a transitional shelter that had agreed to take in Ms. Hernandez Alfaro upon her release from the detention facility.  *See id.* at 4; Letter from Monica Pena-Rasmussen, Client Coordinator, La Posada Providencia (Jan. 17, 2018), Ex. I, ECF No. 2-10.  According to counsel, she followed up with several calls to Ms. Hernandez Alfaro's deportation officer, however, her calls went unanswered.  Gonzalez Decl. ¶¶ 8–9.

Five days later, Ms. Hernandez Alfaro's counsel visited PIDC and met briefly with Officer Cantu in the facility lobby.  *See* Gonzalez Decl. ¶¶ 10–11; Decl. of Robert Cantu ("Cantu Decl.") ¶¶ 6–7, Ex. A, ECF No. 20-1.  According to counsel, she mentioned her prior request for her client's release, noting that she had appended a letter of support from La Posada Providencia. Gonzalez Decl. ¶ 11.  Counsel also explained, among other things, that Ms. Hernandez Alfaro had been classified as an unaccompanied alien child upon her arrival in the United States, that she had applied for asylum, and that she had already completed an asylum interview.  *Id.* According to counsel, during the lobby meeting, Officer Cantu stated that he had not reviewed the materials that she had submitted on behalf of her client.  *Id.* ¶ 12.  Counsel also recalls that Officer Cantu rejected La Posada Providencia as a placement option—contending that many individuals released to the shelter abscond—and that Officer Cantu stated that he would not release Ms. Hernandez Alfaro because she had no other family in the United States and he would only consider releasing her to a family member.  *Id.* ¶ 14.  The Officer purportedly gave counsel

no indication that he had independently considered any less restrictive placements than adult detention for Ms. Hernandez Alfaro.  *See id.* ¶ 17.

While Officer Cantu agrees that he rejected La Posada Providencia as a placement option, he otherwise depicts the conversation differently.  *See* Cantu Decl. ¶¶ 6–7.  He contends that he verbally denied counsel's request "after taking all relevant facts into consideration, including [Ms. Hernandez Alfaro's] illegal entry to the United States as an unaccompanied alien minor, her current age, the copy of her birth certificate, her lack of criminal history, her lack of strong family ties in the United States, the lack of a fixed, permanent address, the lack of a dependable sponsor, and her pending application [for asylum]."  *Id.* ¶ 8.  According to Officer Cantu, he reviewed a file that contained certain information about Ms. Hernandez Alfaro's case, including the letter from La Posada, before speaking with counsel and rejecting the request.  *See id.* ¶¶ 10–15.

Ms. Hernandez Alfaro next sought a change in her custody at a bond hearing before an immigration judge in March 2018.  *See* Mot. for Custody Redetermination, Ex. A at 8–10, ECF No. 20-1.  The immigration judge granted her request, ordering her release from custody under bond of $10,000.  *See* Order of the Immigration Judge with Respect to Custody, Ex. A at 32, ECF No. 20-1.  Ms. Hernandez Alfaro remained detained at PIDC at the time that this suit was filed in March 2018.  *See* First Am. Compl. ¶ 14.

### 3.  Ana P.

Ana P. was born in 2000 in El Paraiso, a town in the department of Sonsonate, El Salvador.  *See* First Am. Compl. ¶ 53.  At age fifteen, she bore a child.  *See id.* ¶ 55.  Strained financially and in need of a job to support her child, Ana secured employment in a neighboring town.  *See id.* ¶ 57.  On her way home from work one day, Ana contends that she was stopped by

two masked gang members, who demanded money from her. *Id.* ¶ 58. After Ana told them that she had no money to give, they purportedly ordered her not to return to the area and threatened her with death if she did so. *See id.* Seeking to avoid the violence in El Salvador, Ana and her child travelled by bus to the United States in January 2018. *See id.* ¶ 60. After the pair entered the country at a port of entry, U.S. Customs agents determined that both Ana and her child were unaccompanied alien children. *See id.* ¶ 61. Both mother and child were transferred to ORR custody and placed in a shelter in New York. *See id.*

According to Ana, on her eighteenth birthday in February 2018, she was told to report to a government office at 5 a.m. *See id.* ¶ 62. Officials told her not to bring her child. *See id.* When Ana arrived at the office, two ICE officers arrested her and transferred her to the Bergen County Jail. *See id.* Ana contends that, at the time that she joined this lawsuit in late March 2018, she had not seen or talked to her child since her transfer to an adult detention facility. *See id.* ¶ 63.

Like the other two named Plaintiffs, Ana sought to change her state of confinement. On March 15, 2018, she submitted a request for release on humanitarian parole under 8 U.S.C. § 1182(d)(5). *See id.* ¶ 66. That request was pending when Ana joined this lawsuit. *See id.* Ana also identified a willing sponsor for her and her child: friends of her child's father's family who live in Texas and who Ana met in 2017. *See id.* ¶ 65. According to Plaintiffs' complaint, Ana had submitted the necessary paperwork to ORR and preparations for her release to the proposed sponsor had been underway when she turned eighteen. *See id.*

Defendants supply a declaration from Supervisory Detention and Deportation Officer Linda Hyde, who contends that she made the custody determination for Ana P. when she was transferred out of an ORR facility and into ICE custody. *See* Decl. of Linda Hyde ("Hyde

Decl.") ¶ 1–2, Ex. B, ECF No. 31-2. According to Officer Hyde, ORR contacted her on the afternoon before Ana's eighteenth birthday, stating that Ana would need to be transferred out of ORR's care. *See id.* ¶ 3. ORR informed Officer Hyde that it had declined to release Ana and her child to a proposed sponsor due to a host of concerns about that potential placement. *See id.* (listing concerns about, among other things, the lack of a preexisting relationship between Ana and the proposed sponsor and an "observed pattern" of the potential sponsor allowing former unaccompanied minors to leave his care after they turned eighteen). In response to that communication, Officer Hyde instructed ORR to "please go ahead, [and] release" Ana and her child, if ORR had located a different, suitable sponsor. *See id.* ¶ 4; *see also* Email from Linda Hyde (Feb. 16, 2018) ("Hyde Email") at 9, Ex. B, ECF No. 31-2. Officer Hyde noted that if ORR had not located a viable sponsor, Ana P. would be transferred to an adult detention facility and the child would remain in ORR's care. *See* Hyde Decl. ¶ 4; Hyde Email at 9.

According to Officer Hyde, based on her review of initial communications with and the facts provided by ORR, she concluded that releasing Ana to the proposed sponsor was not appropriate and, at that time, she was "unaware" of any halfway house or shelter that might accept Ana. Hyde Decl. ¶ 4. Given that Ana had no suitable fixed address and no family connections in the United States, Officer Hyde concluded that she posed a significant flight risk and that she was not eligible to participate in alternative to detention programs. *Id.* ¶ 5. Officer Hyde states that she could not identify other appropriate, viable measures that could alleviate Ana's risk of flight while also ensuring her safety. *Id.* After considering that Ana had no criminal record or history of violence and that she did not appear to be a danger to herself or to others, Officer Hyde concluded that Ana should be transferred to an adult detention facility. *Id.*

Given Ana's lack of criminal history and the fact that she did not appear to be dangerous, DHS housed her in the least restrictive detention setting at Bergen County Jail. *Id.* ¶ 6.

### C. Procedural History

Plaintiffs Garcia Ramirez and Hernandez Alfaro filed this putative class action in March 2018, contending that ICE had not complied with 8 U.S.C. § 1232(c)(2)(B) in placing them and asserting that ICE systematically fails to abide by this statutory provision in placing former unaccompanied minors who age out of ORR's jurisdiction. *See generally* Compl., ECF No. 1. Shortly after, Mr. Garcia Ramirez and Ms. Hernandez Alfaro asked this Court to enter a temporary restraining order and preliminary injunction ordering ICE to comply with the statutory provision. *See* Mot. Temp. Restraining Ord. & Prelim. Injunction, ECF No. 2. After a hearing held just three days after the motion was filed, this Court denied the motion for a temporary restraining order, explaining that, given the dearth of evidence on record, Plaintiffs had not met their burden of showing a substantial likelihood of prevailing on the merits. Tr. of Temp. Restraining Ord. Mot. Hr'g (Mar. 8, 2018) at 37:1–9, ECF No. 19. The Court noted that it would consider Plaintiffs' motion for preliminary injunction—but only as to the two named Plaintiffs rather than as to the entire proposed class—after the parties had investigated and fully briefed the request. *See* Tr. of Temp. Restraining Ord. Mot. Hr'g (Mar. 8, 2018) at 37:11–19, ECF No. 19. After the Government submitted its opposition to Plaintiffs' request for injunctive relief, Plaintiffs filed an amended complaint, which added Ana P. to this action as a named Plaintiff. *See* Am. Compl., ECF No. 21.

On April 18, 2018, this Court granted Plaintiffs Garcia Ramirez and Hernandez Alfaro's motion for preliminary injunction. *See Ramirez v. ICE*, 310 F. Supp. 3d 7, 34 (D.D.C. 2018). In doing so, the Court first rejected Defendants' arguments that several justiciability barriers

precluded the Court from granting the requested relief. *See id.* at 17–25. Specifically, the Court disagreed with Defendants' contentions that this lawsuit was moot at the time that it was filed, that Plaintiffs had not identified a "final agency action" subject to judicial review under the Administrative Procedure Act, and that Plaintiffs had an adequate alternative remedy in the form of bond hearings through which they could seek relief for their purported injuries. *See id.* In assessing the merits of Plaintiffs' request for preliminary injunction, the Court found that Plaintiffs Garcia Ramirez and Hernandez Alfaro were likely to succeed in showing that DHS had not complied with 8 U.S.C. § 1232(c)(2)(B) in placing them, that Plaintiffs had shown that they would suffer irreparable harm in the absence of a preliminary injunction, and that both a balancing of the equities and public interest considerations favored Plaintiffs. *See id.* at 25–34. The Court ordered Defendants to comply with 8 U.S.C. § 1232(c)(2)(B) in placing Mr. Garcia Ramirez and Ms. Hernandez Alfaro. *Id.* at 34. In addition, the Court required Defendants to memorialize their assessments to allow the Court to determine whether the agency had considered the factors required by statute. *See id.*

On May 2, 2018, Defendants responded to the Court's Order, appending declarations from the ICE Officers charged with considering the relevant statutory factors and with placing Plaintiffs Garcia Ramirez and Hernandez Alfaro. *See* Defs.' Resp. to the Court's Ord. of Apr. 18, 2018 to Comply with 8 U.S.C. § 1232(c)(2)(B) with Regard to Two Named Plaintiffs, ECF No. 30. The first declaration memorialized the process of determining a placement for Ms. Hernandez Alfaro. *See* Decl. Jose A. Cortez, Ex. A, ECF No. 30-1. According to Officer Jose A. Cortez, ICE first attempted to identify potential individual and organizational sponsors who could provide a fixed, stable address and who could financially support Ms. Hernandez Alfaro. *See id.* ¶ 3. ICE identified five such potential sponsors, *see id.* ¶¶ 5, 7, 9, 11, 13, however, it

concluded that none of the options were viable sponsors for a host of reasons. *See id.* ¶¶ 6 (finding the first potential sponsor unviable due to unavailability and the potential sponsor's own risk of flight), 8 (finding the second potential sponsor unavailable), 10 (finding that a third potential sponsor could not be located), 12 (determining that a fourth potential sponsor likely would not provide sufficient oversight or accountability to reduce Plaintiff's risk of absconding), 15–16 (finding a sixth potential sponsor unviable due to her attenuated relationship with Plaintiff and her inability to financially support Plaintiff). According to Officer Cortez, ICE also considered enrolling Ms. Hernandez Alfaro in an alternative-to-detention program. *See id.* ¶ 18. However, it determined that she did not qualify for such a program because she lacked a sponsor and a valid sponsor's residential address. *See id.* In Officer Cortez's declaration, he described ICE's determinations regarding Ms. Hernandez Alfaro's risk of flight, danger to self, and danger to others. *See id.* ¶¶ 19–23. According to Officer Cortez, ICE regarded Ms. Hernandez Alfaro as a significant flight risk because she lacked lawful immigration status, had minimal family and community ties, failed to provide a reliable fixed address in the United States, had no prior residence in the United States, and entered the United States without inspection by an immigration officer. *Id.* ¶ 19. ICE did not regard Ms. Hernandez as a danger to herself or to others. *Id.* ¶ 20.

Based on Officer Cortez's assessment, he concluded that Ms. Hernandez Alfaro should remain in ICE custody. *See id.* ¶ 21. On April 25, 2018, after evaluating Ms. Hernandez Alfaro based on federal detention standards, ICE determined that she should remain classified as Level 1-Low Custody and, accordingly, that she should continue to be housed in the least restrictive housing unit available in an adult detention facility. *See id.* ¶ 25. Ms. Hernandez Alfaro ultimately remained detained for only a short time longer, though. *See id.* ¶ 26. On April 30,

2018, the United States Citizenship and Immigration Service provided a copy to ICE of its decision granting Ms. Hernandez Alfaro legal immigration status in the United States. *See id.* Because Ms. Hernandez Alfaro was no longer subject to removal, she was released from ICE custody. *See id.*

The second declaration submitted by Defendants memorialized ICE Officer Andrew Swierski's consideration of the statutory factors outlined at 8 U.S.C. § 1232(c)(2)(B) and his determination of a placement for Mr. Garcia Ramirez. *See* Decl. of Andrew Swierski, Ex. B, ECF No. 30-2. First, Officer Swierski explained that there was no evidence to suggest that Mr. Garcia Ramirez—who has no known criminal record and had no record of disciplinary infractions while in ICE detention—would pose a danger to himself or to the community. *See id.* ¶ 7. Next, Officer Swierski found that, because Mr. Garcia Ramirez had entered the United States without proper documentation and had limited family and community ties in the United States, he posed a risk of flight. *See id.* ¶ 8. In light of these findings, Officer Swierski next considered Mr. Garcia Ramirez for ICE's alternative-to-detention programs, which would permit Mr. Garcia Ramirez to be released on his own recognizance subject to certain conditions. *See id.* ¶ 9.

According to his declaration, Officer Swierski considered a handful of possible release conditions. *See id.* ¶ 10. First, he considered releasing Mr. Garcia Ramirez subject only to periodic reporting. *See id.* Officer Swierski rejected this possibility, however, because Mr. Garcia Ramirez had no significant community or family ties, no place of employment in the United States, and had not lived in the United States for a long period of time. *See id.* The officer reasoned that periodic reporting would not sufficiently mitigate Mr. Garcia Ramirez's risk of flight. *See id.* Next, Officer Swierski considered releasing Mr. Garcia Ramirez with both

periodic reporting and ankle monitoring conditions. *See id.* ¶ 11. Officer Swierski regarded this option as the least restrictive placement available for Mr. Garcia Ramirez, and concluded that the combination of these two conditions would adequately alleviate Mr. Garcia Ramirez's risk of flight. *See id.* Officer Swierski then considered additional placement options: release to an organizational sponsor or supervised group home and release on bond. *See id.* ¶¶ 12–13. Officer Swierski rejected these options, though, because he did not know of a viable organization or group home to which to release Mr. Garcia Ramirez and because he reasoned that, compared with the viable option of release subject to reporting and ankle monitoring, release under bond would be more restrictive. *See id.* In light of Officer Swierski's analysis, on April 27, 2018, DHS released Mr. Garcia Ramirez on his own recognizance subject to ankle monitoring and periodic reporting. *See id.* ¶ 14.

Unrelated to the Court's order, Ana P.'s status has also changed since the Court granted Plaintiffs' motion for preliminary injunction. *See* Pls.' Reply Supp. Mot. for Class Cert. at 7, ECF No. 37; Letter from Thomas Decker to Ana P. (May 11, 2018) ("Decker Letter"), Ex. 1, ECF No. 37-2. On May 11, 2018, Ana P. was granted humanitarian parole and released from detention pending the outcome of her immigration proceedings. *See* Decker Letter.

Now before the Court are Defendants' motion to dismiss Plaintiffs' complaint and Plaintiffs' motion for class certification. *See* Defs.' Mot. to Dismiss Pls.' Am. Compl. ("Defs.' Mot. to Dismiss"), ECF No. 36; Pls.' Mot. for Class Cert., ECF No. 6. Both motions are ripe for the Court's consideration.

## III. ANALYSIS

In this putative class action, Plaintiffs assert that when they turned eighteen years old and were transferred from HHS custody to DHS custody, DHS placed them in adult detention

facilities without considering less restrictive placements in violation of 8 U.S.C. § 1232(c)(2)(B). They also contend that DHS routinely and systematically fails to abide by this statutory provision.  Presently before the Court are Defendants' motion to dismiss and Plaintiffs' motion for class certification.  For the reasons explained below, the Court denies Defendants' motion to dismiss and grants Plaintiffs' motion for class certification.

### A.  Defendants' Motion to Dismiss

The Court first considers Defendants' motion to dismiss Plaintiffs' complaint, which argues that (1) Plaintiffs lack standing to bring their claims, (2) Plaintiffs' claims are moot, (3) Plaintiffs may not properly bring their claims under the Administrative Procedure Act, and (4) Plaintiffs have failed to state any claims upon which relief may be granted.  Disagreeing on all fronts, this Court denies Defendants' motion to dismiss.[1]

### 1.  Legal Standards

#### a.  Federal Rules of Civil Procedure 12(b)(1)

"'Federal courts are courts of limited jurisdiction,' possessing 'only the power authorized by Constitution and statute.'"  *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).  Indeed, because "[w]ithout jurisdiction the court cannot proceed at all in any cause," *see Ex parte McCardle*, 74 U.S. (7

---

[1]  Several of Defendants' arguments for dismissal retread ground covered at the preliminary injunction stage of this litigation.  *See Ramirez*, 310 F. Supp. 3d at 17–25 (rejecting arguments that Plaintiffs' claims were moot when this action was filed; that Plaintiffs had not identified a final agency action subject to judicial review; and that bond hearings before immigration judges served as an adequate remedy for Plaintiffs, thus precluding this Court's review of Plaintiffs' claim).  Because "[i]ssues litigated in a preliminary injunction action 'are not . . . law of the case,'" *Massey v. Am. Fed'n of Gov't Emps.*, 253 F. Supp. 3d 42, 51 (D.D.C. 2017) (quoting *Cmty. Nutrition Inst. v. Block*, 749 F.2d 50, 56 (D.C. Cir. 1984)), the Court does not regard its prior determinations as binding for purposes of assessing Defendants' Motion to Dismiss.  Rather, as explained below, the Court finds dismissal unwarranted based on consideration of the record and arguments presently before the Court.

Wall.) 506, 514 (1868), "[f]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction," *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011); *see also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges whether a court is authorized to consider the claims presented in a lawsuit. *See* Fed. R. Civ. P. 12(b)(1). In assessing such a motion, a court must "presume[] that a cause lies outside [its] limited jurisdiction, and the burden on establishing the contrary rests upon the party asserting jurisdiction." *Kokkonen*, 511 U.S. at 377 (citations omitted). However, a court "assume[s] the truth of all material factual allegations in the complaint," and must "'construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged.'" *Am. Nat'l Ins. Co. v. F.D.I.C.*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)). Nevertheless, a court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must a court accept plaintiff's legal conclusions. *See Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In evaluating subject matter jurisdiction, a court may look to materials outside of the pleadings, where appropriate. *See Am. Freedom L. Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016).

### b. *Federal Rule of Civil Procedure 12(b)(6)*

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain statement of the claim" to give the defendant fair notice of the claim and the grounds upon which it rests. Fed. R. Civ. P. 8(a)(2); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam). A motion to dismiss under Rule 12(b)(6) does not test a plaintiff's ultimate likelihood of success

on the merits; rather, it tests whether a plaintiff has properly stated a claim.  *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).  A court considering such a motion presumes that the complaint's factual allegations are true and construes them liberally in the plaintiff's favor.  *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000).  It is not necessary for the plaintiff to plead all elements of her prima facie case in the complaint.  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–14 (2002); *Bryant v. Pepco*, 730 F. Supp. 2d 25, 28–29 (D.D.C. 2010).

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) (citations omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are therefore insufficient to withstand a motion to dismiss.  *Iqbal*, 556 U.S. at 678.  A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of the legal conclusions that are couched as factual allegations.  *See Twombly*, 550 U.S. at 555.

## 2. Issues

### a. Standing

Defendants first challenge whether Plaintiffs have standing to bring this lawsuit.  *See* Defs.' Mot. to Dismiss at 7–18.  "[T]he question of standing in federal courts is to be considered in the framework of Article III which restricts judicial power to 'cases' and 'controversies.'"

*Assoc. of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 151 (1970). To establish Article III standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). As "[t]he party invoking federal jurisdiction," plaintiff "bears the burden of establishing these elements." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1997). In the class action context, a court's standing inquiry focuses squarely on the class representatives. *See O'Shea v. Littleton*, 414 U.S. 488, 488 (1974). "[W]hen considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim." *Parker v. District of Columbia*, 478 F.3d 370, 377 (D.C. Cir. 2007). And, at the motion to dismiss stage, "general factual allegations" supporting injury-in-fact, causation, and redressability suffice to establish standing. *See Lujan*, 504 U.S. at 561. Contrary to Defendants' assertions, the Court finds that Plaintiffs satisfy all three elements of standing.

### i. Injury in Fact

"To establish injury-in-fact,"—the first element of standing—"a plaintiff must show that he or she suffered [(1)] 'an invasion of a legally protected interest' that is [(2)] 'concrete and particularized' and [(3)] 'actual or imminent.'" *Spokeo, Inc.*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). Defendants contend that Plaintiffs have not met these requirements. *See* Defs.' Mot. to Dismiss at 8–14. Specifically, Defendants maintain that because Mr. Garcia Ramirez and Ms. Hernandez Alfaro were deemed flight risks and because Ana P. was subject to mandatory detention pursuant to 8 U.S.C. § 1225(b), Plaintiffs were not entitled to any further consideration under 8 U.S.C. § 1232(c)(2)(B). *See id.* at 9–11. In addition, Defendants argue that, even if Plaintiffs were entitled to additional consideration under 8 U.S.C. § 1232(c)(2)(B),

they have still failed to allege injury to any legally protected interest because the ultimate decision of where to place each of them is left to the discretion of the agency and is not reviewable by this Court. *See id.* at 11–12. The Court concludes that Plaintiffs have alleged a cognizable injury in fact.

First, Plaintiffs have alleged injuries to their own legally protected interests. The D.C. Circuit has explained that an interest is legally protected for standing purposes if it is cognizable. *See Parker*, 478 F.3d at 377 ("[I]n *Lujan* . . . , when the Supreme Court used the phrase 'legally protected interest' as an element of injury-in-fact, it made clear it was referring only to a 'cognizable interest.'"); *see also Judicial Watch, Inc. v. U.S. Senate*, 432 F.3d 359, 363–66 (D.C. Cir. 2005) (Williams, J., concurring) (illuminating "puzzlement over the meaning of *Lujan*['s] requirement that for 'injury in fact,' the plaintiff must show 'invasion of a *legally protected interest* . . . .'" and writing in support of the view that an interest satisfies the requirement if it is cognizable (quoting *Lujan*, 504 U.S. at 363)). Cognizable interests run the gamut, ranging from purported injuries to economic interests, *see, e.g.*, *Clinton v. City of N.Y.*, 524 U.S. 417, 432 (1998), to injuries to noneconomic interests in, for example, the enjoyment of the esthetic beauty of nature, *see, e.g., Lujan*, 504 U.S. at 562–63 (declaring that "[o]f course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing"). Importantly, the Supreme Court has recognized that "Congress may create a statutory right or entitlement the alleged deprivation of which can confer standing to sue even where the plaintiff would have suffered no judicially cognizable injury in the absence of the statute." *Warth v. Seldin*, 422 U.S. 490, 514 (1975); *see also Spokeo*, 136 S. Ct. at 1549 (acknowledging "Congress' role in identifying and elevating intangible harms").

Whether a plaintiff has asserted a cognizable claim for purposes of standing does not turn on whether plaintiff's claim has merit. *See Parker*, 478 F.3d at 376–77 (labelling "doctrinally quite unsound" the Ninth Circuit's approach of beginning standing analysis by considering whether a statutory provision provides plaintiff with an individual right and explaining that "when considering whether a plaintiff has Article III standing, a federal court must assume *arguendo* the merits of his or her legal claim"). Instead, a court must ask whether the injury asserted by plaintiff is "the sort of interest that the law protects when it is wrongfully invaded." *Aurora Loan Servs., Inc. v. Craddieth*, 442 F.3d 1018, 1024 (7th Cir. 2006). *Compare, e.g.*, *Lujan*, 504 U.S. at 562–63 (finding that plaintiffs' desire to observe animal species for "purely esthetic purposes" would have sufficed as a legally protected interest) *with, e.g.*, *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[I]n American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another.").

Here, Plaintiffs contend that, by enacting 8 U.S.C. § 1232(c)(2)(B), Congress conferred on all former unaccompanied alien children who have been transferred from the custody of ORR to the custody of DHS (including Plaintiffs) the right to have the Secretary of DHS "consider placement in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight." *See* Am. Compl. ¶¶ 3–4, 99–101. Plaintiffs further assert that the statute makes such immigrants "eligible to participate in alternative to detention programs." *See id.* According to Plaintiffs, Defendants' inaction—the purported failure to consider them for the least restrictive setting available and to make them eligible for alternative to detention programs as required by statute—invaded their legally protected interests. *See id.* Plaintiffs insist that they "do *not* complain about, or seek, release from detention (or any other outcome) in individual immigration cases." Pls.' Opp'n to Mot. to

Dismiss at 6.  "Rather, they complain about ICE's systematic and widespread failure to comply with Section 1232 in making those individual placement decisions."  *Id.*[2]

Plaintiffs' asserted injury—in essence, that they have suffered due to the loss of the opportunity to be considered for a type of benefit or relief for which Congress made them eligible—is the type of injury that courts in this jurisdiction have recognized as cognizable for purposes of standing.  Indeed, Judge Boasberg recently addressed the same issue in a case quite like this one.  *See Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5 (D.D.C. 2017).  In *National Venture Capital Association v. Duke*, foreign entrepreneurs challenged DHS's decision to delay the implementation of an immigration rule that would have permitted certain foreign entrepreneurs to obtain immigration parole, arguing that the agency had promulgated the delay rule without abiding the APA's strictures.  *See id.* at 8.  The agency contended, among other things, that the plaintiffs lacked standing to sue because "parole is an immigration action granted at the sole discretion of DHS, and aliens have no legally protected interest in a discretionary immigration determination."  *Id.* at 13 (internal quotation marks omitted) (quoting Opp. at 20).  The agency likewise asserted that no action from the court could redress plaintiffs' purported injuries because they needed "a favorable exercise of DHS discretion," as well as a favorable inspection, to benefit from the planned immigration rule.  *Id.* at 13 (quoting Opp. at 18).

---

[2]  One aspect of Plaintiffs' complaint does not quite align with this characterization of their purported injuries and the relief that they seek in this case.  Among Plaintiffs' "prayer[s] for relief" is a request that this Court "[d]eclare that ICE's failure to place Plaintiffs and members of the class in the 'least restrictive setting available' violates 8 U.S.C. § 1232(c)(2)(B) and 5 U.S.C. §§ 706(1) and 706(2)."  Am. Compl. at 23.  As it appears that Plaintiffs have abandoned arguments that they—or other members of the putative class—were entitled to any particular placement, *see* Pls.' Opp'n to Mot. to Dismiss at 6, the Court need not linger on whether Plaintiffs have established standing to pursue this relief.

Judge Boasberg rejected these arguments, explaining first that the Government had "fail[ed] to engage with Plaintiffs' actual asserted injury: the lost opportunity to obtain parole status." *Id.* Citing *CC Distributors, Inc. v. United States*, 883 F.2d 146 (D.C. Cir. 1989), and other cases, Judge Boasberg observed that courts in this district have regarded the loss of the opportunity to obtain a discretionary benefit as a cognizable injury for standing purposes. *See Nat'l Venture Capital Ass'n*, 291 F. Supp. 3d at 13. Furthermore, Judge Boasberg noted that "[a]lthough the D.C. Circuit has not considered whether a 'lost opportunity' qualifies as a cognizable injury in the immigration context, other courts of appeals have unanimously concluded that it does." *Id.* at 13–14 (citing cases). For standing purposes, it did not matter that DHS might deny parole or that the Court could not review any such denial; plaintiffs' "claim that they ha[d] lost even the opportunity to obtain that immigration benefit" sufficed to establish a cognizable injury. *Id.* at 14; *cf., e.g.*, *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 280 n.14 (1978) (concluding that an applicant for admission had standing to challenge a university's affirmative action admissions program even though the applicant "had been unable to prove that he would have been admitted in the absence of the special program"); *CC Distribs., Inc.*, 883 F.2d at 150 ("[A] plaintiff suffers a constitutionally cognizable injury by the loss of an *opportunity to pursue a benefit* . . . even though the plaintiff may not be able to show that it was *certain to receive* that benefit had it been accorded the lost opportunity"); *Nat'l Harbor GP, LLC v. Gov't of Dist. of Columbia*, 121 F. Supp. 3d 11, 12, 18 (D.D.C. 2015) (concluding that a company had standing to bring claims alleging that the District of Columbia "deprived it of [a] fair chance" to compete for a contract to provide certain government services). Finding this

reasoning persuasive, this Court concludes that Plaintiffs have identified cognizable injuries in the form of the loss of opportunity for consideration guaranteed by statute.[3]

Second, Plaintiffs have asserted injuries that are "concrete" and "particularized," satisfying the next components of injury in fact. These requirements ensure that "the party seeking review [is] himself among the injured." *Lujan*, 504 U.S. at 563. "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way." *Spokeo, Inc.*, 136

---

[3] Plaintiffs' substantive interest in "opportunity" is not the only interest at play. The Court also construes Plaintiffs' complaint as alleging a procedural injury and finds that such allegations are also sufficient to establish standing, at least at this stage of the litigation. *Cf. Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 474, 479 (D.C. Cir. 2009) (assessing plaintiffs' standing under a procedural standing theory where statutory rights at issue were "essentially procedural in character" (internal quotation marks and citation omitted)). As the Supreme Court explained in *Lujan v. Defenders of Wildlife*, a plaintiff may have standing to bring a claim concerning a procedural injury if the plaintiff can show that an agency failed to abide by a procedural requirement that was "designed to protect some threatened concrete interest" of the plaintiff. *Lujan*, 504 U.S. at 573 n.8. However, allegations of "a bare procedural violation" do not suffice. *See Spokeo*, 136 S. Ct. at 1549–50. Instead, the alleged procedural injury "must be tethered to some concrete interest adversely affected by the procedural deprivation." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013). Importantly, "[a] plaintiff who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered. All that is necessary is to show that the procedural step was connected to the substantive result." *Sugar Cane Growers Coop v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002).

Here, Plaintiffs allege that Defendants failed to follow procedures mandated by 8 U.S.C. § 1232(c)(2)(B)—namely, according to Plaintiffs, Defendants did not assess each Plaintiffs' danger to self, danger to community, and risk of flight and did not then consider each Plaintiff for placement in the least restrictive setting available. *See* Am. Compl. ¶¶ 98–101. Plaintiffs' complaint asserts that Congress enacted Section 1232(c)(2)(B) to extend protections to a certain group—unaccompanied immigrant children who turned 18 and were transferred by ORR to the custody of ICE—based on Congress's judgment that kneejerk placement of former unaccompanied minors into adult detention facilities is inappropriate and injurious to those young adults. *See* Am. Compl. ¶¶ 3, 74, 80. And Plaintiffs have alleged real harm flowing from the alleged procedural violations. Specifically, according to Plaintiffs, "[i]n many, if not most, cases [DHS's] failure [to comply with Section 1232(c)(2)(B)] in turn also results in ICE detaining the former [unaccompanied minor] in adult detention for weeks or months when they should have been placed with a sponsor, in a shelter or group home or some other less restrictive setting." Pls.' Opp'n to Mot. To Dismiss at 5. At least at this early stage of this litigation, these contentions suffice to establish Plaintiffs' standing to assert claims based on procedural injuries.

S. Ct. at 1548.  Accordingly, "a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy."  *Lujan*, 504 U.S. at 573–74; *see also, e.g.*, *Perkins v. Lukens Steel Co.*, 310 U.S. 113, 125 (1940) (concluding that plaintiffs who failed to show any injury to "a particular right of their own, as distinguished from the public's interest in the administration of the law" lacked standing).  To be concrete, the "injury must be '*de facto*'; that is, it must actually exist."  *Id.* (citing Black's Law Dictionary 479 (9th ed. 2009)).  Stated otherwise, "[a] concrete injury is 'direct, real, and palpable—not abstract."  *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015).  This does not, however, mean that an injury must be tangible, as it is well established that Congress may "identif[y] and elevat[e] intangible harms" to the status of legally cognizable injury.  *Spokeo, Inc.*, 136 S. Ct. at 1549; *see also, e.g.*, *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018) ("[A] person's interest in being united with his relatives is sufficiently concrete and particularized to form the basis of an Article III injury in fact."); *Schnitzler v. United States*, 761 F.3d 33, 40 (D.C. Cir. 2014) (prisoner had sufficiently alleged injury in fact for standing purposes by alleging that he was "being required to continue his association with the United States against his wishes.").

Plaintiffs contend that Defendants failed to consider each of them for placement in the least restrictive placement available as required by 8 U.S.C. § 1232(c)(2)(B).  *See* Am. Compl. ¶¶ 40, 52, 67.  These allegations concern personal and individual injuries purportedly suffered by each Plaintiff, thus, they are particularized.  Furthermore, the Court concludes that Plaintiffs' alleged injury—the loss of the opportunity for consideration guaranteed by statute—is

sufficiently concrete to establish standing.  Assuming the truth of Plaintiffs' allegations that Defendants failed to consider them for less restrictive placements—instead sending them straight to adult detention facilities despite Congress's explicit mandate—the Court has little difficulty concluding that Plaintiffs' injuries are not abstract, but direct, real, and palpable. *Cf.*, *e.g.*, *Patel v. USCIS*, 732 F.3d 633, 638 (6th Cir. 2013) (concluding that plaintiff's loss of "a significant opportunity to receive an immigrant visa" due to agency's purported arbitrary denial of his request "is itself a concrete injury"); *Nat'l Venture Capital Ass'n*, 291 F. Supp. 3d at 14 (explaining that "[g]iven that [plaintiffs] meet the criteria" to be considered for an immigration benefit, the "claim that they have lost even the opportunity to obtain that immigration benefit" "would be far from illusory" (internal quotation marks and citation omitted)).[4]

Finally, Plaintiffs must show that their alleged injuries are "actual or imminent, not conjectural or hypothetical" to establish that they have suffered an injury in fact.  *See Lujan*, 504 U.S. at 560.  At the motion to dismiss stage, "general factual allegations of injury resulting from the defendant's conduct may suffice."  *Lujan*, 504 U.S. at 561.  However, the complaint must still "clearly and specifically set forth facts sufficient to satisfy" Article III.  *Whitmore v.*

---

[4]  Though the Court is mindful that, at the pleading stage, the standing inquiry is concerned with the presence of injury, causation, and redressability at the time that a complaint was filed, it bears mentioning that events since the Court granted Plaintiffs' motion for preliminary injunction perhaps best illustrate how real, palpable, and direct the purported loss of opportunity was for Plaintiffs.  After this Court ordered DHS to provide Plaintiffs Garcia Ramirez and Hernandez Alfaro with the consideration required by 8 U.S.C. § 1232(c)(2)(B), the agency contacted potential sponsors, explored alternative-to-detention options, and, based on its analysis, released Mr. Garcia Ramirez on his own recognizance subject to reporting and ankle monitoring.  *See* Decl. of Andrew Swierski ¶¶ 10–14, Ex. B, ECF No. 30-2.  Nowhere in the agency's submissions to this Court is there any hint that the information used to make that determination would not have been available to or used by the agency at the time that it first placed Mr. Garcia Ramirez in a detention facility or at the time that it refused his requests for consideration.  That DHS's "consideration" resulted in one Plaintiff's release from a detention facility hardly squares with Defendants' suggestion that Plaintiffs are harmed in only abstract ways by the denial of consideration.

*Arkansas*, 495 U.S. 149, 155 (1990). The "actual or imminent" condition bars a plaintiff from

relying on a remote or speculative theory of injury. *See, e.g.*, *Lujan*, 504 U.S. at 562–64 (vague

plans to return to an area to view purportedly-threatened animal species were not sufficient to

make the possibility of injury to plaintiffs' esthetic interests "actual or imminent"); *O'Shea v.

Littleton*, 414 U.S. 488, 495–96 (1974) (finding that plaintiffs who challenged a city's alleged

pattern of violating its citizen's civil rights without "identif[ying] [themselves] having suffered

any injury in the manner specified" failed to establish that they endured an injury in fact); *Bear

Lodge Multiple Use Ass'n v. Babbitt*, 175 F.3d 814, 821–22 (10th Cir. 1999) (climbers

challenging the National Parks Service's request that they voluntarily refrain from climbing in a

park during a period in which American Indians typically used the park for religious practice had

not suffered any actual or imminent injury based on the "remote and speculative possibilities" of

either mandatory closure of the park or the imposition of an outright ban on climbing). In cases

like this one, "where the plaintiffs seek declaratory and injunctive relief, past injuries alone are

insufficient to establish standing." *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011).

Instead, plaintiffs "must show [they are] suffering an ongoing injury or face[] an immediate

threat of injury." *Id.*

According to Plaintiffs, at the time that they filed their complaint, DHS had placed each

of them in adult detention facilities and had denied or failed to act on requests from each of them

for consideration of placement in less restrictive environments. *See* Am. Compl. ¶¶ 39–40, 51–

52, 65–67. At that time, all three Plaintiffs were housed in adult detention facilities. *See id.*

Plaintiffs supply declarations from attorneys who represented Plaintiffs Garcia Ramirez and

Hernandez Alfaro that support their contentions that ICE had placed them without considering

less restrictive settings and had not taken action to provide such consideration any time before

this Court granted Plaintiffs' motion for preliminary injunction. *See* Decl. of Néstor Allende-Asparó ("Allende-Asparó Decl.") ¶¶ 1, 4–7, Ex. A, ECF No. 23-1; Decl. of Rosemary Gonzalez ("Gonzalez Decl.") ¶¶ 1, 6–7, 10–19 Ex. B, ECF No. 23-2. The Court concludes that Plaintiffs have supplied specific facts establishing that their purported injury—the loss of the opportunity for the consideration guaranteed by 8 U.S.C. § 1232(c)(b)(2)—is actual and not merely speculative, and that it was ongoing at the time that they filed their complaint.

Defendants' arguments that Plaintiffs have not established that they have suffered an injury in fact are unavailing. Defendants first argue that 8 U.S.C. § 1232(c)(2)(B) must be construed as mandating consideration only when DHS has concluded that a former unaccompanied minor does not pose a flight risk and is not dangerous. *See* Defs.' Mot. To Dismiss. at 9–11. According to Defendants, because each named plaintiff was either deemed to pose a risk of flight or was subject to mandatory detention under 8 U.S.C. § 1225(b), none was entitled to consideration under 8 U.S.C. § 1232(c)(2)(B), thus no named plaintiff could have been injured by any alleged agency inaction. *See* Defs.' Mot. to Dismiss at 9–11. Defendants argue that any other construction of the statute would "make no sense," that alternative constructions would render meaningless statutory references to the order in which DHS is supposed to conduct its inquiry, and that a contrary reading would conflict with the broad discretionary authority Congress granted to the agency to determine whether to detain or to release an alien during removal proceedings. *See id.* at 9–11.

Nothing in the text or context supports Defendants' argument that only a subset of former unaccompanied minors who were transferred to DHS custody are entitled to consideration under 8 U.S.C. § 1232(c)(2)(B). For starters, the plain text of the statute reveals no such limitation.

Under the statutory provision, "[i]f a minor described in subparagraph (A)[5] reaches 18 years of age and is transferred to the custody of the Secretary of Homeland Security, the Secretary *shall* consider placement in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight." 8 U.S.C. § 1232(c)(2)(B). Furthermore, "[s]uch aliens shall be eligible to participate in alternative to detention programs." *Id.* The only conditions for entitlement to "consider[ation]" are described in the first clause. When an individual meets these conditions—that is, when an individual is "a minor described in subparagraph (A)" who, upon turning 18, was transferred to DHS custody—the statute imposes on the Secretary of DHS a nondiscretionary duty to "consider" the least restrictive placement available for that individual. Thus, per the plain language of the provision, all who meet those conditions—regardless of the agency's flight risk or dangerousness determinations and irrespective of the provision under which the individual has been detained—are entitled to consideration. Full stop. *See Bd. of Cty. Com'rs of Kay Cty., Okla. v. Fed. Hous. Fin. Agency*, 754 F.3d 1025, 1029 (D.C. Cir. 2014) ("When a statute's language is plain, we 'must enforce it according to its terms.'" (quoting *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009))).[6]

Resisting the plain-as-day meaning of the provision, Defendants suggest that the Court infer limitations from two parts of the statutory provision, from the broader discretionary authority typically afforded to the Executive Branch in the immigration context, or from the fact that Plaintiffs have no right under the statute to actually be placed in the least restrictive setting

---

[5] Subparagraph (A) applies to "an unaccompanied alien child in the custody of the Secretary of Health and Human Services."

[6] Defendants suggest that, if this Court finds the statutory language ambiguous, it should defer to the agency's interpretation consistent with *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837 (1984). *See* Defs.' Mot. to Dismiss at 1 n.1. Because the Court concludes that the language it not ambiguous, it has no occasion to entertain any argument that deference to the agency's interpretation might be warranted.

available and DHS's judgment regarding whether such a placement is appropriate is not reviewable by this Court. *See* Defs.' Mot. To Dismiss at 9–13. None of these arguments warrant more than brief discussion.

First, Defendants note that before providing the mandated consideration, the Secretary of DHS must take into account the alien's danger to self, danger to the community, and risk of flight. *See* Defs.' Mot. To Dismiss at 9. Defendants suggest that the existence of this requirement means that those deemed by the Secretary to pose a risk of flight or those deemed dangerous are not entitled to any further consideration under the statute. *See id.* But Congress's stipulation that the Secretary must "tak[e] into account" certain factors before evaluating placements for each former unaccompanied minor in no way limits *who* is entitled to consideration. Second, Defendants posit that "[s]uch aliens" refers to some subset of former unaccompanied minors. *See* Defs.' Mot. to Dismiss at 10. This interpretation, though, runs counter to basic rules of English grammar. It is plain that "[s]uch aliens" is shorthand for the "alien[s]" previously specified—that is, again, *all* former unaccompanied minors who have been transferred to the custody of DHS—and not to some never-mentioned subset of that group. *See* Webster's Third New International Dictionary 2283 (indicating that "such" is "used to avoid repetition" and that it means "of the sort or degree previously indicated").

Third, Defendants contend that an interpretation of Section 1232(c)(2)(B) as affording consideration to all former unaccompanied minors now in DHS custody might "undermine the broad discretionary authority conferred on the Attorney General in § 1226(a)" or might conflict with § 1225(b), which subjects certain arriving aliens to mandatory detention. *See* Defs.' Mot. To Dismiss at 11. This Court is not convinced that any such conflicts exist. An interpretation of Section 1232(c)(2)(B) as extending to all former unaccompanied minors "consider[ation]" of less

restrictive placements—which is, as explained above, the plain meaning of the provision—in no way restricts the agency's authority to ultimately decide to detain or to release any immigrant facing removal proceedings. Furthermore, that an agency has broad authority in a realm does not give it license to ignore Congress's specific directions or restrictions on its authority. *Cf. Nat'l Venture Capital Ass'n*, 291 F. Supp. 3d at 20 (noting that though "[a]gencies obviously have broad discretion to reconsider a regulation at any time . . . [t]o do so, however, [they] must comply with the Administrative Procedure Act" (internal quotation marks and citations omitted)).[7]

Finally, Defendants contend that Plaintiffs suffered no injury in fact because they have no statutorily or constitutionally protected right to placement in the least restrictive setting available, and DHS's placement decisions are not reviewable by this Court. *See* Defs.' Mot. to Dismiss at 12–13. But Plaintiffs could not have been clearer that they complain about DHS's failure to consider them for less restrictive placements, and they do not assert a right to any particular placement. *See* Pls.' Opp'n to Mot. to Dismiss at 6 ("Plaintiffs do *not* complain about, or seek, release from detention (or any other outcome) in individual immigration cases."). Plaintiffs' complaint clearly asserts that they have a protected interest in receiving the consideration due to them under 8 U.S.C. § 1232(c)(2)(B). *See* Am. Compl. ¶ 4. Defendants make the same mistake

---

[7]  It also bears mentioning that Defendants offer what appear to be inconsistent arguments regarding the treatment of Plaintiff Ana P. On the one hand, Defendants say that Ana could not have been considered for anything other than placement in an adult detention facility because she was subject to mandatory detention pursuant to § 1225(b). *See* Defs.' Mot. to Dismiss at 9–10. But, on the other hand, Defendants contend that Ana *was* in fact considered for placement in less restrictive settings, including release to a sponsor, and a declaration submitted by an ICE Officer responsible for placing Ana suggests that she could have been released to a viable sponsor. *See* Email from Linda Hyde at 9, ECF No. 31-2 (instructing ORR to "please go ahead, [and] release" Ana and her child, if ORR had located a different, suitable sponsor). This further undermines Defendants' argument that its obligations under 8 U.S.C. § 1232(c)(2)(B) might conflict with § 1225(b).

here as the defendants in *National Venture Capital Association v. Duke*, 291 F. Supp. 3d 5 (D.D.C. 2017), conflating plaintiffs' interest in the opportunity to be considered for a type of relief with a demand for that relief. *See id.* at 13–14. As in that case, Defendants get no points for raising a straw man then knocking it down. In short, Plaintiffs have established that they suffered an injury in fact.

## ii. Causation

Having determined that Plaintiffs have adequately alleged that they suffered an injury in fact, the Court next considers whether Plaintiffs have satisfied the causation requirement. "The causation element requires evidence of a substantial probability that 'the challenged acts of the defendant' caused their injury." *Utility Workers Union of Am. Local 464 v. Fed. Energy Reg. Comm'n*, 2018 WL 3542631, at *3 (D.C. Cir. 2018). Here, Defendants contend that Plaintiffs cannot establish causation because "Plaintiffs cannot show beyond mere speculation that the alleged failure of ICE to consider least restrictive settings resulted in them being detained and not placed in such settings." Defs.' Mot. to Dismiss at 13. But this argument misapprehends the conduct challenged in this case. As explained above, Plaintiffs assert that DHS denied them an *opportunity* to be considered for less restrictive placements. *See* Am. Compl. ¶ 4; *see also* Pls.' Opp'n to Mot. to Dismiss at 6 ("Plaintiffs do *not* complain about, or seek, release from detention (or any other outcome) in individual immigration cases."). This challenged conduct is inarguably linked to Defendants' purported inaction, and, thus, the Court concludes that Plaintiffs have satisfied the causation requirement.

## iii. Redressability

Finally, to establish that they have standing to bring this action, Plaintiffs must show "redressability—a likelihood that the requested relief will redress the alleged injury." *Steel Co.*

*v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998).  Plaintiffs' complaint asks this Court to (1) "[d]eclare that ICE's failure to make 'alternative to detention programs' available to Plaintiffs and members of the class violates 8 U.S.C. § 1232(c)(2)(B) and 5 U.S.C. §§ 706(1) and 706(2); (2) "[o]rder that ICE comply with 8 U.S.C. § 1232(c)(2)(B) by considering Plaintiffs and members of the class for, and placing them in, the l[e]ast restrictive setting available after taking into account each individual's danger to self, danger to community, and risk of flight"; and (3) "[o]rder that ICE comply with 8 U.S.C. 1232(c) by allowing Plaintiffs and members of the class to participate in alternative to detention program utilizing a continuum of alternatives based on their need for supervision, including placement with an individual or organizational sponsor, or in a supervised group home."[8]  Am. Compl. at 23.  Plaintiffs' cognizable interest in the *opportunity* to be considered for placement in the least restrictive setting available would be redressed by an order requiring DHS to consider them for such placements.

Defendants maintain otherwise, arguing that (1) "[i]t is unlikely that even if the Court did exactly as the Plaintiffs ask . . . that ICE would use its discretion to reach a different result"; (2) because this Court lacks jurisdiction to review DHS's decisions to detain Plaintiffs under Section 1226(a) and DHS's flight risk determinations, the Court has no power to redress Plaintiffs' alleged injuries; and (3) that this Court's Opinion at the preliminary injunction stage of this litigation demonstrates that the only alleged injury capable of redress is one regarding

---

[8]  Plaintiffs' complaint asked this Court to "[d]eclare that ICE's failure to place Plaintiffs and members of the class in the 'least restrictive setting available' violates 8 U.S.C. § 1232(c)(2)(B) and 5 U.S.C. §§ 706(1) and 706(2)."  Am. Compl. at 23.  But, as explained above, Plaintiffs appear to no longer seek such relief.  *See* Pls.' Opp'n to Mot. to Dismiss at 6 ("Plaintiffs do *not* complain about, or seek, release from detention (or any other outcome) in individual immigration cases.").  And, to the extent that Plaintiffs continue to press for such a relief, the Court concludes that they lack standing to do so.  As Plaintiffs appear to recognize, they have no legally protected interest in any particular placement, thus, this Court could not grant the requested relief.

documentation of ICE's consideration, and Plaintiffs have no protected interest in having ICE's determination memorialized.  *See* Defs.' Mot. to Dismiss at 14–16.  The Court disagrees.

Defendants' first argument misapprehends the nature of the relief Plaintiffs seek. Because Plaintiffs seek the "consider[ation]" entitled to them under 8 U.S.C. § 1232(c)(2)(B)— and do not request that DHS reach any particular decision about where to place each of them— Plaintiffs need not show that DHS would have placed them differently if it afforded them the consideration that they are due under the statute.  *Cf., e.g.*, *Bakke*, 438 U.S. at 280–81 (concluding that an applicant for admission had standing to challenge a university's affirmative action admissions program even though the applicant "had been unable to prove that he would have been admitted in the absence of the program"); *CC Distribs., Inc.*, 883 F.2d at 150 ("[A] plaintiff suffers a constitutionally cognizable injury by the loss of an *opportunity to pursue a benefit* . . . even though the plaintiff may not be able to show that it was *certain to receive* that benefit had it been accorded the lost opportunity").  Furthermore, Defendants' argument that it is unlikely that Plaintiffs would be placed any differently if DHS afforded them consideration as required by the statute is significantly undermined by events in this case.  After the Court ordered DHS to afford Plaintiffs Garcia Ramirez and Hernandez Alfaro the consideration that they are due, DHS determined that Mr. Garcia Ramirez should be released on his own recognizance subject to ankle monitoring and reporting, rather than placed in adult detention. *See* Decl. of Andrew Swierski ¶¶ 10–14, Ex. B, ECF No. 30-2.

Defendants' other arguments fare no better.  Questions about whether this Court has jurisdiction to review DHS's placement decisions under 8 U.S.C. § 1226(a) or DHS's flight risk determinations are non-sequiturs.  Nowhere do Plaintiffs ask this Court to conduct any such review.  And Defendants have not articulated why the Court's power to order DHS to comply

with 8 U.S.C. § 1232(c)(2)(B) hinges on it having the authority to review any detention decision or other determination the DHS might make regarding an immigrant who is in removal proceedings. Relatedly, Defendants' contention that this Court's Opinion at the preliminary injunction stage "highlights the standing issues posed by Plaintiffs' complaint," Defs.' Mot. to Dismiss at 16, are off base. The reason that the Court did not "order that ICE change its decision on whether to detain under § 1226(a)" and did not seek to review ICE's flight risk determinations is simple—neither determination is at issue in this case. Ordering ICE to comply with 8 U.S.C. § 1232(c)(2)(B) does not amount to a review of flight risk determinations or to a review of any placement decision. The Court concludes that Plaintiffs' actual asserted injury—the loss of the opportunity to be considered for a type of relief as required by statute—would be redressable by this Court.

***

In sum, the Court concludes that Plaintiffs have met all three requirements of standing—injury in fact, causation, and redressability. Accordingly, the Court declines to dismiss this suit based on Plaintiffs' purported lack of standing.

b.    *Mootness*

Having determined that Plaintiffs have standing to pursue this lawsuit, the Court next considers Defendants' arguments that Plaintiffs' claims are moot. Specifically, Defendants assert that Plaintiffs' claims are moot because (1) 8 U.S.C. § 1232(c)(2)(B) does not require consideration of any setting less restrictive than adult detention for former unaccompanied minors who are deemed flight risks; (2) the record demonstrates that Plaintiffs received any consideration to which they were entitled before this lawsuit was filed; and (3) all three Plaintiffs have now been released from adult detention—and two Plaintiffs now have legal status in the

37

United States—rendering their claims moot now, even if they were not moot at the time that this suit was filed. *See* Defs.' Mot. to Dismiss at 18–28; Defs.' Reply at 14, ECF No. 39. Plaintiffs disagree, contending that the record demonstrates that they had not received all the consideration due to them at the time that they filed this lawsuit, and that, even if the named Plaintiffs' claims no longer present live controversies, mootness does not bar this class action because the inherently transitory and voluntary cessation exceptions to mootness apply here. *See* Pls.' Opp'n at 19–24. The Court concludes that Plaintiffs' claims were not moot at the time that this suit was filed and that the inherently transitory exception to mootness applies to this case. Accordingly, the Court declines Defendants' invitation to dismiss this suit on mootness grounds.

The Court must first consider whether Plaintiffs presented live claims at the time that this lawsuit was filed. Article III of the Constitution permits federal courts to adjudicate only "actual, ongoing controversies." *Honig v. Doe*, 484 U.S. 305, 317 (1988). This limitation gives rise to the doctrine of mootness. *See Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 669 (2016). "A case is moot when a party has already obtained all the relief that it has sought." *Schnitzler*, 761 F.3d at 37 (internal citations and quotation marks omitted). Under such circumstances, "events have so transpired that the decision [of the court] will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Pharmachemie B.V. v. Barr Labs., Inc.*, 276 F.3d 627, 631 (D.C. Cir. 2002) (internal citation omitted). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Campbell-Ewald Co.*, 136 S. Ct. at 669 (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)); *see also Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) ("A case becomes moot only when it is impossible for a court to grant 'any effectual relief whatever' to the prevailing party." (quoting *Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000))). A "party's

prospects of success on a claim are not pertinent to the mootness inquiry." *Looks Filmproduktionen GmbH v. CIA*, 199 F. Supp. 3d 153, 179 (D.D.C. 2016) (alterations and internal quotation marks omitted) (quoting *Schnitzler*, 761 F.3d at 39). Instead, a court must ask whether the dispute at issue is still "embedded in any actual controversy about the plaintiffs' particular legal rights." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Alvarez v. Smith*, 558 U.S. 87, 93 (2009). "[T]he burden of establishing mootness rests on the party raising the issue, and it is a heavy burden." *Fund for Animals v. Williams*, 311 F. Supp. 2d 1, 6 (D.D.C. 2004).

Naturally, Plaintiffs insist that, at the time that this suit was filed, they had not received the consideration due to them under 8 U.S.C. § 1232(c)(2)(B), and that they brought this suit to compel Defendants to comply with the statutory provision in considering where to place each of them. *See* Am. Compl. ¶¶ 39–40, 51–52, 65–67; Pls.' Opp'n at 19. In support of their position, Plaintiffs point to this Court's rejection of Defendants' mootness arguments at the preliminary injunction stage of this litigation. *See* Pls.' Opp'n at 19; *see also Ramirez*, 310 F. Supp. 3d at 17–19. Defendants maintain that Plaintiffs' claims were moot when this suit was filed. *See* Defs.' Mot. to Dismiss at 18–28; Defs.' Reply at 11–18. Just as the Court did at the preliminary injunction stage, it rejects Defendants' contentions that Plaintiffs' claims were moot at the time that this suit was filed.

First, Defendants contend that 8 U.S.C. § 1232(c)(2)(B) "is unambiguous and does not require that Plaintiffs be considered for lesser restrictive settings than they were, as they were deemed flight risks." Defs.' Mot. to Dismiss at 21. This follows, Defendants say, from (1) the fact that the Secretary is required to consider placing former unaccompanied alien children in the least restrictive setting available only after assessing flight risk, danger to self, and danger to the

community; (2) common sense; (3) the broad discretion afforded to the Executive Branch in determining whether to detain an immigrant during the pendency of removal proceedings; and (4) purported conflicts between Section 1232(c)(2)(B) and the larger statutory scheme governing the detention of immigrants who are subject to removal. *See* Defs.' Mot. to Dismiss at 21–23. Having rejected these very same arguments in the context of discussing Plaintiffs' standing to bring this suit, the Court need not linger long.

Contrary to Defendants' contentions, Section 1232(c)(2)(B) does not limit "consider[ation]" or "eligib[ility] to participate in alternative to detention programs" to those who DHS has determined pose no risk of flight. Rather, assessment of a former unaccompanied minor's risk of flight—along with assessment of whether he or she poses any danger to himself or herself or to the community—is only the beginning of the Secretary's inquiry. By the plain and unambiguous language of the statute, after accounting for these factors, the Secretary "shall consider placement in the least restrictive setting available." 8 U.S.C. § 1232(c)(2)(B). Furthermore, the statute makes clear that *all* former unaccompanied minors who are now in DHS custody "shall be eligible to participate in alternative to detention programs, utilizing a continuum of alternatives *based on the alien's need for supervision*, which may include placement of the alien with an individual or an organizational sponsor, or in a supervised group home." *Id.* That is, the statute calls for an individualized assessment of the proper placement for each former unaccompanied minor in light of DHS's assessment of his or her danger to self, danger to the community, and risk of flight. It includes no provision permitting DHS to short-circuit this inquiry based on a finding that a former unaccompanied alien poses some risk of flight.[9] Accordingly, the

_____

[9] Of course, *after* conducting the assessment required by statute, DHS may conclude that a particular former unaccompanied minor should be housed in an adult detention facility. But nothing in the statutory language permits DHS to avoid performing the entire inquiry that

Court rejects Defendants' contention that its determination that each Plaintiff posed some risk of flight sufficed to satisfy 8 U.S.C. § 1232(c)(2)(B).

Second, Defendants contend that each Plaintiff was, in fact, considered for the least restrictive setting available before this suit was filed, and thus, this suit is moot. *See* Defs.' Mot. to Dismiss at 23–28; Defs.' Reply at 11–18. But as this Court explained at the preliminary injunction stage of this litigation, this argument misunderstands the nature and purpose of the mootness doctrine. *See Ramirez*, 310 F. Supp. 3d at 19. Whether Defendants indeed complied with the statutory provision in placing each of the named Plaintiffs—that is, whether the Court should accept Defendants' view of what the law required and whether there is no genuine dispute that the factual record shows that Defendants acted as required by law—is a merits question, not an issue of mootness. *See id.*; *see also Schnitzler*, 761 F.3d at 39 n.8 (noting that "prospects of success" are "not pertinent to the mootness inquiry" (internal quotation marks omitted) (quoting *Chafin*, 568 U.S. at 174). Defendants cannot wish away the existence of an actual controversy by insisting that Plaintiffs are wrong about what the law requires and about whether the record shows compliance with the law.

This differs from the situation presented in a case like *Lesesne ex rel. B.F. v. District of Columbia*, 447 F.3d 828 (D.C. Cir. 2006). In that case, a plaintiff sued District of Columbia Public Schools, alleging that it had violated the Individuals with Disabilities Education Act by, among other things, failing to provide her child with an individualized education plan ("IEP"). *See id.* at

---

Congress required of it. Indeed, the experience of Plaintiffs in this case reveals that DHS's pre-inquiry judgments about the appropriate placement for a former unaccompanied minor may differ from its judgments after considering the factors outlined in 8 U.S.C. § 1232(c)(2)(B). Contrary to Defendants' bald assertions, *see* Defs.' Reply at 11–18, the record does not prove that this suit was moot when it was filed. *See Ramirez*, 310 F. Supp. 3d at 26–30 (finding that Plaintiffs Garcia Ramirez and Hernandez Alfaro were likely to succeed on the merits of their claim that DHS had not complied with 8 U.S.C. § 1232(c)(2)(B) in placing them).

832–33.  The school district argued that claims related to its purported failure to provide an IEP were moot, pointing to evidence in the record showing that an IEP had been created and observing that plaintiff and her representative had acknowledged receiving and reviewing the IEP, though they declined to accept it.  *See id.* at 832.  The Circuit rebuffed plaintiff's contentions that a live controversy remained regarding whether the school district had developed an IEP.  *See id.*  The record left "no doubt" that the school district had already given the plaintiff the relief that she sought in the lawsuit before the Court.  Not so here.  As the Court explained at the preliminary injunction stage, at the time that this suit was filed, there was plenty of doubt regarding whether Defendants had complied with 8 U.S.C. § 1232(c)(B)(1).  Indeed, Plaintiffs had marshalled evidence showing it likely that Defendants had not complied with the statutory provision.  *See Ramirez*, 310 F. Supp. 3d at 26–30.  Thus, this Court concludes that this suit was not moot at the time that it was filed.

The Court must next consider whether subsequent events have rendered Plaintiffs' claims moot.  Ordinarily, a named plaintiff must present live claims to litigate on behalf of a class.  *See Sosna v. Iowa*, 419 U.S. 393, 402–03 (1975).  However, mootness doctrine "is riddled with exceptions," *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 404 n.11 (1980), and decades worth of Supreme Court precedents explain that a class action "does not inexorably become moot by the intervening resolution of the controversy as to the named plaintiffs," *Sosna*, 419 U.S. at 401.  Under the "inherently transitory" exception to mootness, a named plaintiff whose claims became moot before the court certified a proposed class may nonetheless litigate on behalf of the class after certification if "(1) it is uncertain that a claim will remain live for any individual who could be named as a plaintiff long enough for a court to certify the class, and (2) there will be a constant class of persons suffering the deprivation complained of in the complaint."  *Olson v. Brown*, 594

F.3d 577, 582 (7th Cir. 2010) (citing *Gerstein*, 420 U.S. at 110 n.11); *Zurak v. Regan*, 550 F.2d 86, 91–92 (1977); *see also, e.g.*, *Thorpe v. District of Columbia*, 916 F. Supp. 2d 65, 66–67 (D.D.C. 2013) (applying this test). Courts in this district and others have recognized that claims arising out of pretrial detention, and similar conditions, may qualify as inherently transitory. *See, e.g.*, *Olson*, 594 F.3d at 582 ("[T]he length of incarceration in a county jail generally cannot be determined at the outset and is subject to a number of unpredictable factors, thereby making it inherently transitory."); *R.I.L.-R*, 80 F. Supp. 3d at 183 (concluding that claims that a class of asylum seekers had been unlawfully detained qualified as inherently transitory). Importantly, the Supreme Court has clarified that the "inherently transitory" exception does not apply outside of the class action context. *See United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1538 (2018).

Plaintiffs contend that their claims are inherently transitory because former unaccompanied minors are typically detained for only weeks or months before subsequent events in the government's detention process may result in their release. *See* Pls.' Opp'n at 21. As a result, the "[t]he length of any individual's' detention, therefore, 'is impossible to predict, so even though there are certainly individuals whose claims will not expire within the time it would take to litigate their claims, there is no way for plaintiffs to ensure that the Named Plaintiffs will be those individuals.'" *Id.* (quoting *Thorpe*, 916 F. Supp. 2d at 67). Defendants agree that "claims arising out of pretrial detention or detentions for sentences of one year or less are inherently transitory." Defs.' Reply at 9. Furthermore, Defendants observe that Plaintiffs' claims are inherently transitory "by operation of 8 U.S.C. § 1232(c)(2)(B), which requires DHS to reconsider an alien's placement after the alien is placed in its custody." *Id.* at 10. Despite these concessions, Defendants insist that the named Plaintiffs' claims do not qualify as inherently transitory. Defs.' Reply at 10. This is so, Defendants say, because Plaintiffs have not met the requirements for class certification, and

thus, they are not entitled to rely on an exception to mootness that is reserved for the class action context. *See* Defs.' Reply at 10–11.

The Court agrees with both parties that Plaintiffs' claims are inherently transitory in nature. Neither party disputes that it is uncertain whether any potential named plaintiff in the putative class of former unaccompanied minors would have a live claim long enough for a district court to certify a class. Rather, the period of detention for any former unaccompanied minor is typically weeks or months and is subject to a host of unpredictable factors. *Cf. R.I.L-R*, 80 F. Supp. 3d at 183 (recognizing that the period of detention between ICE's initial screening of asylum seekers and a custody redetermination by an immigration judge is typically weeks or months). Furthermore, there is a constant class of persons suffering the deprivation complained of in the complaint, as Plaintiffs show in their motion for class certification. *See* Pls.' Mot. for Class Cert. ¶ 5, ECF No. 6 (estimating that between 1,100 and 1,200 children were transferred from ORR custody to ICE custody in Fiscal Year 2017 and that there are approximately 100 18-year-olds currently in ICE custody). As explained in detail later in this Opinion, the Court rejects Defendants' contentions that the named Plaintiffs have not satisfied the other requirements for class certification. *See infra* III.B.). Accordingly, the Court concludes that this case meets the requirements of the inherently transitory exception and that this class action suit is not moot.[10]

### c. Administrative Procedure Act

The Court must next address Defendants' contentions that Plaintiffs may not bring their claims pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 101–913, which governs the conduct of federal administrative agencies. The APA permits a court to "compel

---

[10] In light of the Court's determination that the inherently transitory exception to mootness applies here, the Court need not consider Plaintiffs' arguments that other exceptions to mootness might also apply.

agency action unlawfully withheld or unreasonably delayed," and to "hold unlawful and set aside agency action, findings and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706. The APA provides for judicial review of all "final agency action for which there is no other adequate remedy in court," *id.* § 704, except when "statutes preclude judicial review" or the "agency action is committed to agency discretion by law," *id.* § 701(a). Defendants contend that Plaintiffs' claims are not reviewable by this Court under the APA because (1) the actions challenged in this lawsuit were committed to agency discretion by law and are not subject to judicial review; (2) Plaintiffs have not challenged any final agency action; and (3) Plaintiffs had available to them another adequate remedy at law. *See* Defs.' Mot. to Dismiss at 28–38. Defendants asserted—and this Court rejected—substantially similar arguments at the preliminary injunction stage of this litigation. *See Ramirez*, 310 F. Supp. 3d at 20–25. As in its prior Opinion, this Court concludes that Plaintiffs' claims are reviewable under the APA.

### i. Judicial Review

Defendants first contend that Plaintiffs' challenges are not subject to judicial review under the APA because (1) the decision to detain Plaintiffs under 8 U.S.C. § 1226(a) is committed to ICE's discretion by law, and (2) ICE's discretionary determination as to whether to place Plaintiffs in the least restrictive setting is precluded from review by 8 U.S.C. § 1252(a)(2)(B)(ii). Defs.' Mot. to Dismiss at 29–32. Plaintiffs contend that Defendants' nonreviewability arguments are premised on the mistaken notion that Plaintiffs challenge individual detention decisions. *See* Pls.' Opp'n to Mot. to Dismiss at 25–26. Plaintiffs assert that the agency action that they challenge in this suit—DHS's purported failure to consider them for placement in the least restrictive settings available after taking into account statutorily

enumerated factors—is not committed to agency discretion and no statute precludes judicial review of Defendants' compliance with it. *See id.* As explained below, the Court concludes that Plaintiffs' claims are subject to judicial review under the APA.

The APA "applies, according to the provisions thereof, except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). The Supreme Court has illuminated the difference between § 701(a)(1) and (a)(2), stating that:

> The former applies when Congress has expressed an intent to preclude judicial review. The latter applies in different circumstances; even where Congress has not affirmatively precluded review, review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion. In such a case, the statute ("law") can be taken to have "committed" the decisionmaking to the agency's judgment absolutely.

*Heckler v. Chaney*, 470 U.S. 821, 830 (1985). In assessing whether either exception to judicial review applies, courts begin "with the strong presumption that Congress intends judicial review of administrative action." *Bowen v. Mich. Academy of Family Physicians*, 476 U.S. 667, 670 (1986). This presumption "like all presumptions used in interpreting statutes, may be overcome by *inter alia*, specific language or specific legislative history that is a reliable indicator of congressional intent, or a specific congressional intent to preclude judicial review that is fairly discernible in the detail of the legislative scheme." *Id.* at 673 (internal citation omitted) (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984)). The government bears a "heavy burden of overcoming the strong presumption" in favor of judicial review. *Dunlop v. Bachowski*, 421 U.S. 560, 567 (1975). In particular, the presumption may be overcome "upon a showing of clear and convincing evidence of a contrary legislative intent [to] restrict access to

judicial review." *Id.* (internal quotation marks and citation omitted). Courts "turn[] to the statute's 'language, structure and purpose, its legislative history, and whether the claims can be afforded meaningful review.'" *Amgen, Inc. v. Smith*, 357 F.3d 103, 112 (D.C. Cir. 2004) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 206 (1994)). To determine "whether a matter has been committed solely to agency discretion, [courts] consider both the nature of the administrative action at issue and the language and structure of the statute that supplies the applicable legal standards for reviewing that action." *Sec'y of Labor v. Twentymile Coal Co.*, 456 F.3d 151, 156 (D.C. Cir. 2006) (citation omitted). Importantly, "[t]his 'very narrow exception' to the general rule applies only 'in those rare instances where statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Cook v. FDA*, 733 F.3d 1, 6 (D.C. Cir. 2013) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971)).

Defendants have fallen well short of rebutting the presumption that DHS's compliance with 8 U.S.C. § 1232(c)(2)(B) is judicially reviewable. First, the language of the statutory provision features no terms either expressly or impliedly precluding judicial review. *Compare* 8 U.S.C. § 1232(c)(2)(B), *with, e.g.*, 8 U.S.C. § 1226(e) (stating that "discretionary judgment regarding the application of [Section 1226] shall not be subject to review"). Second, Defendants have not pointed to any legislative history showing congressional intent to preclude judicial review. Third, the consideration mandated by 8 U.S.C. § 1232(c)(2)(B) does not fall into the "categories of administrative decisions" that the Supreme Court and the D.C. Circuit have held are unreviewable. *Twentymile Coal Co.*, 456 F.3d at 156; *see also Watervale Marine Co. Ltd. v. U.S. Dep't of Homeland Sec.*, 55 F. Supp. 3d 124, 138 (D.D.C. 2014) ("[I]t is established in this circuit that 'executive branch decision[s] involving foreign policy matters or sensitive matters of

national security are nonjusticiable by nature." (second alteration in original) (internal quotation marks and citations omitted)); *Capital Area Immigrants' Rights Coalition v. U.S. Dep't of Justice*, 264 F. Supp. 2d 14, 22 (D.D.C. 2003) ("Categories of actions committed to agency discretion include: (1) agency decisions to institute enforcement proceedings; (2) an agency's refusal to grant reconsideration of an action; (3) a decision by the CIA to terminate an employee in the interests of national security; and (4) an agency's allocation of funds from a lump-sum appropriation.").

Fourth, contrary to Defendants' contentions, the statutory text is not "drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park*, 401 U.S. at 410. Rather, Congress provided meaningful standards against which to judge whether DHS has complied with 8 U.S.C. § 1232(c)(2)(B). Specifically, Congress required that for each former unaccompanied minor, DHS must take account of "the alien's danger to self, danger to the community, and risk of flight" and must then "consider placement in the least restrictive setting available." *Id.* And Congress mandated that former unaccompanied minors "shall be eligible to participate in alternative to detention programs, utilizing a continuum of alternatives." *Id.* These standards provide courts with criteria to evaluate whether the agency complied with its statutory duty. As the D.C. Circuit has explained, "[i]f Congress is not indifferent to the choices an agency makes, within a sphere of action delegated to it, and does not reserve oversight exclusively to itself by precluding judicial review, then we presume the legislature expected the courts to review those choices with a degree of scrutiny calibrated to the issues involved." *Nat'l Treas. Emps. Union v. Horner*, 854 F.2d 490, 495 (D.C. Cir. 1988). To be sure, 8 U.S.C. § 1232(c)(2)(B) features permissive and indeterminate language, but the Circuit has repeatedly found that statutes providing similar standards are subject to judicial review under

the APA. *See, e.g.*, *Cody v. Cox*, 509 F.3d 606, 608 (D.C. Cir. 2007) (concluding that statutory provision mandating that defendant agency "shall provide for the overall health care needs of residents in a high quality and cost-effective manner" contained a meaningful standard against which to judge the agency's exercise of discretion); *Marshall Cnty Health Care Auth. v. Shalala*, 988 F.2d 1221, 1223–25 (D.C. Cir. 1993) (finding that a statute directing an agency's Secretary to provide "exceptions" to payments "as the Secretary deems appropriate" was not entirely unreviewable because "Congress ha[d] provided a rather specific norm . . . to guide the Secretary's judgment"); *Nat'l Treas. Emps. Union*, 854 F.2d at 495 (identifying statutory provisions that, "viewed together, provide a meaningful—not a rigorous, but neither a meaningless—standard against which to judge" an agency's action).

Defendants' invocation of other statutory provisions that afford deference to the Executive Branch on immigration matters does not counsel a different result. Defendants first contend that the fact that the decisions whether to detain each Plaintiff under 8 U.S.C. § 1226(a) are committed to ICE's discretion by law might bear on the reviewability of DHS's compliance with 8 U.S.C. § 1232(c)(2)(B). *See* Defs.' Mot. to Dismiss at 30. And Defendants also contend that 8 U.S.C. § 1252(a)(2)(B)(ii), which bars judicial review of discretionary decisions made under the Immigration and Nationality Act, might somehow preclude this Court's review of Defendants' compliance with 8 U.S.C. § 1232(c)(2)(B). Defs.' Mot. to Dismiss at 31 (arguing that this Court is precluded from reviewing ICE's discretionary determination as to whether to place Plaintiffs in the least restrictive setting). The Court disagrees on both counts. As the Court explained above, Plaintiffs do not dispute that the decisions of whether and where to detain each of them are not reviewable by this Court. And Plaintiffs explicitly disclaim any suggestion that they seek review of any aspect of DHS's ultimate choice of placements. Instead, they seek to

compel DHS to comply with 8 U.S.C. § 1232(c)(2)(B), which specifies that DHS must take account of certain factors and must consider certain placements before making its discretionary placement decisions.  The Court agrees with Plaintiffs that it need not have the authority to review every aspect of DHS's placement decisions to have the authority to review aspects for which there are meaningful standards for judicial review and for which Congress did not preclude such review.  *Cf. Kucana v. Holder*, 558 U.S. 233, 248–49 (2010) (explaining that federal court review of administrative decisions denying motions to reopen removal proceedings are not precluded by statute because, among other things, "[a] court decision reversing the denial of a motion to reopen does not direct the Executive to afford the alien substantive relief; ordinarily, it touches and concerns only the question whether the alien's claims have been accorded a reasonable hearing"); *Geneme v. Holder*, 935 F. Supp. 2d 184, 192 (D.D.C. 2013) (concluding that because 8 U.S.C. § 1252(a)(2)(B)(ii) "does not specify that [U.S. Citizenship and Immigration Services] shall have discretion to decide whether and when to adjudicate applications for adjustment of status, . . . the court retains jurisdiction over [plaintiff's] claim that it has unreasonably delayed the adjudication").  In sum, the Court is not persuaded that 8 U.S.C. § 1232(c)(2)(B) is not subject to judicial review.

### ii. Final Agency Action

Defendants next question—just as they did at the preliminary injunction stage of this litigation—whether Plaintiffs have identified final agency action that is subject to review under the APA.  *See* Defs.' Mot. to Dismiss at 32–36; *see also Ramirez*, 310 F. Supp. 3d at 19–23 (rejecting Defendants' arguments that Plaintiffs had failed to identify final agency actions reviewable under the APA).  Specifically, Defendants assert that (1) the plain meaning of "consider" indicates only a mental process and demands no action on the part of the agency; (2)

consideration of less restrictive placements does not mark the consummation of any agency decisionmaking process; (3) no legal consequences flow from any consideration afforded under 8 U.S.C. § 1232(c)(2)(B); and (4) allegations that, as a matter of course, ICE fails to comply with 8 U.S.C. § 1232(c)(2)(B) constitute generalized complaints about agency behavior, not subject to review under the APA. The Court stands by its prior conclusion. Plaintiffs have identified final agency action reviewable under the APA.

The D.C. Circuit has acknowledged that "the term 'agency action' undoubtedly has a broad sweep." *Indep. Equip. Dealers Ass'n v. EPA*, 372 F.3d 420, 427 (D.C. Cir. 2004). The APA defines "agency action" as an "agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); 5 U.S.C. § 701(b)(2) (explaining that "agency action" for purposes of the judicial review provisions of the APA carries the same meaning given by 5 U.S.C. § 551). With respect to complaints that an agency failed to act, "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 64 (2004). This condition precludes attacks that seek broad programmatic improvements of agency behavior and also precludes judicial review of "even discrete agency action that is not demanded by law." *Id.* at 65.

Even discrete agency actions are reviewable by a court under the APA only if they are final. *See* 5 U.S.C. § 704 (establishing reviewability of "final agency action"). Courts take a pragmatic approach to finality. *U.S. Army Corps of Eng'rs v. Hawkes Co., Inc.*, 136 S. Ct. 1807, 1815 (2016). As the Supreme Court established in *Bennett v. Spear*, 520 U.S. 154 (1997), a court will find that an agency action is final if two conditions are met: "First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely

tentative or interlocutory nature. And, second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Id.* at 177–78 (internal quotation marks and citations omitted). Where there is no final agency action, a plaintiff has no cause of action under the APA. *See Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 183–85 (D.C. Cir. 2006) (explaining that the "final agency action" requirement is not jurisdictional, but instead determines whether a plaintiff has a cause of action under the APA).

As the Court explained at the preliminary injunction stage of this litigation, Plaintiffs have challenged final agency action subject to review under the APA. *See Ramirez*, 310 F. Supp. 3d at 19–23. According to Plaintiffs, DHS placed them in adult detention facilities without considering them for less restrictive placements as required by 8 U.S.C. § 1232(c)(2)(B). Plaintiffs have not lodged a generalized attack, seeking wholesale change to a federal program. They instead seek to compel Defendants to conduct the inquiry mandated by statute before determining where to place each former unaccompanied minor now in DHS's care and custody. *See Ramirez*, 310 F. Supp. 3d at 20–21. Approaching finality pragmatically, this Court reasoned that Defendants had consummated a decisionmaking process by failing to consider each Plaintiff for less restrictive placements as required by the statutory provision and that legal consequences flowed from those failures. *Id.* at 22–23. The Court observed that Defendants had placed Plaintiffs in adult detention facilities and had likely done so without complying with 8 U.S.C. § 1232(c)(2)(B), had affirmatively rejected Plaintiffs' request for additional consideration of less restrictive placements, and had offered no other indications that they planned to reconsider the factors outlined in 8 U.S.C. § 1232(c)(2)(B). *See Ramirez*, 310 F. Supp. 3d at 22–23. Furthermore, because of Defendants' inaction, Plaintiffs were left to "bear detention in more restrictive settings than Defendants might otherwise deem appropriate" had they considered the

mandated statutory factors. *See id.* at 23. Defendants' current arguments merely repeat or repackage arguments that this Court rejected at the preliminary injunction stage. *See id.* at 19–23. Although this Court is not bound by its prior conclusions, Defendants have not provided any arguments that undermine the logic of those prior determinations. Thus, the Court again concludes that this suit concerns final agency action reviewable under the APA.

### iii. Adequate Remedy at Law

Defendants revive another challenge that they first lodged at the preliminary injunction stage of this litigation. Specifically, Defendants assert once again that Plaintiffs may not bring their APA claims to this Court because they have another adequate remedy in the form of the opportunity to request bond hearings before immigration judges. *See* Defs.' Mot. to Dismiss at 36–38; *see also Ramirez*, 310 F. Supp. 3d at 23–25. Once again, this Court rejects Defendants' arguments.

"Section 704 reflects Congress' judgment that 'the general grant of review in the APA' ought not 'duplicate existing procedures for review of agency action' or 'provide additional judicial remedies in situations where Congress has provided special and adequate review procedures.'" *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice* ("*CREW*"), 846 F.3d 1235, 1244 (D.C. Cir. 2017) (quoting *Bowen*, 487 U.S. at 903). However, the Supreme Court has explained that "[t]he exception that was intended to avoid such duplication should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action." *Bowen*, 487 U.S. at 903. "When considering whether an alternative remedy is 'adequate' and therefore preclusive of APA review, [courts] look for 'clear and convincing evidence' of 'legislative intent' to create a special, alternative remedy and thereby bar APA review." *CREW*, 846 F.3d at 1244 (quoting *Garcia v. Vilsack*, 563 F.3d 519, 523 (D.C. Cir.

2009)).  Generally, "where a statute affords an opportunity for *de novo* district-court review

[courts] ha[ve] held that APA review [i]s precluded because 'Congress did not intend to permit a

litigant challenging an administrative denial . . . to utilize simultaneously both [the review

provision] and the APA.'"  *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of

Health & Human Servs.*, 396 F.3d 1265, 1270 (D.C. Cir. 2005) (last alteration in original)

(quoting *Envtl. Def. Fund v. Reilly*, 909 F.2d 1497, 1501 (D.C. Cir. 1990)).  An alternative

remedy is adequate if it offers relief of "the same genre," even if that remedy does not provide

relief identical to that offered under the APA.  *Ramirez*, 563 F.3d at 522.  By contrast, an

alternative remedy "will not be adequate under § 704 if the remedy offers only 'doubtful and

limited relief.'"  *Id.* at 522 (quoting *Bowen*, 487 U.S. at 901).

  At the preliminary injunction stage, this Court rejected Defendants' arguments that the

availability of bond hearings qualified as an adequate, alternative remedy for Plaintiffs'

challenges.  *See Ramirez*, 310 F. Supp. 3d at 23–25.  The Court explained that prompt action on

a request for a bond hearing is not necessarily guaranteed, and that, though 8 U.S.C. §

1232(c)(2)(B) includes no explicit temporal requirement, it is likely that Congress intended DHS

to consider such placements soon after the transfer of a former unaccompanied minor to DHS

custody.  *Ramirez*, 310 F. Supp. 3d at 24–25.  The Court also observed that while Section

1232(c)(2)(B) requires affirmative action of DHS and imposes no financial obligation on the

former unaccompanied minors entitled to consideration under the statutory provision, an

immigration judge may require payment before any non-citizen may be released to a setting less

restrictive than adult detention.  *See Ramirez*, 310 F. Supp. 3d at 24–25.

  At this stage of the litigation, Defendants do not offer any new evidence—let alone clear

and convincing evidence—of legislative intent showing that bond hearings serve as a forum

through which a former unaccompanied minor can seek adequate relief for DHS's failure to comply with 8 U.S.C. § 1232(c)(2)(B).  Instead, Defendants primarily restate and repackage arguments rejected at the preliminary injunction stage.  *See* Defs.' Mot. to Dismiss at 36–38 (arguing that bond hearings provide an adequate remedy).  And, to the extent that Defendants offer arguments that were not rejected at that stage, this Court has already rejected in this Opinion arguments that other provisions of immigration law deprive this Court of the authority to review DHS's compliance with 8 U.S.C. § 1232(c)(2)(B).  *See* Defs.' Mot. to Dismiss at 37–38.  Again, although not bound by its prior holdings, the Court stands by its prior analysis, and again concludes that Defendants have not shown that there exists an adequate alternative remedy for Plaintiffs' challenges precluding review under the APA.

### d.  Failure to State a Claim

Finally, Defendants seek dismissal on the grounds that (1) Plaintiffs cannot demonstrate that ICE is uniformly failing to consider the least restrictive settings with respect to former unaccompanied minors who are now in DHS care, and (2) Plaintiffs fail to establish either that ICE does not have any, or has only insufficient, policies and procedures implementing 8 U.S.C. § 1232(c)(2)(B).  *See* Defs.' Mot. to Dismiss at 38–44.  Defendants contend that because of these purported deficiencies, Plaintiffs have failed to state claims upon which relief can be granted. *See id.*  Plaintiffs disagree, arguing that Defendants' contentions are premised on a misreading of the statutory text.  *See* Pls.' Opp'n to Mot. to Dismiss at 32.  Plaintiffs also argue that, in any event, Defendants' contentions provide no basis for dismissal as they challenge the merits of Plaintiffs' claims, not the adequacy of Plaintiffs' complaint.  The Court finds no basis for dismissal.

"[U]nder Federal Rule 12(b)(6), a plaintiff can overcome a motion to dismiss by simply alleging facts sufficient to state a claim that is plausible on its face." *Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328, 1334 (D.C. Cir. 2015) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A well-pleaded complaint 'may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable.'" *Abbas*, 783 F.3d at 1334 (quoting *Twombly*, 550 U.S. at 556)). In short, "the Federal Rules do not require a plaintiff to show a likelihood of success on the merits in order to avoid pre-trial dismissal." *Abbas*, 783 F.3d at 1334. Instead, "[d]ismissal under Rule 12(b)(6) is proper when a plaintiff has failed to plead 'enough facts to state a claim to relief that is plausible on its face' and to nudge his claims 'across the line from conceivable to plausible.'" *Abbas*, 783 F.3d at 1338 (quoting *Twombly*, 550 U.S. at 570). Here, Defendants' additional arguments for dismissal focus on purported inadequacies in the proof marshaled by Plaintiffs. Defendants also speculate that Plaintiffs will not be able to prove the truth of any of their claims. *See* Defs.' Mot. to Dismiss at 38–44. But, as Plaintiffs argue, these attacks focus on the merits of Plaintiffs' suit and such considerations are not properly addressed on a motion to dismiss. The Court declines to dismiss Plaintiffs' complaint.

## B. Plaintiffs' Motion for Class Certification

Having rejected Defendants' arguments for dismissal of this action, the Court next considers Plaintiffs' motion for class certification. *See generally* Pls.' Mot. for Class Cert., ECF No. 6. Plaintiffs seek certification of a class defined as:

> All former unaccompanied alien children who are detained or will be detained by ICE after being transferred by ORR because they have turned 18 years of age and as to whom ICE did not consider placement in the least restrictive setting available, including alternatives to detention programs, as required by 8 U.S.C. § 1232(c)(2)(B).

56

*Id.* at ¶ 3.  Upon consideration of the parties' submissions and the rest of the record in this case, the Court concludes that class certification is warranted and, accordingly, it grants Plaintiffs' motion.

## 1. Legal Standard

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'"  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)).  Federal Rule of Civil Procedure 23 governs class certification.  A party seeking certification of a proposed class must first demonstrate that the proposed class satisfies the four requirements of Rule 23(a), that:

> (1)    the class is so numerous that joinder of all members is impracticable,
>
> (2)    there are questions of law or fact common to the class,
>
> (3)    the claims or defenses of the representative parties are typical of the claims or defenses of the class, and
>
> (4)    the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  In addition to meeting these requirements, a proposed class must satisfy at least one of the three subsections of Rule 23(b).  Plaintiffs in this case seek certification under subsection (b)(2), which applies to cases where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

Motions for class certification "have their own distinct burdens and fact finding requirements."  *Parker v. Bank of America, N.A.*, 99 F. Supp. 3d 69, 80 (D.D.C. 2015).  The burden of proving each of the requisite elements of Rule 23 is on the party seeking certification,

and the failure to prove any element precludes certification. *See In re Rail Freight Fuel Surcharge Antitrust Litig.–MDL No. 1869*, 725 F.3d 244, 249 (D.C. Cir. 2013). "The D.C. Circuit has not yet spoken to the precise burden of proof applicable to establishing that the requirements of Rule 23 have been met; however, courts in this Circuit have routinely applied a preponderance of the evidence standard." *Parker*, 99 F. Supp. 3d at 80. As the Supreme Court has explained, "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "[C]ertification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied.'" *Id.* at 351 (quoting *Gen. Telephone Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). Moreover, "[t]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen, Inc. v. Conn. Retirement Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

### 2. Certification Requirements

Plaintiffs insist that they have met all of the requirements for certification of their proposed class. *See generally* Pls.' Mot. for Class Cert., ECF No. 6. Defendants concede that Plaintiffs satisfy the numerosity and adequacy of representation requirements set out in Rule 23(a). *See* Defs.' Opp'n to Class Cert. at 14 n.3, ECF No. 31. However, Defendants dispute that Plaintiffs have met the commonality and typicality requirements and that Plaintiffs have shown

that Defendants acted or refused to act on grounds generally applicable to the proposed class, as required for certification under Rule 23(b)(2). *See id.* at 15–24. Finding that Plaintiffs have satisfied all of the requirements for certification, the Court grants their motion.

*a. Numerosity*

Plaintiffs have established that their proposed class is so numerous as to warrant class certification. Because of the general rule confining litigation to only named parties, *see Comcast Corp.*, 569 U.S. at 33, a class action is appropriate only when "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). To meet this requirement, a plaintiff need not meet any "specific threshold," though "courts in this jurisdiction have observed that a class of at least forty members is sufficiently large to meet this requirement." *Taylor v. D.C. Water & Sewer Auth.*, 241 F.R.D. 33, 37 (D.D.C. 2007). In addition, a plaintiff may satisfy the requirement by supplying estimates, rather than a precise number, of putative class members. *See Pigford v. Glickman*, 182 F.R.D. 341, 347–48 (D.D.C. 1998). Though "[m]ere conjecture, without more, is insufficient to establish numerosity," *id.* at 347, a plaintiff need only provide "a reasonable basis for the estimate provided." *Kifafi v. Hilton Hotels Retirement Plan*, 189 F.R.D. 174, 176 (D.D.C. 1999).

Relying on statistics setting out the number of children referred to ORR as unaccompanied alien children in Fiscal Year 2017, the number of those children who were seventeen years old when they entered ORR custody, and the average length of a child's stay in ORR custody during Fiscal Year 2017, Plaintiffs estimate that between 1,000 and 1,200 former unaccompanied minors were transferred from ORR custody to the custody of DHS during Fiscal Year 2017. Pls.' Mot. for Class Cert. ¶ 5. Plaintiffs also estimate that approximately 100 eighteen-year-old, former unaccompanied minors are currently in ICE custody. *See id.* In

addition, Plaintiffs explain that the putative class members lack geographic proximity and are spread across the country. *See id.* ¶ 6. Former unaccompanied minors who were recently transferred to DHS custody may be housed in any of ICE's approximately 200 detention facilities. *See id.* Moreover, Plaintiffs assert that most members of the proposed class lack financial resources and the ability to bring individual lawsuits regarding their respective placements. *See id.* ¶ 7. Finally, Plaintiffs note that the class at issue is inherently transitory. *See id.* ¶ 8. There is no telling how long each member of the proposed class will be detained in an adult facility, and the class regularly adds new members as individuals age out of ORR's jurisdiction. *See id.*

Defendants do not dispute that Plaintiffs' class is sufficiently numerous to warrant certification. *See* Defs.' Opp'n to Class Cert. at 14 n.3. The Court agrees. Plaintiffs have ably demonstrated that the proposed class likely contains at least forty members and that lack of geographic proximity of the proposed members and the inherently transitory nature of the class would make joinder impracticable. Accordingly, the Court concludes that Plaintiffs have satisfied the numerosity requirement.

### b. Commonality

Plaintiffs have also established that there are questions of law and fact common to the proposed class, meeting the commonality requirement. *See* Fed. R. Civ. P. 23(a)(2); *see also Dukes*, 564 U.S. at 350. To satisfy this requirement, plaintiffs must "demonstrate that the class members have suffered the same injury." *Dukes*, 564 U.S. at 350 (internal quotation marks and citation omitted). This requires more than the identification of the purported violation of the same provision of law. *Id.*; *see also DL v. District*, 713 F.3d 120, 127–30 (D.C. Cir. 2013) (vacating an order certifying a class composed of students who were purportedly each denied a

free appropriate public education on the ground that plaintiffs had identified only sufferers of a violation of the same provision of law and had not met the commonality requirement). Instead, plaintiffs' claims "must depend upon a common contention . . . of such a nature that is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 564 U.S. at 350. Importantly, "[w]hat matters to class certification . . . [is] the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.*

Here, Plaintiffs theorize that Defendants have denied all former unaccompanied minors consideration due to each of them under 8 U.S.C § 1232(c)(2)(B). *See* Pls.' Mot. for Class Cert. ¶ 9; *see also* Am. Compl. According to Plaintiffs, all members of the putative class are "subject to ICE's failure to comply with, and to establish policies and practices implementing, the requirements of Section 1232(c)(2)(B)." Pls.' Mot. for Class Cert. ¶ 9. As Plaintiffs argue, this action raises common questions of law and fact regarding, among other things, whether, as a matter of course, ICE disregards the requirements of 8 U.S.C. § 1232(c)(2)(B), and whether, as a matter of course, ICE has or does not have policies properly implementing the statutory requirements. *See* Pls.' Mot. for Class Cert. ¶ 9.

Defendants dispute that Plaintiffs have met the commonality requirement, arguing that Plaintiffs' proposed class lacks commonality because it "includes individuals in different procedural postures in their immigration proceedings and who are detained under different statutory sources of authority." Defs.' Opp'n to Mot. for Class Cert. at 16. According to Defendants, this "distinction is material because where an alien falls within this statutory scheme determines whether detention is mandatory or discretionary as well as the process available for contesting his or her detention." *Id.* Defendants also suggest there may be alternative remedies

available for certain former unaccompanied minors, and the availability of such remedies turns on the statutory scheme under which each individual is detained. *See id.* But the Court disagrees that differences in procedural postures and in the authority under which individuals are detained are material to whether Defendants must comply with 8 U.S.C. § 1232(c)(2)(B). As the Court explained above, the obligation to place former unaccompanied minors consistent with 8 U.S.C. § 1232(c)(2)(B) arises upon their transfer to DHS custody and does not turn on the statutory authority under which a particular former unaccompanied minor is detained.

Unlike in *Wal-Mart Stores, Inc. v. Dukes*, where the Supreme Court reversed the decision to certify a class of half a million women who alleged discrimination under Title VII, on the basis that no "glue" held together the reasons for each of the purported acts of discrimination, 564 U.S. at 352, Plaintiffs in this case have identified a single alleged practice—the refusal to comply with 8 U.S.C. § 1232(c)(2)(B)—that provides the basis for every class member's injury. Courts in this district have certified classes under similar circumstances. *See, e.g.*, *D.L. v. District of Columbia*, 860 F.3d 713, 723–26 (D.C. Cir. 2017) (affirming district court's certification of "three subclasses . . . each defined by reference to a 'uniform policy or practice' governing a specific stage of the special education process"); *Thorpe*, 303 F.R.D. 120, 145–47 (D.D.C. 2014) (finding the commonality requirement met where "[t]he gravamen of plaintiffs' case [wa]s their contention that the District [wa]s violating the integration mandate and injuring each and every class member by virtue of its failure to implement an effective system of transition assistance"). Accordingly, the Court concludes that Plaintiffs have satisfied Rule 23(a)(2)'s commonality requirement.

### c. *Typicality*

Contrary to Defendants' arguments, Plaintiffs have also met the typicality requirement set out in Rule 23(a)(3). Rule 23(a)(3) requires a plaintiff to show that "the claims or defense of the representative parties are typical of the claims or defense of the class." Fed. R. Civ. P. 23(a)(3). Usually, "[t]he commonality and typicality requirements . . . tend to merge." *Dukes*, 564 U.S. at 349 n.5 (internal quotation marks and citation omitted). "Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). Typicality "screen[s] out class actions in which the legal or factual position of the representatives is markedly different from that of other members of the class even though common issues of law or fact are present." 7A Charles Wright & Arthur Miller, Federal Practice & Procedures § 1764 (3d ed. 2017). "Generally speaking, 'typicality is . . . satisfied when the plaintiffs' claims arise from the same course of conduct, series of events, or legal theories of other class members.'" *Daskalea v. Wash. Humane Soc'y*, 275 F.R.D. 346, 358 (D.D.C. 2011) (quoting *In re Satellite Radio Holdings Sec. Litig.*, 237 F.R.D. 13, 18 (D.D.C. 2006)). But "[t]he facts and claims of each class member do not have to be identical to support a finding of typicality; rather, typicality refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff." *Id.*

Here, Plaintiffs explain that, like the other members of the putative class, the named Plaintiffs are former unaccompanied minors who, upon reaching their respective eighteenth birthdays, were transferred from ORR custody to DHS and placed in adult facilities. *See* Pls.'s Mot. for Class Cert. ¶ 10. Plaintiffs contend that they suffered the exact same injury as the other

class members: ICE failed to take account of the factors enumerated in 8 U.S.C. § 1232(c)(2)(B), failed to consider them for the least restrictive placement available, and failed to make them eligible for alternative to detention programs. *See* Pls.' Mot. for Class Cert. ¶ 10. Seeking to refute Plaintiffs' contentions, Defendants offer only that the proposed class includes individuals in different procedural postures in their immigration proceedings and who are detained under different statutory sources of authority. *See* Defs.' Opp'n to Class Cert. at 16. But, as explained above, Defendants' obligation to consider Plaintiffs for less restrictive placements does not turn on the source of statutory authority under which they are detained or on the stage of the immigration proceedings. Plaintiffs have shown that their claims are typical of the claims asserted by the rest of the class members.

### d. Adequacy

Plaintiffs have also met Rule 23(a)'s final requirement: adequacy of representation. Adequacy of representation imposes two criteria on plaintiffs seeking to represent a class: "(1) the named representative must not have antagonistic or conflicting interests with the unnamed members of the class, and (2) the representative must appear able to vigorously prosecute the interests of the class through qualified counsel." *Twelve John Does v. Dist. of Columbia*, 117 F.3d 571, 575 (D.C. Cir. 1997). The requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). Defendants do not dispute that this requirement is met. *See* Defs.' Opp'n to Mot. for Class Cert. at 14 n.3. And the Court agrees. Plaintiffs' counsel have supplied declarations attesting to their willingness and abilities to take an active role in this litigation and to protect the interests of absent plaintiffs. *See* Exs. A-D, ECF No. 6. Furthermore, nothing in the record before the Court suggests that the named Plaintiffs have interests that might compete

with those of unnamed members of the class. Accordingly, the Court concludes that the adequacy-of-representation requirement is met.

### e. 23(b) Requirement

Having determined that Plaintiffs meet the requirements of Rule 23(a), the Court must next determine whether they meet the requirements of Rule 23(b). Plaintiffs seek certification of a Rule 23(b)(2) class. Such a class may be maintained when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Dukes*, 564 U.S. at 360 (internal quotation marks and citations omitted). "As a corollary to this principle, certification is generally inappropriate in actions raising significant individual liability or defense issues," *Lightfoot v. District of Columbia*, 273 F.R.D. 314, 329 (D.D.C. 2011), or "when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant." *Dukes*, 564 U.S. at 360. Contrary to Defendants' contentions, the Court finds that Plaintiffs have satisfied the requirements of 23(b)(2).

Plaintiffs contend that their requested relief—declaratory and injunctive relief requiring Defendants to comply with 8 U.S.C. § 1232(c)(2)(B)—would remedy the injuries of all class members. *See* Defs.' Mot. for Class Cert. ¶¶ 14–15. Defendants disagree arguing that (1) the inquiry under 8 U.S.C. § 1232(c)(2)(B) requires individualized determinations and thus classwide relief is not appropriate; (2) the proposed class definition does not meet the requirements of Rule 23(b)(2) because it is administratively infeasible; (3) Plaintiffs appear to

allege that DHS has "unreasonably delay[ed]" in conducting the inquiry required by 8 U.S.C. § 1232(c)(2)(B), but they have not indicated what length of time constitutes unreasonable delay; and (4) this Court lacks jurisdiction to grant class-wide relief. *See* Defs.' Opp'n to Class Cert. at 17–24. The Court disagrees on all fronts.

First, Defendants' argument that classwide relief is not appropriate because Defendants' compliance with 8 U.S.C. § 1232(c)(2)(B) entails making individualized determinations about each former unaccompanied minor is unpersuasive. While it is true that the statute demands such individualized determinations, in this suit Plaintiffs challenge Defendants' practice of failing to comply with the statutory provision at all. They seek injunctive relief requiring only such compliance. They do not seek a court order mandating any particular outcome with respect to any particular former unaccompanied minor. That individualized determinations must be made under the statute does not preclude class certification. Indeed, the D.C. Circuit implicitly rejected this same argument in *DL v. District of Columbia*, finding that a subclass of special education students—who each required individualized assessments and specially designed educational programming tailored to their respective needs—was properly certified under 8 U.S.C. § 1232(c)(2)(B). *See DL*, 860 F.3d at 726. The D.C. Circuit has explained that the purpose of Rule 23(b)(2) is to "avoid piecemeal litigation when common claims arise from systemic harms that demand injunctive relief." *DL*, 860 F.3d at 726. This litigation avoids the need for each former unaccompanied minor to bring his or her own lawsuit seeking that, as a matter of course, DHS comply with 8 U.S.C. § 1232(c)(2)(B) in placing those who have recently aged into DHS's jurisdiction.

Second, the Court disagrees with Defendants that Plaintiffs have failed to define an ascertainable class. Defendants' administrative infeasibility argument centers on the notion that

"there exists an 'implied requirement' that a class be 'adequately defined' and 'clearly ascertainable' before it can be certified." Defs.' Opp'n to Class Cert. at 19 (citing *Thorpe*, 303 F.R.D at 139). According to Defendants, one aspect of ascertainability is that the class definition cannot depend on the merits of the underlying claim—that is, a plaintiff cannot permissibly define a class by reference to success or failure in proving their claims. This is so, Defendants argue, because permitting what is known as a "fail-safe class" "is unfair to defendants, it prevents an adverse judgment being entered against plaintiffs, and it is unmanageable because the members of the class could only be known after a determination of liability." Defs.' Opp'n to Class Cert. at 19–20. The Court disagrees that Plaintiffs' class definition fails on the basis of a lack of ascertainability.

As an initial matter, the Court observes that it is far from clear that there exists in this district a requirement that a class certified under Rule 23(b)(2) must demonstrate ascertainability to merit certification. *See* Pls.' Reply in Supp. Mot. for Class Cert. at 16–18 (citing cases), ECF No. 37; *Hoyte v. District of Columbia*, 2017 WL 3208456, at *3 n.3 (D.D.C. July 27, 2017) (noting that "[t]he ascertainability requirement, while adopted by some courts in this district, has been recently disavowed by four federal appellate courts" and explaining that "the D.C. Circuit has not opined on the requirement"). To the extent that a showing of ascertainably is required, the Court is not convinced that Plaintiffs' class definition fails to meet the requirement solely because it is defined—superficially, at least—by reference to success on the merits of Plaintiffs' claims. Contrary to Defendants' arguments, Plaintiffs have identified clear and objective criteria on which to show membership in the proposed class—namely, status as a former unaccompanied minor who has been transferred from ORR custody to DHS custody. Plaintiffs' argument—that, as a matter of course, Defendants fail to afford *any* members of this group with the consideration

due under the statutory provision—reveals entirely the bounds of this group.  And those bounds are neither vague nor subjective.  Moreover, it is not clear why Defendants might be harmed or at all disadvantaged by Plaintiffs' reliance on a fail-safe class definition in the context of this particular case.  As Plaintiffs explain, DHS has an obligation under 8 U.S.C. § 1232(c)(2)(B) independent of the status of this litigation.  *See* Pls.' Reply Supp. Class Cert. at 17–18; *see also Thorpe*, 303 F.R.D. at 139–40 (observing that classes certified under Rule 23(b)(2) "will not require individualized notice, opt-out rights, or individual damage assessments, and the defendant will be required to comply with the relief ordered no matter who is in the class").  Thus, to the extent that Plaintiffs rely on a fail-safe definition, the Court concludes that the class proposed is none the less ascertainable and meets any such requirement for certification.  *Cf. Thorpe*, 303 F.R.D. at 140 (certifying a class where "not every resident who has been in a facility for over 90 days necessarily needs transition assistance, but that criteria is an adequate proxy to 'accurately articulate[] the general demarcations of the class of individuals who are being harmed by the alleged deficiencies under Rule 23(b)(2)'").

Third, this Court disagrees that Plaintiffs must identify a time period within which Defendants must comply with 8 U.S.C. § 1232(c)(2)(B) to warrant class certification.  Plaintiffs' arguments center not on the notion that consideration under the statute is late coming, but that it is denied all together.  *See* Pls.' Mot. for Class Cert. ¶ 14 (asserting that "[f]or each class member, ICE has failed to consider their placement in the least restrictive setting and failed to make them eligible to participate in alternative to detention programs").  Finally, the Court disagrees that it lacks jurisdiction to certify the proposed class.  Defendants argue that 8 U.S.C. § 1252(f)(1)—which prohibits any "court (other than the Supreme Court" from "enjoin[ing] or restrain[ing] the operation of the provision of part IV of this subchapter . . . other than with

respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated,"—prohibits certification of the proposed class.  *See* Defs.' Opp'n to Class Cert. at 22.  Conforming to the practice of other courts, this Court concludes that class certification is not precluded where, as here, an injunction "'will only require the government to comply' with the statute in question, not to restrain it."  Pls.' Reply at 19 (quoting *Reid v. Donelan*, 22 F. Supp. 3d 84, 90 (D. Mass. 2014)); *see also, e.g.*, *Diaz v. Hott*, 297 F. Supp. 3d 618, 627–28 (E.D. Va. 2018) (concluding that the prohibition against class certification under 8 U.S.C. § 1252(f)(1) "is limited to injunctions against the operation of the relevant [statutory] provisions" and not "an injunction requiring [the government] to comply with the terms of the [statute]").  In sum, the Court concludes that Plaintiffs have met the requirement for certification under 8 U.S.C. 1232(c)(2)(B).

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss (ECF No. 36) is **DENIED**, and Plaintiffs' Motion for Class Certification (ECF No. 6) is **GRANTED**.  The following class is hereby **CERTIFIED** under Rule 23(b)(2):

> All former unaccompanied alien children who are detained or will be detained by ICE after being transferred by ORR because they have turned 18 years of age and as to whom ICE did not consider placement in the least restrictive setting available, including alternatives to detention programs, as required by 8 U.S.C. § 1232(c)(2)(B).

An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: August 30, 2018                                             RUDOLPH CONTRERAS
                                                                             United States District Judge