# Exhibit B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA


Case No. 1:18-cv-00508-RC

------------------------------X

WILMER GARCIA RAMIREZ, et al.,

             Plaintiffs,

    vs.

U.S. IMMIGRATION AND CUSTOMS

ENFORCEMENT, et al.,

             Defendants.

------------------------------X


DEPOSITION OF MELLISSA HARPER


Washington, D.C.

Thursday, December 6, 2018

9:00 a.m.


Reporter:  Raymond Brynteson, RMR-CRR-RDR

Job No. 12499

1

2          Deposition of MELLISSA HARPER

3

4          Thursday, December 6, 2018

5              9:00 a.m.

6

7

8

9     The deposition of MELLISSA HARPER was held at

10   the offices of Kirkland & Ellis LLP, 655

11   Fifteenth Street, N.W., Washington, D.C.,

12   pursuant to notice, the proceedings recorded

13   stenographically by Raymond G. Brynteson,

14   RMR-CRR-RDR and Notary Public.

15

16

17

18

19

20

21

22

1   A P P E A R A N C E S:

2

3   FOR THE PLAINTIFFS:

4

5       KIRKLAND & ELLIS LLP

6       300 North LaSalle

7       Chicago, Illinois  60654

8       BY:  STEPHEN R. PATTON, ESQ.

9            REBECCA FORRESTAL, ESQ.

10      312-862-2000

11      stephen.patton@kirkland.com

12      rebecca.forrestal@kirkland.com

13

14      NATIONAL IMMIGRANT JUSTICE CENTER

15      208 South LaSalle Street

16      Suite 1300

17      Chicago, Illinois  60604

18      BY:  KATE MELLOY GOETTEL, ESQ.

19      312-660-1335

20      kgoettel@heartlandalliance.org

21

22

1   APPEARANCES: (Continued)

2

3   FOR THE DEFENDANTS:

4

5       U.S. DEPARTMENT OF JUSTICE

6       Civil Division, Appellate Section

7       Office of Immigration Litigation

8       Ben Franklin Station, P.O. Box 868

9       Washington, D.C.  20044

10      BY:  COLIN ABBOTT KISOR, ESQ.

11           CHRISTINA PARASCANDOLA, ESQ.

12      202-532-4075

13      colin.kisor@usdoj.gov

14      christina.parascandola@usdoj.gov

15

16

17  ALSO PRESENT:

18

19  CYRENA KHOURY, ESQ., DHS ICE

20  HILARY RAINONE, ESQ., DHS ICE

21

22

1              I N D E X

2

3    MELLISSA HARPER                        PAGE

4

5    Examination by Mr. Patton...............  7

6    Examination by Mr. Kisor............... 226

7    Examination by Mr. Patton............. 233

8

9    AFTERNOON SESSION: (1:06 p.m.).......... 143

10

11              E X H I B I T S

12

13   HARPER EXHIBIT NO.                      PAGE

14

15   Exhibit 1   Risk Classification

16               Assessment in EARM 5.0 Quick

17               Reference Guide.............  105

18   Exhibit 2   Alternatives to Detention

19               Handbook....................  105

20   Exhibit 3   10-17-18 memo, ERO Taskings to

21               Field Office Directors, et al. 111

22

1  immigration since 2001.

2      Q.   What is your current title or position

3  with ICE?

4      A.   Unit Chief of the Juvenile and Family

5  Residential Management Unit.

6      Q.   Sometimes referred to as J-F-R-M-U?

7      A.   JFRMU.

8      Q.   So when you say "JFRMU," the court

9  reporter will know it's J-F-R-M-U.

10         What is the role or function of JFRMU?

11     A.   JFRMU is the headquarters unit that

12  provides oversight, training and guidance for

13  the field and all matters related to aliens that

14  are juveniles, and family detention.

15     Q.   Does that include age-outs?

16     A.   Yes, it does.

17     Q.   And by age-outs, to make sure we're

18  using the same terminology, are you referring to

19  former unaccompanied alien children who are not

20  placed by ORR before their 18th birthday and,

21  therefore, are turned over to the custody of ICE

22  on the 18th birthday?

1      A.   Well, I didn't introduce the term.  Is

2  that what you are referring to?

3      Q.   Yes.  Well, I'm asking you, is age-out

4  a --

5      A.   You are asking me if that's my

6  definition --

7      Q.   Yes.

8      A.   -- of an age-out?  An age-out is

9  somebody who is a juvenile for care and custody

10  and turns 18 while in their custody and is

11  released to ICE.

12      Q.   I think that's what I tried to say.

13  Is age-out a term that you use in your work?

14      A.   Yes.

15      Q.   And is that the term that you used to

16  former unaccompanied alien children who turn 18

17  without being placed by ORR and are transferred

18  by ORR to the custody of ICE?

19      A.   Yes, that's a term that we use.

20      Q.   And what are JFRMU's duties and

21  responsibilities with respect to age-outs?

22      A.   With respect to age-outs JFRMU

1    provides advice and guidance to the field, if

2    they need -- have any questions about a

3    particular age-out.  We provide training through

4    monthly phone calls, the annual FOJC training,

5    which is congressionally mandated, and then any

6    ongoing issues that arise related to UACs.

7            And now we have a tracking mechanism

8    in place to help create a centralized database

9    of documents and paperwork related to age-outs.

10   Q.   And that tracking system is new?

11   A.   The system is new, yes.

12   Q.   You previously tracked out -- tracked

13   age-outs, correct?

14   A.   We did track them, yes.

15   Q.   You tracked them through a monthly

16   age-out report?

17   A.   Yes, an Excel spreadsheet.

18   Q.   Did you track them in any other way

19   prior to October 17th of 2018?

20   A.   Not that I'm aware of.

21   Q.   And the new system that you're talking

22   about, the tracking system, is one that was

1   announced on or about October 17, 2018, correct?

2        A.   Yes.

3        Q.   Who -- we will go back to that or come

4   back to that here shortly.  I want to get the

5   rest of the information about what you do in

6   JFRMU.

7             You described JFRMU --

8        A.   "JFRMU."

9        Q.   "JFRMU."  Why don't I just say

10  J-F-R-M-U.

11       A.   It is your choice.

12       Q.   Yeah, okay.  You described JFRMU's

13  role with respect to age-outs.

14            Does JFRMU do anything else with

15  respect to age-outs other than what you

16  described?

17       A.   No.  Like I said, we provide guidance

18  to the field.  We provide training.  We answer

19  questions.  And now with the new tracking system

20  we also have a full-time person monitoring the

21  documentation so that we can ensure that the

22  documentation is in place to support a process

1   that we've always done.

2       Q.   So the process didn't change with this

3   new tracking system, just the documentation,

4   correct?

5       A.   There is no change in the process.

6       Q.   Who is the person, the full-time

7   person who is monitoring the new tracking

8   system?

9       A.   I have a team of officers, but one

10  particular officer has it as a primary role.

11  Her name is Ana Sanchez.

12      Q.   And what is it that Ms. Sanchez is

13  tasked with doing precisely with respect to the

14  new documentation system?

15      A.   Well, because we want to ensure that

16  the documentation is there to support the

17  process that the officers go through each time

18  in considering the lease restrictive setting

19  under VAWA, we wanted to make sure that the

20  paperwork was loaded up appropriately where we

21  could access it.

22          So every time that there is a new

1   age-out added to the SharePoint she reviews the

2   paperwork and ensures that the documentation is

3   sufficient.  She runs the audit for my review.

4   Approximately 10 percent of the cases a month

5   come to my attention.

6            Of course we just started this so it's

7   a work in progress.  And then any case that she

8   has any questions about she follows up with the

9   field.

10       Q.   Anything else that Ms. Sanchez does

11  with respect to the new documentation system?

12       A.   Not that I can think of right now.

13       Q.   You said that she reviews the

14  paperwork for every age-out as it is submitted

15  from the field office.  Correct?

16       A.   Yes.

17       Q.   And what is she reviewing that

18  paperwork for?

19       A.   To make sure the forms are filled out

20  correctly, that the A numbers are correct, that

21  the names are correct, making sure that, if the

22  person has any extenuating factors, that those

1    are reviewed and taken into consideration, and

2    to identify any other outlying issues like, say,

3    criminal activity, gang membership, just to make

4    sure that the breadth of all the information

5    that needs to be considered appears to have been

6    considered.

7          She has a lot of experience.  It's

8    just another set of eyes.

9          Q.   To be clear, by the time she receives

10   this documentation, the field office has already

11   made a decision whether to detain the age-out,

12   correct?

13         A.   Right.  We have to make a decision

14   based on the information that we have at the

15   time they turn 18.

16         Q.   But the decision has already been made

17   by the time the paperwork is submitted to ICE

18   headquarters, correct?

19         A.   Yes.

20         Q.   So Ms. Sanchez is just checking to

21   make sure that the paperwork for a decision that

22   has already been made is complete and accurate,

1  correct?

2      A.   Yes.

3      Q.   Now, did you have anyone that played

4  the same role or conducted the same task with

5  respect to the prior monthly age-out reports?

6      A.   I did not.  I have only been the unit

7  chief since the end of October 2017.

8      Q.   During your tenure, was there anyone

9  that checked for the completeness or accuracy of

10 the monthly age-out reports when they were

11 submitted by the field offices?

12     A.   We're not checking the accuracy of a

13 monthly report.  We're checking the accuracy of

14 the individual records to make sure we have the

15 correct paperwork uploaded.

16     Q.   And my -- and is that also true for

17 the work Ms. Sanchez does?

18     A.   That is the work that Ms. Sanchez

19 does.

20     Q.   She is not checking the accuracy of

21 the decision, but just making sure that the

22 information, such as A number or name, as

1   reported by the field office is correct?

2        A.   That's correct.  However, if in her

3   experience she saw something that she felt like

4   required additional consideration by me, she can

5   bring that to my attention.

6             Just like when the field asks for help

7   in any JFRMU-related issue, the questions

8   usually get elevated to me to ensure that, you

9   know, everything is in compliance.

10       Q.   So if there is a question about the

11  form, a question about policy, and Ms. Sanchez

12  learns about that, she will report that up to

13  you, correct?

14       A.   Right.  She could also report to me if

15  she felt like new information had been obtained

16  or there was information that she would think

17  should be considered in the determination

18  whether to -- a person should have been in

19  custody or perhaps an alternative form of

20  detention could be applied.

21       Q.   Has that ever happened so far?

22       A.   Not so far, but we've only been doing

1   it about five weeks.

2        Q.   Five weeks.  I thought you started --

3   and maybe my math is wrong -- you started this

4   in mid October, correct, on or about October

5   17th?

6        A.   17th or 18th, yes.

7        Q.   Whatever that is.

8        A.   Six weeks.

9        Q.   I'm not going to quibble with you.

10  But at least during that period Ms. Sanchez has

11  not come to you and said, hey, I think there is

12  a mistake or I think there is information that

13  should have been considered by the field office

14  that wasn't, correct?

15       A.   No, but this process has been a

16  continuous ramp-up.  So first we worked on the

17  standardized sheet and then we implemented the

18  SharePoint system.  And as it has been rolled

19  out to the field, we've been continuing to

20  improve the process as it is.

21            So, so far no, but because we haven't

22  made any changes in the policy, the law hasn't

1  changed and the officers for the most part have

2  been doing this, they have a lot of experience,

3  I wouldn't expect mistakes from the field very

4  often.

5      Q.   But, again, to be clear, at least to

6  date Ms. Sanchez hasn't reported any mistakes

7  from the field or anything that she thinks

8  requires additional consideration, or that

9  wasn't considered and should have been

10  considered, correct?

11      A.   She has not brought any of those cases

12  to my attention.

13      Q.   And, again, to be clear, there was no

14  change in policy that accompanied this new

15  documentation, correct?

16      A.   No.

17      Q.   Now, let's go back to the former

18  age-out, monthly age-out reports.

19          Did anyone at ICE review the accuracy

20  or completeness of those reports as they were

21  submitted by the field offices?

22      A.   No, because those were spreadsheets.

1  couple of iterations with OPLA, and I reviewed

2  it at different times as it relates to being

3  crafted.

4      Q.   When did you decide to adopt this new

5  system and create this worksheet?

6      A.   Well, when I first entered on duty as

7  the unit chief 13 months ago, one of the things

8  that I noticed right away was that they needed a

9  lot more I felt like data quality.  We call it

10 data quality and integrity.

11        So I felt like there were programs out

12 there and a lot of work was being done but it

13 wasn't always documented really well.  So over

14 time I've been implementing data quality checks

15 in different aspects of the program.

16        So this is one of the ones that was on

17 our radar, and we talked about it some, and then

18 we finally worked it out sometime back in

19 October, I think.

20     Q.   When did you start working on this

21 form and this new documentation system?

22     A.   Maybe in August I had -- I had an

1    employee that -- not a contract employee, but

2    she learned how to do SharePoint, and so we had

3    the idea that between a worksheet and a

4    SharePoint we should be able to visually track

5    the information a lot better.

6        Q.    What was the name of that employee?

7        A.    Kyla Voit, V-o-i-t.  She is a

8    contractor.

9        Q.    Did a contractor help develop the

10   SharePoint site in this worksheet?

11       A.    Not the worksheet.

12       Q.    What about the SharePoint site?

13       A.    Yes.

14       Q.    Who was the contractor?

15       A.    Her.

16       Q.    And what company or what firm was she

17   with, or is she with?

18       A.    She's with Capgemini.

19       Q.    And they are an outside provider to

20   ICE for a number of different services, correct?

21       A.    Yes.

22       Q.    Consulting services.  Was she assigned

1      Q.   Let me direct your attention to the

2  first page of the worksheet, which is the fifth

3  page of Plaintiff's Exhibit 3.

4           And specifically the last sentence of

5  the first paragraph:  "Please complete the

6  worksheet for each former UAC who has aged out

7  of HHS ORR custody and who is being or has been

8  transferred to ICE ERO custody."

9           Do you see what I'm referring to

10  there?

11     A.   Yes.

12     Q.   Is that an accurate statement in terms

13  of the former UACs or age-outs for whom this

14  form is to be completed?

15     A.   Yes.

16     Q.   When it refers to age-outs who have

17  been transferred to ICE custody, I think we've

18  talked about that before, those are folks that

19  weren't placed by ORR and they are or have or

20  are about to turn 18, correct?

21     A.   Yes.

22     Q.   But this also refers to age-outs who

1   are being transferred, if I'm reading right, who

2   is being or has been transferred, and maybe I'm

3   reading this over-technically.

4          Who is the -- who is being referred to

5   in the clause "who is being transferred to ICE"?

6   Anyone other than the group that we just

7   described?

8       A.   Well, that would be any former UAC

9   because they are not UACs when they turn 18, and

10  then who is being transferred to ICE ERO

11  custody.

12      Q.   So it's somebody who is in the process

13  of being transferred or has just recently been

14  transferred?

15      A.   Yes.

16      Q.   But in all cases this form is to be

17  completed for former UACs who have aged out and

18  are in or in the process of being in ICE's

19  custody?

20      A.   I'm sorry, can you repeat the first

21  part of your question?

22          MR. PATTON:  Please read it back.

1           THE REPORTER:  "Question:  But in all

2    cases this form is to be completed for former

3    UACs who have aged out and are in or in the

4    process of being in ICE's custody?"

5           THE WITNESS:  Well, the form isn't

6    retroactive.  It's for people that are aging out

7    and coming into ICE custody.

8    BY MR. PATTON:

9       Q.   Does the form apply to age-outs who

10   are released before they come into ICE's

11   custody?

12      A.   No, because that wouldn't be an

13   age-out.

14      Q.   Let me direct your attention to the

15   next page, to item 8, or question 8:  "Is this

16   age-out a flight risk, danger to the community,

17   or danger to themselves?"  And then there is a

18   box yes and a box no.

19           Do you see what I'm referring to?

20      A.   I do.

21      Q.   Did you consider separating out the --

22   well, strike that.

1          Is it correct that those are the three

2    factors that are identified in VAWA or Section

3    1232(c)(2)(B)?

4          A.   Those are the factors that are

5    specifically delineated, yes.

6          Q.   Did you consider separating out those

7    three factors individually and asking questions

8    as to each?

9          A.   I believe that this question came from

10   the old form but, as I said, I have one

11   particular officer who is assigned to review the

12   SharePoints continually.  And she had discussed

13   with me over the course of last week and then --

14   that she felt like some of the questions should

15   be reworked.

16          And since we're trying to make this

17   the clearest and best source of documentation of

18   the officers' work, we talked about reworking a

19   few of these questions and sort of making it a

20   little clearer for the officers.

21          Q.   So is this a question that you talked

22   about reworking?

1   anything that falls within the broad spectrum of

2   the VAWA language, which is supervised group

3   homes, organizational sponsors and other kinds

4   of placement.

5        Q.   On item 12, that reads "are any

6   individual or organizational sponsors or

7   supervised group homes available to the age-out

8   for placement?"  Correct?

9        A.   Yes, that's what it says.

10       Q.   What is your understanding as to the

11  meaning of what "available" means in that

12  question?

13       A.   Available would mean that a program

14  had a spot available and set aside for that

15  age-out.

16       Q.   Anything more than that?

17       A.   I mean, do you have a specific

18  question?

19       Q.   Well, if you look at the note under

20  that it says:  "If no, briefly explain in the

21  remarks which of these options were evaluated

22  and why they were not used."

1      A.    Uh-huh.

2      Q.    Which, I understand your definition of

3 the word available, if I just read the question

4 that's what I would think, hey, is it available,

5 can the age-out or the UAC be a part of the

6 program?

7           But the note makes this suggest that

8 what this form is asking for, yeah, there was

9 some program that somebody recommended, ORR, the

10 attorney, but the deportation officer said, no,

11 it's not available, as I view availability, and

12 then they have to explain why they rejected

13 that.

14     A.    Right.

15     Q.    Am I misreading the import of this

16 question when you consider it with the comment

17 below it or the note below it?

18     A.    So this particular question relates to

19 the follow-up of the post-18 plan.  Was anything

20 recommended or put in place by ORR for this

21 age-out?  Yes or no.  If no --

22     Q.    Do you see the note?

1      A.   Yes, then briefly explain in the

2   remarks which of these options were evaluated

3   and why they were not used.

4      Q.   So this at least means to me that

5   there could be an alternative, a less

6   restrictive setting that was available, even

7   recommended by ORR.  The deportation officer

8   says no, checks no.

9           And this is saying, if you check no,

10   explain why that option was evaluated and they

11   were not used or approved?

12      A.   Well, two comments:  One, I think that

13   we should reword this question in an effort to

14   better document our work on the UAC age-out

15   process.

16           But essentially if an organization was

17   available or a supervised group home was

18   available and the FOJC decided not to use that

19   or the supervisor did, then we would want them

20   to explain why they eliminated that possible

21   un-discretionary form of an alternative to

22   detention.

1          The purpose of the form is to try and

2     ensure that the officers have exercised all the

3     discretion available to them and made the best

4     decision possible.

5          So that's why that question is in

6     there, to make them explain why they didn't

7     accept or go with the recommended placement.

8          Q.   But the question acknowledges that,

9     just because there is a least restrictive

10    setting available, doesn't mean that the officer

11    has to approve that.  The officer can still say

12    no and explain why.  Correct?

13         A.   Well, that's not actually what the

14    question says.

15         Q.   But is that the intent or purpose

16    behind the question when read with the note

17    underneath it?

18         A.   I believe it is the intent of the

19    question but that is actually not what the

20    question says.

21         Q.   I agree with you.  So this is another

22    one that you are going to add to your list as

1    potentially considering for revision?

2         A.    Yes, but I would still keep the part

3    where the officers say why a particularly

4    available program was not -- why they didn't,

5    you know, avail the UAC of that program.  So

6    that it causes them to think and apply the

7    standards that are required under VAWA.

8         Q.    I'm going to ask you some questions

9    about the monthly age-out report and some

10   changes that were made in January of 2018 to

11   that report.

12             Do you recall that occurring, that

13   there were changes that were made to the age-out

14   report earlier this year?

15        A.    I think we changed some of the

16   categories, yeah, I think we added some

17   categories for additional clarity.

18             MR. PATTON:  Please mark this as

19   Exhibit 4.

20        (Deposition Exhibit Number 4 was marked for

21        identification.)

22   BY MR. PATTON:

1      A.   It was for November, well, since we

2  started.

3      Q.   How many age-outs have you had since

4  you started with the new documentation, the new

5  SharePoint system?

6      A.   234.

7      Q.   And how many of those 234 have been

8  detained?

9      A.   I don't remember any longer.  I think

10  it was about the same as always.  I think it was

11  in the 60 percent area, I think.  I think our

12  historical number is about 53 percent.  I think

13  that's the overall historical number.

14      Q.   53 percent or 63 percent?  I'm sorry,

15  I just didn't hear you.

16      A.   I think the average is 53 percent, but

17  I'm not sure.

18      Q.   Okay.  When you say you think the

19  average is 53 percent, over what time period are

20  you referring to?

21      A.   From the time period that we have

22  data, which I believe they started the reports I

1   believe in the beginning of 2016.

2        Q.   During the 13 months that you've been

3   unit chief, what has been the approximate

4   percentage of total age-outs that were detained?

5        A.   I'm not really sure.  I think it has

6   always been around 60 percent or so, but I can't

7   say for sure.  You probably have the reports

8   more readily available than I do.

9        Q.   Don't necessarily assume that.

10       A.   A lot of these reports, you know, they

11  go into my mailboxes, and I intend to look at

12  them and I don't have time but, yes, I am copied

13  on all of them.

14       Q.   Do you intend to continue to receive

15  and monitor similar monthly summaries of number

16  of age-outs and the number detained and released

17  under the new documentation system?

18       A.   Yes.

19       Q.   And did you -- was yesterday -- or I

20  can't remember when you said you looked at this,

21  I thought it was yesterday -- part of that

22  effort to monitor age-out statistics under the

1  new system?

2      A.   No, I was looking at it the other day,

3  I think since the beginning of this week,

4  because we wanted to know how many people had

5  aged out since the program new process was put

6  in place.

7          And we were looking at whether or not

8  the appropriate documents had been uploaded.

9  And so I had an entire spreadsheet of

10 information that I was asking Ana Sanchez about.

11     Q.   Okay.  And what did that information

12 show with respect to the uploading into the

13 SharePoint system of information concerning

14 these 234 age-outs?

15     A.   So there was worksheets uploaded for

16 all of the 234, except for seven, and Ana spoke

17 to the FOJCs that had done those seven, and they

18 had the sheets but they had not yet gotten

19 access to the SharePoint.

20     Q.   And why had they not received access

21 to the SharePoint?

22     A.   Because in the beginning of fiscal

1   years, and then in the months following that,

2   field officers have often a rotation of

3   assignments, and it just happens to fall on

4   fiscal years.  It's just easier that way.

5          They have a rotation in the

6   assignments for officers.  They go from one unit

7   to another, and some officers.  So some of them

8   were new FOJCs that hadn't made it onto the

9   distribution list yet, and then others were it

10  seemed dropped off when the SharePoint was moved

11  from one ICE server to the next server.

12         So one day we came in and we couldn't

13  get on the SharePoint.  And the Capgemini team

14  called the IT Department, and they said they had

15  moved servers and they would have to change some

16  language so we could get it again.

17         Q.   Do FOJCs rotate on some kind of a

18  periodic basis?

19         A.   It's supposed to be at least a year.

20  I asked for two years now that I'm in the

21  position and I see the specialized training

22  involved, but that's totally up to the field

1  office director.

2     Q.   Do FOJCs receive any formal training

3  when they are named FOJCs?

4     A.   Well, when they are first named FOJCs

5  they are trained by the outgoing FOJC.  And then

6  they have access to our website, which is part

7  of the ICE website, and the handbook is on

8  there.

9         There is some training guides on

10  there, interactive training, that they can go

11  through and take a test and make sure that they

12  know the basics.

13         And then they come to the national

14  training when we have that.  And they are on all

15  of the monthly calls that we have and on my

16  distribution list for -- to receive materials

17  sent out from my unit.

18     Q.   But if I understand your testimony

19  correctly, there is no training program or

20  session that is provided to new FOJCs at or

21  about the time they become FOJCs, is that

22  correct?

1   A.   It could be either way, depending on

2   the way that the particular ORR program works

3   and the relationship that is in place with the

4   ICE officer.

5         So sometimes they are detained for a

6   short period of time and then released to that

7   facility, or sometimes ORR will have ICE or

8   allow ICE to do the paperwork ahead of time and

9   then they can go right from the ORR shelter to

10  the other program.

11  Q.   Okay.  I want to ask you a little bit

12  about age-outs since the October 17th transition

13  to documenting it in the new way.

14        Remind me how many -- Mr. Patton asked

15  you this question -- remind me how many age-outs

16  there have been since October 17, 2018?

17  A.   Through December 3rd there were 234.

18  Q.   And for how many of those people did

19  ICE consider the least restrictive setting

20  available prior to making a detention or release

21  decision?

22  A.   For all of those people.

1    Q.   And for all -- for the 234 people, how

2  many of those people had proper documentation

3  uploaded to the SharePoint website?

4    A.   All but seven had the worksheet

5  uploaded, and the seven, the worksheets are

6  done, my officers have been in contact with them

7  and they are just giving them access to upload

8  the documents.

9    Q.   And were these 234 from all different

10  field offices across the country?  I mean, was

11  this dispersed across the country?

12    A.   It was dispersed across, I think, 16

13  -- 15 or 16 field offices.

14    Q.   Okay.  How many field offices does ICE

15  have?

16    A.   24.

17    Q.   And of the 24 field offices, how many

18  of those field offices have an ORR shelter under

19  that area of responsibility?

20    A.   About the same number I would say.

21  About maybe 16.

22    Q.   16?

1          A.    17, 15, right around there.

2          Q.    So do you get age-outs from the

3     remainder where there isn't a shelter?

4          A.    No.

5          Q.    So if I can ask you about Boston, for

6     example.   Is there an ORR shelter in Boston?

7          A.    I don't believe so.

8          Q.    Do you ever get age-outs from Boston?

9          A.    Not that I'm aware of.

10         Q.    So what percentage of the field

11    offices that have a shelter and have age-outs

12    are reporting in when they get age-outs to the

13    SharePoint website?

14         A.    All of them.

15         Q.    How do you know it is all of them?

16         A.    Because that's the way that we train

17    them and that's the way that we expect them to

18    do their duties.

19         Q.    And do they generally comply with what

20    you told them to do?

21              MR. PATTON:   Objection.

22              THE WITNESS:   Absolutely.

1      A.   I mean, I think that sometimes happens

2  in life, yes.

3      Q.   In any event, is there any other basis

4  for your testimony that the less restrictive

5  setting was considered in all these cases other

6  than your belief that, well, that's what we tell

7  them to do so they must have done it?

8      A.   Yes, because they have gone through

9  and completed the worksheet and identified all

10  of the factors that were involved in taking --

11  in making their decision.

12      Q.   Any other basis for that testimony?

13      A.   No.

14      Q.   And what are the particular answers to

15  the worksheet that you are relying on when you

16  say -- testified that in all cases the

17  deportation officer must have considered the

18  least restrictive setting?

19      A.   So all of these questions are factors

20  in determining the appropriate setting or

21  placement of an age-out, including what would

22  naturally be the least restrictive setting of

1  any spectrum.

2          So in addition to all of these

3  factors, question 15 says detention decision

4  considering the least restrictive setting

5  available.

6          So even at the end by signature they

7  have to attest that they have considered it.

8      Q.   You also testified or gave the opinion

9  that since October 17, 2018, there have been no

10  class members.  Do you recall that?

11      A.   There have been no new class members.

12      Q.   Yes.  Do you recall that testimony?

13      A.   I do.

14      Q.   And was your basis for that testimony

15  the same as that you've just described, that

16  that is what you tell the deportation officers

17  to do so they must have done it, number 1, and,

18  number 2, there was a completed worksheet for

19  each of those 234 persons?

20      A.   Well, in addition to those two

21  factors, the FOJCs in the field have been doing

22  this process for a long period of time, ever

1   since the inception of the VAWA requirement.

2          So I don't see any reason why they

3   would not continue to do their job the way that

4   they have done it before successfully.

5          Q.   So the third reason you are giving is

6   that you believe that the field officers have

7   always complied with Section 1232(c)(2)(B) so

8   you assume they have continued to comply with it

9   as to these 234 new age-outs since October 17,

10  2018, correct?

11         A.   Yes.  And now they have documentation

12  to support the work that they do in evaluating

13  these decisions.

14         Q.   Do you know the circumstances of any

15  of those 234 individual age-outs, the facts and

16  circumstances of the particular age-outs?

17         A.   I think one was a rapist, but other

18  than that.

19         Q.   The answer is no?

20         A.   Right.

21         Q.   And did you talk to any of the

22  individuals who made those custody decisions as

1   to those 234 age-outs?

2        A.   No, I haven't talked to them.

3        Q.   Did you review any of the

4   documentation on the share site with respect to

5   any of those 234 individual age-outs?

6        A.   I have reviewed some of the

7   SharePoints.  I have officers that are reviewing

8   it and I have one dedicated officer that reviews

9   it all the time.

10       Q.   Not my question.

11            In giving your opinion that there are

12  no class members and that there is 100 percent

13  compliance, as to the 234 age-outs sent October

14  17, 2018, did you review any of the

15  documentation with respect to any of those

16  age-outs?

17       A.   I have reviewed some documentation but

18  not all of it.

19       Q.   What documentation did you review?

20       A.   Just some of the miscellaneous

21  worksheets that were brought to me to look at.

22       Q.   Did you even review the worksheets for

1  all 234 or did someone else do that?

2       A.    No, my officer does that.

3       Q.    But the basis for your testimony is

4  you have been told by Ms. Sanchez that an

5  age-out sheet was completed for each of those

6  234, correct?

7       A.    That the process has been documented

8  for all 234, that's correct.

9       Q.    A sheet was filled out, right?

10      A.    The sheet documenting the process was

11  in existence, was completed, that's right, yes.

12      Q.    What about any of the age-out

13  decisions that were made after you became the

14  unit chief and before October 17, 2018, do you

15  know any of the facts and circumstances of those

16  individual age-outs?

17      A.    Just some of the ones that have been

18  brought up in different depositions and things

19  like that.

20      Q.    Have you talked to the officers in the

21  field who made the custodial decisions as to any

22  of those age-outs?

1       A.   I have talked to officers about cases

2  when they have called to discuss them with me,

3  yes.

4       Q.   But other than that, have you talked

5  to the officers that made the decisions in the

6  field as to whether to detain age-outs during

7  that period?

8       A.   I have talked to the ones that have

9  called me.

10      Q.   To ask a question?

11      A.   To ask questions about particular

12 cases, yes.

13      Q.   Have you reviewed any of the

14 documentation as to any of those individual

15 age-outs during the period from the fall of 2017

16 when you first became unit chief until October

17 17 of 2018?

18      A.   Only in like if somebody contacted me

19 and then sent me forward paperwork to look at,

20 then I would have reviewed it.

21      Q.   But only in those circumstances?

22      A.   Well, those are the only circumstances

1   I could do that in, because this is an ongoing

2   daily activity.  Prior to this I didn't have all

3   of the documentation.

4        Q.   So you couldn't have reviewed it even

5   if you had wanted to, correct?

6        A.   If I had wanted to, I could have asked

7   for it.

8        Q.   But you didn't?

9        A.   I didn't because I'm not -- I can't

10  track every single age-out in the country by

11  myself.

12       Q.   But I think you testified that one of

13  the reasons why you assume that there has been

14  100 percent compliance with the statute since

15  October 17 of 2018 is because you believe there

16  was 100 percent compliance before, right?  Isn't

17  that your testimony?

18       A.   I believe that the FOJCs have always

19  considered the least restrictive setting as

20  required by VAWA.

21       Q.   And my question is, that as to any of

22  those age-outs as to which custody decisions

1    were made, after you became unit chief and

2    before October 17, 2018, did you review any of

3    the documentation concerning any of those

4    age-outs except in the rare occasion when

5    someone asked you a question about a particular

6    case?

7        A.    No.

8        Q.    And did you talk to the detention

9    officers that made those age-out decisions

10   during that period except in the rare

11   circumstance where somebody raised a question

12   about a particular case?

13       A.    We don't have detention officers.

14       Q.    Deportation officers.

15       A.    No, I speak to them when they call me

16   and ask me for advice or questions.

17            MR. PATTON:   I have nothing further.

18            MR. KISOR:   Me neither.

19            (Whereupon, at 3:47 p.m., reading and

20       signing not waived, the deposition was

21       concluded.)

22