**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WILMER GARCIA RAMIREZ, SULMA HERNANDEZ ALFARO, on behalf of themselves and others similarly situated, | ) ) ) ) |
| | ) Case No. 1:18-cv-00508-RC |
| *Plaintiffs*, | ) ) Class Action |
| | ) |
| v. | ) ) |
| | ) |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et al.*, | ) ) ) |
| | ) |
| *Defendants*. | ) ) |
| | ) ) |

## TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................1

II.   THE SCOPE OF ANY INJUNCTION SHOULD NOT EXCEED THE
STATUTE OR BROADLY INTERPRET THE STATUTORY LANGUAGE..... 2

    A.   Any injunction imposed by the Court should recognize that the plain
meaning of "consider" requires DHS only to "take into account" or "bear
in mind" factors in the statute, and the obligation is a minimal one.......... 2

    B.   The other elements of Section 1232(c)(2)(B) ............................................ 9

III.   PROPOSED SPECIFIC REMEDIES SHOULD THIS COURT FIND
A CLASSWIDE VIOLATION............................................................. 11

    A.   The Court should evaluate ICE's present practice to determine the scope
of any injunction, which should be limited to remedy any present, ongoing
violation. .............................................................................................. 11

    B.   The revised ICE Form 70-070 (08/19) is an effective means of
determining, after-the-fact, whether FOJCs considered the least restrictive
setting available for age-outs who were detained .....................................12

    C.   ICE reconciling data with ORR regarding the number of age-out each
month ................................................................................................... 13

    D.   Requesting that ORR issue guidance to its field offices regarding that a
standardized Post-18 Plan be developed and implemented ...................... 14

    E.   Training on 8 U.S.C. § 1232(c)(2)(B)...................................................... 14

        1.   JFRMU visits to ICE Field Offices................................................ 14

        2.   The JFRMU 2020 Annual Training................................................ 15

        3.   JFRMU Monthly calls with Field Offices ..................................... 15

        4.   Additional guidance to the Field Offices ...................................... 16

IV.   VOLUNTARY CESSATION........................................................... 16

V.   ENFORCEMENT MECHANISM ...................................................... 18

i

VI.     REMEDIES WHICH THIS COURT SHOULD NOT IMPOSE ......................... 20

    A.  In crafting a remedy, this Court should not, and indeed cannot, either re-write the statute or impose a set of extra-statutory requirements ............. 21

    B.  This Court should not impose any sort of quota or cap in the detention rates of age-outs that Congress did not legislate........................................ 22

    C.  The Court should decline to issue a nationwide injunction ...................... 23

VII.    CONCLUSION..................................................................................................... 24

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*A.L. Mechling Barge Lines v. United States*,
    368 U.S. 324 (1961) ....................................................................................17

*Already, LLC v. Nike, Inc.*,
    568 U.S. 85....................................................................................................17

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ....................................................................................23

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ....................................................................................19

*City of Mesquite v. Aladdin's Castle, Inc.*,
    455 U.S. 283 (1982) ...............................................................................16, 17

*Clark County v. FAA*,
    522 F.3d 437 (D.C. Cir. 2008) ...................................................................20

*County of Los Angeles v. Davis*,
    440 U.S. 625 (1979) ....................................................................................16

*Crenshaw v. Antokol*,
    287 F. Supp. 2d 37 (D.D.C. 2003) ...............................................................5

*DeFunis v. Odegaard*,
    416 U.S. 312 (1974) ....................................................................................16

*Delta Air Lines, Inc. v. Export-Import Bank of United States*,
    85 F. Supp. 3d 387 (D.D.C. 2015) ....................................................4, 5, 23

*Dep't of Homeland Sec. v. N.Y.*,
    140 S.Ct. 599 (2020) ...................................................................................23

*Entergy Corp. v. Riverkeeper, Inc.*,
    556 U.S. 208 (2009) ......................................................................................6

*Eugene Burger Manag. Corp. v. U.S. Dep't of Housing and Urban Develop.*
    192 F.R.D. 1, 6 n.4 (D.D.C. 1999). ..............................................................5

*Friends of the Earth v. Laidlaw Envtl. Servs.*,
  528 U.S. 167 (2000) ....................................................................................................17

*Gray v. Sanders*,
  372 U.S. 368 (1963) ....................................................................................................16

*Hamama v. Adducci*,
  912 F.3d 869 (6th Cir. 2018) .......................................................................................24

*Hamama v. Adducci*,
  -- F.3d --, 2020 WL 39020 (6th Cir. 2020) ................................................................24

*Jennings v. Rodriguez*,
  138 S.Ct. 830 (2018) ..............................................................................................23, 24

*K Mart Corp. v. Cartier*,
  486 U.S. 281 (1988) ......................................................................................................3

*Lewis v. Pension Benefit Guarantee Corp.*,
  40 F. Supp. 3d. 147 (D.D.C. 2014) .............................................................................19

*Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm*,
  463 U.S 29 (1983). ......................................................................................................20

*Nat'l Endow. for the Arts v. Finley*,
  524 U.S. 569 (1998) ...............................................................................................6, 8, 9

*New Mexico Navajo Ranchers Ass'n v. I.C.C.*,
  850 F.2d 729 (D.C. Cir. 1988) ......................................................................................5

*Porter v. Lee*,
  328 U.S. 246 (1946) ....................................................................................................16

*Princeton University v. Schmidt*,
  455 U.S. 100 (1982) ....................................................................................................16

*Pub. Investors Arbit. Bar Ass'n v. S.E.C.*,
  771 F.3d 1, 5 (D.C. Cir. 2014) ......................................................................................3

*Reno v. Am.- Arab Anti-Discrimination Comm.*,
  525 U.S. 471 (1999) ....................................................................................................24

*Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A.*,
  705 F.2d 506 (D.C. Cir. 1983) .................................................................5, 8

*Tourus Records, Inc. v. Drug Enf. Admin.*,
  259 F.3d 731 (D.C. Cir. 2001) ....................................................................20

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  582 U.S. 2012................................................................................................17

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) ..................................................................................24

*United States v. Bruce*,
  285 F.3d 69 (D.C. Cir. 2002) .........................................................................7

*United States ex rel. Davis v. District of Columbia*,
  34 F.Supp.3d 30 (D.D.C. 2014) ...................................................................10

*United States v. Aluminum Co. of America*,
  148 F.2d 416 (2d. Cir. 1945)........................................................................17

*United States v. Concentrated Phosphate Export Ass'n*,
  393 U.S. 199 (1969) ......................................................................................16

*United States v. Speqtrum*, Inc.,
  47 F. Supp. 2d 81 (D.D.C. 2014) ..................................................................5

*United States v. Trans-Missouri Freight Ass'n*,
  166 U.S. 290 (1897) ......................................................................................16

*United States v. W.T. Grant Co.*,
  345 U.S. 629 (1953) ...........................................................................16, 17, 18

*Vitek v. Jones*,
  445 U.S. 480 (1980) ......................................................................................16

*Walling v. Helmerich & Payne*,
  323 U.S. 37 (1944) ........................................................................................16

*Weyerhaeuser Co. v. Costle*,
  590 F.2d 1011 (D.C. Cir. 1978) ..............................................................4, 5, 8

## FEDERAL STATUTES

5 U.S.C. § 706(1) ................................................................................................20, 21

8 U.S.C. § 1221-1232 ..............................................................................................24

8 U.S.C. § 1226......................................................................................................22

8 U.S.C. § 1232........................................................................................................2

8 U.S.C. § 1232(c)(2)(A) ...............................................................................4, 21, 22

8 U.S.C. § 1232(c)(2)(B) ..............................................................................**passim**

8 U.S.C. § 1232(e) ..................................................................................................15

8 U.S.C. § 1252(f)(1) ..............................................................................................24

18 U.S.C. § 3553(a) ..................................................................................................7

20 U.S.C. § 954(d)(1) .........................................................................................6, 9

33 U.S.C. § 1314(b)(2)(B) .........................................................................................8

33 U.S.C. § 1326(b) ..................................................................................................6

## OTHER

THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 392
(5TH ED. 2016) ..................................................................................................... 3, 6

WEBSTER'S II NEW COLLEGE DICTIONARY 246 (3D ED. 2005)........................... 3

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED 483
(1993)...................................................................................................................... 7

**DEFENDANTS' PROPOSED REMEDIES SHOULD THE COURT FIND LIABILITY
UNDER 8 U.S.C. § 1232(c)(2)(B)**

Pursuant to the Court's minute order of January 16, 2020, Defendants submit a brief concerning proposed remedies, should the Court find an ongoing classwide violation of 8 U.S.C. § 1232(c)(2)(B). The Defendants request the opportunity to provide a closing argument to the Court, based on the evidence adduced at trial, and on the governing law, either in written form or orally. This remedies brief should not be construed as an admission of liability on the part of the Defendants, but rather as a brief discussing remedial options which would be (and which would not be) appropriate should the Court find that Plaintiffs have met their burden of proof at trial.

## I.    INTRODUCTION

Section 1232(c)(2)(B) spans two sentences and contains 96 words. No regulations implement the statute, and (to date) no judicial decisions – aside from ones issued in this case – interpret it. The statute's words impose only a minimal obligation onto the Department of Homeland Security and U.S. Immigration and Customs Enforcement. Given the statute's spare textual blueprint, this Court should not build an intricate system of interlocking must-dos and shall-nots. The operative complaint reveals that Plaintiffs' preferences greatly exceed what the actual statutory text requires – and this Court should not issue an injunction that effectively serves to re-write the statute as a remedy.

Rather, if there is presently an ongoing classwide violation, that U.S. Immigration and Customs Enforcement ("ICE") Field Office Juvenile Coordinators ("FOJCs") and their Supervisory Detention and Deportation Officers ("SDDOs"), fail to *consider* the least restrictive setting available when deciding whether to detain or release age-outs, then this Court should order demonstrable compliance with the statute. That is, for every age-out who is detained, ICE

must show that it considered the least restrictive setting available after taking into account the age-out's flight risk, danger to himself or herself, and danger to the community.

Section 1232 cuts in two directions at once. Namely, the encompassing broader statute requires DHS and ICE to take steps to prevent human trafficking, which might lean toward placement decisions favoring stricter scrutiny of the viability of sponsors. At the same time, Section 1232 requires DHS to consider the least restrictive setting available for age outs. *See generally* 8 U.S.C. § 1232 (which is titled as "Enhancing efforts to combat the trafficking of children"). Accordingly, in crafting a remedy this Court should also apply deference to ICE policy decisions and training because the agency decisions, by their nature, involve assessments concerning harm to self and/or others, and flight risk, and because these decisions involve application of agency expertise in law enforcement.

## II.     THE SCOPE OF ANY INJUNCTION SHOULD NOT EXCEED THE STATUTE OR BROADLY INTERPRET THE STATUTORY LANGUAGE

### A.     Any injunction imposed by the Court should recognize that the plain meaning of "consider" requires DHS only to "take into account" or "bear in mind" factors in the statute, and the obligation is a minimal one.

VAWA requires ICE to "consider" the least restrictive setting taking into account flight risk, danger to self, and danger to the community. *See* 8 U.S.C. § 1232(c)(2)(B).[1] Section

---

[1]     The full text of 8 U.S.C. § 1232(c)(2)(B) reads:

(B) Aliens transferred from Department of Health and Human Services to Department of Homeland Security custody

If a minor described in subparagraph (A) reaches 18 years of age and is transferred to the custody of the Secretary of Homeland Security, the Secretary shall consider placement in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight. Such aliens shall be eligible to participate in alternative to detention programs, utilizing a continuum of alternatives based on the alien's need for supervision, which

1232(c)(2)(B) does not have a definition section that defines the word "consider." Therefore, looking to the plain meaning of the language, Congress, dictionaries, and the courts all have defined "consider" to mean to "take into account" or "bear in mind" -- and the obligation is a minimal one, for the following reasons.

"In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K Mart Corp. v. Cartier*, 486 U.S. 281, 291 (1988). Further, it is appropriate for this Court to be "[g]uided by the dictionary." *Pub. Investors Arbit. Bar Ass'n v. S.E.C.*, 771 F.3d 1, 5 (D.C. Cir. 2014). For the verb "consider," the statute's "design" and "language," along with dictionary definitions, and other instances of how courts have applied the word, all demonstrate that the plain meaning of the verb places only a modest obligation onto the agency.

The language of the statute itself points that way. It states that the DHS Secretary shall "consider" after "*taking into account*" various factors. 8 U.S.C. § 1232(c)(2)(B) (emphasis added). Meaning, while Congress has not explicitly defined the verb in this statute, the statutory text nonetheless strongly indicates that Congress itself viewed the verb as meaning "taking into account."

The definition that Congress indicates coincides perfectly with one that dictionaries offer. They define "consider" as to "bear in mind" or "take into account." *See, e.g.,* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 392 (5th ed. 2016); WEBSTER'S II NEW COLLEGE DICTIONARY 246 (3d ed. 2005).[2]

---

may include placement of the alien with an individual or an organizational sponsor, or in a supervised group home.

[2] These dictionaries, and others, contain additional definitions as well. For instance, BLACK'S LAW DICTIONARY 306 (6th ed. 1990) mentions connotations, including "careful examination" and "[t]o deliberate about and ponder over."

The crucial word in the statute is the verb "consider." That is, the crux of the statute states that the DHS "Secretary shall *consider* placement in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight." 8 U.S.C. § 1232(c)(2)(B) (emphasis added). A requirement to "consider" does not impose much of a burden at all. That the obligation to "consider" is a minimal one follows from the plain meaning of the word, and from how the Supreme Court, the D.C. Circuit, other judges in this district court, and even this Court, have interpreted the verb. *See, e.g., Delta Air Lines, Inc. v. Export-Import Bank of United States*, 85 F. Supp. 3d 387, 407 (D.D.C. 2015) (Contreras, J.). Indeed, precedent makes clear that this Court cannot mandate how much weight, if any, the agency gives to a given factor in the statute. *See Weyerhaeuser Co. v. Costle*, 590 F.2d 1011, 1046 (D.C. Cir. 1978). Simply put, the verb "consider" cannot be read to impose investigative and fact-finding requirements compelling DHS officers to conduct a nationwide search for any and all available placements nationwide. If Congress wanted to require all of those things, it knew what to write; but Congress did not do so in Section 1232(c)(2)(B). In stark contrast, Congress *did require* more of the HHS Office of Refugee Resettlement in a previous part of the statute, 8 U.S.C. § 1232(c)(2)(A), *requiring* prompt placement in the least restrictive setting, and imposing a requirement to revisit custody every 30 days. *See* 8 U.S.C. § 1232(c)(2)(A).

Indeed, if this Court were to try to adopt a definition of "consider" which deviates from the plain meaning of that verb that could send shockwaves throughout the statutory and regulatory firmament. The verb "consider" appears everywhere. As a limited sample, Defendants have identified dozens of provisions in immigration statutes, regulations, and executive orders

that use the identical "shall consider" phrasing as Section 1232(c)(2)(B), attached hereto as Appendices A, B, and C.

Further, when the D.C. Circuit and the D.D.C. construe "consider", they also have defined the verb to mean "bear in mind" or "take into account." The D.C. Circuit has repeatedly used "consider" in this manner. *See, e.g.*, *Small Refiner Lead Phase-Down Task Force v. U.S.E.P.A.*, 705 F.2d 506, 516 n.17 (D.C. Cir. 1983) (a statute "directs" an agency "to 'consider' certain factors; this requires the agency *only* to '*take into account*' those factors . . . .") (emphasis added), *quoting Weyerhaeuser*, 590 F.2d at 1046 (D.C. Cir. 1978); *see also New Mexico Navajo Ranchers Ass'n v. I.C.C.*, 850 F.2d 729, 735 (D.C. Cir. 1988) ("the Commission's mandate to consider the public interest required it to *take into account* their underlying policies") (emphasis added).

Given this Circuit precedent, it is not surprising that the D.D.C. in multiple cases reads "consider" the same way. As this Court itself has written just a few years ago: "[t]hough these provisions utilize somewhat different language, it is undisputed that, taken together, they require the Bank to consider (or, more accurately, '*take into account*') the potential adverse effects . . . ." *Delta Air Lines, Inc. v. Export-Import Bank of United States*, 85 F. Supp. 3d 387, 407 (D.D.C. 2015) (Contreras, J.) (emphasis added); *see also Crenshaw v. Antokol*, 287 F. Supp. 2d 37, 42 (D.D.C. 2003) ("[C]ourts consider a variety of factors. First, courts take into account the location of the parties . . . ."); *United States v. Speqtrum*, Inc., 47 F. Supp. 2d 81, 89 (D.D.C. 2014) ("[T]he court will take them into account. The Court, however, will also consider the Government's Surreply").[3]

---

[3]     Additionally, Defendants have found one case where the D.D.C. defined the verb "deliberate" to mean, in part, to consider. *Eugene Burger Manag. Corp. v. U.S. Dep't of Housing and Urban Develop.*, 192 F.R.D. 1, 6 n.4 (D.D.C. 1999).

Supreme Court justices have gone out of their way, by writing concurrences, to make this point. In *Nat'l Endow. for the Arts v. Finley*, 524 U.S. 569, 572 (1998), the Court considered a statute that set forth criteria for a federal agency when reviewing applications for grants in the arts, under 20 U.S.C. § 954(d)(1). That provision stated that the agency's chairperson "shall ensure that – artistic excellence and artistic merit are the criteria by which applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public." Justice Scalia focused on the verb "consider" in his concurrence, writing: "[g]eneral standards of decency and respect for Americans' belief and values must . . . be taken into account, see, *e.g.*, American Heritage Dictionary 402 (3d ed. 1992) [(]'consider . . . [t]o *take into account; bear in mind*'), in evaluating all applications." 524 U.S. at 591 (Scalia, J., concurring) (some punctuation and emphasis modified).

Other justices agree with this definition of the verb. Justice Thomas joined Justice Scalia in his *Finley* concurrence. 524 U.S. at 590. And Justice Breyer has expressed a similar view. In *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 213 (2009), the Court examined various regulatory requirements under the Clean Water Act, and specifically, 33 U.S.C. § 1326(b). In summarizing one senator's views about the requirements of the statute, Justice Breyer wrote that the senator's statement "thereby says the Administrator should consider, *i.e., take into account*, how much pollution would still remain . . . ." 556 U.S. at 234 (Breyer, J., concurring in part and dissenting in part) (emphasis added). While these concurrences do not strictly bind this Court, they do starkly illustrate how a range of Supreme Court justices have interpreted the plain meaning of the verb "consider" to mean only to "bear in mind" or "take into account," and no more.

Further, when Congress uses the verb "consider," it does not require significant work. To be sure, the D.C. Circuit has not always stuck to the "bear in mind" or "take into account" definition of "consider." But where the D.C. Circuit looked to a somewhat longer definition, it took steps to clearly emphasize that the verb "consider" imposes only a minimal obligation. In *U.S. v. Bruce*, 285 F.3d 69, 72-74 (D.C. Cir. 2002), the D.C. Circuit interpreted a provision of sentencing law, 18 U.S.C. § 3553(a). According to the Court, "[t]he plain language of Section 3553(a) *merely* states that a district court must '*consider* . . . the applicable guidelines or policy statements . . . .'" 285 F.3d at 73 (some emphasis added). As the Court continued: "[t]o 'consider' means to 'reflect on,' 'think about,' 'deliberate,' 'ponder,' or 'study.' . . . . It does *not* mean to 'adhere to,' 'be bound by,' or 'follow.'" *Id.* (*quoting* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED 483 (1993)). The Court's language, with its original emphasis, bears repeating: the statute "*merely* states that a district court must 'consider . . . .'" *Id.* And this form of consideration is exactly what FOJCs should be required by the Court to do in their Field Offices.

*Bruce* further emphasized the minimal exertion that "consider" requires. It drew a marked contrast between when Congress decides to "require adherence" from district courts, on the one hand, versus when Congress imposes the markedly less onerous obligation to just "consider" something. 285 F.3d at 73. In essence, when Congress wants to impose a stronger requirement, it can simply write that into the law, using a verb made from stronger stuff than "consider." *Id.* ("Congress *could have* amended [the provision] to *require* adherence" but "did not") (emphasis in original).

The D.C. Circuit has also made clear in other cases how little the verb "consider" requires. That is, just like in *Bruce*, other D.C. Circuit cases emphasize what the verb "consider"

does *not* require. In *Weyerhaeuser*, the D.C. Circuit examined an environmental law, 33 U.S.C.

§ 1314(b)(2)(B), that called for the Environmental Protection Agency to "take into account" a

range of factors. 590 F.2d at 1045. The Court referred to them as the "consideration factors." *Id.*

For these, according to the Court, "Congress did *not* mandate any particular structure or weight."

*Id.* (emphasis added). Rather, by omitting any additional guidance, the provision "left EPA with

discretion to decide how to account for the consideration factors, and how much weight to give

to each factor." *Id.* As a result, the Court had no authority to require the EPA "to give each

consideration any specific weight." *Id.* The agency was explicit in its decision to treat the

obligation for the agency to "take into account" various factors as a minimal one. Concerning

other factors in the environmental law, according to the Court, "Congress elevated them to a

level of great attention and rigor." *Id.* at 1045-46. "By contrast, the statute directs the Agency

only to 'take into account' the consideration factors, without prescribing any structure for the

EPA's deliberations." *Id.* at 1046. The minimal nature of the obligation is apparent: "[s]o long as

EPA pays *some attention* to the congressionally specified factors, the section on its face lets EPA

relate the various factors as it deems necessary." *Id.* (emphasis added). Again, for emphasis: only

"[s]ome attention." *Id.* This was not a one-off decision, either. The D.C. Circuit quoted and

relied on this reasoning in *Small Refiner*, 705 F.2d at 516 n.17. That same conclusion must apply

to 8 U.S.C. § 1232(c)(2)(B), where Congress similarly mandated no specific structure for the

agency to use when it considered the factors listed.

    As a final and striking example that demonstrates the weak force held by the verb

"consider," it is helpful to look at the Supreme Court's majority decision in *Finley*, 524 U.S. at

569. There, as mentioned above, the Court interpreted a statute requiring the chairperson of a

federal agency to take into "consideration general standards of decency and respect for the

diverse beliefs and values of the American public." 20 U.S.C. § 954(d)(1). The Court's conclusion about what this language required is telling. The government sought to satisfy this requirement "*merely* by ensuring that members of the advisory panels that conduct the initial review of grant applications represent geographic, ethnic, and esthetic diversity." 524 U.S. at 577. The Court refrained from deciding whether the agency's approach was "reasonable." *Id.* at 581. But it did make clear how much it devalued Congress' mandate for consideration of factors. *Id.* Congress had written only "advisory language" that "imposes no categorical requirements." *Id.* The provision there "admonishes" the agency "*merely* to take . . . into consideration." *Id.* (emphasis added). And when Congress wanted more from the agency, it knew how to write a stricter statute. *Id.* at 581 ("When Congress has in fact intended to affirmatively constrain [the agency] . . . it has done so in no uncertain terms").

In short, Courts have repeatedly recognized that when Congress wants concrete results, it makes an agency do significantly more than just "consider." Thus, any injunction imposed by this Court should not require more of the word "consider" than the statute requires.

**B.      The other elements of Section 1232(c)(2)(B).**

First, as discussed above, the statute requires that "the Secretary shall consider placement in the least restrictive setting available." 8 U.S.C. §1232(c)(2)(B). The word "available" does nothing to alter the analysis above about the weak nature of the obligation that the word "consider" imposes on the agency. Indeed, the word "available" serves to *further limit* the obligation on the agency.

Without that word, "available," it might be possible for one to read the statute to require the DHS Secretary to consider placement in a least restrictive setting *anywhere*. But Congress decided against that sort of heavy obligation. Instead, Congress chose to curtail the requirement

9

it placed onto the DHS Secretary. Therefore, Congress requires the Secretary to consider

placement only in last restrictive settings that are *available*. To see why this language should be

read as limiting, consider Section 1232(c)(2)(A). There, by contrast, Congress did not impose the

limiting "available" language. Instead, it requires HHS to place minors in "the least restrictive

setting that is in the best interest of the child." Given that strong language from Congress, it is

not surprising that HHS places minors around the country. Congress could have used that same

language in Section 1232(c)(2)(B). But it did not. Instead, it used limiting language more in line

with the mild obligation that Section 1232(c)(2)(B) places onto the DHS Secretary to merely

"consider" placement.

In crafting a remedy, this Court should not depart from the common-sense reading of

"available." That is, this Court should not issue any injunction that would require the DHS

Secretary to consider a least restrictive setting that is available *anywhere*. That would depart

from the context of the statute, and makes no sense when compared to Section 1232(c)(2)(A).

*See United States ex rel. Davis v. District of Columbia*, 34 F.Supp.3d 30, 49 (D.D.C. 2014)

("When faced with two potential interpretations of the statutory phrase . . . one of which leads to

an absurd conclusion, the Court is on firmer ground interpreting the statute to avoid that

absurdity.") (citations omitted). The contrast with Section 1232(c)(2)(A) demonstrates why

"available" means "locally available" and not "available nationwide."

Second, Section 1232(c)(2)(B) states that, in considering the least restrictive setting

available, age-outs "shall be eligible to participate in alternative to detention programs, utilizing

a continuum of alternatives based on the alien's need for supervision, which may include

placement of the alien with an individual or an organizational sponsor, or in a supervised group

home." This language on alternatives to detention must be read as merely part of the "shall

consider" language that modifies the rest of this provision. That is, the alternatives to detention language is not a separate requirement, but is just one sort of "least restrictive setting available" that the DHS Secretary shall consider. So, the "alternatives to detention" does not require that the Secretary actually place people into alternatives to detention. Further, the "alternatives to detention" language in the statute makes explicit that the Secretary may consider a "range" of alternatives, including "placement of the alien with an individual or an organizational sponsor, or in a supervised group home." The statute does not explicitly require that the Secretary consider any other alternatives, such as ankle-bracelets, or checking in by telephones, or using a smartphone. And even the use of individual or organization sponsors is something that the Secretary "may include" in his consideration – those are not elements that the Secretary *must* consider.

III.     **PROPOSED SPECIFIC REMEDIES SHOULD THIS COURT FIND A CLASSWIDE VIOLATION**

A.      **The Court should evaluate ICE's present practices to determine the scope of any injunction, which should be limited to remedy any present, ongoing violation.**

The evidence presented at trial in this case shows that since the inception of this litigation, ICE has been proactively improving its process of ensuring that FOJCs consider the least restrictive setting available when making a detention/release decision for an age-out under 8 U.S.C. § 1232(c)(2)(B), including the documentation of this consideration for approval by SDDOs. However, an additional combination of remedial measures, including the revised Age-Out Review Worksheet (ICE Form 70-070 (08/19)), that were simultaneously put in place in August 2019 have not been fully evaluated for effectiveness by this Court because discovery closed in this case in May 2019. Although there was testimony and documentary evidence

presented at trial about these additional remedial measures, the Court should have an opportunity

to gauge the effectiveness of what is already in place, prior to deciding what additional measures

may be necessary in an injunction.

> **B.    The revised ICE Form 70-070 (08/19) is an effective means of determining, after-the-fact, whether FOJCs considered the least restrictive setting available for age-outs who were detained.**

There needs to be some mechanism by which the Court can evaluate each month whether

ICE officers in the field have considered the least restrictive setting for those age outs which ICE

detained in the prior month. Accordingly, this Court could order that Defendants produce to

Plaintiffs and provide to the Court all of the ICE Form 70-070s and corresponding

documentation for age-outs who were detained during the most recent six-month period of

August 2019 through January 2020. During that period there were approximately 452 age-outs,

of which 121 (27%) were detained. *See* Attachment D and exhibits thereto.[4] Additionally, this

Court could order that the ICE Form 70-070s and related materials for each detained age-out be

provided to Plaintiffs' counsel by the end of each subsequent month, so that Plaintiffs may

review each of the FOJC's consideration of the least restrictive setting available prior to

detaining the age-out on a month-by-month basis.

Because the undisputed evidence at trial demonstrates that ICE Form 70-070 (08/19) is

substantially more clear that the initial version,[5] and because the Juvenile and Family Residential

Management Unit ("JFRMU") has provided guidance to the FOJCs on how to make a

recommendation under 8 U.S.C. §1232(c)(2)(B), a completed ICE Form 70-070 (08/19) is the

---

[4] At trial, this Court indicted it might consider either a declaration containing information related to the time period after discovery closed, or perhaps additional testimony. Trial Tr. 8:11-13, Jan. 14, 2020, 9:30 AM. Defendants submit such a declaration for the Court's consideration as Attachment D.

[5] Compare DX 5 and DX 6; *see also* Trial Tr. 15:11- 27:1, Jan. 15, 2019, 10:14 AM.

best source of information available to Plaintiffs and the Court about whether FOJCs considered the least restrictive setting available for the age-outs who were detained. The Court may also order revisions to the Form 70-070 if it determines that such revisions are necessary. And, that if additional revisions are made, that immediate guidance be disseminated to the Field Offices from JFRMU as to how FOJCs and SDDOs are to implement these changes.

  **C. ICE reconciling data with ORR regarding the number of age-outs each month.**

  In August 2019, ICE and the Office of Refugee Resettlement ("ORR") came to an informal agreement that ICE and ORR would share data on the number of age-outs each month so that ICE and ORR could be certain of how many age-outs there were, and ICE can ensure that a custody determination compliant with 8 U.S.C. § 1232(c)(2)(B) was made and documented for all unaccompanied alien children who age-out of ORR custody during the prior month.[6] From the beginning of August 2019 through January 2020, there were 452 age-outs, and ICE was able to determine that FOJCs had uploaded 437 of their Form 70-070s and supporting documentation to the JFRMU SharePoint site.  Of the 15 forms that were not timely uploaded, 12 of the age-outs had been released on their 18th birthdays and only 3 were detained. All 15 worksheets were eventually uploaded. *See* Declaration of Melissa Harper, Feb. 18, 2020 (attached hereto as Appendix D.)

  Accordingly, this Court could order that ICE continue to engage in this process -- provided that ORR continues to voluntarily share its information and data with ICE -- and to provide Plaintiffs and the Court with the monthly numbers (both in their totality and also broken

---

[6] *See* Trial Tr. 12:8-23, Jan. 15, 2019, 10:14 AM.

out by each Field Office, along with an explanation for any discrepancies, at the end of each month for the prior month).

**D.      Requesting that ORR issue guidance to its field offices regarding that a standardized Post-18 Plan be developed and implemented.**

Several witnesses agreed, and no witnesses disputed, that the absence of a Post-18 Plan provided by ORR increases the likelihood that an age-out will be detained. *See*, *e.g*., Trial Tr. 7:25-10:14, Jan. 15, 2019, 10:14 AM. Chief Harper also testified that, despite repeated requests to make it a national policy to provide Post-18 Plans for *every* age-out, ORR has not agreed to make this mandatory. *See* Trial Tr.9:19-23, Jan. 15, 2019, 10:14 AM.

The Department of Health and Human Services ("HHS"), ORR is not a party to this case and, as a consequence, the Court cannot issue any injunction against ORR here. And, importantly, at no point in this litigation did Plaintiffs seek leave to amend the operative complaint to add ORR as a defendant agency.  Although based on the undisputed evidence presented at trial it might make sense on the surface to issue a mandatory injunction to ORR, in this case, because Plaintiffs claims are only against ICE, this Court lacks the power to require ORR to provide Post-18 Plans, or provide them in a certain period of time before a UAC ages out of ORR custody, or to standardize the Post-18 Plans it does provide. To be clear, nothing in 8 U.S.C § 1232(c)(2)(B) requires a Post-18 Plan at all, and the statute does not even mention that term. Nonetheless, Defendants submit that that ICE could update the Court and Plaintiffs on ICE's progress to obtain a commitment from ORR to provide Post-18 Plans 2 weeks prior to an age-outs' 18th birthday, and to include standardized information in those plans.

**E.      Training on 8 U.S.C. § 1232(c)(2)(B)**

**1.  *JFRMU visits to ICE Field Offices***

14

The first of the Field Office visits occurred in August 2019. *See* Trial Tr. 24:2-28:16, Jan. 15, 2020, 10:14 AM; DX 102-109. The Court may order that ICE JFRMU staff (assuming that funding permits) continue to provide additional training to the Field Offices for Deportation Officers who serve as FOJCs and their SDDOs on the basics of juvenile and family immigration issues and available resources. Defendants are willing to submit notice of these visits to Plaintiffs' counsel and the Court as they are scheduled and funded. Defendants do not believe it would be appropriate for the Court to order that Plaintiffs' counsel be allowed to attend the site visits or any training.

### 2.   The JFRMU 2020 Annual Training

Of significant importance is the training that FOJCs receive at the JFRMU annual training, including training on the requirements of 8 U.S.C. § 1232(c)(2)(B). Defendants believe that the Court will want to review the relevant section(s) of the 2020 JFRMU annual training dedicated to the requirements of 8 U.S.C. § 1232(c)(2)(B).[7] The Court should order that the Court and Plaintiffs' counsel be provided with the relevant training materials at least 14 days prior to the training. The Court could also order that Plaintiffs' counsel be provided an opportunity to provide input or suggestions to JFRMU on the training materials.

### 3.   JFRMU Monthly calls with Field Offices

The Court may order that ICE JFRMU staff should continue the monthly FOJC teleconference calls with the Field Offices to discuss issues related to age-outs to both deportation officers who serve as FOJCs and their SDDOs on the requirements of 8 U.S.C. §

---

[7] Currently scheduled for May 2020, in Dallas, Texas. Trial Tr. 23:1-22, Jan. 15, 2020, 10:14 AM. Training of FOJCs is required by statute insofar as they have substantive contact with unaccompanied alien children. *See* 8 U.S.C. § 1232(e).

1232(c)(2)(B). Defendants are willing to raise relevant issues on the calls that Plaintiffs' counsel would like addressed.

### 4. Additional guidance to the Field Offices

To effectuate the Court's ruling, ICE could send a broadcast message to the ICE Field Office Directors (similar to the October 17, 2018 and August 29, 2019 messages) to communicate the requirements of 8 U.S.C. § 1232(c)(2)(B), the procedures for completing and uploading the Form 70-070s to the JFRMU SharePoint site, and any other terms the Court may order. Plaintiffs' counsel and Defendants could discuss proposed language for the broadcast message.

## IV.   VOLUNTARY CESSATION

Based on the evidence presented at trial and with this Brief, the Court might reasonably find that although the classwide claims are moot, the voluntary cessation exception to mootness applies.

The "voluntary cessation" doctrine, focuses on whether challenged conduct which has lapsed or the utilization of a statute which has been superseded, is likely to recur. *United States v. Trans-Missouri Freight Ass'n*, 166 U.S. 290 (1897); *Walling v. Helmerich & Payne*, 323 U.S. 37 (1944); *Porter v. Lee*, 328 U.S. 246 (1946); *United States v. W.T. Grant Co.*, 345 U.S. 629 (1953); *Gray v. Sanders*, 372 U.S. 368 (1963); *United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 202–04 (1969); *DeFunis v. Odegaard*, 416 U.S. 312, 318 (1974); *County of Los Angeles v. Davis*, 440 U.S. 625, 631–34 (1979), and *id.* at 641–46 (Justice Powell dissenting); *Vitek v. Jones*, 445 U.S. 480, 486–487 (1980), and *id.* at 500–601 (Justice Stewart dissenting); *Princeton University v. Schmidt*, 455 U.S. 100 (1982); *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 288–289 (1982).

Thus, cessation of the challenged activity by the voluntary choice of the entity engaging in it, especially if the entity contends that it was properly engaging in it, will moot the case only if it can be said with assurance "that 'there is no reasonable expectation that the wrong will be repeated.'" *W.T. Grant Co.*, 345 U.S. at 633 (quoting *United States v. Aluminum Co. of America*, 148 F.2d 416, 448 (2d. Cir. 1945)). Admittedly, this amounts to a "formidable burden" of showing with absolute clarity that there is no reasonable prospect of renewed activity. *Already, LLC v. Nike, Inc.,* 568 U.S. ___, No. 11–982, slip op. at 4 (2013) (dismissal of a trademark infringement claim against rival and submittal of an unconditional and irrevocable covenant not to sue satisfied the burden under the voluntary cessation test) (citing *Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 190 (2000)); *see also Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. ___, No. 15–577, slip op. at 5 n.1 (2017) (holding that a governor's announcement that religious organizations could compete for state monetary grants did not moot a case challenging a previous policy of issuing grants only to non-religious entities as the state had failed to carry its "heavy burden" of "making absolutely clear" that it could not revert to its policy of excluding religious organizations from the grant program).

Otherwise, "[t]he defendant is free to return to his old ways" and this fact would be enough to prevent mootness because of the "public interest in having the legality of the practices settled." *W.T. Grant Co.,* 345 U.S. at 632; *but see A.L. Mechling Barge Lines v. United States*, 368 U.S. 324 (1961). "It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc.*, 528 U.S. at 174 (quoting *City of Mesquite*, 455 U.S. at 289) (holding that an industrial polluter, against whom various deterrent civil penalties were being pursued, could not claim that the case was moot, even though the polluter had ceased polluting

17

and had closed the factory responsible for the pollution). "Though there is no bright-line rule for application of the voluntary cessation doctrine, this much is apparent: a claim is not moot if the government remains practically and legally "free to return to [its] old ways" despite abandoning them in the ongoing litigation." *W.T. Grant Co.*, 345 U.S. at 632.

In this case, the Court might reasonably find that ICE has already remedied whatever violation was occurring, and has taken significant steps to standardize nationwide improvements. If the remedial measures put in place in 2018 and 2019 by JFRMU, including ICE's implementation of the Form 70-070, reconciling ICE data with ORR data, the training, the SharePoint quality control mechanism, and the ongoing monthly calls, taken together constitute "voluntary cessation" of a nationwide violation, this necessarily means that ICE has ceased violating the law. Accordingly, Defendants submit that no further remedy is necessary, apart from an order to continue to do these things and document compliance.


V.      **ENFORCEMENT MECHANISM**

There should be an efficient process by which Plaintiffs and Defendants can obtain resolution of any prospective disputes involving future allegations of noncompliance with this Court's Orders, should any such disputes occur. But resolving a discreet dispute is complicated by the fact that so long as an FOJC actually considered the least restrictive setting, individual age-outs lack standing to challenge the individual age-out determinations in this Court. *See* ECF No. 50 at. 24 n.2, and 35 n.8. Additionally, individual remedies separately exist for age-outs who believe that ICE's age-out determination was arbitrary and capricious. Accordingly, the mechanism to invoke the Court's review under the APA should be limited to the Court providing a determination of whether a FOJC actually considered the least restrictive setting available prior making an age-out determination, and the remedy limited to a consideration under 8 U.S.C. §

1232(c)(2)(B). This would logically begin by the Court reviewing the relevant Form 70-070 to see if it was: (1) timely completed (generally no later than twenty-four hours of the age-out's birthday, barring extenuating circumstances, such as officer travel); and (2) reveals that the FOJC and SDDO considered the least restrictive setting available in that location, at that time, before making an age-out determination. *See Lewis v. Pension Benefit Guarantee Corp.*, 40 F. Supp. 3d. 147, 151 (D.D.C. 2014) (stating that an agency decision should be upheld so long as the agency engaged in reason decision-making and its decision is adequately explained and supported by the record.). In such an instance, and in the context of this case, the reviewable decision would be whether ICE made a proper consideration of the least restrictive setting available, not whether ICE's ultimate decision was arbitrary and capricious. *Id.*; *see also* ECF No. 50 at. 24 n.2, and 35 n.8.

Further, this Court should clearly state, to prevent disputes in the future, that that a fully completed Form 70-070 with corresponding documentation is presumptive evidence that the ICE officer considered the least restrictive setting available at that time. Indeed, this Court has stated the undisputable, general principle of administrative law which is that while a reviewing court must conduct a searching and careful review, an agency's action remains entitled to a presumption of regularity. *See Lewis*, 40 F. Supp. 3d at 151 (citing *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415 (1971)). Under the APA, an agency's decision should be upheld so long as the agency engaged in reasoned decision making and its decision is adequately explained and supported by the record. *Id.* Indeed, nothing more than a brief statement is necessary, as long as the agency explains why it chose to do what it did, and the court can reasonably discern the agency's path. *See Lewis*, 40 F. Supp. 3d at 151. The agency need not write much about its decision, either. The explanation need be only "a brief statement"

explaining "why it chose to do what it did." *Tourus Records, Inc. v. Drug Enf. Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001) (internal citation and punctuation omitted). And courts "will, however, uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned." *Motor Vehicle Mfrs. Ass'n of U.S. Inc. v. State Farm*, 463 U.S. at 43. Thus, the remedy selected by this Court should go no further than the Statute's requirements, and allegations of future violations must be evaluated in the context of the APA.

In this case, a fully completed Form 70-070 and supporting documentation should satisfy the Court that a FOJC accurately performed their duties under 8 U.S.C. § 1232(c)(2)(B), even if the Court disagrees with the FOJC's decision with respect to a particular age-out.

However, should review of a Form 70-070 raise a question about whether the FOJC actually considered the least restrictive setting available *at the time*, or should Plaintiffs' counsel otherwise become aware of circumstances that raise an individual issue (like a missing Form 70-070), then Plaintiffs should first raise the matter through Defendants' counsel in an effort to resolve it without involving the Court. Should that meet and confer process not resolve the issue of whether the FOJC performed his or her duty under 8 U.S.C. § 1232(c)(2)(B) before detaining an age-out within 5 business days of Class counsel providing notice to Defendants, Plaintiffs may file a motion for relief with this Court.

## VI.     REMEDIES WHICH THIS COURT SHOULD <u>NOT</u> IMPOSE

This case was brought entirely under the APA, 5 U.S.C. § 706(1) and 706(2). This Court has recognized that the remedies available under the APA are limited by the statute: it can compel agency action that is required and being unlawfully withheld, and it can set aside a final agency action that is arbitrary and capricious or contrary to law. *See* ECF No. 50 at 44. Indeed, in the Joint Pretrial Statement, Plaintiffs recognize some of these limitations and state,

Plaintiffs seek three forms of relief, each of which is specifically authorized by Section 703 of the APA: (1) a declaratory judgment that ICE's failure to consider Plaintiffs and members of the class for placement in the "least restrictive setting available," and to make "alternative to detention programs" available to them violates 8 U.S.C. § 1232(c)(2)(B) and 5 U.S. C. §§ 706(1) and 706(2); (2) a permanent mandatory injunction ordering ICE to comply with section 1232(c)(2)(B) by considering members of the class for the least restrictive setting available and *making available to them* "alternatives to detention programs, utilizing a continuum of alternatives," including placement "with an individual or organizational sponsor, or in a supervised group home"; and (3) a prohibitory injunction enjoining ICE's non-compliance with the statute.

ECF No. 242 at 7 (emphasis added).

**A.    In crafting a remedy, this Court should not, and indeed cannot, either re-write the statute or impose a set of extra-statutory requirements.**

In their request for relief, Plaintiffs subtly changed the statutory language "shall be eligible to participate in" to "making available to them." which seeks to impose an affirmative extra-statutory requirement on ICE. ECF No. 242 at 7. Further, in 8 U.S.C. § 1232(c)(2)(B), Congress stated that the Secretary of DHS "shall consider placement in the least restrictive setting available" but nowhere in the statute does Congress require the secretary to re- review the placement decision later.  *See* 8 U.S.C. § 1232(c)(2)(B). This is in stark contrast to the requirements Congress imposed on ORR to: (1) "promptly place" an unaccompanied alien child in the least restrictive setting that is in the best interest of the child; and (2) review it every 30 days. In 8 U.S.C. § 1232(c)(2)(A) Congress stated that "the placement of a child in a secure facility shall be reviewed, at a minimum, on a monthly basis, in accordance with procedures prescribed by the Secretary to determine if such placement remains warranted." 8 U.S.C. § 1232(c)(2)(A). Congress enacted no similar requirement into 8 U.S.C. § 1232(c)(2)(B). Thus, the Court should declare that the 8 U.S.C. § 1232(c)(2)(B) custody determination will always be the initial custody determination for an age-out. Any subsequent custody determination that involves release on OREC, OSUP, bond, ATD or otherwise, such as one that may occur upon request and

receipt of additional evidence from the age-out or his/her attorney or representative, is authorized as a custody re-determination under 8 U.S.C. § 1226, and is not required under 8 U.S.C. § 1232(c)(2)(B) .

To the extent that Plaintiffs argue that this Court should interpret 8 U.S.C. § 1232(c)(2)(B) by either deleting the words "consider" and "available" from or writing the final sentence of 8 U.S.C. § 1232(c)(2)(A) into 8 U.S.C. § 1232(c)(2)(B) where it does not presently exist, this Court should deny those requests. As neither term is defined in the statute, both have their ordinary meanings. "Available" means available to the FOJC in the geographic Area of Responsibility of the Field Office on the age-out's 18th birthday. Congress obviously did not require that ICE search all over the United States for an individual sponsor, shelter, or group home for an age-out for whom ORR was unable to identify any such release options while the individual was in ORR custody.

The Court should, as part of a declaratory judgment, reiterate that ICE officers are not required to either seek out or identify sponsors for age-outs. However, when making an 8 U.S.C. § 1232(c)(2)(B) custody recommendation, FOJCs should consider any sponsor (individual or organizational) that ORR, the age-out, attorney, or representative has identified or suggested as an individual or organization willing to sponsor the specific age-out (so long as sufficient contact information is provided).

## B.    This Court should not impose any sort of quota or cap in the detention rates of age-outs that Congress did not legislate.

Nor should the Court consider any remedy which expands the statute to require that ICE implement some sort of a quota or cap on detention of age-outs, either by capping the number or imposing a maximum percentage of age-outs who may be detained, in any particular ICE Field Office. Such a holding would directly contradict the Court's prior orders and Plaintiffs' stated

position that this case is not about the ultimate placement decision, but rather the statutory procedures that must be followed in making those decisions. *See* ECF No. 50 at. 24 n.2, and 35 n.8. Regarding detention rates in various filed offices. This Court generally should not consider percentages when Congress has not mandated specific numeric lines in the sand. In the *Delta Air Lines, Inc.* case, this Court made clear that a plaintiff needed a stronger argument when it pointed to an agency's high percent of adverse decisions, as supposed evidence of the agency's dereliction. "If Congress desired" to make relief "mandatory for a greater percentage . . . it certainly was free to do so . . . . [b]ut instead, Congress has left it to the" agency to make its own decisions. *Delta*, 85 F. Supp. 3d at 413.

      **C.**     **This Court should decline to issue a nationwide injunction.**

      It is axiomatic that if the Court finds that ICE is violating 8 U.S.C. § 1232(c)(2)(B), the Court should order the least restrictive injunction necessary to bring ICE into compliance with the law. This restates the general principle that injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs. *See generally, Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). In this case, the Court should not order a nationwide or universal injunction to remedy violations it finds in a small number of Field Offices (if any exist), but should narrowly tailor the relief to target the specific ICE Field Offices where the violations are occurring.

      Recently two Justices from the United States Supreme Court have criticized the prevailing trend of nationwide injunctions. *See Dep't of Homeland Sec. v. N.Y.*, 140 S.Ct. 599 (2020) (Gorsuch, J., concurring, joined by Thomas, J.) (full citation not yet available); *see also Jennings*, 138 S.Ct. at 852 (Thomas J., concurring in part, joined in part by Gorsuch, J.). In another concurring opinion, Justice Thomas expressed skepticism that the district courts have the

authority to issue universal (nationwide) injunctions at all. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring).  He observed, "[t]hese injunctions are beginning to take a toll on the federal court system – preventing legal questions from percolating through federal courts encouraging forum shopping, and making every case a national emergency for the courts and for the executive branch." *Id.*

Separately, Title 8 of the United States Code provides that regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of (sections 8 U.S.C. § 1221-1232), as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated. *See* 8 U.S.C. § 1252(f)(1); *see Jennings v. Rodriguez*, 138 S. Ct. 830, 851 (2018)); *see also Hamama v. Adducci*, 912 F.3d 869 (6th Cir. 2018) (*Hamama I*); *Hamama v. Adducci*, -- F.3d --, 2020 WL 39020 (6th Cir. 2020) (*Hamama II*).  The statute "prohibits federal courts from granting classwide injunctive relief against the operation of §§ 1221–123[2]." *Reno v. Am.- Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999); *see Jennings*, 138 S.Ct. at 830.[8]

## VII.   CONCLUSION

Should the Court find that the remedial measures ICE has already put in place are insufficient, and that ICE is presently violating 8 U.S.C. § 1232(c)(2)(B) on a classwide basis, this Court should craft an injunction carefully, and tailor it to effectively remedy discreet type(s) of violation(s) which it finds exist in *specific* Field Offices. Further, if the injunction includes

---

[8] Defendants recognize that this Court rejected this argument in granting class certification. *See* ECF No. 50 at 68-69, but seek to preserve this argument for possible appeal.

periodic reporting requirements or data production, the injunction should last be for a fixed term

of three years.  After a term of three years, any injunction should dissolve unless the Court finds

it necessary for the periodic reporting or data production to continue.

DATE:  February 18, 2019                    Respectfully submitted,


                                            */s/ Colin A. Kisor*
                                            COLIN A. KISOR
                                            Deputy Director
                                            U.S. Department of Justice, Civil Division
                                            Office of Immigration Litigation –
                                            District Court Section
                                            P.O. Box 868, Washington, DC 20044
                                            Phone: (202) 532-4331
                                            colin.kisor@usdoj.gov

                                            ATTORNEY FOR DEFENDANTS

25

## CERTIFICATE OF SERVICE

Civil Action No. 1:18-00508-RC

I HEREBY CERTIFY that on February 18, 2020, a true copy of this Brief was filed with the Clerk of the Court using the CM/ECF system, which sent notification of such filing via e-mail to the following counsel

Tia T. Trout Perez
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 389-5000
ttrout-perez@kirkland.com

Katherine E.M. Goettel
NATIONAL IMMIGRANT JUSTICE CENTER
208 LaSalle St.
Ben Franklin Station, St. 1300
Chicago, IL 60604
(312) 660-1335
kgoettel@heartlandalliance.org

Stephen R. Patton
KIRLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000
stephen.patton@kirkland.com

Michael B. Slade
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-3348
mslade@kirkland.com

Erin Reynolds
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2618
erin.reynolds@kirkland.com

*/s/ Colin A. Kisor*