# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| WILMER GARCIA RAMIREZ, *et al.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | Case No. 1:18-cv-00508-RC |
| | ) | |
| v. | ) | Class Action |
| | ) | |
| U.S. IMMIGRATION AND | ) | |
| CUSTOMS ENFORCEMENT, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |
| | ) | |

## PLAINTIFFS' MEMORANDUM CONCERNING REMEDIES

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................Error! Bookmark not defined.

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ......................................................................................................................... 2

I.    PLAINTIFFS HAVE SUFFERED AND WILL CONTINUE TO SUFFER IRREPARABLE HARM FROM DEFENDANTS' NONCOMPLIANCE. ................ 2

II.    ICE AND THE PUBLIC ARE ALSO HARMED BY DEFENDANTS' NONCOMPLIANCE. ..................................................................................................... 4

III.    DEFENDANTS HAVE DEFIED THE COURT'S 2018 PRELIMINARY INJUNCTION RULING. ................................................................................................ 5

ARGUMENT ............................................................................................................................... 9

I.    PLAINTIFFS ARE ENTITLED TO DECLARATORY RELIEF ............................... 9

II.    PLAINTIFFS ARE ENTITLED TO SPECIFIC, DETAILED INJUNCTIVE RELIEF ...................................................................................................................... 10

    A.    Plaintiffs' Requested Injunction Is Appropriate Under The APA. ...................... 11

    B.    A Specific, Detailed Injunction Is Necessary To Ensure Defendants' Compliance. ......................................................................................................... 15

    C.    The Four-Factor Test Supports Entry Of Plaintiffs' Requested Injunction. ......... 18

    D.    Defendants' Claim That They Have Begun Complying With The Statute Does Not Alleviate The Need For Injunctive Relief. ........................................... 22

III.    A MONITOR IS NECESSARY TO ENSURE DEFENDANTS' COMPLIANCE WITH THE STATUTE. .................................................................... 23

CONCLUSION ......................................................................................................................... 29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Am. Bar Ass'n v. U.S. Dep't of Educ.*,
   370 F. Supp. 3d 1 (D.D.C. 2019) ....................................................................................9, 11

*Am. Hosp. Ass'n v. Azar*,
   385 F. Supp. 3d 1 (D.D.C. 2019) ..........................................................................................15

*Caudle v. D.C.*,
   825 F. Supp. 2d 73 (D.D.C. 2011) ...................................................................................17, 18

*City of New York v. Baker*,
   878 F. 2d 507 (D.C. Cir. 1989) .............................................................................................22

*Cobb v. Green*,
   574 F. Supp. 256 (W.D. Mich. 1983) ...................................................................................19

*Cobell v. Norton*,
   392 F.3d 461 (D.C. Cir. 2004) .........................................................................................24, 28

*Commodity Futures Trading Comm'n v. Hunt*,
   591 F.2d 1211, 1220 (7th Cir. 1979)), *aff'd*, 650 F. App'x 20 (D.C. Cir. 2018)....................23

*Common Cause v. Nuclear Regulatory Comm'n*,
   674 F.2d 921 (D.C. Cir. 1982) ..............................................................................................17

*Conservation Law Found. v. Pritzker*,
   37 F. Supp. 3d 254 (D.D.C. 2014) ........................................................................................22

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006)........................................................................................................10, 18

*Friends of the Earth v. Laidlaw Env'tl Servs. (TOC), Inc.*,
   528 U.S. 167 (2000)...............................................................................................................22

*Gary W. v. Louisiana*,
   601 F.2d 240 (5th Cir. 1979) ................................................................................................25

*Grace v. Sessions*,
   Case. No. 18-cv-01853, 2018 WL 6716136 (D.D.C. Oct. 10, 2018) ......................................13

*Grace v. Whitaker*,
   344 F. Supp. 3d 96 (D.D.C. 2018), *appeal docketed* (D.C. Cir. No. 19-5013) .............. *passim*

*Hook v. State of Arizona*,
120 F.3d 921 (9th Cir. 1997) ...................................................................24

*Jacksonville Port. Auth. v. Adams*,
556 F.2d 52 (D.C. Cir. 1977) ...................................................................21

*Kravitz v. U.S. Dep't of Commerce*,
366 F. Supp. 3d 681 (D. Md. 2019) .........................................................13

*Local 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.*,
478 U.S. 421 (1986).................................................................................24

*Md. Cas. Co. v. Pac. Coal & Oil Co.*,
312 U.S. 270 (1941)...................................................................................9

*MedImmune, Inc. v. Genentech, Inc.*,
549 U.S. 118 (2007)...................................................................................9

*Morales Feliciano v. Romero Barcelo*,
672 F. Supp. 591 (D.P.R. 1986)..............................................................25

*Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*,
785 F.3d 684 (D.C. Cir. 2015) .................................................................11

*Nat'l Org. for the Reform of Marijuana Laws v. Mullen*,
828 F.2d 536 (9th Cir. 1987) ...................................................................24

*Nken v. Holder*,
556 U.S. 418 (2009).................................................................................19

*Pietrangelo v. Refresh Club, Inc.*,
No. 18-cv-1943, 2019 WL 2357379 (D.D.C. June 4, 2019)....................23

*Planned Parenthood of Greater Wash. and N. Idaho v. U.S. Dep't of Health and Human Servs.*,
328 F. Supp. 3d 1133 (E.D. Wash. 2018) ...............................................13

*Pursuing America's Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2016) ...........................................................18, 22

*R.I.L-R v. Johnson.*,
80 F. Supp. 3d 164 (D.D.C. 2015) ...............................................19, 20, 21

*Ruiz v. Estelle*,
679 F.2d 1115 (5th Cir. 1982), *amended in part, reh'g denied in part on other grounds,* 688 F.2d 266 (5th Cir. 1982) ........................................... *passim*

*Salazar v. D.C.,*
   No. CA-93-452(GK), 1997 WL 306876 (D.D.C. Jan. 17, 1997) ............................................24

*Schmidt v. Lessard,*
   414 U.S. 473 (1974) ...............................................................................................................17

*Seretse-Khama v. Ashcroft,*
   215 F. Supp. 2d 37 (D.D.C. 2002) ..........................................................................................19

*State v. Ross,*
   358 F. Supp. 3d 965 (N.D. Cal. 2019) ....................................................................................13

*U.S. Dep't of Justice v. Daniel Chapter One,*
   89 F. Supp. 3d 132 (D.D.C. 2015) ....................................................................................18, 23

*United States v. Phillip Morris USA Inc.,*
   566 F.3d 1095 (D.C. Cir. 2009) ..............................................................................................17

*United States v. W. T. Grant Co.,*
   345 U.S. 629 (1953) ...............................................................................................................22

*Williams v. Lane,*
   851 F.2d 867 (7th Cir. 1988) ..................................................................................................25

*Zenith Radio Corp. v. Hazeltine Research, Inc.,*
   395 U.S. 100 (1969) ...............................................................................................................18

**Statutes**

5 U.S.C. § 703 ...................................................................................................................................9

5 U.S.C. § 706 .............................................................................................................................9, 10

8 U.S.C. § 1232(c)(2)(B) .................................................................................................... *passim*

28 U.S.C. § 2201(a) ..........................................................................................................................9

**Rules**

Fed. R. Civ. P. 53 ................................................................................................................ *passim*

Fed. R. Civ. P. 65(d)(1) ...................................................................................................................17

## INTRODUCTION

In granting Plaintiffs' motion for a preliminary injunction nearly two years ago, the Court held that "deprivations of physical liberty are the sort of actual and imminent injuries that constitute irreparable harm," and that "the major hardship posed by needless prolonged detention is a form of irreparable harm."  (ECF 28 (P.I. Op.) at 36–37.)  Despite clear guidance from the Court that ICE had failed to properly consider alternatives to detention for the named Plaintiffs, the evidence at trial revealed that Defendants have only doubled-down on their refusal to comply with Section 1232(c)(2)(B).  Contrary to the Court's preliminary findings, Defendants took the position that they should ***not*** change anything about their Age-Out custody determinations, and instead should simply "document" their continued, inappropriate practices.   Even then, Defendants' efforts only highlighted their noncompliance—revealing that there were hundreds of "missing" Age-Outs of which ICE claimed it was unaware, and that JFRMU had engaged in an extensive, *post-hoc* effort to "correct" documentation, demonstrating Defendants' failure to consider detention alternatives as required by the statute.

Defendants' continued refusal to comply with Section 1232(c)(2)(B) has imposed, and will continue to impose, significant emotional and physical harm on Plaintiffs.  The evidence shows that, like the named Plaintiffs, most, if not all, of the Age-Out class members were transferred to adult detention upon their eighteenth birthdays without any evidence of potential danger to the community, danger to self, lack of a potential sponsor, or evidence indicating flight risk that could not be addressed by release to a sponsor.  Plaintiffs' investigation shows that these Age-Outs have been detained for extended time periods, and the unrebutted testimony of Plaintiffs' experts makes clear that this treatment subjects Age-Outs to continuing physical and psychological harm.  The harmful effects of unnecessary detention on these Age-Outs is only exacerbated by their vulnerable

condition, as many have come to the United States to escape traumatic experiences or persecution in their countries of origin, only to suffer additional trauma at the hands of Defendants.

Along with declaratory relief, immediate injunctive relief is necessary to redress this ongoing, irreparable harm to Plaintiffs.  Thus, the Court should enter a detailed permanent injunction requiring Defendants to take specific steps to comply with Section 1232(c)(2)(B). Moreover, given the complexity of supervising Defendants' compliance with any injunction; the time, expertise, and resources required to do so; and Defendants' past failure to accurately record and report information concerning their detention and release of Age-Outs; the Court should use its well-established power under Federal Rule of Civil Procedure 53, and its inherent power to enforce its rulings, to appoint a monitor who will ensure Defendants are taking the requisite steps to comply with the statute.

## **BACKGROUND**

The facts supporting Plaintiffs' requested remedies are set forth in detail in Plaintiffs' Proposed Findings of Fact and Conclusions of Law Concerning Remedies ("Plaintiffs' Proposed Remedies Findings").  Among other things, this evidence makes clear that:  (1) Plaintiffs have and will continue to suffer irreparable harm from Defendants' failure to comply with Section 1232(c)(2)(B); (2) ICE and the public are also harmed by Defendants' noncompliance; and (3) Defendants, despite the Court's preliminary injunction ruling and clear guidance, have refused to comply with the statue, and instead have attempted to paper over their failure to properly consider alternatives to detention.

**I.      PLAINTIFFS HAVE SUFFERED AND WILL CONTINUE TO SUFFER IRREPARABLE HARM FROM DEFENDANTS' NONCOMPLIANCE.**

The evidence is clear that Plaintiffs have suffered, and will continue to suffer, irreparable harm as a result of Defendants' failure to comply with Section 1232(c)(2)(B).  Each of the named

Plaintiffs testified as to how they were detained by ICE, for prolonged periods, despite the availability on their eighteenth birthdays of an individual or organizational sponsor who was willing to house and support them.  (*See* Plaintiffs' Proposed Remedies Findings ¶¶ 1–3.)  And that is just the tip of the iceberg:  data analyzed by Plaintiffs' statistical expert, Dr. Justin Lenzo, demonstrates that during the seven and a half month period from October 17, 2018 to May 24, 2019, ICE transferred over a thousand Age-Outs to county jails and other adult detention facilities throughout the United States.  (*Id*. ¶ 4.)  Yet, only 19.6% of those Age-Outs had *any* evidence of potential danger to the community, danger to self, lack of a potential sponsor, or evidence indicating flight risk that would not be addressed by release to a sponsor.  (*Id*.)  Those detained were held in custody for weeks or months, and even those detained but subsequently released by ICE or by an immigration judge on bond remained in detention for prolonged periods.  (*See id*. ¶¶ 5–6.)

Unrebutted testimony from Plaintiffs' expert, Dr. Julie Linton, further underscores the harm resulting from ICE's detention practices—what the Court has previously termed the "major hardship posed by needless prolonged detention."  (*See* ECF 28 (P.I. Op.) at 36–37.)  As Dr. Linton explained, adult detention of Age-Outs, even for brief periods, is correlated with short-term and long-term adverse physical and mental health effects, such as diabetes, depression, suicide attempts, post-traumatic stress disorder, heart disease, cancer, stroke, and chronic obstructive pulmonary disease.  (*See* Plaintiffs' Proposed Remedies Findings ¶¶ 11–12.)  Age-Outs, in particular, are vulnerable to these adverse outcomes because many have already experienced physical or mental trauma before fleeing their countries of origin and seeking refuge in the United States, which can be re-triggered by the trauma of adult detention.  (*See id*. ¶¶ 15–16.)  Defendants

did not and could not rebut this testimony, because there is no evidence that any amount of time in detention, and particularly adult detention, is safe for youth.  (*Id*. ¶ 17.)

## II.    ICE AND THE PUBLIC ARE ALSO HARMED BY DEFENDANTS' NONCOMPLIANCE.

It is not only Plaintiffs who have been harmed by Defendants' noncompliance, but also ICE and the public.  As Plaintiffs' remedies expert, former ICE Acting Director John Sandweg, testified at trial, ICE's failure to comply with Section 1232(c)(2)(B) harms ICE in at least three respects.  First, "the biggest problem" ICE currently faces is "reputational":  a significant portion of the public, the media, and members of Congress believe ICE is a rogue agency that just wants to inflict harm on immigrants.  (Plaintiffs' Proposed Remedies Findings ¶ 24.)  Detaining an Age-Out who "poses no public safety risk [and] no real flight risk" contributes to this reputational problem by perpetuating the narrative that ICE "wants to detain people simply because they are immigrants and not because they pose an active threat [to] public safety or flight [risk]."  (*Id*.)  This reputational problem harms ICE's enforcement mission by inhibiting cooperation from local and state law enforcement agencies and the public.  (*Id*. ¶ 25.)  It further harms ICE's relationship with Congress, leading to more restrictions and lower appropriations.  (*Id*. ¶ 26.)

Second, detaining Age-Outs who do not pose a danger to the community, a danger to themselves, or a significant flight risk imposes additional and unnecessary administrative and financial burdens on ICE.  (*See id*. ¶ 27.)  It costs ICE an average of $120 per day just to feed, house and supervise someone in adult detention—costs which are avoided entirely where an Age-Out is released on his or her own recognizance, and reduced to a few dollars a day where an Age-Out is released pursuant to ICE's ATD program.  (*See id*.)  Moreover, detaining Age-Outs who are not a threat to public safety or a significant flight risk diverts scarce resources from real enforcement needs.  (*See id*.)

Third, detaining Age-Outs who should be released to a less restrictive alternative results in ICE's assumption of the financial and other risks that are associated with detention.  (*See id.* ¶ 28.) County jails and other adult detention facilities are inherently risky places.  As Mr. Sandweg put it, "[Y]ou're jamming a large number of people in confined space under duress and there are things you cannot control."  (*Id.*)  That, in turn, creates financial, reputational, and other risks—from disease, to physical injuries, to self-harm, and violence—that it is impossible to entirely prevent.[1] (*See id.*)  Thus, both ICE itself and the public at large would benefit significantly from Defendants' compliance with the statute.

## III.  DEFENDANTS HAVE DEFIED THE COURT'S 2018 PRELIMINARY INJUNCTION RULING.

In the Court's April 2018 preliminary injunction decision, the Court explained in detail the statutory requirements and how ICE's custody determinations with respect to the named Plaintiffs failed to comply with Section 1232(c)(2)(B).  (*See* ECF 28 (P.I. Op.).)  Yet, instead of examining how it makes custody decisions in light of the Court's guidance, ICE stubbornly doubled down on the very practices the Court found did not comply with the statute.  As explained in detail in Plaintiffs' Proposed Findings of Fact and Conclusions of Law Concerning Liability ("Plaintiffs' Proposed Liability Findings"), this included:

- Instructing and training field officers to make custody determinations based on a standard—"the totality of the circumstances"—that is not set forth in the statute and is the same standard ICE has long applied in making all adult custody determinations, and then failing to provide "any guidance in terms of what totality of circumstances means"; and instead, instructing field officers that this standard is entirely discretionary and allows field officers to consider any information they deem relevant.  (*See* Plaintiffs' Proposed Liability Findings ¶¶ 95–98.)

---

[1]  While Defendants have attempted to justify these and the harms imposed on Age-Outs by claiming that detention is necessary to ensure that Age-Outs appear for Immigration Court hearings, there are numerous other ways to achieve that objective without the costs and risks of adult detention.  (See Plaintiffs' Proposed Remedies Findings ¶ 29.)

- Requiring that officers, as the first step in the custody determination process, perform a Risk Classification Assessment ("RCA"), without advising them that the RCA was changed in August 2017 so that it never recommends release. (*See id*. ¶¶ 99–106.)

- Directing sequential decision-making in which alternatives to detention are considered only after the officer first makes a determination whether to detain or release, and only in those cases where the decision is to release. (*See id*. ¶¶ 107–08.)

- Considering all Age-Outs to be presumptive flight risks based on factors, such as lack of a permanent address and community ties in the United States, that apply to almost all Age-Outs, and then relying on that presumption to justify detaining any Age-Out who does not have a sponsor ICE deems "viable." (*See id*. ¶¶ 109–18.)

- Limiting the sponsors and other alternatives officers are required to consider to those provided by ORR or some other third party, and excusing officers from any attempt, let alone obligation, to identify sponsors and other alternatives that are "available" within the meaning of the statute. (*See id*. ¶¶ 123–33.)

- Relying on ORR's failure to approve a sponsor as a presumption that the sponsor was not "viable" and on ORR's failure to release an Age-Out to a sponsor as a presumption that no sponsor was available. (*See id*. ¶¶ 134–35.)

In addition, not only did ICE allow these policies and practices to continue after the Court's April 18, 2018 decision—but it affirmatively trained and instructed field officers to follow and apply them in making Age-Out custody determinations at the April 2019 annual training meeting. That is, ICE specifically instructed and trained officers, *inter alia*, (1) to make custody determinations based on the same undefined "totality of the circumstances" standard they apply in making all adult custody determinations, and emphasized the discretionary nature of that decision; (2) to perform an RCA as the required first step in making an Age-Out custody determination, and instructed officers that the "RCA should be used as an aid in making custody determinations," without disclosing that the RCA had been changed so that it no longer recommends release; (3) to consider alternatives to detention only after the decision whether to detain is made, *and only in those cases where the decision was to release*; in other words, alternatives to detention are relevant to, and considered in connection with, only the form of release; (4) to consider Age-Outs presumptive flight risks based on factors (lack of a permanent address and community ties to the

6

United States) that apply to almost all Age-Outs and then relying on that presumption to detain any Age-Out who does not have a sponsor that ICE deems "viable;" (5) that field officers are not required to make any effort to identify potential sponsors or other alternatives to detention, and instead, are required to consider only those potential sponsors or other alternatives that are proposed by ORR or the Age-Out's counsel or advocate; and (6) that they should rely on ORR's failure to approve a sponsor as evidence the sponsor was not viable, and ICE's failure to release an Age-Out to a sponsor before the Age-Out turns eighteen as evidence there was no sponsor available.  (*See* Plaintiffs' Proposed Liability Findings ¶¶ 159–217; Plaintiffs' Proposed Remedies Findings ¶ 51.)

To make matters worse, and instead of examining and revising its prior guidance, practices, and training in light of the Court's April 2018 opinion, ICE took the polar opposite position—that the problem was *not* a failure to comply with the statute, but merely a "documentation" issue; its field officers simply needed to do a better job of documenting their custody determinations.  (*See* Plaintiffs' Proposed Remedies Findings ¶¶ 52–53.)  Consistent with this position, ICE's only response to the Court's preliminary guidance was to create the Age-Out Review Worksheet and the SharePoint documentation system, which was not intended as a remedial effort, but was prepared by ICE's in-house attorneys to create a record ICE could rely upon in this and other litigation to support its erroneous position that it was complying with the statute.  (*See id.* ¶¶ 53–56.)  This new "documentation system" did not, and was never intended to, change *how* field officers made Age-Out custody determinations, or ensure that they complied with the statute.  Rather, it was completed after-the-fact simply to document a decision that had already been made.

Ironically, ICE's new documentation system only further exposed the scope of Defendants' noncompliance.  Notwithstanding that ICE was premising its defense of this lawsuit on tracking

and completing an Age-Out Review Worksheet for every Age-Out, and that it represented to the Court and Plaintiffs, under oath in sworn testimony and declarations, that it was, in fact, doing so, Defendants eventually admitted that they had failed to timely complete worksheets for over 300 Age-Outs—or one in four of all Age-Outs for the seven-month period for which Defendants produced worksheets. (*See* Plaintiffs' Proposed Remedies Findings ¶¶ 57–58.) The only explanation Defendants provided (blaming ORR for not providing a monthly list of Age-Outs before ICE first requested it sometime in the summer of 2019) concerned ICE's claimed ignorance of the identity and number of the Age-Outs who were not reported. (*Id*.) ICE offered *no* explanation for its underlying failure to report and complete worksheets for the missing Age-Outs in the first place, or as to why ORR was able to maintain an accurate record of Age-Outs when ICE was not. (*Id*.)

Discovery also uncovered Defendants' *post-hoc* "correction" of Age-Out Review Worksheets long after the relevant custody determination had been made. This involved JFRMU's most senior officials directing field officers to change the text of previously-completed Age-Out Review Worksheets in an effort to justify the field officers' detention determinations prior to their production to Plaintiffs for use in upcoming depositions. (*See* Plaintiffs' Proposed Remedies Findings ¶ 59.) What's more, the senior officials instructed field officers to create documentation for previous determinations—even when the field officers "documenting" the custody decisions were not the field officers who had made the original decision. (*See id*.) This effort to belatedly create and to alter the evidence ICE relied on to establish its compliance with the statute before it was produced to Plaintiffs raises serious questions about whether ICE can be trusted and relied upon to accurately report information relating to its compliance (or non-compliance) with an injunction or other final order entered by the Court.

**ARGUMENT**

Courts in this Circuit have recognized that, in a case like this, where Plaintiffs allege violations of the Administrative Procedure Act ("APA"), courts have "wide discretion to apply an appropriate remedy." *Am. Bar Ass'n v. U.S. Dep't of Educ.*, 370 F. Supp. 3d 1, 40 (D.D.C. 2019). Indeed, Section 703 of the APA expressly provides for "actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction." 5 U.S.C. § 703. Such "declaratory judgment" and "prohibitory or mandatory injunction" are well-supported here. And in addition, because Defendants have shown they are incapable of self-policing their compliance with Section 1232(c)(2)(B), the Court should appoint a monitor to review and ensure that Defendants are complying with the Court's decree.

**I.      PLAINTIFFS ARE ENTITLED TO DECLARATORY RELIEF.**

Pursuant to the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction … any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 126 (2007). To satisfy the "case of actual controversy" requirement, "the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Medimmune, Inc.*, 549 U.S. at 126 (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). That is unambiguously the case here.

Plaintiffs request two forms of declaratory relief. First, Plaintiffs seek a declaration that ICE's failure to place Plaintiffs and class members in the "least restrictive setting available after taking into account [their] danger to self, danger to community, and risk of flight" violates Section 1232(c)(2)(B) and Sections 706(1) and 706(2) of the APA. Second, Plaintiffs request a declaration

that ICE's failure to make available to, and consider Plaintiffs and class members eligible to participate in, "alternative to detention programs, utilizing a continuum of alternatives based on [their] need for supervision, which may include placement … with an individual or organizational sponsor, or in a supervised group home," violates Section 1232(c)(2)(B) and APA Sections 706(1) and 706(2).  (*See* Plaintiffs' Proposed Liability Findings ¶¶ 8(a)–(b).)

Plaintiffs' allegations, the course of this litigation, and the evidence presented at trial all demonstrate that there is a substantial controversy between Plaintiffs and Defendants regarding whether Defendants have violated and are continuing to violate the statutory requirements of Section 1232(c)(2)(B).  Moreover, Defendants' Age-Out custody determinations result in the infliction of immediate and irreparable harm on Plaintiffs.  (*See* Plaintiffs' Proposed Remedies Findings ¶¶ 1–19.)  As detailed in Plaintiffs' Proposed Liability Findings and Conclusions of Law, Defendants have violated, and continue to violate, Section 1232(c)(2)(B) and Sections 706(1) and 706(2) of the APA.  As such, Plaintiffs are entitled to the declaratory judgment requested and pled in Plaintiffs' Amended Complaint.

## II.       PLAINTIFFS ARE ENTITLED TO SPECIFIC, DETAILED INJUNCTIVE RELIEF.

"According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.  A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Grace v. Whitaker*, 344 F. Supp. 3d 96, 145 (D.D.C. 2018), *appeal docketed* (D.C. Cir. No. 19-5013) ("A plaintiff seeking a permanent

injunction must satisfy a four-factor test."), *citing Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*, 785 F.3d 684, 695 (D.C. Cir. 2015); *see also Am. Bar Ass'n*, 370 F. Supp. 3d at 40 (courts have "wide discretion to apply an appropriate remedy in APA cases"). Each of these prerequisites is satisfied here, and Plaintiffs are entitled to a detailed, specific permanent injunction requiring Defendants to comply with Section 1232(c)(2)(B).

### A. Plaintiffs' Requested Injunction Is Appropriate Under The APA.

As set forth in Plaintiffs' Proposed Remedies Findings, Plaintiffs request that the Court enter a specific, detailed injunction including at least the following, specific provisions to ensure that field officers consider all available sponsors and other less restrictive alternatives to detention, as required by Section 1232(c)(2)(B):

- A requirement that ICE request, at least two weeks in advance of a UAC's eighteenth birthday, that ORR or its contractors, and if the UAC is represented by counsel or a child advocate or other representative, the counsel and/or other representative, provide a Post-18 Plan that, at a minimum, sets forth the names, addresses, and contact information for all potential individual and organizational sponsors;

- A requirement that ICE review the Form I-213 and any other information in its files regarding the UAC that might identify potential sponsors;

- A requirement that ICE promptly consider each potential individual and organizational sponsor or other placement identified by ORR and the UAC's attorney or other representative, and its review of the Form I-213 and other information relating to the UAC, and promptly determine whether the proposed sponsor is available to serve as a sponsor, including, where necessary, verifying the sponsor's address in the U.S. Postal Service database;

- If a sponsor has not been identified and approved before the UAC turns eighteen, a requirement that ICE conduct an in-person interview of the UAC on the UAC's eighteenth birthday to obtain the UAC's help in identifying and contacting any potential sponsors, including family members, other relatives, and friends; and that ICE shall promptly call (or have the UAC or the UAC's attorney or other representative call) such potential sponsors to determine their willingness to serve as sponsors;

- Where ICE is not able to identify and/or approve placement with an individual sponsor, a requirement that ICE consider placement with an organizational sponsor, including shelters and group homes; and

- A finding that ICE's obligation to consider less restrictive alternatives does not end on the day a UAC turns eighteen, but continues after an Age-Out's eighteenth birthday, including, in those cases where an individual sponsor, shelter, group home or other less restrictive alternative is not available when an Age-Out first turns eighteen, after the Age-Out is placed in adult detention.

(*See* Plaintiffs' Proposed Remedies Findings ¶¶ 34–35.)

In addition, Plaintiffs request that the Court include in the injunction the following provisions to ensure ICE's compliance with Section 1232(c)(2)(B)'s requirement that Age-Outs "shall be eligible to participate in alternative to detention programs, utilizing a continuum of alternatives based on the [Age-Out's] need for supervision, which may include placement of the [Age-Out] with an individual or an organizational sponsor, or in a supervised group home":

- A requirement that each ICE field office identify, and develop relationships with, shelters, group homes, and other organizational sponsors willing to sponsor Age-Outs, including sponsors willing to provide a temporary home for Age-Outs who have just turned eighteen and as to whom ICE is trying to arrange a long-term sponsor.  Such shelters, group homes, and other organizational sponsors should not be limited to those within the ICE field office's area of responsibility;

- A direction that JFRMU, through specific training and guidance, make field officers aware of, and encourage them to consider Age-Outs for participation in, ICE's ATD program in lieu of detention; and

- A direction that JFRMU, through specific training and guidance, make all field officers aware of, and encourage them to consider releasing Age-Outs pursuant to, ICE bonds in lieu of detention.

(*See* Plaintiffs' Proposed Remedies Findings ¶ 36.)

Such an injunction is appropriate, and indeed necessary, to remedy Defendants' violations of the APA.  Courts across the country have considered and granted similar injunctive and declaratory relief under the APA as a matter of course.  *See*, *e.g.*, *Grace*, 344 F. Supp. 3d at 145-46 (holding that the government's expedited removal policy that reduced asylum protections for immigrants fleeing domestic violence and gang brutality violated the APA and entering injunction requiring the government to return to the U.S. those plaintiffs who were removed under the policy

so that they could pursue asylum claims); *Planned Parenthood of Greater Wash. and N. Idaho v. U.S. Dep't of Health and Human Servs.*, 328 F. Supp. 3d 1133, 1147–53 (E.D. Wash. 2018) (holding that termination of grant agreements with plaintiffs was "arbitrary and capricious" under the APA and entering permanent injunction requiring HHS to continue the grant agreements); *State v. Ross*, 358 F. Supp. 3d 965, 1050–51 (N.D. Cal. 2019) (finding APA violation and entering permanent injunction against government's inclusion of citizenship question on 2020 census form unless and until the government established that such inclusion was compliant with law); *Kravitz v. U.S. Dep't of Commerce*, 366 F. Supp. 3d 681, 755–56 (D. Md. 2019) (same).

For example, as recently as December 2018, the United States District Court for the District of Columbia granted a permanent injunction in favor of plaintiffs for violations of the APA and the Immigration and Nationality Act ("INA").  In *Grace v. Whitaker*, plaintiffs challenged the government's expedited removal policy that reduced asylum protections for immigrants asserting a "credible fear" of domestic or gang violence, arguing that the policy was arbitrary and capricious under the APA.  *See* 344 F. Supp. 3d at 104.  The government argued that "[u]nder the APA, the Court cannot grant relief beyond a remand to the agency."  *See* Defs.' Opp'n to Pls.' Cross-Mot. for Summ. J. & Reply in Supp. of Its Mot. for Summ. J., *Grace v. Sessions*, Case. No. 18-cv-01853, 2018 WL 6716136 (D.D.C. Oct. 10, 2018) at 57.  The court rejected the government's argument and granted a permanent injunction, concluding that "injunctive relief is necessary for the Court to fashion an effective remedy in this case."  *Grace*, 344 F. Supp. 3d at 145.  The court's injunction required the government to return to the United States plaintiffs deported under the arbitrary and capricious policy so that they could pursue asylum under the appropriate legal standards.  *See id.* at 141–46.

As in *Grace*, Plaintiffs seek an injunction requiring that the government comply with the statute at issue and consider current and future Age-Outs for placement under the appropriate legal standards. But unlike *Grace*, in which the Court awarded injunctive relief for a violation of the APA prior to trial on the basis of declarations, documents, and written discovery, here Plaintiffs proved Defendants' APA violations with testimony and documentary evidence at a four-week trial. This is all the more reason to award Plaintiffs the specific, detailed injunctive relief sought here.

Although remand or vacatur are other potential remedies for APA violations, injunctive relief remains an appropriate remedy in these circumstances, as the Court recognized in rejecting Defendants' motion *in limine* to exclude Dr. Linton's testimony at trial. (ECF 251 (Mem. Op.) at 11.) In that motion, Defendants asserted that Dr. Linton's testimony was irrelevant because it was only germane to Plaintiffs' requested injunctive relief, and no such relief was available under the APA. The Court rejected that argument, noting that "the APA allows plaintiffs to seek injunctions, among other forms of relief." (*Id.*)

Here, injunctive relief is preferable to remand or vacatur because there is no existing policy or agency regulation the Court can vacate or remand without worsening ICE's violation. That is, this is not a case where the agency has established a rule or regulation contrary to law that the Court can vacate or remand for further consideration. Rather, the evidence shows that Defendants have entirely failed to establish policies, programs, or procedures sufficient to meet their statutory obligations under Section 1232(c)(2)(B) to consider the least restrictive setting available, and have refused to change their behavior even in the face of the Court's warnings in its order granting Plaintiffs' request for a preliminary injunction. Defendants' continuing statutory violation cannot be reconsidered on a remand to the agency—it will continue to cause irreparable harm unless and until the Court mandates Defendants' compliance.

14

In addition, injunctive relief is necessary because the agency's required action is straightforward.  *See Am. Hosp. Ass'n v. Azar*, 385 F. Supp. 3d 1 (D.D.C. 2019).  In *American Hospital Association*, this Court confirmed that "[i]njunctive relief is typically appropriate when there is only one rational course for the [a]gency to follow upon remand."  *Id.* at 11 (internal quotation marks omitted).  *American Hospital Association* dealt with a complex scheme by which the Secretary of Health and Human Services determined the Medicare reimbursement rate to hospitals for certain pharmaceuticals.  *Id.* at 3.  This Court found that the agency had a number of potential courses to remedy the situation on remand, and remand was therefore the most appropriate course.  *Id.* at 11 n.15 ("The path forward is not sufficiently clear cut that this Court should chart it in the first instance.").  Those facts are not present here.  Unlike the plaintiffs in *American Hospital Association*, who challenged a specific, complex agency action, Plaintiffs here challenge Defendants' failure to comply with a statute.  Defendants have shown that they are unwilling to comply with their statutory obligations without a court order, and the Court has ample power to enforce that compliance under the APA.  *See Grace*, 344 F. Supp. 3d at 144 (rejecting the Government's "proposition that a Court may declare an action unlawful but have no power to prevent that action from violating the rights of the very people it affects").

**B.      A Specific, Detailed Injunction Is Necessary To Ensure Defendants' Compliance.**

Furthermore, a specific, detailed injunction is required to ensure Defendants' compliance. Plaintiffs request that—in addition to the detailed provisions included in section II.A., *supra*, any injunction include what Mr. Sandweg described as a "step-by-step guide" listing the specific steps that field officers should take in identifying and considering Age-Outs for placement in the least restrictive available alternative.  Namely, Plaintiffs request that the injunction include a provision requiring that Defendants instruct and require field officers to take the following steps:

- Monitor on a daily or weekly basis ORR's UAC Portal to identify those UAC's who are about to age out of ORR custody;

- At least two weeks before a UAC's eighteenth birthday, identify and call the UAC's case manager (a) to request a Post-18 plan, and (b) to discuss the status of ORR's efforts to reunify the UAC with family members or friends in the U.S., any special health or other needs or problems the UAC may have, and the identity, address, and contact information for any potential individual or organizational sponsors;

- At least one week before the UAC's eighteenth birthday, review the Form I-213 and any other information relating to the UAC that may identify potential sponsors;

- Maintain a list of, and develop relationships with, shelters, group homes or other potential organizational sponsors that will accept UACs from the field office's area of responsibility, and in those cases where an individual sponsor is not available, contact such organizational sponsors to determine if they are available to sponsor the UAC;

- Where an officer has reasonable questions or concerns as to whether a potential sponsor is available, including whether the individual or organization is willing to serve as a sponsor, the officer should identify and address those questions and/or concerns promptly and before the UAC's eighteenth birthday;

- In making placement decisions, first identify and then consider *all* potential individual and organizational sponsors, including any potential sponsors identified by the UAC, ORR (including the UAC's shelter, case manager, and/or the local Federal Field Specialist), and the UAC's attorney, advocate, or other representative, and a review of the UAC's Form I-213 and other documents or information relating to the UAC. Because ORR's requirements may be more stringent than ICE's, and in many cases it may not have time to complete its approval process before a UAC turns eighteen, the fact that ORR did not approve or rejected a proposed sponsor does *not* mean that the sponsor is disqualified or should not be considered by ICE;

- Where an officer is not able to identify and/or approve placement with an individual sponsor, consider placement with an organizational sponsor, including shelters and group homes;

- If a sponsor has not been identified and approved by the day the UAC turns eighteen, conduct an in-person interview of the UAC on his eighteenth birthday to obtain the UAC's help in identifying and contacting any other potential sponsors, including family members, other relatives, or friends.  Promptly call (or have the UAC call) any such potential sponsors to determine their availability and willingness to serve as a sponsor.  If no sponsor is available, consider release on an ICE bond or pursuant to ICE's Alternative to Detention program; and

- ICE's obligation to consider less restrictive alternatives does not end on the day the UAC turns eighteen and continues after an Age-Out is placed in adult detention.  For example, the officer should consider potential sponsors subsequently identified by the

> Age-Out or the Age-Out's counsel or other representative.  In addition, in those cases where a potential individual or organizational sponsor could not be reached or for some other reason was not available (*e.g*., a group home lacked bed space) before the Age-Out was placed into adult detention, continue to make reasonable attempts to contact the sponsor and/or determine their availability after the Age-Out is placed in adult detention.  If a sponsor is subsequently contacted and/or becomes available, promptly notify the Detained Unit and work with them to have the Age-Out released from adult detention to the sponsor.

(*See* Plaintiffs' Proposed Remedies Findings ¶¶ 42–43; *see also* PX-487.)

This sort of detailed, specific injunction is necessary to ensure Defendants' compliance—and indeed is required by the Federal Rules.  Rule 65(d)(1) provides that "[e]very order granting an injunction … must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail … the act or acts restrained or required."  FED. R. CIV. P. 65(d)(1); *see also United States v. Phillip Morris USA Inc.*, 566 F.3d 1095, 1137 (D.C. Cir. 2009), *quoting Schmidt v. Lessard*, 414 U.S. 473, 476 (1974) ("[Rule 65(d)(1)] was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders." (internal quotation marks omitted).)  Moreover, "basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed."  *Philip Morris*, 566 F.3d at 1137, *quoting Schmidt*, 414 U.S. at 476 (internal quotation marks omitted); *see also Common Cause v. Nuclear Regulatory Comm'n*, 674 F.2d 921, 927 (D.C. Cir. 1982) (holding that federal courts should frame their orders "so that those who must obey them will know what the court intends to require and what it means to forbid") (citation omitted).

Pursuant to these principles, a vague injunction simply instructing Defendants to comply with Section 1232(c)(2)(B) would be inappropriate.  *See Philip Morris*, 566 F.3d at 1137 (noting that the D.C. Circuit has "held injunctions to be too vague when they enjoin all violations of a statute in the abstract without any further specification"); *Caudle v. D.C.*, 825 F. Supp. 2d 73, 81 (D.D.C. 2011) (holding that "an impermissible 'obey the law' injunction is one that is not

meaningfully more specific than the law in question").  Furthermore, creating a "step-by-step" compliance guide will only enhance field officers' ability to make appropriate decisions in a more efficient manner.  As Mr. Sandweg testified, if field officers are "not given the tools to understand what is required, what steps, practical steps … you need to take to achieve compliance, you're not going to see consistent compliance at ICE."  (*See* Plaintiffs' Proposed Remedies Findings ¶ 41.)  Mr. Sandweg's conclusion that such "specific, how-to instructions were necessary here" was prompted, in part, by his review of the testimony of the lead FOJC in San Antonio (Mr. Munguia), "and the steps he takes" in making placement decisions.  (*Id.*)  Mr. Sandweg opined that a "step-by-step guide" based on the steps and practices that have proven successful in actual practice, which all field offices would be required to follow, would greatly reduce, if not eliminate, violations of the statute.[2]  (*Id.*)

## C.    The Four-Factor Test Supports Entry Of Plaintiffs' Requested Injunction.

The evidence at trial amply supports the entry of Plaintiffs' requested injunction, as it demonstrates that:  (1) Plaintiffs have suffered and will continue to suffer irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for such injury; (3) considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) the public interest would not be disserved by a permanent injunction.  *See eBay Inc.*, 547 U.S. at 391; *see also Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511

---

[2]    Furthermore, Plaintiffs' requested injunctive relief is not overbroad:  its provisions are directed at the very conduct the Court has found to violate Section 1232(c)(2)(B) and acts "which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future, unless enjoined, may fairly be anticipated from the defendant's conduct in the past."  *U.S. Dep't of Justice v. Daniel Chapter One*, 89 F. Supp. 3d 132, 143 (D.D.C. 2015), *quoting Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 132 (1969) (internal quotation marks omitted).  Indeed, it is based in large part on the practices of those ICE field offices that the evidence shows are making substantial efforts to comply with the statutory requirements.

(D.C. Cir. 2016) (noting that in evaluating injunctive relief sought against the government, "assessing the harm to the opposing party and weighing the public interest merge"); *accord. Nken v. Holder*, 556 U.S. 418, 435 (2009).

*First*, as the Court held in granting Plaintiffs' request for a preliminary injunction, courts have routinely found that "deprivations of physical liberty are the sort of actual and imminent injuries that constitute irreparable harm."  (ECF 28 (P.I. Op.) at 36–37, *citing Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37, 53 n.20 (D.D.C. 2002) (collecting cases).)  That is because "[t]here is no adequate remedy at law for a deprivation of one's physical liberty." *Cobb v. Green*, 574 F. Supp. 256, 262 (W.D. Mich. 1983).  "Courts have likewise recognized that the 'major hardship posed by needless prolonged detention' is a form of irreparable harm."  (ECF 28 (P.I. Op.) at 37, *quoting R.I.L-R v. Johnson.*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015).)

Here, the evidence unambiguously shows that Defendants have unlawfully detained Plaintiffs—and, absent an injunction, will continue to do so—in violation of Section 1232(c)(2)(B).  (*See* Plaintiffs' Proposed Remedies Findings ¶¶ 1–6.)  As Dr. Linton explained, and Defendants did not contest, adult detention of vulnerable Age-Outs, even for brief periods, is correlated with short-term and long-term adverse physical and mental health effects.  (*See id*. ¶¶ 7–19.)  This is exactly the sort of injury courts have repeatedly found to require equitable relief.  *See Seretse-Khama,* 215 F. Supp. 2d at 53 n.20 (collecting cases).

*Second*, by its very nature, the harm imposed on Plaintiffs cannot be remedied with monetary damages.  As the Court held in granting Plaintiffs' motion for a preliminary injunction, "where a plaintiff requests injunctive relief mandating that an agency comply with a process that, if completed could secure plaintiff's freedom or could alleviate harsh conditions of confinement, the harm from detention surely cannot be remediated after the fact."  (ECF 28 (P.I. Op.) at 37,

*citing R.I.L-R*, 80 F. Supp. 3d at 191.)   And as in *Grace*, Plaintiffs "do not seek monetary compensation" and "[t]he harm they suffer will continue" unless and until Defendants are forced to comply with the dictates of Section 1232(c)(2)(B).  *Grace*, 344 F. Supp. 3d at 146.  Without a specific, detailed injunction requiring Defendants to comply with the statute, Defendants have demonstrated that they will continue to detain Age-Outs who possess none of the statutory risk factors, and who will continue to be traumatized by lengthy and unnecessary adult detention.

*Third*, the balance of the hardships tilts decidedly in Plaintiffs' favor.  As the unrebutted testimony of Mr. Sandweg establishes, ICE itself will be benefitted by compliance with Section 1232(c)(2)(B).  (*See* Plaintiffs' Proposed Remedies Findings  ¶¶ 20–29.)  Moreover, any costs associated with doing so are only the costs associated with doing what Defendants are required to do under the statute.  "The '[g]overnment cannot suffer harm from an injunction that merely ends an unlawful practice.'"  *Grace*, 344 F. Supp. 3d at 146, *quoting R.I.L-R*, 80 F. Supp. 3d at 191 (alteration in original).

Nothing about Plaintiffs' proposed injunctive requirements will impose burdensome costs on Defendants.  Rather, as Mr. Sandweg's undisputed testimony confirmed, Plaintiffs' remedial requests are based, in large part, on the practices that are already being followed by two of ICE's field offices—San Antonio and Harlingen.  These field offices' success in implementing these practices, in San Antonio's case, consistently since at least 2012, and in Harlingen's case, immediately upon the September 25, 2018 directive of its field office management, demonstrates that they are reasonable and practical, *not* burdensome or costly, and that they will be effective in remedying ICE's non-compliance.  (*See* Plaintiffs' Proposed Liability Findings ¶¶ 269–315.)  San Antonio's long-time primary FOJC, Jose Munguia, and Harlingen's primary FOJC, Stephen Venegas, testified that their offices were successful in identifying and placing nearly every single

20

one of their Age-Outs with a sponsor by following the practices codified in Plaintiffs' requested injunction.  (*Id*. at ¶¶ 285, 311.)   Neither testified that following these practices was overly burdensome or costly, nor did Defendants present any other evidence to that effect.

In addition, the evidence shows that the specific guidance set forth in Plaintiffs' proposed injunction will only alleviate the current burden imposed on individual field officers of attempting (and often failing) to apply the requirements of Section 1232(c)(2)(B) without adequate guidance, training, or supervision.  As Mr. Sandweg testified, "I think by having clear guidance coming from headquarters, you're going to see that that is the official policy and this is the law," and "if ICE agents understand what they are required to do, they will do it."  (*See* Plaintiffs' Proposed Remedies Findings ¶ 44.)  Current agency practice, which does not provide accurate guidance or training to, or adequate supervision of, field officers on available alternatives to detention, results in many field offices having little or no knowledge of, and failing to make available and consider, alternative options for Age-Outs.  (*See* Plaintiffs' Proposed Liability Findings ¶¶ 159–217.)

***Fourth***, there can be no dispute that it is in the public's interest to require Defendants to comply with their statutory mandate.  "[O]f course, the public interest is served when administrative agencies comply with their obligations under the APA."  *Grace*, 344 F. Supp. at 146, *quoting R.I.L-R*, 80 F. Supp. 3d at 191 (quotation marks and alterations omitted); *accord* ECF 28 (P.I. Op.) at 40 ("The public interest surely does not cut in favor of permitting an agency to fail to comply with a statutory mandate."); *Jacksonville Port. Auth. v. Adams*, 556 F.2d 52, 58– 59 (D.C. Cir. 1977) ("[T]here is an overriding public interest … in the general importance of an agency's faithful adherence to its statutory mandate.").  There is no public interest, and Defendants have shown none, in allowing Defendants to continue to defy the requirements of a statute that was passed, as the Court held, to "clearly constrain" the agency's discretion.  (ECF 28 (P.I. Op.)

at 40.)  Thus, the third and fourth factors, which "merge" here, *see Pursuing America's Greatness*, 831 F.3d at 511, weigh strongly in Plaintiffs' favor.

### D.      Defendants' Claim That They Have Begun Complying With The Statute Does Not Alleviate The Need For Injunctive Relief.

Finally, Defendants' contention that no further relief is necessary because they have purportedly fixed any compliance issues does not alleviate the need for injunctive relief.  For one, Defendants' unsupported assertions that they are now complying with the statute are refuted by the evidence at trial.  As detailed at length in Plaintiffs' Proposed Liability Findings, Defendants continue to fail to comply with the statutory requirements in numerous respects.  Defendants' purported remedial efforts are merely cosmetic, do not address the underlying problems the requested injunction is necessary to solve, and cannot guarantee that ICE will comply with the statute in the future.  Thus, injunctive relief remains vitally necessary.  *See Conservation Law Found. v. Pritzker*, 37 F. Supp. 3d 254, 264–65 (D.D.C. 2014) (entering injunction despite defendant National Marine Fisheries Service's claim that a "new policy might prevent future injury," because "the Service has not yet ceased its allegedly unlawful conduct.").

But even if Defendants had provided evidence that they are attempting to comply with the statute, this would not change the necessity of immediate injunctive relief.  "Along with its power to hear the case, the court's power to grant injunctive relief survives discontinuance of the illegal conduct."  *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953); *see also City of New York v. Baker*, 878 F. 2d 507, 511–12 (D.C. Cir. 1989).  That is because there is no guarantee that a defendant's wrongful conduct will not be repeated as soon as the case is dismissed.  *See Friends of the Earth v. Laidlaw Env'tl Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000) ("[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.");

*Pietrangelo v. Refresh Club, Inc.*, No. 18-cv-1943, 2019 WL 2357379, at \*8 (D.D.C. June 4, 2019) (same).  Thus, "[o]nce a violation is demonstrated, all that need be shown [to obtain an injunction] is that 'there is some reasonable likelihood of future violations,' and past unlawful conduct is 'highly suggestive of the likelihood of future violations.'" *U.S. Dep't of Justice v. Daniel Chapter One*, 89 F. Supp. 3d 132, 143 (D.D.C. 2015) (quoting *Commodity Futures Trading Comm'n v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979)), *aff'd*, 650 F. App'x 20 (D.C. Cir. 2018).

Here, Defendants' actions in response to the Court's preliminary injunction refute any suggestion that Defendants have "corrected" their non-compliance with the statute.  To the contrary, Defendants defied the Court's guidance, refused to change their policies or practices as to Age-Out custody determinations, and created an elaborate "documentation" system for the sole purpose of rationalizing their practices to the Court.  And once the documentation system only highlighted their non-compliance, Defendants undertook to revise and "correct," weeks and months after the fact, previously-completed worksheets that they represented were contemporaneous evidence of ICE's compliance with the statute.  These are simply not the actions of an agency interested in complying with its statutory mandate, and any suggestion that they will *now* comply cannot be used as their "get out of jail free" card.

## III.  A MONITOR IS NECESSARY TO ENSURE DEFENDANTS' COMPLIANCE WITH THE STATUTE.

In addition, the Court should appoint a monitor to ensure Defendants are complying with the mandates of Section 1232(c)(2)(B) going forward.  A district court's power to appoint monitors "to supervise the implementation of its decrees has long been established."  *See Ruiz v. Estelle*, 679 F.2d 1115, 1161 (5th Cir. 1982), *amended in part, reh'g denied in part on other grounds,* 688 F.2d 266 (5th Cir. 1982).  The Court's authority stems both from Rule 53, which grants the power to appoint a master to "address pretrial and posttrial matters that cannot be effectively and timely

addressed by an available district judge or magistrate judge of the district," *see* FED. R. CIV. P. 53(a)(1)(C), and the court's inherent capacity to enforce its orders. *See, e.g., Salazar v. D.C.*, No. CA-93-452(GK), 1997 WL 306876, at *2 (D.D.C. Jan. 17, 1997) (collecting cases) (affirming appointment of monitor under Rule 53(b)); *Nat'l Org. for the Reform of Marijuana Laws v. Mullen*, 828 F.2d 536, 544 (9th Cir. 1987) ("In addition to invoking Fed .R. Civ. P. 53, the district court ordered reference to a master pursuant to 'the inherent power of the court to enforce its orders.'"); *Ruiz*, 679 F.2d at 1159 ("As authority for the appointment [of a special master and monitors] the district court invoked both Fed. R. Civ. P. 53 and its inherent power as a court of equity.") (footnote omitted).

To that end, the D.C. Circuit has repeatedly affirmed that a monitor is appropriate in cases where enforcing statutory compliance will be a "complex and time-consuming task," where "monitoring [an order's] provisions is absolutely essential if they are to have their full impact," *Salazar*, 1997 WL 306876, at *2, or where "observation of the defendant's conduct is restricted." *Cobell v. Norton*, 392 F.3d 461, 477 (D.C. Cir. 2004). All three factors are present here.

***First***, as the course of this litigation has proven, it will be a complex and time-consuming task for the Court to determine whether Defendants are complying with their statutory mandate. The evidence revealed at trial shows that—left to its own devices—ICE will not willingly change its policies or procedures for complying with Section 1232(c)(2)(B). (*See* Plaintiffs' Proposed Remedies Findings ¶¶ 50–59.) Defendants' refusal to change its policies or procedures, in the face of the Court's prior guidance, is alone sufficient to support the appointment of a monitor. *See, e.g.*, *Local 28 of Sheet Metal Workers' Int'l Ass'n v. E.E.O.C.*, 478 U.S. 421, 482 (1986) (affirming appropriateness of monitorship given "petitioners' established record of resistance to prior state and federal court orders"); *Hook v. State of Arizona*, 120 F.3d 921, 926 (9th Cir. 1997) (affirming

district court's appointment of special master under Rule 53 given defendant's "history of noncompliance," and where the court "lacked the resources to constantly monitor compliance with the decree, as it was required to do because of the Department's noncompliance"); *Williams v. Lane*, 851 F.2d 867, 884 (7th Cir. 1988) (appointing special master where "[t]he record here is replete with instances of administrative recalcitrance"); *Gary W. v. Louisiana*, 601 F.2d 240, 244 (5th Cir. 1979) (finding that "[t]he record amply supports the District Court's conclusion" to appoint a special master to oversee implementation of injunction, and that "[p]erhaps the most telling observation is that during the past two years the appellants have failed to comply substantially with the original injunction"); *Morales Feliciano v. Romero Barcelo*, 672 F. Supp. 591, 622 (D.P.R. 1986) ("The record of intransigence and lengthy noncompliance by defendants constitutes an "exceptional condition" within the meaning of Rule 53(b) authorizing the appointment of a Court Monitor.").

Moreover, Defendants have repeatedly demonstrated that they are incapable of properly recording and reporting information relating to their decisions to release or detain Age-Outs. For example, Defendants' new documentation system inexplicably omitted hundreds of Age-Outs; Defendants implicitly acknowledged (by their extensive efforts to "correct" the Age-Out Review Worksheets) that even those field officers who had documented their custody determinations had not done so adequately; and Defendants repeatedly failed to produce the correct data to Plaintiffs necessary to derive Age-Out detention rates.

Indeed, Defendants repeatedly failed to produce complete and accurate data on Age-Out detention rates for over a year, and continued to submit corrected data during trial. (*See* ECF 262 (Pls.' Mem. in Supp. of Admitting Demonstratives) at 7–9 (detailing Defendants' repeated failure to produce data requested by Plaintiffs in this litigation).) For example, it was only after Plaintiffs

subpoenaed data separately from ORR, which showed inexplicable discrepancies with ICE's data, that the government provided data allowing Plaintiffs to accurately calculate Age-Out detention rates.  (*See id*. at 7–8)  It is not feasible or practicable for the Court to be burdened with the same significant costs Defendants imposed on Plaintiffs and Plaintiffs' statistical expert to determine whether ICE's frequent claims of compliance are accurate.  The Court simply does not have the time necessary, among other things, to continually review what may well be flawed data on Age-Out custody determinations, analyze the training materials or updated Age-Out Review Worksheets provided to field officers, and ask questions of ICE personnel about why and how they are implementing the Court's order.  As Mr. Sandweg testified, "You need to have someone who's empowered to review the data, to review the training materials, to ask the questions related to why you are getting a certain outcome."  (*See* Plaintiffs' Proposed Remedies Findings ¶ 45.)  As this litigation has proven, that task will be time consuming and resource-intensive, requiring a monitor.

There is no reason to believe that these same difficulties will not continue in the absence of a monitor.  Without a monitor, Plaintiffs will likely be forced to step into the role, and frequently request the Court's assistance when Defendants fail to provide the necessary data or documentation necessary to review ICE's Age-Out custody determinations.  This will be an expensive and time-consuming process, both for Plaintiffs' counsel and for the Court—who will presumably be required to rule (as during the litigation) on numerous disputes regarding the accuracy and completeness of the data Defendants are providing to demonstrate their compliance.  A monitor, who would have better access to the relevant data and documentation, would greatly economize this review process.  *See e.g., Ruiz*, 679 F.2d at 1162 ("The scope and complexity of the decree and the importance as well as the difficulty of ensuring compliance gave the court adequate reason to invoke its implied authority as a court of equity.").

**Second**, monitoring compliance with the injunction is necessary to ensure that the specific provisions of the injunction are followed and effective in remedying Defendants' non-compliance. The monitor will ensure that compliance with the statute receives the management time and focus it requires: ICE managers and officials have a multitude of responsibilities, and compliance can, as Mr. Sandweg pointed out, "get lost in the daily rush of activities." (*See* Plaintiffs' Proposed Remedies Findings ¶ 47.) A monitor is necessary to confirm that these statutory requirements are a priority and receive the attention that is required to correct ICE's past non-compliance and ensure its future compliance.

As Mr. Sandweg further explained, the need for a monitor is heightened here by ICE's law-enforcement mission and focus, which does not readily comport with identifying and considering Age-Outs for placement in less restrictive alternatives to detention. (*Id.* ¶ 48.) ICE is a law enforcement agency and the officers who make placement decisions are law-enforcement officers. They view their core mission as the apprehension, detention, and removal of unlawfully present immigrants—not releasing them from custody to less restrictive alternatives. (*See id.*) Indeed, Ms. Harper and other ICE witnesses referred to attempts to identify potential sponsors and other alternatives to detention as "social programming" and repeatedly expressed that identifying alternatives to detention was not part of their job responsibilities. As Ms. Harper testified, "[a]s a law enforcement agency, it's not our job to seek out social programming." (*See id.*) A dedicated monitor will ensure that ICE officials focus on compliance, rather than simply detention.

The need for a monitor is further established by Ms. Harper's contention at trial that because the field officers who make Age-Out custody decisions are not direct reports, JFRMU lacks authority to tell them what to do or to overturn their decisions. (*See id.* ¶ 49.) In response, Mr. Sandweg explained that, even if that were true as a technical, organizational matter, it is not

27

true as a practical matter:  ICE headquarters staff overturn custody determinations in the field "all the time."  (*Id*.)  And even Ms. Harper conceded that if a field office or officer were to refuse to follow JFRMU's direction, she could enforce her directive by elevating the matter to a supervisor.  (*Id*.)  Nevertheless, to the extent there is, in fact, any question or uncertainty as to JFRMU's authority and ability to enforce compliance with the statute, a monitor would clearly have that authority and eliminate that uncertainty.

A monitor is also necessary to collect data and review Defendants' performance so ICE can make adjustments to improve compliance over time.  As Mr. Sandweg testified, "No matter how hard you try to get it right the first time, there's a likelihood you're not going to get it right.  There are issues you can't expect, things that [are] going to change. …. [T]hat's why you need to have the ability to continually monitor the situation and make adjustments as need be, and that's basically the role I see a monitor serving."  (*See id*. ¶ 46.)

***Third***, here "observation of [Defendants'] conduct is restricted."  *See Cobell*, 392 F.3d  at 477.  Obtaining complete and accurate data from Defendants regarding their Age-Out custody determinations proved to be an expensive and time-consuming process in this litigation, and there is no easy way for the Court or Plaintiffs to independently review each of the numerous Age-Out custody determinations that ICE is constantly making at field offices throughout the country.  As previously discussed, Defendants further obscured their noncompliance by failing to produce complete and accurate data, including with respect to Age-Out detention rates.  In the absence of a monitor, it is probable that Defendants will resort to the same tactics they used after the Court's preliminary injunction opinion:  falsely claiming compliance, altering the documentary record to support their claims, and refusing to produce the data or evidence that would undermine their claims.  There is no reason that the Court should be burdened with the continuing obligation to

scrutinize Defendants' conduct and ensure that Defendants are complying with their statutory obligations when a monitor can do so in a more efficient and effective manner.

## **CONCLUSION**

For the reasons detailed herein, Plaintiffs respectfully request that the Court grant the declaratory relief requested in Plaintiffs' Amended Complaint; enter a permanent injunction, with the specific terms detailed in Plaintiffs' Proposed Remedies Findings; and appoint a monitor with the power to review and ensure Defendants' compliance with the Court's decree.

Dated:  February 18, 2020

/s/ Stephen R. Patton

Stephen R. Patton
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
stephen.patton@kirkland.com

Tia T. Trout Perez (D.C. Bar No. 990447)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
Telephone: (202) 389-5000
Facsimile: (202) 389-5200
tia.trout-perez@kirkland.com

Katherine Melloy Goettel
NATIONAL IMMIGRANT JUSTICE CENTER
208 South LaSalle Street, Suite 1300
Chicago, IL  60604
Telephone: (312) 660-1335
Facsimile: (312) 660-1505
kgoettel@heartlandalliance.org

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 18th day of February, 2020, a true and correct copy of the foregoing was served via ECF upon counsel of record.

*/s/ Stephen R. Patton*
Stephen R. Patton