**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WILMER GARCIA RAMIREZ, *et al.*, | ) |
| | ) Case No. 1:18-cv-00508-RC |
| *Plaintiffs,* | ) |
| | ) Class Action |
| v. | ) |
| | ) |
| U.S. IMMIGRATION AND | ) |
| CUSTOMS ENFORCEMENT (ICE), *et al.*, | ) |
| | ) |
| *Defendants.* | ) |
| | ) |

**PLAINTIFFS' REPLY MEMORANDUM IN FURTHER SUPPORT
OF THEIR MOTION FOR ENTRY OF A FINAL JUDGMENT
AND PERMANENT INJUNCTION**

Stephen R. Patton
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
stephen.patton@kirkland.com

Tia T. Trout Perez (D.C. Bar No. 990447)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
Telephone:    (202) 879-5000
Facsimile:    (202) 879-5200
tia.trout-perez@kirkland.com

Mark Fleming
NATIONAL IMMIGRANT JUSTICE CENTER
224 South Michigan, Suite 600
Chicago, IL 60604
Telephone:    (312) 660-1628
Facsimile:    (312) 660-1505
mfleming@heartlandalliance.org

Katherine Melloy Goettel
Gianna Borroto
AMERICAN IMMIGRATION COUNSEL
1331 G Street, NW, Suite 200
Washington, DC  20005
Telephone:    (202) 507-7552
kgoettel@immcouncil.org
gborroto@immcouncil.org

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

DEFENDANTS' PROPOSED FINAL ORDER ........................................................... 3

ARGUMENT ....................................................................................................................... 7

I.    REMAND TO THE AGENCY IS NOT LEGALLY APPROPRIATE, LET
      ALONE REQUIRED, HERE. ................................................................................. 7

II.   INJUNCTIVE RELIEF IS NECESSARY ........................................................... 15

III.  PLAINTIFFS' PROPOSED JUDGMENT DOES NOT PLACE AN
      UNDUE OR UNNECESSARY BURDEN ON DEFENDANTS. ................... 19

IV.   DEFENDANTS' OBJECTIONS TO SPECIFIC PROVISIONS IN
      PLAINTIFFS' PROPOSED ORDER ARE BASELESS AND
      UNREASONABLE. ................................................................................................ 20

      A.    Six-Month Review Of Defendants' Revised AORW. ........................... 20

      B.    Updates To ICE's Nationwide List Of Organizational Sponsors ........ 21

      C.    Advance Notice Of, And An Opportunity To Object To, ICE's
            Revisions To The Agreed, Or Adoption Of New, Training Materials
            And Policy Guidance. ................................................................................. 23

      D.    Attorneys' Fees. ........................................................................................... 24

CONCLUSION .................................................................................................................... 25

## **INTRODUCTION**

The principal difference between Plaintiffs' and Defendants' proposed final orders is not simply that Plaintiffs' includes a permanent injunction whereas Defendants' does not, although that is a critically-important difference given the extensive evidence establishing, and this Court's detailed findings confirming, ICE's widespread and repeated violations of the Statute.  More fundamentally, Defendants' order omits any requirement that Defendants comply with the Statute and this Court's July 2, 2020 Decision (ECF 333, "Decision") and any authority for Plaintiffs to seek, and the Court to order, any relief in the event ICE fails to comply with the Statute or the Court's Decision.  Instead, Defendants' proposed order specifically limits Plaintiffs' and the Court's "enforcement" authority to certain largely ministerial acts to which Defendants "consent," specifically, completion of an Age-Out Review Worksheet ("AORW"), monthly reporting, training of FOJCs, and issuance of a revised FOJC Handbook.  *See* ECF 362-1 (Defs.' Proposed Order), at 3-6.  And even as to those discrete actions, ICE in most cases would have complete and unbridled discretion to subsequently revise the training materials and policy guidance used by ICE in performing these tasks and/or adopt new training and guidance concerning what the Statute means and requires and when and how Age-Out placement determinations should be made.

Defendants do not provide any case or other support for this limited "relief" or their request that the Court "remand to Defendants to permit them" to "implement" only those "remedies" to which Defendants "consent" in their proposed order.  *See* ECF 362 (hereinafter "Opp'n"), at 1, 3, 9.  Instead, they rely on inapposite cases where an agency issued a rule, made an adjudicatory decision, or took some other action on an administrative matter within the agency's expertise and discretion, plaintiff "appealed" that determination by seeking judicial review, and the court found that, while the agency's action was unlawful, there were multiple ways to correct that deficiency and the appropriate relief was to remand to the agency to determine the fix.  *See* Opp'n at 5-6, 8.

*See* discussion, *infra*, at 11-13 & n.2.  None of these cases involved a suit, like this one, where an agency was found to have violated a statute imposing non-discretionary requirements as to *how* an agency determination is made.

*None* of the circumstances in these cases exist here.  As this Court made clear in its Decision, the actions ICE is required to take to comply with the Statute are not discretionary policy or other matters for ICE to decide; they are legal questions for the Court.  Nor are they matters for which there are multiple correct answers from which the agency may choose.  To the contrary, there is only "one rational course" for the agency to follow—compliance with the Statute—and there is accordingly nothing to "remand" to the agency.  Nor are Plaintiffs "appealing" ICE's individual Age-Out placement determinations or some other agency decision or statute.  Rather, they are challenging ICE's failure to comply with *a statute* that imposes requirements on *how* ICE makes Age-Out placement determinations.  *See* discussion, *infra* at 10-15.

Equally baseless is Defendants' argument that a permanent injunction is no longer "necessary" because ICE is currently releasing 99.5 percent of all Age-Outs.  *See* Opp'n at 2, 8-9. Defendants simply repeat their prior "voluntary cessation" argument, which this Court has already rejected, without even acknowledging, let alone addressing, the fatal legal and factual flaws in that argument.  *See* discussion, *infra* at 15-16.  More fundamentally, ICE's current, reduced detention rate does *not* demonstrate compliance, let alone a reformed agency and robust compliance program in which FOJCs have received new guidance and training as to what the Statute requires.  In fact, very little has changed since trial.  ICE has *not*:  conducted any new training with respect to the Statute; promulgated new policies or guidance; revised its prior policies and guidance; or even informed FOJCs of this Court's July 2, 2020 findings.  Even if ICE's current release rate did show compliance (which it does not), as this Court found in its Decision, and undisputed evidence at

trial established, that "compliance" could evaporate in a heartbeat.  *See* discussion, *infra* at 16-19.

Finally, Defendants' specific objections to a handful of provisions in Plaintiffs' order are both legally wrong and unreasonable.  *See* discussion, *infra* at 19-24.

Plaintiffs' proposed Final Judgment and Permanent Injunction is supported by settled law, an extensive evidentiary record, and this Court's detailed findings in its Decision.  It is also targeted, balanced, and reasonable.  Plaintiffs respectfully request that it be entered.

## DEFENDANTS' PROPOSED FINAL ORDER

For the Court's convenience, a redline comparison which shows the differences between the parties' proposed orders is attached as Exhibit A.  Not only does Defendants' proposed order omit any injunctive relief, it also omits any obligation or requirement that ICE comply with the Statute or this Court's Decision.  Instead, it limits ICE's obligations going forward—and Plaintiffs' and this Court's enforcement authority—to a handful of specific actions ICE "consents" to, such as conducting annual training and providing monthly reporting.  *See* Ex. A at 4-7.  While these same actions are required by Plaintiffs' proposed order, under Plaintiffs' order they are a means to an end—ensuring ICE's future compliance, and Plaintiffs have authority to seek, and the Court has jurisdiction to order, further relief if ICE fails to comply with the Statute or this Court's Decision.  *See* ECF 359-1 (Pls.' Proposed Order), at 2-10.  Under Defendants' order, on the other hand, they are the only obligations ICE has and the only obligations that Plaintiffs and the Court have authority to enforce.  *See* ECF 362-1, at 3-7.  There is no mechanism or authority to enforce the Statute and this Court's Decision, and if ICE fails to comply with the Statute or the Decision, Plaintiffs' only recourse is to bring a new action.  *See* Opp'n at 9-10.

Moreover, as to most of those agreed actions, Defendants' proposed order reserves to ICE the unfettered, unilateral ability to revise the substance of the training, policy guidance, and other materials that are the subject of those tasks, without providing notice to, or receiving input and

approval from, Plaintiffs or the Court.  For example, while ICE "consents" to complete an AORW for each Age-Out placement decision, it can use any form of AORW it elects.  *See* Ex. A at 4.

      As Exhibit A demonstrates, the two forms have significant differences:

-     <u>Age-Out Placement Determinations</u>.  Defendants' order omits any obligation or requirement that ICE comply with the Statute or this Court's Decision, or even the training materials agreed to by the parties.  *See* Ex. A at 3.  As Defendants concede, if ICE were to fail to comply with the Statute or this Court's Decision, Plaintiffs only recourse would be to file a new lawsuit.  *See* Opp'n at 9-10.

-     <u>AORW</u>.  ICE agrees only that it will "complete a revised Age-Out Review Worksheet ('AORW') with respect to each Age-Out and Age-Out placement determination."  This "may," but is not required to, include the revised AORW it previously proposed.  *See* Ex. A at 4. In terms of addressing the undisputed evidence at trial that in many cases AORWs were not completed until weeks or months after an Age-Out placement determination was made (*see* ECF 333, ¶¶ 62-69), ICE agrees only that "normally" an AORW will be completed and uploaded within 24 hours after the custody determination is made.  *See* Ex. A at 4.

-     <u>Organizational Sponsors</u>.  ICE's proposed order omits any provisions, or even references, to organizational sponsors.  This includes any obligation to maintain or periodically update the Nationwide Age-Out Shelter List it references in its Opposition.  *See id.* at 3-4.  (This is in contradiction of Defendants' Opposition, which states ICE's intent to "update its National Age-Out Shelter List every six months."  Opp'n at 14.)

-     <u>Training</u>.  This is one of three provisions (along with Periodic Reporting and the FOJC Handbook) in which Defendants' order largely tracks Plaintiffs'.  ICE agrees to use the training materials agreed upon by the parties, and that such materials shall be "subject to any

revisions that may be subsequently agreed to by the parties and/or approved by the Court." Ex. A at 5. However, Defendants' order apparently reserves to ICE the unilateral right to make subsequent revisions to those training materials, and adopt entirely new and/or additional training concerning what the statute means and requires, and when and how Age-Out placement determinations should be made, without providing any notice to Plaintiffs' counsel or the Court or seeking their input or approval. *See* Ex. A at 8, 10 (deleting Plaintiffs' proposed authority to object to and the Court's authority to resolve any disputes concerning, "any changes proposed by ICE to the agreed training materials").

- <u>FOJC Handbook</u>.  Defendants' order includes ICE's agreement to revise its FOJC Handbook to include the revised sections agreed upon by the parties. *See id.* at 6.[1] However, ICE retains *carte blanche* to revise to these sections and/or to adopt new and different policy guidance with respect to what the Statute requires and when and how Age-Out placement determinations should be made.  *See id.* at 8, 10 (deleting Plaintiffs' proposed authority to object to, and the Court's authority to resolve any disputes concerning, "any changes proposed by ICE to … the sections of the FOJC Handbook attached as Exhibit 1, and any other proposed policies, practices or policy guidance concerning what the Statute means or requires and/or when or how Age-Out placement determinations should be made").

- <u>Periodic Reporting</u>.  ICE includes in its proposed order the periodic reporting obligations previously agreed to by the parties. *See id.* at 7.

- <u>Role and Authority of Plaintiffs' Counsel</u>.  Under Defendants' proposed order, Plaintiffs' counsel would be limited to "rais[ing] with the Court any issues or concerns with respect

---

[1]   However, the version of the FOJC Handbook submitted by Defendants as Ex. A does not match the version Plaintiffs understood the parties agreed to. *Compare* ECF 360-1, § 2.8 *with* ECF 362-1, at Exhibit 1, § 2.8.

to ICE's compliance *with implementation of this Order* after remand." *Id.* at 8 (emphasis added). Unlike Defendants' order, Plaintiffs' counsel would *not* have authority to raise any issues or concerns with respect to ICE's compliance with *the Statute* or to receive advance notice of, and raise with the Court any concerns with respect to, "any changes proposed by ICE to the agreed training materials, the nationwide list of organizational sponsors, the revised AORW, the sections of the FOJC Handbook, and any other proposed policies, practices or policy guidance concerning what the Statute means or requires and/or when or how Age-Out placement determinations should be made." ECF 359-1, at 7. And, unlike Plaintiffs' order, Defendants' Order omits any obligation for Defendants' to cooperate in good faith with Plaintiffs' counsel with respect to monitoring ICE's compliance with the order and the Statute, including "timely responding to Plaintiffs' counsel's requests for information" relating to ICE's compliance, and "providing … at least thirty (30) days in advance of their proposed effective date, notice and copies of any new or revised policies or practices, training, or documentation concerning the Statute." Ex. A at 8.

- Court's Continuing Jurisdiction. Under Defendants' order, the Court's jurisdiction would be limited to resolving disputes concerning, and enforcing, Defendants' compliance with the limited and specific actions Defendants consent to take in their order. *See id.* at 8. The Court would not have authority to review and resolve disputes concerning: ICE's compliance with the Statute; any revisions or changes to the AORW, agreed training, or sections of the FOJC Handbook concerning the Statute agreed to by the parties; or "any new or revised policy guidance, procedures, or training concerning what the Statute means or requires, and/or when Age-Out placement determinations should be made." *See* Ex. A at 10-11; ECF 359-1, at 7-10.

- <u>Attorneys' Fees</u>.  Defendants' order omits any provision for Plaintiffs' counsel to be reimbursed for their reasonable fees and expenses in monitoring and enforcing Defendants' compliance with the order and the Statute.  *See* Ex. A at 9.

## **ARGUMENT**

## I.     **REMAND TO THE AGENCY IS NOT LEGALLY APPROPRIATE, LET ALONE REQUIRED, HERE.**

It is well settled that courts have "broad remedial powers" to determine the appropriate remedy for statutory violations.  *See, e.g.*, *United States v. E. I. du Pont de Nemours & Co.*, 366 U.S. 316, 329 n.9 (1961); *Swann v. Charlotte-Mecklenberg Bd. of Ed.*, 402, U.S. 1, 15 (1971) ("breadth and flexibility are inherent in equitable remedies").  This includes the power to enter permanent injunctions enjoining future non-compliance and requiring compliance with statutes. *See, e.g.*, *Sec. Indus. Ass'n v. Bd. of Governors of Fed. Rsrv. Sys.*, 628 F. Supp. 1438, 1444 (D.D.C. 1986); *Nat'l Wildlife Fed. v. Andrus*, 440 F. Supp. 1245, 1255-56 (D.D.C. 1977); *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177-78 (9th Cir. 2002); *Gonzalez Rosario v. U.S. Citizenship and Immig. Servs.*, 365 F. Supp. 3d 1156, 1162-63 (W.D. Wash. 2018).  Indeed, prior decisions of this Court have suggested that where, as here, "a federal statute has been violated, the court will not inquire into the traditional requirements for equitable relief but will instead grant an injunction against further violation of the statute without regard to those requirements."  *Andrus*, 440 F. Supp. at 1255-56; *see, e.g., Sec. Ind. Ass'n*, 628 F. Supp. at 1443 (while "a finding of a statutory violation does not lead automatically to the issuance of an injunction," courts have regularly "found it unnecessary to inquire into the traditional requirements for injunctive relief when statutory violations are involved").

This broad authority extends to determining remedies for violations of the APA, including the power to order permanent injunctive relief.  *See, e.g.*, *Bowen v. Massachusetts*, 487 U.S. 879,

912-13 (1988); *Am. Bar Ass'n v. U.S. Dep't of Educ.*, 370 F. Supp. 3d 1, 40 (D.D.C. 2019) (courts have "wide discretion to apply an appropriate remedy" where Plaintiffs allege violations of the APA).   Indeed, the APA expressly authorizes injunctive relief.   *See* 5 U.S.C. § 703 (authorizing "actions for declaratory judgments or writs of prohibitory or mandatory injunction").   Accordingly, courts clearly have authority to—and do—enter permanent injunctions against agencies in APA cases.   *See, e.g.*, *Nat'l Mining Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (affirming District Court's entry of permanent injunction against the enforcement of a rule promulgated by the Army Corps of Engineers); *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health and Human Services*, 485 F. Supp. 3d 1, 62 (D.D.C. 2020) ("binding authority confirms the propriety of nationwide injunctions in APA cases"); *Doe v. Rumsfeld*, 341 F. Supp. 2d 1, 17-19 (D.D.C. 2004) (permanently enjoining Defense Department's "involuntary anthrax inoculation program" after finding APA violation); *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Human Servs.*, 328 F. Supp. 3d 1133, 1147–53 (E.D. Wash. 2018) (holding that termination of grant agreements with plaintiffs violated the APA and granting permanent injunction); *Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647, 657 (D. Md. 2018) (same); *Grace v. Whitaker*, 344 F. Supp. 3d 96, 144 (D.D.C. 2018) (rejecting Government's "proposition that a Court may declare an action unlawful but have no power to prevent that action from violating the rights of the very people it affects"), *aff'd in part, rev'd in part and remanded sub nom. Grace v. Barr*, 965 F.3d 883 (D.C. Cir. 2020).

Defendants no longer seriously dispute this Court's broad remedial authority, or that it includes the authority to enter a permanent injunction enjoining ICE's non-compliance and requiring its compliance with the Statute.   *See* Opp'n at 5-7.   In fact, citing this Court's decision in *American Hospital Association v. Azar*, 385 F. Supp. 3d 1, 11 (D.D.C. 2019), *rev'd on other*

*grounds*, 967 F.3d 818 (D.C. Cir. 2020), they now concede that "the APA permits," but does not require, "remand to the agency" in lieu of "an injunction compelling the agency to take a specific action." *See* Opp'n at 5. Moreover, Defendants do not dispute that the decision whether to enter a permanent injunction or remand is for this Court. *See id.* And, Defendants further concede that, "[i]njunctive relief is typically appropriate when 'there is only one rational course for the agency to follow on remand,'" which, as demonstrated below, is the case here. *See* Opp'n at 7 (quoting *Am. Hosp. Ass'n*, 385 F. Supp. 3d at 11).

Defendants also do not dispute that each of the four factors for determining whether a permanent injunction should be entered weighs in favor of an injunction here. *See generally* ECF 272 (Pls.' Proposed Findings & Conclusions Concerning Remedies), ¶¶ 71-78; ECF 273 (Pls.' Mem. Concerning Remedies), at 10-11. In particular:

- The Court has already found that Plaintiffs have established *irreparable harm* and that Defendants agreed at trial that they did not contest that showing. ECF 333, ¶ 27. As the Court found, "[d]eprivation of liberty is irreparable harm in and of itself," and that is in addition to the short and long-term harm from detention explained by Dr. Julie Linton in testimony which was unrebutted and which the Court credited. *See id.* ¶¶ 22-27.

- The Court has likewise already found *the absence of an adequate remedy at law*. As the Court held in granting the named Plaintiffs' motion for preliminary injunction, "the harm from detention surely cannot be remediated after the fact." ECF 28 (P.I. Op.), at 37.

- Similarly, the *balance of the hardships* clearly favors Plaintiffs and an injunction. The irreparable harm to Plaintiffs if an injunction is denied is clear and undisputed. On the other hand, an injunction would result in no harm to Defendants. It would require only that they comply with the Statute, something they are already obligated to do, and thus the balance of hardships

weighs in Plaintiffs' favor as a matter of law.  *See, e.g. Sierra Club v. Trump*, 977 F.3d 853, 888-89 (9th Cir. 2020); *Andrus*, 440 F. Supp. at 1256.  And even if compliance could constitute a hardship, the evidence was undisputed that all compliance requires here is a series of straightforward, common sense steps that are neither costly nor burdensome, and which ICE was already taking at two of its field offices that largely comply with the Statute: San Antonio and Harlingen.  *See* ECF 333, ¶¶ 215-224 (San Antonio), ¶¶ 225-232 (Harlingen).

- Finally, *an injunction is in the public interest*.  It requires that ICE comply with the law, and such compliance is always in the public interest, as a matter of law.  ECF 273, at 21-22.

Instead, Defendants argue that the Court "may and should, order remand," relying on inapposite cases where an agency issued a rule, made an adjudicatory decision, or took some other action on an administrative matter within the agency's expertise and discretion, plaintiff "appealed" that determination by seeking judicial review, and the court found that, while the agency's action was unlawful, there were multiple ways to correct that problem and, accordingly, the appropriate relief was to remand to the agency to determine the "fix."  *See* Opp'n at 5-8.  As demonstrated below, none of these circumstances exist here.

As a threshold matter, the Court has already rejected this argument.  Defendants sought the same relief, and relied on many of the same cases, in their April 17, 2020 Reply Concerning Remedies.  ECF 319 (Defs.' Resp. to Pls.' Mem. Concerning Remedies), at 5-13, 16-20 ("If this Court finds a violation, it should limit its remedy to a declaratory judgment, and permit the agency to continue fixing any problem.").  Nevertheless, in its Decision, the Court found that what the statute means and requires are questions of law for the Court, and not discretionary issues for ICE, to decide.  For example, Defendants argued that the Statute did not impose any obligation on ICE to research and identify, and contact, potential sponsors and other less restrictive alternatives:

> Plaintiffs have suggested that FOJCs should themselves research potential individual and institutional sponsors; should try to call such sponsors for age-outs; and should even call to find possible beds in shelters in other cities or even across the country for age-outs. The statute's requirement that the agency "consider" the least restrictive setting "available" mandates none of this.

*Id*. at 12 (footnote omitted). The Court rejected this argument, and specifically found that the statute *did* impose these obligations. *See* ECF 333, at 160-162. In so holding, the Court made clear that the actions ICE is required to take to comply with the Statute are not discretionary matters for ICE, on remand or otherwise. Rather, they present legal questions of statutory interpretation for the Court. Unlike the proposed rules, adjudicatory decisions, and other discrete administrative actions at issue in the cases Defendants cite (*see* discussion below), such legal obligations are *not* matters that are left to agency discretion or as to which there are multiple correct answers from which the agency can choose. *See*, *e.g.*, *id*. at 147 n.38, 153, 163.

The inapplicability of Defendants' remand argument is demonstrated by the cases they rely on. None involve a suit, like this one, where an agency was found to have violated a statute imposing requirements as to *how* an agency determination should be made, and compliance with those requirements was not discretionary. In such cases, what the statute means and requires are legal questions for the Court to decide, not policy or other issues that call for the agency's expertise and are relegated to its discretion. *See* ECF 333, at 147 n.38 (determining compliance with the statue "is indisputably the Court's role."). Moreover, there is typically only "one rational course" for the agency to follow—compliance with the statute—and there is, accordingly, nothing remaining for the agency to decide on remand. *See*, *e.g.*, *Am. Hosp. Ass'n*, 385 F. Supp. 3d at 11 (quoting *Berge v. United States*, 149 F. Supp. 2d 36, 43 (D.D.C. 2013)).

The cases Defendants rely on, on the other hand, involved challenges to agency rule-making and other allegedly unlawful discretionary agency actions, where there were multiple ways the agency could correct its violation and which of those alterations was best was a matter

11

of agency discretion, and remand to the agency, therefore, was "the better course of action." *Id.*

Moreover, in such administrative law cases the district court is typically acting "as an appellate

tribunal" and not deciding the matter in the first instance. *See, e.g., Berge*, 149 F. Supp. 2d at 42.

That is *not* the case here. Plaintiffs are not "appealing" from an agency adjudication or other

administrative determination. Rather, they are challenging ICE's failure to comply with a statute.[2]

Defendants' own brief demonstrates that these cases, and the "remand" relief they ordered,

do not apply here. Quoting this Court's decision in *American Hospital Association v. Azar*,

Defendants concede that these cases involved situations where the defendant agency "ha[d]

multiple courses" of action they could choose from on remand and choosing between those

alternatives called for the exercise of the agency's expertise and Congressionally-delegated

discretion. Opp'n at 8 (quoting *Am. Hosp. Ass'n*, 385 F. Supp. at 11). On the other hand, where

"there is only one rational course for the agency to follow on remand," "[i]njunctive relief is

typically appropriate." Opp'n at 6, 7 (quoting *Am. Hosp. Ass'n*, 385 F. Supp. at 11). Yet,

Defendants never explain why that is not the case here, given this Court's Decision, which makes

clear that what the Statute means and requires, including the specific steps ICE should—and should

---

[2] *See Am. Hosp. Ass'n*, 385 F. Supp. 3d 1 (Opp'n at 5) (challenge to HHS rule reducing Medicare reimbursement for certain outpatient drugs); *Berge v. United States*, 949 F. Supp. 2d 36 (D.D.C. 2013) (Opp'n at 6) (challenge to DoD determinations that a therapy for autism was a covered benefit only under a supplemental program for active duty service members, but not military's basic health care program); *Baptist Medical Ctr. v. Burwell*, 2019 WL 978957 (D.D.C. Feb. 28, 2019) (Opp'n at 6) (appeal from decision of HHS Provider Reimbursement Review Board rejecting plaintiffs' challenge to calculation of Medicare reimbursements), *Palisades Gen. Hosp., Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005) (Opp'n at 8) (appeal by Medicare provider from HHS's denial of its requests for corrections to wage data used in fiscal year wage index); *Tenn. Gas Pipeline Co. v. F.E.R.C.*, 926 F.2d 1206, 1208 (D.C. Cir. 1991) (Opp'n at 8) (appeal from FERC's selection of 15.1 percent as approved return on equity for plaintiff gas pipeline company; "as ratemaking is for the Commission and not for us … we must again remand"); *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005 (D.C. Cir. 1999) (Opp'n at 8) (appeal by Medicare providers from HHS determination that they were not entitled to retroactive adjustments to "outlier payments" under Medicare program), *Flaherty v. Pritzker*, 17 F. Supp. 3d 52 (D.D.C. 2014) (Opp'n at 8) (challenge to administrative amendment to Atlantic Herring Fishery Management Plan). The Supreme Court's recent decision in *Garland v. Ming Dai*, 141 S. Ct. 1669 (2021) (Opp'n at 5), is even further afield. It did not address remedies under the APA, and as the out-of-context excerpt Defendants quote makes clear, the court found that "*a reviewing court* is 'generally not free to impose' additional *judge-made procedural requirements on agencies*." *Id.* at 1671 (emphasis added). This Court is not acting as a reviewing court and is not imposing "judge made procedural requirement"; it is applying a Congressionally-enacted statute.

not—take in making Age-Out placement determinations, are questions of law for the Court to decide and which the Court, in fact, decided in its 180-page decision.  Instead, Defendants simply *assert* that "[b]oth parties have proposed feasible mechanisms to comply with § 1232(c)(2)(B)," presumably referring to the parties' proposed orders, without identifying or explaining how those "mechanisms" provide multiple "course[s] of action" for ICE to comply *with the Statute*, let alone demonstrating that choosing between these courses of action concerns a matter Congress delegated to ICE's discretion.  *See* Opp'n at 7-8.  In fact, the steps ICE must take—and not take—to comply with the Statute are set forth in the Court's Decision and incorporated in the training materials and the revised sections of the FOJC Handbook agreed to by the parties.  *See* ECF 346-1 (PowerPoint Training Presentation); ECF 360-1, at Exhibit 1 (Revised FOJC Handbook).  Both parties' orders provide that these materials should be used (although, as discussed above, Defendants' order would allow ICE subsequently to revise or replace them).  *See* Ex. A, at 5-6, 8.

The differences between the parties' respective orders do not concern the steps ICE must take to *comply with the Statute*.  Rather, they concern Plaintiffs'—and the Court's—ability to *enforce* its prior Decision and ensure that those steps are actually being taken and that the Statute and this Court's Decision are being complied with.  Defendants' order would limit future "enforcement" to largely ministerial actions, such as ensuring that training is conducted and data is reported.  *See* Ex. A.  Neither Plaintiffs nor the Court would have the authority to ensure that the training is actually being followed, that the steps required to comply with the Statute are being taken, and that ICE is complying *with this Court's Decision and the Statute*.  Moreover, Defendants would have *carte blanche* to revise the substantive materials used in performing these tasks in their sole and unbridled discretion, and to issue entirely new training materials and policy guidance concerning what the Statute means and requires and when and how Age-Out

13

determination should be made, without notice to Plaintiffs and the Court or their input and approval.  As to reporting, the information provided might indicate whether ICE is complying with the Statute, but Plaintiffs—and the Court—would not be able to do anything with that information, except bring a new action.  *See* Opp'n at 10-11.  Indeed, ICE could revert to some or all of the practices the Court found violated the Statute (such as using the Risk Classification Assessment or the "totality of circumstances" standard) and there would be nothing Plaintiffs or the Court could do about it.

Relatedly, Defendants never explain what issues remain for ICE to determine on remand.  For good reason.  Defendants make clear that the only "remedies" they intend to implement are set forth in their proposed order, and that they seek a remand *not* to determine what remedies are appropriate, but rather to implement the order they ask this Court to enter:  "Defendants ask this Court to remand for implementation of the proper remedy, … which Defendants present in their Proposed Final Judgment and Remand."  *See* Ex. A; Opp'n at 1.  In short, Defendants *concede* there is no issue relating to remedies remaining for ICE to decide on remand, let alone one that calls for the exercise of ICE's Congressionally-delegated discretion.

Finally, if there were ever a case where remand would *not* be appropriate, it is this one.  The Court in effect did that three years ago in its April 18, 2018 decision granting preliminary injunctive relief, in which the Court determined that ICE had not complied with the Statute and provided guidance as to how to do so.  However, instead of following the Court's guidance and changing how it made custody determinations to comply with the Statute, ICE doubled down on its prior non-compliance.  Among other things, it stubbornly maintained that the problem was not a lack of compliance, but a lack of documentation, and trained it field officers to make placement determinations in ways that were directly contrary to the Court's guidance.  ICE then implemented

a new worksheet and documentation system that instructed field officers that they should *not* change how they were making custody determinations, but merely document the decisions they were already making. But that process omitted hundreds of "missing Age-Outs" which ICE claims it was not even aware of and for which worksheets were not completed. And, when it became clear those worksheets that were completed undermined its claims of compliance. ICE conducted a *post hoc* effort to revise and "correct" previously-completed worksheets that it falsely represented were contemporaneous evidence of its compliance, weeks or months after-the-fact and immediately before they were produced to Plaintiffs. *See, e.g.*, ECF 272, ¶¶ 50-60; ECF 271 (Pls.' Proposed Liability Findings) ¶¶ 60-68.[3]

In sum, this Court's exercise of its broad remedial discretion to enter a permanent injunction is supported here by settled law and an extensive and undisputed evidentiary record.

## II.     INJUNCTIVE RELIEF IS NECESSARY.

Defendants next argue that a preliminary injunction is no longer "necessary" because ICE is currently releasing 99.5 percent of Age-Outs. *See* Opp'n at 2, 7-9. Even if this demonstrated its compliance with the Statute (which as demonstrated below, it does not), it would not constitute a basis for denying injunctive relief. Defendants simply repeat their "voluntary cessation" argument without even acknowledging, let alone attempting to overcome, this Court's prior rejection of that argument and the numerous legal and evidentiary reasons why that doctrine does

---

[3] *See, e.g.*, *Williams v. Lane*, 851 F.2d 867, 884-85 (7th Cir. 1988) (affirming not merely an injunction, but appointment of a special master to monitor defendants' compliance with a permanent injunction, where, the record demonstrated "administrative recalcitrance"). Moreover, even if this case were appropriate for remand (which it is not), the proper relief would *not* be what Defendants propose: remanding the matter to the agency to determine the appropriate remedy, if any; limiting the Court's jurisdiction to enforcing only those remedial actions ICE has previously consented to; and requiring that, if Plaintiffs challenge the remedy (or lack thereof), that ICE deems appropriate, Plaintiffs must file and prosecute a new action. Rather, it would be what this Court ordered in *American Hospital Association v. Azar*: "retain jurisdiction over this matter, and … reconsider the remedy if the agency fails to fulfill its responsibilities in a prompt manner." 385 F. Supp. 3d at 12. Indeed, even Defendants previously conceded this. *See* ECF 319, at 19.

not apply here.  *See, e.g.*, ECF 267 (Defs.' Remedies Mem.), at 16-18; ECF 209 (Defs.' Mot. for

Summ. J.), at 11-20; ECF 240 (Summ. J. Op.), at 3; ECF 318 (Pls.' Remedies Resp.), at 20-21.  As

Defendants conceded in their Remedies Brief, to avoid an injunction on this basis, they must satisfy

a "formidable burden" and show voluntary cessation "with absolute clarity"; "voluntary cessation

of the challenged activity" will foreclose injunctive relief "only if it can be said with assurance

'that there is no reasonable expectation that the wrong will be repeated.'"  ECF 267, at 17.

Defendants have not, and cannot, make that showing here.

Among other things, Plaintiffs introduced undisputed evidence at trial that both a

permanent injunction *and* a monitor were necessary because (1) even though the percentages of

Age-Outs detained by ICE declined significantly after this suit was filed, including at some field

offices from close to 100 percent detention to almost zero, past history demonstrated that such

declines can be reversed in a heartbeat, and (2) the actions ICE claimed demonstrated its

compliance, and would ensure its compliance going forward, such as completing a revised AORW,

"compliance checks" of each AORW by JFRMU, and monthly reporting of data on Age-Out

custody determinations, did nothing of the sort and, in fact, only further demonstrated ICE's

non-compliance.  *See, e.g.*, ECF 271, ¶¶ 60-68, 291, 316.  The Court thereafter cited and relied

upon this evidence in finding that Defendants had violated and failed to comply with the Statute.

*See, e.g.*, ECF 333, ¶¶ 62-69, 225-258.

Defendants' Opposition does not even address, let alone attempt to rebut, this evidence.

Nevertheless, they cite these exact same factors—a significant reduction in ICE's current detention

rate and "continued use of the AORW 8/19[,] compliance checks by ICE Headquarters[,] [and]

monthly reporting of data on Age-Out custody determinations"—as "significant developments"

that "advise strongly against a permanent injunction." Opp'n at 8-9. As this Court's decision makes clear, they do nothing of the sort.

In fact, in terms of ensuring ICE's future compliance, very little has changed in the fifteen months since the parties filed their final post-trial submissions. ICE has not conducted any new or additional training with respect to the Statute. ICE has not promulgated any new or revised policies or guidance with respect to the Statute. Nor has ICE revised its prior policies and guidance, including its FOJC Handbook, to conform to this Court's Decision. Indeed, ICE has not even informed FOJCs of this Court's findings. The point here is not to fault ICE for this inaction (although nothing prevented it from seeking this Court's approval to immediately implement the new training materials and policy guidance agreed upon by the parties).[4] Rather, it is to make clear that its current 99.5 percent release rate is *not* the result of a reformed agency and robust compliance program in which FOJCs have received new and clear guidance and training as to what the Statute requires and the steps they should take—and, equally important, not take—in order to comply with the Statute. Instead, that release rate appears to be the result of an informal edict from JFRMU that Age-Outs should almost always be released, at least while this case is pending and the Court is deciding the relief that should be ordered. While this may result in the same *outcomes* as compliance with the Statute, it does *not* demonstrate that FOJCs understand what the statute requires and are taking the steps, and following the process, this Court found are required to make Age-Out placement determinations in conformance with the Statute.

---

[4] Instead, Defendants sought to "propose interim guidance" that was contrary to this Court's decision and the Statute and would have further confused FOJCs as to what the Statute requires. *See* ECF 339 (Pls.' Opp'n to Defs.' Proposed Interim Guidance), at 1-4. At the same time, Defendants rejected Plaintiffs' request that ICE issue interim guidance that would have advised field officers of the steps they should take to comply with this Court's decision and the Statute. *See id.* at 5-6.

But even if the current release rate *did* demonstrate compliance, it still would not eliminate the need for permanent injunctive relief. As the Court found in its Decision, undisputed evidence at trial demonstrated that such "compliance" can be reversed in a heartbeat. Harlingen is an example. It has gone from releasing to detaining almost 100 percent of its Age-Outs—and *vice versa*—on several prior occasions, based on the directive of the field office supervisor then in charge. *See* ECF 333, ¶¶ 225-232. Chicago is another example. It went from releasing almost all of its Age-Outs to detaining them when a new supervisor took over, and then reversed course a few years later in response to this litigation. *Id.* ¶¶ 233-240.

The continuing necessity for an injunction is further established by the unrebutted testimony of former Acting ICE Director, John Sandweg. *See* ECF 272, ¶¶ 45-60. Based on his six years of experience as a senior official in DHS and ICE, Mr. Sandweg described a number of real-world reasons why a monitor was necessary here, each of which applies with equal force to the predicate, and less intrusive, relief of a permanent injunction. *See id.* One is ensuring that Defendants maintain a sustained focus on complying with the Statute going forward, and the Court's ability to order adjustments to address future non-compliance and/or improve compliance. *Id.* ¶ 46. Relatedly, an injunction is necessary to ensure that the Statute receives the management time and attention it requires and does not "get lost in the daily rush of activities" and other priorities. *See id.* ¶ 47; Trial Tr. at 2196-97. Importantly, these concerns are heightened by ICE's law-enforcement mission and focus, which does not naturally comport with considering Age-Outs for placement in less restrictive alternatives. *Id.* FOJCs and other deportation officers who make and supervise placement determinations are law enforcement officers, who view their core mission as the apprehension, detention, and removal of unlawful immigrants, not releasing them from custody to less restrictive alternatives. *Id.* For example, at trial, JFRMU's chief, Mellissa Harper,

and other ICE witnesses referred to attempts to identify sponsors and other alternatives to detention as "social programming" and testified that "[a]s a law enforcement agency, it's not our job to seek out social programming."  *See*, *e.g.*, ECF 272, ¶ 48; 5/2/19 Harper Dep. Des. 42:21-43:17.

In short, Defendants' assertion that an injunction should be denied because they are currently complying with the Statute, is belied by settled law, undisputed evidence at trial, and this Court's Decision.

### III.   PLAINTIFFS' PROPOSED JUDGMENT DOES NOT PLACE AN UNDUE OR UNNECESSARY BURDEN ON DEFENDANTS.

Plaintiffs' proposed order does not "place unnecessary burdens" on ICE.  (Opp'n at 1.)  In fact, it does not require ICE to do anything that Defendants' order does not require, except comply with the Statute.  Both orders require that ICE provide monthly documentation, conduct annual training of FOJCs and quarterly training of new FOJCs, complete on AORW as to each Age-Out placement determination, and revise and re-issue its FOJC Handbook to include the revised section agreed to by the parties.  *See* Ex. A.  Moreover, with one exception (quarterly training of new FOJCs), these are all things ICE is already doing, and has been doing for some time.

The differences between the two orders—and the basis for Defendants' objections—is *not* the respective burdens they impose, but rather the obligation to comply with the Statute and to make Age-Out placement determinations "in accordance with … the Court's July 2, 2020 Decision and the training materials previously agreed upon by the parties" (ECF 359-1, at 2) that Plaintiffs' Order imposes, and the possibility of future enforcement if ICE does not do so.  This includes certain enforcement-related provisions in Plaintiffs' order to monitor and ensure ICE's compliance, including:  Plaintiffs' right to raise with the Court any issues or concerns with respect to ICE's compliance with the Statute, and the Court's authority to resolve those issues and, if warranted order compliance; notice to Plaintiffs of any proposed revisions to the training materials

and the FOJC Handbook sections agreed to by the parties, and the revised AORW proposed by ICE, and any new policies, practices or policy guidance concerning what the Statute means or requires and/or when or how Age-Out placement determinations are made, and Plaintiffs' right to raise with the Court, and the Court's authority to resolve, any issues or concerns with respect to such revised or new training practices or policy guidance.

## IV.   DEFENDANTS' OBJECTIONS TO SPECIFIC PROVISIONS IN PLAINTIFFS' PROPOSED ORDER ARE BASELESS AND UNREASONABLE.

Defendants' objections to a handful of specific provisions in Plaintiffs' proposed order are equally baseless and unreasonable.  None withstands even cursory analysis.

### A.   Six-Month Review Of Defendants' Revised AORW.

Defendants urge that the Court reject Plaintiffs' compromise proposal whereby Defendants' revised AORW would be used for a six-month trial period, after which the parties would meet and confer concerning any revision either side believes should be made, and the Court would resolve any disputes.  *See* Ex. A, at 4-5.  To address Defendants' prior complaint that many of Plaintiffs' concerns and proposed revisions to the AORW were not relevant to compliance, Plaintiffs' proposed order requires that any future revisions would be limited to those that will help "ensure that (a) the AORW provides the information that will allow the parties to monitor whether ICE is complying with the Statute … and/or (b) that ICE is complying with the Statute."  *See id*. Defendants argue that the Court "should preclude Plaintiffs from imposing a temporal limit on Defendants' use of their proposed AORW" and their proposed order would give ICE unfettered discretion to make any changes to its revised AORW and/or use any other AORW they choose. *See* Opp'n at 10; ECF 362-1, at 3.

Defendants do not dispute the importance of the AORW as both a guide to ensure that FOJCs comply with the Statute in making Age-Out placement determinative and as a key source

of information for determining and monitoring whether they are complying with the Statute. *See* ECF 351 (Pls.' Submission Concerning ICE's Proposed AORW), at 1; Opp'n at 10. However, they ignore the fact that a six-month review will allow the parties to assess whether ICE's revised AORW is accomplishing these twin objectives, and to modify the form if a review shows that it is not or there are ambiguities or omissions that need to be corrected. The need for such a review was demonstrated by evidence at trial concerning ambiguities and FOJC confusion with respect to the initial and current versions of the AORW. ECF 333, ¶¶ 57-61, 135-138.

Defendants' objections to such a review—that the AORW "is the type of procedural requirement that the Supreme Court has stated a district court may not graft onto the APA" (Opp'n at 10 (citing *Ming Dai* 141 S. Ct. at 1669))—misunderstands the nature of both the AORW and the six-month review. Neither is a "*procedural requirement*" for bringing a claim under the *APA*. Rather, they are part of the proposed *remedy* for avoiding future non-compliance *under the Statute*. Given the AORW's undisputed role in promoting and monitoring compliance with the Statute, a review of completed forms to ensure it is accomplishing its remedial purpose is clearly within this Court's broad authority and discretion with respect to remedies.

### B.   Updates To ICE's Nationwide List Of Organizational Sponsors

Defendants raise similar objections to Plaintiffs' proposal that, if ICE rejects organizational sponsors suggested by Plaintiffs for inclusion in ICE's nationwide list, it should explain why, and if the parties cannot agree on whether to include the sponsor, Plaintiffs may raise the issue with the Court. *See* Opp'n at 11-14; ECF 359-1, at 3. Defendants concede that this is the same process the parties followed with respect to the initial list, and that the parties were able to quickly reach agreement as to the sponsors proposed by Plaintiffs. Opp'n at 12. Nevertheless, Defendants object to this provision on the grounds that "[t]he APA … does not permit Plaintiffs to dictate or challenge Defendants' exercise of agency discretion." *Id*. at 11.

21

Once again, Defendants' objection misunderstands the nature of the nationwide list and Plaintiffs' proposed process for periodically updating it.  Both are part of the proposed remedy for addressing ICE's past non-compliance and ensuring its future compliance with the Statute.  As Plaintiffs explained in their initial memorandum, this Court's Decision emphasized the critical role of organizational sponsors in providing a less restrictive alternative to detention and complying with the Statute, and detailed ICE's past refusal to consider such sponsors.  *See* ECF 359 (Pls.' Mot. for Entry of J.), at 4-5; ECF 333, at 3, 160-62 & ¶¶ 38-42, 106, 183, 203.  Undisputed evidence at trial further demonstrated that ICE often rejected organizational sponsors without any legitimate reason and/or based on inaccurate or pretextual reasons.  *See* ECF 359, at 5; ECF 333, ¶¶ 17-18.  The proposed requirement that ICE explain its reasons for rejecting proposed organizational sponsors, and that Plaintiffs may raise, and the Court resolve, any dispute is in direct response to this evidence, and it is clearly within this Court's broad remedial authority.  It is also important, as FOJCs are unlikely to consider or approve organizational sponsors that are not included on ICE's approved nationwide list.[5]

Finally, the related requirement in Plaintiffs' proposed order that "[e]ach ICE field office should identify and maintain a list of, and develop relationships with … organizational sponsors that will accept Age-Outs from that office's Area of Responsibility" (ECF 359-1, at 3), is not "repetitive and unnecessary."  Opp'n at 14.  The evidence demonstrated that field offices, like San Antonio, that successfully placed their Age-Outs with organizational sponsors had a close, working relationship with local shelters, which made it more likely the field office would seek placement at that shelter and that the shelter would accept Age-Outs.  ECF 333, ¶¶ 215-224.

---

[5]    Defendants mistakenly assert, without citation or support, that Plaintiffs intend to create their own national shelter list.  (Opp'n at 13.)  They do not.  And even if they did, it would not provide a substitute for ICE's list.  As discussed above, FOJCs are not likely to approve sponsors that are not "approved" by ICE and included on its list.

C.      **Advance Notice Of, And An Opportunity To Object To, ICE's Revisions To The Agreed, Or Adoption Of New, Training Materials And Policy Guidance.**

Defendants argue that "[u]nder the APA, Plaintiffs are not entitled to receive advance notice of, review, or object to, 'any proposed revisions to the revised policy guidance and training materials agreed upon by the parties,'" as Plaintiffs proposed.  Opp'n at 14 (quoting ECF 359, at 2).  As Plaintiffs demonstrated in their initial memorandum, these provisions—and this Court's authority to enforce them—are essential to ensuring ICE's compliance.  Without them, the new "revised policy guidance and training agreed upon by the parties could be undermined in whole or in part, and compliance with the Statute thwarted."  ECF 359, at 2.  ICE would have *carte blanche* to adopt new or revised training and guidance that is inconsistent with the Statute and/or violates this Court's Decision.  Even if Plaintiffs subsequently learned about that non-compliant training or guidance, there would be nothing they could do.  Under Defendants' order, they would not have authority to complain about new or revised training and guidance, and the Court would not have authority to hear complaints or to order any relief.  *See* Ex. A at 8, 10-11.

Defendants have no response.  Their assertion that "Defendants appreciate that potential disputes could arise, but Plaintiffs may raise their concerns with ICE at any time" (Opp'n at 14) is a non-response.  They do not, and cannot, explain how that would ensure compliance with the Statute or prevent ICE from undermining even the limited relief they "consent" to in their proposed order.  Defendants' further assertion that Plaintiffs could "also may file a motion to enforce should they seek additional action from the Court" (*id.*) makes no sense.  Under their proposed order, there would be nothing to enforce and no authority for the Court to exercise.

The need for this provision is confirmed by the revised FOJC Handbook attached to Defendants' Opposition.  It contains a description of this Court's findings as to what the Statute requires that differs materially from the description in the agreed training materials, which

Plaintiffs understood Defendants had previously agreed to include in the revised Handbook. *Compare* ECF 360-1, § 2.8 *with* ECF 362-1, at Exhibit 1, § 2.8.

      **D.**      **Attorneys' Fees.**

      Finally, Defendants assert that Plaintiffs' proposal for reimbursement of class counsel's fees and costs in monitoring and enforcing ICE's compliance "is unrelated to any injunction or remand that this Court may order" and should be "tabled" until Plaintiffs file a motion for recovery of their *past* fees in prosecuting this action under the Equal Access to Justice Act (EAJA). *See* Opp'n at 14 n.7. This is wrong on multiple grounds. Defendants' proposal is directly related to any injunction or other final order entered in this case. In fact, the only way to ensure fees for monitoring ICE's compliance will be recoverable is to include them in this Court's order. *See Johnson v. City of Tulsa, Okla.*, 489 F.3d 1089, 1108-09 (10th Cir. 2007) ("[T]he decree itself can spell out what efforts by plaintiffs' counsel are to be compensated. Indeed, the amount of litigation on the subject suggests that explicit provisions in consent decrees would be a boon for all concerned (certainly the courts)."). There is currently a circuit split over the circumstances in which post-judgment fees are recoverable, and the D.C. Circuit has not addressed the issue. *Compare Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 452 (9th Cir. 2010) (post-settlement-agreement monitoring was compensable even if the monitoring did not produce a new court order); *with All. to End Repression v. City of Chi.*, 356 F.3d 767, 772-73 (7th Cir. 2004) (interpreting the "prevailing party" test to disallow post-consent-decree fees where plaintiffs' motions were unsuccessful); *see also Binta B. ex rel. S.A. v. Gordon*, 710 F.3d 608, 625 (6th Cir. 2013) (collecting cases). Moreover, Plaintiffs' request under EAJA relates to Plaintiff's counsel's *past and current* work in prosecuting this action—not their *future* work in monitoring and enforcing ICE's compliance with a final decree and remedial order. In short, after opposing a monitor on the grounds that Plaintiffs' counsel should monitor and enforce ICE's compliance,

Defendants now try to evade an order that would ensure Plaintiffs' counsel are paid for that work.

That feint is not only unreasonable, but legally and factually baseless.

## <u>CONCLUSION</u>

For all the foregoing reasons, Plaintiffs respectfully request that the Court enter Plaintiffs'

Proposed Final Judgment and Permanent Injunction (ECF 359-1).

Dated:  July 15, 2021

*/s/ Stephen R. Patton*
Stephen R. Patton
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200
stephen.patton@kirkland.com

Tia T. Trout Perez (D.C. Bar No. 990447)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Ave., NW
Washington, DC 20004
Telephone:     (202) 879-5000
Facsimile:      (202) 879-5200
tia.trout-perez@kirkland.com

Mark Fleming
NATIONAL IMMIGRANT JUSTICE CENTER
208 South LaSalle, Suite 1300
Chicago, IL 60604
Telephone:     (312) 660-1335
Facsimile:      (312) 660-1505
mfleming@heartlandalliance.org

Katherine Melloy Goettel
Gianna Borroto
AMERICAN IMMIGRATION COUNSEL
1331 G Street, NW, Suite 200
Washington, DC  20005
Telephone:     (202) 507-7552
kgoettel@immcouncil.org
gborroto@immcouncil.org

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this 15th day of July, 2021, a true and correct copy of the

foregoing was served via ECF upon counsel of record.

*/s/ Stephen R. Patton*
Stephen R. Patton
