**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| WILMER GARCIA RAMIREZ, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 18-508 (RC) |
| | : | | |
| v. | : | Re Document No.: | 337, 359 |
| | : | | |
| | : | | |
| U.S. IMMIGRATION AND CUSTOMS | : | | |
| ENFORCEMENT, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

**MEMORANDUM OPINION AND ORDER**

**GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR ENTRY OF FINAL
JUDGMENT AND PERMANENT INJUNCTION**

This case concerns violations of the Administrative Procedure Act ("APA") by the U.S.

Immigration and Customs Enforcement ("ICE" or "the agency") in connection with ICE's

processing of eighteen-year-olds who came to the United States as unaccompanied alien children

("UACs").  Plaintiffs—immigrant teenagers who entered the United States as UACs—bring this

class action against ICE, the Acting Director of ICE, the Department of Homeland Security

("DHS"), and the Secretary of Homeland Security (collectively "Defendants" or "the

Government").

Following a three-week trial, the Court issued its Findings of Fact and Conclusions of

Law Concerning Liability in this case.  *See Ramirez v. U.S. Immigr. & Customs Enf't*, 471 F.

Supp. 3d 88 (D.D.C. 2020) ("FF & CL").  The Court found that ICE was liable under the APA

for failing to follow procedures made necessary by the Violence Against Women Act

Reauthorization of 2013 ("VAWA"), 8 U.S.C. § 1232(c)(2)(B), and for refusing to take actions it

was required to take under that statute.  *Id.* at 182–91.  Plaintiffs have now moved, pursuant to

Rule 54 of the Federal Rules of Civil Procedure, for the entry of a Final Judgment and Permanent

Injunction.  For the reasons explained below, the Court concludes that limited injunctive relief is appropriate here, in order to ensure that the previously found violations do not continue going forward.

## I.  BACKGROUND

The Court assumes familiarity with its prior Findings of Fact and Conclusions of Law and incorporates those findings of fact by reference here.  With that in mind, only a brief summary of the dispute at issue is warranted.

When minors lacking immigration status arrive in the United States without parents or other guardians, they are designated UACs and are placed in the custody of the Department of Health and Human Services, Office of Refugee Resettlement ("HHS" and "ORR").  If they are still in custody on their eighteenth birthday, the now-adult immigrants "age out" of HHS and ORR custody and are transferred to ICE custody.  Immigrants who undergo this transfer from HHS to ORR are referred to by the parties as "age-outs," and a subset of these age-outs make up the plaintiff class in this case.  Section 1232(c)(2)(B) requires that when ICE receives custody of an age-out it "consider placement in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight."  8 U.S.C. § 1232(c)(2)(B).  The Court has found Defendants liable for failing to follow the requirements of the statute and found in the Plaintiffs' favor with regard to both counts of their Amended Complaint.  In particular, the Court found that Defendants act in a manner that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of 5 U.S.C. § 706(2), when they fail to make a custody determination that considers placement in the least restrictive setting after taking into account the factors identified in the statute (Count I).  FF & CL at 175-91.  The Court also found that by this same conduct Defendants "fail[] to take a

discrete agency action that [the agency] is required to take," in violation of 5 U.S.C. § 706(1)

(Count II).  *Id.*

Section 1232(c)(2)(B) reads as follows:

If [an unaccompanied alien child in the custody of the Secretary of HHS] reaches 18 years of age and is transferred to the custody of the Secretary of Homeland Security, the Secretary [of DHS] shall consider placement in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight.  Such aliens shall be eligible to participate in alternative to detention programs, utilizing a continuum of alternatives based on the alien's need for supervision, which may include placement of the alien with an individual or an organizational sponsor, or in a supervised group home.

8 U.S.C. § 1232(c)(2)(B).  As the Court has explained, considering placement in the least

restrictive setting available "necessarily requires making an inquiry aimed at determining what

settings are available and which of these is the least restrictive," and the evidence and testimony

in this case demonstrated that "ICE officers are consistently failing to take either of these steps."

FF & CL at 191.

Their training does not emphasize the proper considerations or decisionmaking processes and, in fact, gives instructions that are contrary to the statute.  Field officers are left with nearly unbridled discretion to make age-out custody determinations however they would like, and this discretion is exercised in ways that does not comply with the agency's statutory obligations.

*Id.*

Plaintiffs originally filed this lawsuit on March 5, 2018.  Compl., ECF No. 1.  They

amended their complaint later that same month.  Am. Compl., ECF No. 21.  The Court went on

to grant Plaintiffs' subsequent motion for class certification, allowing Plaintiffs to proceed on

behalf of a class defined as:

All former unaccompanied alien children who are detained or will be detained by ICE after being transferred by ORR because they have turned 18 years of age and as to whom ICE did not consider placement in the least restrictive setting available, including alternatives to detention programs, as required by 8 U.S.C. § 1232(c)(2)(B).

Mem. Op. Den. Defs.' Mot. Dismiss and Granting Pls.' Mot. for Class Certification. at 56–57

("MTD and Class Cert. Op."), ECF No. 50.  The Court conducted a bench trial over the course of

eighteen days between December 2, 2019 and January 15, 2020.  Transcript of Bench Trial

("Trial Tr."), ECF Nos. 280–313.[1]

Following the close of trial, each party submitted proposed findings of fact and

conclusions of law to the Court.  One set of briefing, at the Court's instruction, addressed

remedies.  Defs.' Proposed Findings of Fact and Conclusions of Law Concerning Remedies[[2]]

("Defs.' Remedies Br."), ECF No. 267; Pls.' Proposed Findings of Fact and Conclusions of Law

Concerning Remedies ("Pls.' Remedies Br."), ECF No. 272; Pls.' Mem. Concerning Remedies

("Pls.' Remedies Mem."), ECF No. 273.  The parties then filed responses to each other's

proposed findings of fact and conclusions of law.  Pls.' Resp. to Defs.' Proposed Remedies

Mem. ("Pls.' Remedies Resp."), ECF No. 318; Defs.' Reply to Pls.' Mem. Concerning Remedies

("Defs.' Mem. Resp."), ECF No. 319; Defs.' Resps. To Pls.' Proposed Findings of Fact and

Conclusions of Law Concerning Remedies ("Defs.' Remedies Resp."), ECF No. 322.

On July 2, 2020, the Court issued its Findings of Fact and Conclusions of Law

concerning liability in this case, finding Defendants liable in the ways described above.  A

number of developments, however, have transpired in the thirteen months since this opinion was

issued, and in the eighteen months since the parties submitted their proposed remedies briefing.

During this time, at the Court's direction, the Plaintiffs have reviewed and proposed revisions to

Defendants' revised training materials and Age-Out Review Worksheet ("AORW").  *See* Nov.

---

[1] The Trial Transcript has been consecutively paginated.  Accordingly, the Court will only reference page and line numbers when citing to the transcript, rather than identifying the particular date of the cited testimony or the Electronic Case Filing Number assigned to that portion of the testimony.

[2] The Court has supplied this title because Defendants did not title this document.

19, 2020 Joint Status Report, ECF No. 345; Jan. 22, 2021 Joint Status Report, ECF No. 355. The parties also engaged in mediation.  *See* Dec. 16, 2020 Order Referring Case to Magistrate Judge for Mediation, ECF No. 352.  Plaintiffs have now moved for the entry of a final judgment under Federal Rule of Procedure 54(b) and a permanent injunction, submitting to the Court a proposed Final Judgment and Injunction ("Pls.' Proposed Final J. and Inj."), ECF No. 359-1, which incorporates a number of concessions, including the withdrawal of Plaintiffs' previous request for a Special Master and the use of Defendants' AORW form.  *See* Pls.' Mot. for Entry of Final J. and Permanent Inj. ("Pls.' Mot."), ECF No. 359.  Defendants, while supporting the issuance of a Final Judgment, oppose Plaintiffs' request for an injunction on the grounds that it would "place[] unnecessary burdens on Defendants and improperly vitiate[] Defendants' discretion."  Defs.' Opp'n to Pls.' Proposed Permanent Inj., ("Defs.' Opp'n") at 1, ECF No. 362. Defendants instead request "remand" back to the agency for implementation of the proper remedy, which they have submitted to the Court in the form of a proposed Final Order here. Defs.' Proposed Final J. and Remand, ECF No. 362-1.[3]

## II.  LEGAL STANDARD

A party seeking a permanent injunction must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010).  Because the government is a party, and "the government's interest is the public

---

[3] Defendants' Motion to Issue Interim Guidance, ECF No. 337, is also still pending. Given that interim guidance is no longer necessary in light of the final guidance issued here, the Court will deny this motion as MOOT.

interest," the last two factors merge.  *Pursuing Am. Greatness v. Fed. Election Comm'n*, 831

F.3d 500, 511 (D.C. Cir. 2016).

### III.  ANALYSIS

Plaintiffs ask the Court to enter a Final Judgment in its favor along with awarding

specific injunctive relief.  Pls.' Mot. at 1.  As part of that injunctive relief, Plaintiffs request that

they be given advanced notice of, and the right to object to, any new or supplemental ICE

policies, practices, and training, that Defendants be required to explain any objections to updates

to ICE's nationwide list of organizational sponsors, that the adoption of Defendants' Proposed

AORW be limited to a six-month trial period, and that Plaintiffs' counsel be reimbursed for

reasonable fees for monitoring Defendants' compliance with this Final Judgment and Injunction.

*Id.* at 1-5.  Defendants argue in response that an injunction is both unnecessary, given the lack of

any compliance issues to date, as well as legally inappropriate under the APA.  Defs.' Opp'n at

1.  Instead, they urge the Court to "remand" this matter back to ICE for implementation of the

proper remedy.  *Id.*  This is a somewhat confusing turn of phrase given that Defendants have

proposed their own final order here, in effect already completing the "remand" process.  And

while Defendants' proposed order adopts much of the substance of Plaintiffs' proposed

injunction, it has certain key differences.  These include limits on the Court's continuing

jurisdiction to resolve disputes, and a rejection of both Plaintiffs' proposed six-month trial period

for use of Defendants' revised AORW form and their proposed procedures for updating ICE's

Nationwide Age-Out Shelter List.  *See* Defs.' Proposed Final J. and Remand; *see also* Defs.'

Opp'n. at 7, 10-14.  Defendants also reserve the right to make any revisions ICE deems fit to the

training materials agreed upon by the parties as well as the Field Office Juvenile Coordinators

("FOJCs") handbook, and limit the role of Plaintiffs' counsel as a monitor to only being able to

enforce compliance with the order, not the overall statute.  Defs.' Proposed Final J. and Remand at 4, 6.  The Court will first address the general availability of injunctive relief in this action, before resolving each of the specific provisions of the proposed relief in dispute.

### A.   Limited Injunctive Relief is Appropriate in This Case

As a starting point, "it goes without saying that federal courts must vigilantly enforce federal law and must not hesitate in awarding necessary relief."  *DL v. District of Columbia*, 860 F.3d 713, 726 (D.C. Cir. 2017) (quoting *Horne v. Flores*, 557 U.S. 433, 450 (2009)).  To this end, the APA explicitly contemplates that injunctive relief may be proper when an APA violation is identified.  5 U.S.C. § 703 (providing that the APA allows "actions for . . . writs of prohibitory or mandatory injunction"); *see also Bowen v. Massachusetts*, 487 U.S. 879, 912 (1988) (detailing how district courts have the power to "hold unlawful and set aside agency action" found to be "not in accordance with law").  And courts use this broad remedial power to issue permanent injunctive relief for APA violations.  *See, e.g., Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,* 145 F.3d 1399, 1410 (D.C. Cir. 1998) (affirming district court's entry of permanent injunction against the enforcement of a rule promulgated by the Army Corps of Engineers); *Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647, 657 (D. Md. 2018) (ordering specific agency action to bring agency into statutory compliance after agency ignored statutory restrictions on funding decisions); *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Human Servs.*, 328 F. Supp. 3d 1133, 1147–53 (E.D. Wash. 2018) (same, entering permanent injunction where "Plaintiffs establish[ed] actual success on the merits of their APA claims," requiring agency to continue grant agreements); *Doe v. Rumsfeld*, 341 F. Supp. 2d 1, 17–19 (D.D.C. 2004) (permanently enjoining Defense Department's inoculation program after finding APA violation).

However, Plaintiffs have requested a detailed injunction mandating certain steps to ensure Defendants' compliance with Section 1232(c)(2)(B).  *See* Pls.' Proposed Final J. and Inj. Structural injunctions of this nature "are typically used as public law remedies for serious and pervasive rights violations," *Lampkin v. District of Columbia*, 886 F. Supp. 56, 62 (D.D.C. 1995), and are considered a "doubly exceptional" form of relief.  *Salazar by Salazar v. District of Columbia,* 896 F.3d 489, 497 (D.C. Cir. 2018) (cleaned up).[4]  This is due to the potential separation of powers issues that arise with these types of injunctions, "when the judicial branch undertakes to restructure the operations of an executive branch of government and to superintend its operations on an ongoing basis."  *Id.*; *see also Brown v. Plata,* 563 U.S. 493, 555 (2011) ("When a judge manages a structural injunction . . . [they] will inevitably be required to make very broad empirical predictions necessarily based in large part upon policy views—the sort of predictions regularly made by legislators and executive officials, but inappropriate for the Third Branch.") (Scalia, J., dissenting); *see also Bell v. Wolfish*, 441 U.S. 520, 562 (1979) (warning that courts should not "become . . . enmeshed in the minutiae" of agency administration).

On the other hand, the D.C. Circuit has also discussed the possibility that injunctive relief of this nature can, in some instances, help advance separation of powers principles.  In *Women's Equity Action League v. Cavazos*, the court asserted that "[i]f, as [plaintiffs] charge, administrative action is legally inadequate under the legislation they invoke, judicial review would serve to promote rather than undermine the separation of powers, for it helps to prevent the executive branch from ignoring congressional directives."  879 F.2d 880, 886 (D.C. Cir.

---

[4] The term "structural injunction" is defined as an "injunction seeking to effect the reform of a social institution."  Owen M. Fiss, *The Civil Rights Injunction* 9 (1978); *see also Lampkin*, 886 F. Supp. at 62 ("The purpose of a structural injunction is to remodel an existing social or political institution to bring it into conformity with constitutional [or statutory] demands; e.g., restructuring a school system to facilitate equal educational opportunities.").

1989) (cleaned up).  The court continued on, explaining that "[i]t would be ironic indeed if article III were interpreted to preclude federal courts from compelling regulatory agencies to adhere to the will of Congress by undertaking enforcement action to the degree or of the nature that statutes require." *Id.* (quoting Cass Sunstein, *Standing and the Privatization of Public Law*, 88 Colum. L. Rev. 1432, 1480 (1988)); *see also Perez v. Boston Hous. Auth.*, 379 Mass. 703, 739 (1980) ("But if it is a function of the judicial branch to provide remedies for violations of law, including violations committed by the executive branch, then an injunction with that intent does not derogate from the [separation-of-powers] principle . . . .").

In light of these policy concerns, the D.C. Circuit has endorsed a "restrained approach" by district courts regarding the issuance of structural injunctions to correct statutory violations. *DL*, 860 F.3d at 730-32 (affirming issuance of injunction to address systemic flaws with District of Columbia's compliance with Individuals with Disabilities Education Act).  Generally, a "court is limited to considering specific claims that [defendants] breached particular statutory . . . duties . . . and to ordering specific relief for those breaches." *Cobell v. Norton*, 392 F.3d 461, 477 (D.C. Cir. 2004) ("Cobell IV");[5] *see also Milliken v. Bradley*, 433 U.S. 267, 282 (1977) ("[F]ederal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation…."). In other words, any injunction must "be grounded in specific findings that [an agency] breached its statutory . . . duties. *Cobell v. Norton*, 428 F.3d 1070, 1076 (D.C. Cir. 2005) ("Cobell VI").

---

[5] For the sake of convenience, the Court adopts numerical abbreviations when referencing the various *Cobell* opinions.  These abbreviations, based only on the *Cobell* opinions cited in this opinion, differ in part from those previously adopted by the district court and Court of Appeals that authored the opinions at issue.  A fairly comprehensive recounting of these opinions and their corresponding abbreviations can be found at *Cobell v. Norton,* 226 F.R.D. 67, 74 n.4 (D.D.C. 2005), as well as *Cobell v. Kempthorne*, 455 F.3d 301, 302 (D.C. Cir. 2006).

With this background in mind, the Court will first explain why, contrary to Defendants' arguments, limited injunctive relief is appropriate.  It will then detail how Plaintiffs have met the prerequisite conditions for injunctive relief and, following that, will address the substance of the injunction and final order to be issued.

### 1.  Complete Remand is Not Required Under the APA

Defendants suggest that, rather than issue an injunction, the Court should "remand the proceedings" back to ICE to allow the agency to determine how best to resolve the statutory noncompliance previously identified by this Court.  Defs.' Opp'n at 7; *see also* Defs.' Mem. Resp. at 17.  Remand is sometimes appropriate relief in an APA case, but it is most useful when an agency retains some discretion with regard to the action it took in violation of the APA.  *Am. Hosp. Assoc. v. Azar*, 385 F. Supp. 3d 1, 11 (D.D.C. 2019).  When the agency only has one option, an injunction is the proper remedy.  *Id.*  As this Court has explained, "[i]njunctive relief is typically appropriate when 'there is only one rational course for the [a]gency to follow upon remand.'"  *Id.* (quoting *Berge v. United States*, 949 F. Supp. 2d. 36, 43 (D.D.C. 2013) (internal quotation marks omitted)).  Here, it is not a matter of "only one rational course" but of only one *lawful* course of action: ICE must make its determinations in accordance with Section 1232(c)(2)(B).  Pursuant to the statute, ICE agents are required—not at their discretion— to "consider placement in the least restrictive setting available after taking into account the [age-out]'s danger to self, danger to the community, and risk of flight."  8 U.S.C. § 1232(c)(2)(B).

Defendants take issue with this proposition, arguing that "there are multiple ways Defendants may develop and implement policies, procedures, and tools" for complying with Section 1232(c)(2)(B), meaning "no injunction is necessary or required."  Defs.' Opp'n at 7–8.

In essence, Defendants posit that they must be granted the discretion to create and largely self-enforce their own remedy for the widespread statutory violation identified by this Court.

The Court agrees with Defendants, in part.  It is ICE, not the Court, who is charged with the "primary responsibility for 'work[ing] out compliance'" with Section 1232(c)(2)(B).  *Cobell VI*, 428 F.3d at 1076 (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 67 (2004)); *see also Huff v. Vilsack*, 195 F. Supp. 3d 343, 362 (D.D.C. 2016) (explaining that remand "is generally warranted because courts prefer that agencies apply their expertise to pertinent issues of fact and law in the first instance").  However, this is not a standard APA case concerning a rulemaking or adjudication that occurred within the scope of ICE's expertise, but rather a suit challenging ICE's basic "failure to comply with a statutory obligation on a widespread basis." Nov. 14, 2019 Mem. Op. at 12, ECF No. 251.  And as the Court illustrated in the Court's Findings of Fact and Conclusions of Law, the bench trial brought to light disturbing and pervasive lapses in ICE's statutory compliance.  *See generally* FF & CL.

While a fairly unique issue, the D.C. Circuit has previously addressed this question on several occasions in the context of the long-running *Cobell* litigation, and the analysis provided is instructive.  Originally brought as *Cobell v. Babbitt*, 91 F. Supp. 2d 1 (D.D.C. 1999) ("Cobell I"), *aff'd and remanded sub nom. Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001) ("Cobell II"), this decade-long class action produced a flurry of opinions.  The action was brought under the APA and alleged that the Secretaries of the Interior and Treasury mismanaged Individual Indian Money accounts in violation of both their fiduciary duties and statutory obligations imposed by Congress.  *See generally id.*  Following the initial bench trial, the district court found significant violations of these duties by the agencies and issued an order "to compel those actions which had been unlawfully withheld or unreasonably delayed."  *Cobell II*, 240 F.3d at 1107.  The

specifics of this relief took the form of both a directed remand to the agencies so they could

discharge the duties specified by the court, while the court retained jurisdiction to ensure that

compliance was actually achieved.  *Id.*  On appeal, the defendant agencies challenged this

finding, arguing (in a similar vein to the arguments raised by Defendants here), "that the

[agency], and not the court, would have the authority to determine the nature and scope of" how

they must comply with their statutory obligations.  *Cobell II*, 240 F.3d at 1102.  The Circuit

disagreed.  It analyzed the underlying statutory language at issue and concluded that it was

proper for the district court to order the agency to comply with the explicit dictates of the statute.

*Id.* at 1102–04.  The court went on to explain that, notwithstanding the fact this case was brought

under the APA:

> [T]he district court acted well within its broad equitable powers in ordering
> specific relief . . . . As this court has concluded in other contexts, 'courts are
> presumed to possess the full range of remedial powers—legal as well as
> equitable—unless Congress has expressly restricted their exercise.'  *Crocker v.
> Piedmont Aviation, Inc.*, 49 F.3d 735, 749 (D.C. Cir. 1995).  This means that the
> district court has substantial ability to order that relief which is necessary to cure
> [defendant's] legal transgressions:

*Cobell II*, 240 F.3d at 1108.[6]

The district court would go on to issue two far more comprehensive structural

injunctions, in 2003 and again in 2005, seeking to overhaul the Department of Interior programs

at issue.  *See Cobell v. Norton*, 283 F. Supp. 2d 66, 287–95 (D.D.C. 2003) ("Cobell III"), *Cobell

v. Norton*, 357 F. Supp. 2d 298, 302–07 (D.D.C. 2005) ("Cobell V").  While both injunctions

would ultimately be vacated by the Circuit, critically, the Court of Appeals never held that such

---

[6] It bears noting that the D.C. Circuit went on, in its discussion of the contours of relief
available to the district court, to cite to two Supreme Court decisions that specifically allowed for
the issuance of structural injunctions— *Brown II* and *Swann*.  *Cobell II*, 240 F.3d at 1108.  Such
citations would seem to imply that structural injunctive relief remain available in such a case.

relief was categorically beyond the authority of district courts when adjudicating an APA matter. *See Cobell IV*, 392 F.3d at 478 (vacating in part first entry of structural injunction based on limiting language in the 2004 Congressional Appropriations Act); *Cobell VI,* 428 F.3d at 1078–79 (reversing reissuance of injunction following expiration of Congressional Appropriations Act without further hearing). Rather, the D.C. Circuit used these opinions to lay out the rules that govern the award of injunctive relief in cases brought under the APA. The availability of this type of relief would be reaffirmed by later opinions. *Cobell v. Kempthorne*, 455 F.3d 301, 307 (D.C. Cir. 2006) ("Cobell VII") (describing court's "ability to grant relief once a specific breach of an established duty has been found").

This case and its various holdings thus refute Defendants' contention that *any* injunctive relief is beyond the Court's powers simply because this action was brought under the APA. Rather, an injunction can be issued under these circumstances when it is grounded in both (1) an agency's "statutory duties," as well as "specific findings that [the agency] breached those duties." *Cobell VI*, 428 F.3d at 1074. Both of these requirements have been met here, given the Court's previous Findings of Fact and Conclusions of Law, which identified both the procedures required under Section 1232(c)(2)(B) and the myriad ways ICE officers' conduct fell below the statutory minimum. *See, e.g.*, FF & CL at 191 ("Field officers are left with nearly unbridled discretion to make age-out custody determinations however they would like, and this discretion is exercised in ways that does not comply with the agency's statutory obligations.").

This is not to say that the Court can ignore altogether the deferential posture that accompanies this type of action. For when crafting injunctive relief within the APA context, courts "may not prescribe the specific steps the government must take to comply with these obligations unless it has found that government actions (or inactions) breached a legal duty and

that the steps ordered by the court constituted an essential remedy." *Cobell IV*, 392 F.3d at 476. But this is quite different than Defendants' assertion that the Court is unable to prescribe any injunctive relief. In sum, the Court concludes that tailored injunctive relief—that falls within the tightly constrained boundaries described above— is both within its authority and necessary for the Court to ensure effective and lasting compliance with Section 1232(c)(2)(B).

## 2.  ICE's Conduct Throughout the Litigation Further Emphasizes the Need for Injunctive Relief

An additional factor to be considered when determining if injunctive relief is warranted is the conduct of the defendant. The Supreme Court has said that a "comprehensive [injunctive] order" is particularly justified when the government has had "repeated opportunities to remedy" violations and where the history of litigation has been extensive. *Hutto v. Finney*, 437 U.S. 678, 687 (1978). The D.C. Circuit has held similarly. *See DL*, 194 F. Supp. 3d 30, 105 (D.D.C. 2016), *aff'd*, 860 F.3d 713 (D.C. Cir. 2017) (imposing structural injunction where defendant school system had "ample time and robust incentives to come into full compliance with the law" and had failed to meet benchmarks); *Cobell II,* 240 F.3d at 1109 (finding injunctive relief "particularly appropriate" given the "record of agency recalcitrance and resistance to the fulfillment of its legal duties") (citing *In re Ctr. for Auto Safety*, 793 F.2d 1346, 1354 (D.C. Cir. 1986)); *Cobell IV*, 392 F.3d at 477–78 (explaining that, under Circuit precedent, where an agency's "malfeasance is demonstrated to be prolonged and ongoing, more intrusive relief," including of the injunctive variety, "may be appropriate."). The Court believes that Defendants' actions throughout this litigation further reinforce the necessity of injunctive relief here.

Admittedly, there is some room between this case and the precedent invoked. For example, *Hutto v. Finney* lasted nine years as of the Supreme Court's decision, while the *DL* and *Cobell* litigation stretched on for almost a decade. However, the record here is extensive, and the

litigation history is not short.  And while Defendants have not directly contravened any prior orders of this Court, their efforts to adopt and put into application this Court's prior orders about what Section 1232(c)(2)(B) requires have been minimal at best.  For example, the Court noted when it granted a preliminary injunction that the ORR should and does have more onerous sponsorship requirements than ICE, but that ICE is not bound by these standards when making determinations under the statute.  Mem. Op. Granting Pls.' Mot. For Prelim. Inj., ("P.I. Op.") at 31, ECF No. 28; FF & CL at 131, ¶ 154.  In many instances, though, FOJCs continued to reject proposed sponsors for age-outs throughout 2018 and 2019 because the potential sponsors had not met ORR-specific sponsorship requirements.  FF & CL at 132–33, ¶ 157.  Likewise, the Court explained in August 2018 that "Section 1232(c)(2)(B) does not limit 'consider[ation]' or 'eligib[ity] to participate in alternative to detention programs' to those who DHS has determined pose no risk of flight," MTD and Class Cert. Op. at 40, but in December 2018 and again in April 2019 ICE headquarters showed FOJCs a flowchart suggesting that they should first make a custody determination and then, "[i]f appropriate," consider alternatives to detention, FF & CL at 113, ¶¶ 78–79; 126, ¶¶ 131–33 (describing this aspect of the April 2019 training); *id.* at 175–76 (explaining why this practice is contrary to Section 1232(c)(2)(B)).

Nor did the Court's finding in its issuance of a preliminary injunction that ICE was likely violating the APA by failing to follow the procedures dictated by Section 1232(c)(2)(B), *see* P.I. Op. at 27, spur the agency into action.  ICE responded only by developing a new "AORW" documentation system, not by reexamining the substance of its actual decision-making processes.  FF & CL at 105–06, ¶ 54.  But as the Court explained in its findings of fact and conclusions of law, it is ICE's decision-making processes that are the problem, not just its officers' documentation of their decisions.  *See id.* at 186 (explaining that "[t]he testimony of

ICE officials bolsters the Court's view of the AORWs and also stands on its own as further evidence that" ICE did not comply with the statute as required).

The Court also remains troubled by ICE's conduct during the pendency of this case. While this litigation was ongoing, ICE attempted to circumvent its newly instituted reporting requirement by completing many AORW forms *after* custody determinations had actually been made, often times even having officers who were entirely uninvolved in the original custody determination complete and sign off on the documentation. *Id*. at 185. ICE also eventually admitted that, contrary to its representations to the Court, it had failed to document a significant portion of age-outs on AORW forms and had misrepresented these statistics. *Id*. at 111, ¶ 69 ("Between April 1, 2016 and March 31, 2019, ICE had failed to make records for 1,473 age-outs, including 228 age-outs processed between October 17, 2018 and March 31, 2019 while the AORW/SharePoint system was in place. Additionally, 88 individuals had aged out between March 31, 2019 and May 24, 2019 without being recorded in the SharePoint site.") (internal citation omitted).

Taken together, the above conduct constitutes a pattern "of agency recalcitrance and resistance to the fulfillment of its legal duties[,]" *Cobell II,* 240 F3d 1109, a finding that strongly supports the imposition of injunctive relief. An agency that had shown a responsiveness to prior decisions more proactively and not attempted to shirk its legal obligations could perhaps be counted on to effectively implement remedial measures and police itself without the specter of a formal injunction. But, due to these facts, the Court continues to harbor doubts about ICE's ability to do so here. [7]

---

[7] Defendants argued in their original remedies briefing (though, perhaps wisely, did not raise this issue in the most recent round of briefing) that the Court should not impose a "nationwide injunction," Defs.' Remedies Br. at 23–24, citing several recent Supreme Court concurrences

### 3. Prerequisites for Injunctive Relief

Having determined that injunctive relief is available, the Court will now review the

required factors for injunctive relief.  Success on the merits of a case "does not automatically

entitle [a plaintiff] to injunctive relief as of right." *Eco Tour Adventures, Inc. v. Zinke*, 249 F.

Supp. 3d 360, 385 (D.D.C. 2017) (citing *Winter v. NRDC, Inc.*, 555 U.S. 7, 32 (2008)).

> Ordinarily, to obtain a running structural injunction, the plaintiff bears the burden
> of proving both the facts that warrant such intrusive relief and that (i) the
> plaintiff(s) suffered an irreparable injury, (ii) traditional legal remedies cannot
> redress the injury, (iii) the balance of hardships between the parties justifies
> extraordinary relief, and (iv) the injunction is not counter to the public interest.

*Salazar*, 896 F.3d at 497; *see also eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391

(2006)).  Having already discussed why this type of relief is warranted here, the Court will now

turn to the classic four-factor analysis.  "Failing to satisfy any factor is grounds for denying

relief."  *Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*, 785 F.3d 684, 694 (D.C. Cir.

2015).[8]

---

criticizing overbroad injunctions, *see e.g., Trump v. Hawaii*, 138 S. Ct. 2392, 2424–29 (2018)
(Thomas, J., concurring).  But the debate over "nationwide" or "universal" injunctions has no
bearing on this case.  The injunctions that have come under criticism are those "that prohibit the
Executive Branch from applying a law or policy against anyone" and "not just the plaintiffs."  *Id.*
at 2424.  These injunctions "direct how the defendant must act toward persons who are not
parties to the case."  *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch,
J., concurring in grant of stay).  Injunctive relief at the conclusion of a class action is a different
matter entirely.  No non-parties are impacted because the class is defined so as to encompass
future age-outs that ICE might process without following the statute.  The Department of
Justice's 2018 Litigation Guidelines for Cases Presenting the Possibility of Nationwide
Injunctions contrasts these sorts of injunctions with class actions, which it calls "the specific
mechanism that the law provides for large numbers of similarly situated persons to pursue relief
efficiently."  Dep't of Justice, Litigation Guidelines for Cases Presenting the Possibility of
Nationwide Injunctions at 5 (Sept. 13, 2018), https://www.justice.gov/opa/press-
release/file/1093881/download.
[8] The Court notes that Defendants failed to discuss these factors in the most recent round of
briefing.  As a result, the Court will incorporate some of the arguments raised in the parties'
original briefing on remedies, which did reach these issues.

*a. Irreparable Injury*

The Court has previously addressed the injuries caused by violations of Section 1232(c)(2)(B) in its Memorandum Opinion granting a preliminary injunction in this case. *See generally* P.I. Op. As the Court noted then, "[c]ourts in this jurisdiction have recognized that '[t]he concept of irreparable harm does not readily lend itself to definition.'" *Id.* at 36 (quoting *Judicial Watch, Inc. v. U.S. Dep't of Homeland Sec.*, 514 F. Supp. 2d 7, 10 (D.D.C. 2007)). Nonetheless, the Court found that "deprivations of physical liberty are the sort of actual and imminent injuries that constitute irreparable harm," and that "the 'major hardship posed by needless prolonged detention' is a form of irreparable harm." *Id.* at 36–37 (citing *Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37, 53 n.20 (D.D.C. 2002) and then citing *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)). These preliminary conclusions, which the Court reached at an early stage of the litigation, have been borne out by the weight of evidence and testimony in this case.

At trial, Defendants presented expert testimony from Dr. Julie Linton, "a pediatrician, professor and assistant dean for admission at the University of South Carolina School of Medicine in Greenville, South Carolina, and medical director of PASOs, a program that 'connects Latino or Hispanic families to community-based resources.'" FF & CL at 101, ¶ 23 (citing Trial Tr. at 2390:10–19 (Linton)). Dr. Linton reached three conclusions, summarized briefly in the Courts findings of fact, which Defendants did not contest. *Id.* at 101–02, ¶¶ 24–27. Her first conclusion was that "youth from ages 15 to 24 are still undergoing critical brain development" and that "the experience of detention for 18-year-old immigrant youth would be particularly detrimental to this continuing development." *Id.* at 101–02, ¶ 24 (citing Trial Tr. at 2404:24–2405:3). Her second conclusion was that "detention, particularly in adult settings, is

physically and psychologically harmful to children and youth, and threatens both their short- and long-term health and well-being." *Id.* at 102, ¶ 25 (citing Trial Tr. at 2405:4–7). And her third conclusion was that "alternatives to detention, including placement in community settings . . . while awaiting court cases are markedly better for the health and well-being of youth." *Id.* at 102, ¶ 26 (citing Trial Tr. at 2405:8–11). All of this is entirely in line with the Court's earlier conclusions that deprivation of liberty and needless detention constitute irreparable harm. Dr. Linton's testimony established that this harm is heightened and particularly acute when the individual being deprived of liberty is a young adult. None of this was contested at trial. During Dr. Linton's direct testimony, the Court observed that "there's case law that says deprivation of liberty is irreparable [harm] in and of itself," and lead counsel for Defendants agreed, commenting that "this is not going to be a contested issue" and that Defendants were "not contesting that as a legal position." *Id.* at 192 (citing 2423:6–2424:9).

In their responses to Dr. Linton's testimony, Defendants do not dispute any particular points made by Dr. Linton but instead raise and repeat a generalized argument against the idea that Plaintiffs have demonstrated irreparable harm in this case. *See* Defs.' Remedies Resp. ¶¶ 8–19 (repeating the same paragraph multiple times). This argument states first that an eighteen-year-old unlawfully present in this country is "subject to detention, just like any other adult" and that Section 1232(c)(2)(B) both allows for detention of age-outs and "anticipates that many age-outs who are eighteen will be detained." *Id.* Because "Congress *anticipated* that many age-outs would indeed be detained," *id.*, Defendants seem to suggest—but never directly state—the Court should not agree with Dr. Linton's conclusions about the harm age-outs would suffer from being placed in adult detention, or should not find these harms legally relevant. Though Defendants' argument is somewhat vague, it is clear enough that they misunderstand the harm at issue.

The Court understands, as it has stated multiple times, that no age-out is entitled to any particular placement under the statute.  FF & CL at 172 (citing Mem. Op. Den. Defs.' Mot. Dismiss and Granting Pls.' Mot. for Class Cert. at 35 n.8 ("MTD and Class Cert. Op."), ECF No. 50 ("As Plaintiffs appear to recognize, they have no legally protected interest in any particular placement . . . .")).  Section 1232(c)(2)(B) only dictates a certain process, which requires proper consideration of certain factors and of certain alternatives.  The violation of the APA occurs when Defendants fail to follow the procedures Congress has set out, when they do not "consider placement in the least restrictive setting available after taking into account the [age-out]'s danger to self, danger to the community, and risk of flight."  8 U.S.C. § 1232(c)(2)(B).  Dr. Linton's testimony suggests that Defendants are correct that any and all age-outs who are placed in adult detention are injured in some way, and they are also correct that Congress likely anticipated this.  But this harm is not the legally relevant harm that the Court has been called on to remedy.  The harm that matters here is only the harm caused to class members—to those age-outs who, by definition, are detained by Defendants *without Section 1232(c)(2)(B) having been followed*.  This harm cannot be written off in the way Defendants suggest because Congress did not anticipate that any age-outs would be detained without DHS having considered the least restrictive setting available to them, or without taking into account the relevant statutory factors.

The fact that other age-outs could still be subject to the harm caused by detention if the agency followed the proper procedure required by Section 1232(c)(2)(B) does not cure the APA violation caused by the failure to follow the procedure for members of the class.  Administrative law requires that an agency follow the administrative procedure laid out by Congress when it acts, and the fact that an agency might have reached the same result by proper procedures does not cure the agency's failure to do so.  *Cf. Dep't of Homeland Sec. v. Regents of Univ. of Cal.*,

140 S. Ct. 1891, 1905 (2020) (noting that "all parties agree[d]" that DHS could rescind the Deferred Action for Childhood Arrivals program but that "[t]he dispute [was] instead primarily about the procedure the agency followed in doing so").  Defendants' suggested rule, that harm resulting from improper administrative procedures is not cognizable if the same harm could have potentially occurred if proper procedures were followed, would do away with countless binding precedents and much of the APA.

Class members are those age-outs for whom ICE does not follow proper procedures, and they are harmed when they are detained.  If ICE followed the proper procedures, it is not necessarily the case that none of them would be detained, but as the Court has explained, there is good reason to think that very many of them would be released.  "The evidence at trial was overwhelming that ICE officers making ordinary efforts to identify placements for age-outs tend to be able to find them, and tend to release more of their age-outs."  FF & CL at 189 (citing *id.* ¶¶ 215–23, ¶¶ 231–32, ¶¶ 237–40) (discussing the San Antonio, Harlingen, and Chicago offices). Absent an injunction, there is no way for the Court to satisfy itself that Defendants will follow Section 1232(c)(2)(B) going forward, and if ICE does not follow the statute, more class members will be detained in violation of the APA.

Defendants also suggest that, even though such irreparable harm was suffered in the past, it is not occurring presently, thus, in essence mooting the need for injunctive relief.  Defs.' Opp'n at 8–10 (arguing "ICE has demonstrated its path toward compliance with § 1232(c)(2)(B)" because the number of age-outs detained in the past year has been "de minimis").  Plaintiffs respond by stating that in light of ICE's behavior throughout this litigation, any of their professed efforts at remediation should be viewed skeptically, and that history has also demonstrated that any progress regarding ICE's detention rate of age-outs can swiftly be upended.  Pls.' Reply at

16–17; *see also* Pls.' Remedies Mem. at 5–8 (describing agency's ongoing failure to adapt its procedures following the Court's 2018 decisions granting a preliminary injunction, granting class certification, and denying Defendants' motion to dismiss).  For the reasons listed below, the Court explains why this argument does not change its mind regarding why a limited injunction is warranted.

First, it must be noted that while not explicitly framed as such, Defendants appear to invoke the doctrine of mootness by arguing that they have cured their previous statutory non-compliance, so no irreparable injury remains.  A case becomes constitutionally moot when "the issues presented are no longer live," *Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013), and "[c]orrective action by an agency is one type of subsequent development that can moot a previously justiciable issue." *Nat. Res. Def. Council v. U.S. Nuclear Regul. Comm'n,* 680 F.2d 810, 814 (D.C. Cir. 1982).  However, "[i]t is a well-recognized principle that a case will not become moot merely because a defendant agrees voluntarily to cease engaging in the challenged conduct, as there remains a risk that the defendant will merely resume the challenged conduct after the case is dismissed." *Wash. Legal Found. v. Henney*, 202 F.3d 331, 336 (D.C. Cir. 2000); *see also Bundy v. Jackson*, 641 F.2d 934, 946 n.13 (D.C. Cir. 1981) ("Common sense tells us that [defendants] . . . may well have ceased their actions solely because of the pendency of [plaintiffs'] complaint and lawsuit[,]" and consequently, "the law tells us that a suit for injunctive relief does not become moot simply because the offending party has ceased the offending conduct, since the offending party might be free otherwise to renew that conduct once the court denied the relief.").  Instead, a defendant's voluntary cessation of a challenged practice will moot a case only when "(i) 'there is no reasonable expectation . . . that the alleged violation will recur,' and (ii) 'interim relief or events have completely and irrevocably eradicated

the effects of the alleged violation.'"  *Aref v. Lynch*, 833 F.3d 242, 251 (D.C. Cir. 2016)

(omission in original) (quoting *Am. Bar Ass'n v. F.T.C.*, 636 F.3d 641, 648 (D.C. Cir. 2011)).

The initial "'heavy burden' of establishing mootness lies with the party asserting a case is moot."

*Honeywell Int'l, Inc. v. Nuclear Regul. Comm'n*, 628 F.3d 568, 576 (D.C. Cir. 2010) (citing

*Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 459 (D.C. Cir. 1998)).

     Defendants are unable to meet their heavy burden here, as they have not shown "that it is

*absolutely clear* that the allegedly wrongful behavior could not reasonably be expected to recur."

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting

*United States v. Concentrated Phosphate Export Ass'n*, 393 U.S. 199, 203 (1968)) (emphasis

added) (holding that an industrial polluter, against whom various civil penalties were sought,

could only argue that the case was moot if it was "absolutely clear" that the closure of the

polluting factory meant permit violations would not recur).  This is particularly true in the

context of a request for an injunction, where "[o]nce a violation is demonstrated, all that need be

shown [to obtain an injunction]" is "'some reasonable likelihood of future violations,' and past

unlawful conduct is 'highly suggestive of the likelihood of future violations.'"  *U.S. Dep't of*

*Justice v. Daniel Chapter One*, 89 F. Supp. 3d 132, 143 (D.D.C. 2015) (quoting *Commodity*

*Futures Trading Comm'n v. Hunt*, 591 F.2d 1211, 1220 (7th Cir. 1979)), *aff'd*, 650 F. App'x 20

(D.C. Cir. 2018).

     While Defendants' progress at demonstrating compliance with Section 1232(c)(2)(B) is a

step in the right direction, the Court is not satisfied that it is "absolutely clear" that ICE's

statutory violations will not recur—or that it has been completely cured in the first place.

Defendants argue that an injunction is no longer required because ICE currently releases 99.5%

of age-outs, which they contend is sufficient to show current compliance with Section

1232(c)(2)(B).  Defs.' Opp'n at 8.  But even assuming (without deciding) that the release rate alone is sufficient to show statutory compliance, the evidence at trial made clear that release statistics can be rapidly reversed.  *See* FF & CL at 150, ¶ 225 (describing "fairly dramatic swings in the detention rate" at the ICE sub-office in Harlingen, Texas, including a shift from an 88% detention rate between April through October 2016 to an 95% release rate between October 2016 through February 2017); *see also id.* at 152, ¶ 233 (describing shift at Chicago ICE office from 90% detention rate from April 2016 to August 2019, to an 82.5% release rate from Fall 2019 to Spring 2019).  These statistics show that a high current release rate does not mean that figure will remain stable in the future, once ICE is no longer under this Court's supervision.

Moreover, the officers charged with making age-out decisions have not received any additional training on the requirements of Section 1232(c)(2)(B), or even been informed by Defendants of the outcome of this case.  *See* Defs.' Mot. to Issue Interim Guidance, ECF No. 337 (proposing to disseminate an interim guidance notifying officers of this Court's findings of fact and conclusions of law); Pls.' Reply Mem. in Supp. of Mot. Final J. and Perm. Inj. at 17, ECF No. 365 (noting that Defendants have not done so).  That would seem to indicate that the current high rate of release (particularly when compared to pre-trial rates), does not reflect a reformed and newly-trained workforce, but rather adherence among ICE officers to some sort of informal agency policy tied to this case.  *See, e.g., Aref,* 833 F.3d at 251 n.6 (*"*[T]he cessation of an ongoing activity pending a lawsuit may [also] well imply an intent to renew the activity once the court has dropped out.") (quoting *Clarke v. United States*, 915 F.2d 699, 705–06 (D.C. Cir. 1990)).  As a result, the Court cannot be confident that this progress would not be eroded in the absence of continuing supervision.  ICE's ongoing efforts at compliance, although commendable, are therefore not a sufficient reason for the Court to decline to enter an injunction.

24

Further adding to the Court's skepticism is Defendants' general hesitancy to implement reforms and false assurances of statutory compliance that have occurred through the history of this litigation.  As already described, Defendants failed to take corrective action in response to this Court's various holdings regarding their legal obligations.  *See* FF & CL at 126, ¶¶ 131–33 (implementing guidance at an April 2019 training session that contravened this Court's MTD and Class Cert. Op.); *id.* at 175–76 (explaining why this training was contrary to Section 1232(c)(2)(B)); *see also* FF & CL at 105–06, ¶ 54 (describing how ICE's only response to this Court's issuance of a preliminary injunction was the institution of a new documentation system with notable flaws, not a reexamination of the substance of its actual decision-making processes).

Additionally, contrary to Defendants' claims, ICE's ongoing use of the AORW form— while a positive development—hardly shows that a permanent injunction is unnecessary.  The Court previously found that ICE's utilization of the AORW system was plagued with reliability issues.  *Id.* at 110–11, ¶¶ 62–69.  As already described, while this litigation was pending ICE attempted to circumvent the reporting requirement by completing AORW forms after custody determinations had already been made, often times even having officers who were uninvolved in the original custody determination complete the form.  *Id.* at 185.  ICE also eventually admitted that it had failed to document a significant portion of age-outs on AORW forms and had misrepresented these statistics to the Court.  *Id.* at 111–12, ¶¶ 67–69 ("Between April 1, 2016 and March 31, 2019, ICE had failed to make records for 1,473 age-outs, including 228 age-outs processed between October 17, 2018 and March 31, 2019 while the AORW/SharePoint system was in place.  Additionally, 88 individuals had aged out between March 31, 2019 and May 24, 2019 without being recorded in the SharePoint site.") (internal citation omitted).  In short, the

Court has seen firsthand that AORW usage does not necessarily demonstrate compliance with ICE's statutory obligations under Section 1232(c)(2)(B).  And even setting aside concerns of the agency's ability to, in good faith, properly use the reporting system, the Court found that the AORW form in use at the time of trial did not even necessarily show that the officer "had actually considered the least restrictive setting available rather than simply engag[ing] in a superficial box-checking exercise." *Id.* at 185.  In short, a current high rate of usage of the revised AORW forms, particularly in light of ICE's history, is not enough to convince the Court that an injunction is unnecessary.  Taking all of these facts together, the Court concludes that this case is not moot, given there remains a possibility that ICE would resume its wrongful behavior without an injunction.

Going beyond the mootness inquiry, the Supreme Court has also indicated that "abandonment" of a challenged practice "is an important factor bearing on the question whether a court should exercise its power to enjoin the defendant from renewing the practice." *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982); *see also Cobell VI*, 428 F.3d at 1076 (noting that where, during interim period between findings and issuance of the injunction, defendants "continued to submit status reports" and "otherwise fulfilled" their legal duties, it was error to ignore this progress when crafting injunctive relief).  This is, admittedly, a closer call. The Court ultimately concludes that injunctive relief remains appropriate.  Particularly because ICE has yet to implement any new training on this issue (raising questions about the permanence of the current low detention rate), combined with ICE's past behavior, the Court is wary of simply assuming that the problem has been addressed in full.  This is not to say it does not recognize the positive steps taken by Defendants over the past year.  As indicated below, the Court takes account of this progress when crafting the scope of relief, but remains unconvinced,

particularly in light of ICE's conduct throughout this case, that an appropriate remedy can be reached in the absence of an injunction.

### b.  Insufficiency of Monetary Damages

The Court's decision granting a preliminary injunction also addressed the insufficiency of monetary damages, though only in passing.  The Court observed that "where a plaintiff requests injunctive relief mandating that an agency comply with a process that, if completed could secure plaintiff's freedom or could alleviate harsh conditions of confinement, the harm from detention surely cannot be remediated after the fact."  P.I. Op. at 37 (citing *R.I.L-R*, 80 F. Supp. 3d at 191). The types of harm caused by violations like the Defendants' is different in this way from purely economic losses.  *See Taylor v. Resol. Trust Corp.*, 56 F.3d 1497, 1507 (D.C. Cir. 1995) ("[I]n the absence of special circumstances . . . recoverable economic losses are not considered irreparable.").  Defendants do not raise any argument concerning this factor in their briefing, aside from the argument that because there has been no irreparable injury, money damages cannot be insufficient.  *See* Defs.' Mem. Resp. at 21 (making this argument); *see also* Defs.' Remedies Resp. ¶ 75 (raising no argument in response to Plaintiffs' discussion of this factor). Furthermore, money damages are not available under the APA.  *See Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 186 (D.C. Cir. 2006) (explaining that the text of the APA, in § 702, "waives the Government's immunity from actions seeking relief" but only for actions "other than [for] money damages.") (quoting *Dep't of Army v. Blue Fox, Inc*., 525 U.S. 255, 260–61 (1999)). The Court therefore finds that this factor has also been met.

### c.  Balancing Equities

The remaining two factors, the balance of the equities and the public interest, merge and can be considered together when the government is the party opposing injunctive relief.

*Pursuing Am.'s Greatness*, 831 F.3d at 511 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). The Court's conclusions of law concerning liability have more or less settled this question. The Court has identified a number of ways in which ICE has "acted in a manner that is 'arbitrary, capricious, an abuse of discretion' and—most clearly—'otherwise not in accordance with law'" and has "'unlawfully withheld or unreasonably delayed' required consideration of placement in the least restrictive setting available." FF & CL at 191. Because the government has no interest in acting unlawfully, and because the public has an interest in having its government follow the law, the balance here tilts strongly in favor of an injunction.

Defendants incorrectly describe the third and fourth factors in the analysis as "essentially looking at the burden on the government." Defs.' Mem. Resp. at 21. This is a mischaracterization of the relevant consideration, because the question is not how much work it would take to comply with the proposed injunction, but instead what level of interest the public and the public servants in the government have in maintaining the status quo versus obeying the proposed injunction. While certain individuals at ICE and DHS may find it difficult to remedy these violations, any hardship they might claim is not legally relevant because as a legal matter "[t]he Government 'cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required . . . .'" *R.I.L.-R*, 80 F. Supp. 3d at 191 (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). "[T]he government has no legitimate interest in acting unlawfully." *N.S. v. Hughes*, 335 F.R.D. 337, 355 (D.D.C. 2020); *see also id.* ("The public has a clear interest in seeing that government officials do not exceed their statutory authority."). [9]

---

Plaintiffs devoted ten paragraphs in their proposed findings of fact to the testimony of their expert, John Sandweg, detailing the ways in which injunctive relief will benefit ICE. Pls.' Remedies Br. ¶¶ 20–30. Defendants dispute much of this as either incorrect or irrelevant. Defs.'

On the other side of the balance, it has been well established in this Circuit that "[t]he public interest is served when administrative agencies comply with their obligations under the APA." *R.I.L.-R*, 80 F. Supp. 3d at 191 (quoting *N. Mariana Islands v. United States,* 686 F. Supp. 2d 7, 21 (D.D.C. 2009)); *see also Grace v. Whitaker*, 344 F. Supp. 3d 96, 146 (2018) (same); *Aracely, R. v. Nielsen*, 319 F. Supp. 3d 110, 156 (D.D.C. 2018) (same); *Damus v. Nielsen*, 313 F. Supp. 3d 317, 342 (D.D.C. 2018) (same); *see also Patriot, Inc. v. U.S. Dep't of Housing & Urban Dev.*, 963 F. Supp. 1, 6 (D.D.C. 1997) ("[T]he public interest is best served by having federal agencies comply with the requirements of federal law . . . ."). Now that the Court has identified a fairly extensive pattern of violations of Section 1232(c)(2)(B) and of the APA, the American public, as well as Plaintiffs, have an interest in those violations being remedied.

Defendants also argued—seemingly in an effort to evoke the public interest— that "[i]f Plaintiffs have their way, it is likely that DHS will no longer be able to fully protect age-outs from trafficking." Defs.' Mem. Resp. at 21. This line of thinking would appear to be a policy argument against the requirements of Section 1232(c)(2)(B). But Plaintiffs only ask, and the Court has only ordered, that Defendants comply with the statutory directives laid out by Congress. It is the legislature, not the Courts, that established the requirements of Section 1232(c)(2)(B) as an appropriate means of balancing the safety of age-outs, their well-being, state control over immigration, public safety, and any number of other policy factors. Defendants may disagree about which of these factors is most important, but there is no public interest in

---

Remedies Resp. ¶¶ 20–30. The Court declines to wade into this dispute because the balancing of the equities does not require that ICE be able to derive practical benefits from complying with the law. ICE has no proper interest in continuing to violate Section 1232(c)(2)(B) and the APA, so any difficulties it faces in achieving compliance are not legally relevant. That side of the scale is empty and is necessarily outweighed by the benefit to Plaintiffs and the public from the Government complying with the law.

rebalancing these priorities in a way other than that which Congress settled on.  If Defendants think that following the statute will lead to more age-outs being trafficked, that is a critique of Congress's work, not the Court's.[10]

*     *     *

In light of these findings as to the four relevant factors, the Court concludes that injunctive relief is within its authority and appropriate due to the pervasive violations of the statute found in this Court's July 2, 2020 opinion.  Accordingly, the Court will enjoin Defendants from further violations of Section 1232(c)(2)(B) and require compliance with this Court's order going forward, which is detailed below.

### B.  Substance of the Final Order

Plaintiffs have established the legal and equitable prerequisites for the grant of a limited injunction, so the Court will now turn to the substance of its relief.  Recognizing that many of the "choices at issue" to ensure ICE's compliance with Section 1232(c)(2)(B) "require[] both subject-matter expertise and judgment about the allocation of scarce resources, classic reasons for deference to administrators," *Cobell VI*, 428 F.3d at 1076, the Court will adopt the majority of Defendants' proposed Final Order, in effect largely granting their request for remand for ICE to determine in the first instance the proper discharge of its statutory obligations.  In doing so it adheres to the principle that "[agency] defendants should be afforded sufficient discretion in

---

[10] This argument by Defendants is additionally misleading insofar as it suggests that Plaintiffs' analysis did not consider the fact that age-outs should not be released to traffickers. Plaintiffs' statistical expert, Dr. Lenzo, did not treat sponsors as available if ICE had recorded any derogatory information about them.  FF & CL at 162, ¶ 285.  Certainly, information suggesting that a proposed sponsor might be a trafficker would have been considered derogatory. Further, Defendants presented no evidence at trial suggesting that processing age-outs as required by the statute—in the San Antonio office, for instance—has led to age-outs being trafficked.

determining the precise route they take, so long as this threshold [of statutory compliance] is met." *Cobell II*, 240 F.3d at 1106.  Defendants will, however, be enjoined from further violations of Section 1232(c)(2)(B) and obligated to comply with the requirements of the Court's Final Order.  The Court will retain jurisdiction to enforce and resolve any disputes concerning the terms of, and Defendants' compliance with, this Court's Order and its statutory obligations for a period of five years.  *See id.* at 1109 (approving district court's retention of jurisdiction for five years, noting "federal courts regularly retain jurisdiction until a federal agency has complied with its legal obligations . . . .").[11]

Due in no small part to the parties' diligent work in mediation this past year, Defendants and Plaintiffs have already reached agreement as to the majority of the substance of the final relief in this case.  They do, however, differ as to a few specific points, which the Court addresses in turn below.

### 1. AORW Form Dispute

One remaining area of contention between the parties is their competing versions of the AORW form.  *See* Defs.' Proposed AORW ("Defs.' AORW"), ECF No. 345-3; Pls.' Proposed AORW ("Pls.' AORW"), ECF No. 345-4.  The AORW form is a document "intended to guide the FOJC through the Age-Out custody determination process and to provide evidence of the FOJC's compliance with his or her obligations pursuant to 8 U.S.C. § 1232(c)(2)(B)."  Parties' Training Slides at 48, ECF No. 346-1.  Defendants' proposed Final Order would allow ICE to

---

[11] Plaintiffs moved for a five-year period during which the Court would retain jurisdiction.  In contrast, Defendants, while not objecting to the Court's retention of jurisdiction, did not elaborate on how long this period should last.  The Court believes the five-year period is appropriate in order to ensure ICE complies with its legal obligations.  The Court wishes to make clear, however, that Defendants remain able to move for reconsideration "should they be able to demonstrate at some time in the future that adequate compliance has been achieved" prior to the termination of the Court's five-year jurisdiction period.  *Cobell II*, 240 F.3d at 1109.

use their revised AORW form without any temporal limitation.  Def.'s Opp'n at 11.  In contrast, Plaintiffs' proposed injunction states that Defendants' revised AORW form would be used for a six-month trial period, after which time the parties would meet and confer as to any possible revisions, and the Court would resolve any disputes.  Pls.' Proposed Final J. and Inj. at 3.  It limits any proposed revisions to those that would "ensure (a) that the AORW provides the information that will allow the parties to monitor whether ICE is complying with the Statute . . . and/or (b) that ICE is complying with the Statute."  *Id.*  Defendants take issue with this provision, arguing that because the AORW is a discretionary tool and not statutorily required, this six-month trial period is "the type of procedural requirement that the Supreme Court has stated a district court may not graft onto the APA."  Defs.' Opp'n at 10 (citing *Garland v. Ming Dai,* 141 S. Ct. 1669, 1677 (2021)).  Defendants argue further that their form should be used because it is an improvement on the form currently in use and because it is more consistent with the training materials the parties have agreed to implement.  *Id.* at 11.

Rather than engage in an analysis of whether the proposed six-month trial period is an acceptable measure, the Court believes it is more efficient to review Defendants' proposed AORW form for compliance with ICE's statutory obligations, an issue which the parties have previously briefed.  *See* Defs.' Statement of Position on Unresolved Issues ("Defs.' Statement"), ECF No. 347; Pls.' Submission Concerning Unresolved Issues with Respect to ICE's Age-Out Review Worksheet ("Pls.' Submission"), ECF No. 351.  It is useful at this juncture to review the standard under which the Court will evaluate Defendants' proposed AORW form.  The D.C. Circuit has made clear that agencies are to "be afforded sufficient discretion in determining the precise route they take" in fulfilling their statutory obligations, "so long as th[e] threshold [of statutory compliance] is met."  *Cobell II*, 240 F.3d at 1106.  In this way, a district court's role is

"limited . . . to accepting or rejecting [an agency's] proposals, rather than dictating their substance . . . ." *Cobell VII*, 455 F.3d at 305 (internal quotations omitted). Accordingly, the Court will limit its review of Defendants' proposed AORW form to the aspects that it finds contravene the statutory requirements of Section 1232(c)(2)(B), as detailed in its Findings of Fact and Conclusions of Law.

Consequently, Defendants' objection on the grounds of *Vermont Yankee* has little application to the matter at hand. The Court does not dispute the long-accepted rule of administrative law that "a reviewing court is 'generally not free to impose' additional judge-made procedural requirements on agencies that Congress has not prescribed and the Constitution does not compel." *Ming Dai*, 141 S. Ct. at 1677 (citing *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 524 (1978)). But this rule is not implicated here. "The freedom of administrative agencies to fashion their procedures recognized in *Vermont Yankee . . . does not encompass freedom to ignore statutory requirements*." *U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 542 n.63 (D.C. Cir. 1978) (emphasis added). Indeed, in the original *Vermont Yankee* opinion, the Supreme Court was careful to point out that "[o]f course, the court must determine whether the agency complied with the procedures mandated by the relevant statutes." *Vermont Yankee*, 435 U.S. at 549 n.21 (citation omitted). That is all the Court does here, as it reviews Defendants' proposed AORW form for inconsistencies with the requirements of Section 1232(c)(2)(B), a review Defendants concede is proper. *See* Defs.' Opp'n at 10–11 (stating that any "'revisions' [to Defendants' proposed form] would only be necessary if . . . Defendants' revised AORW . . . fails to comply with the statute and this Court's July 2, 2020 Decision.").

### a.   *Defendants' Proposed AORW Form*

The Court will now review the significant issues Plaintiffs have identified with Defendants' proposed AORW form.  It finds that the majority of Plaintiffs' objections, while focused on improvements that could be made to the form, do not identify problems that directly contravene Section 1232(c)(2)(B) or the Court's findings as to what the statute requires.

### i.   Report of the Number of Days the Age-Out was in ORR Custody

Plaintiffs first criticism takes issue with a question on Defendants' proposed AORW that requires FOJCs to report the number of days the age-out was in ORR custody.  *See* Defs.' AORW at 1.  The Court determined in its Findings of Fact and Conclusions of Law that ICE's previous practice of instructing FOJCs to view a long period of time in ORR custody as evidence that the age-out in question is a flight risk was often "wrong."  FF & CL at 120, ¶ 114 (explaining why, in many cases, "the opposite is true").  Defendants do not provide any justification or alternative rationale for retaining this requirement.  Accordingly, in light of the Court's previous finding that ICE historically used this factor to reach improper conclusions under the statute, and the lack of any explanation from Defendants as to any proper purpose that could justify the need for this question going forward, the Court will order Defendants to remove this question from their AORW.

Plaintiffs raise a second objection on this same topic.  Section 3(c) of Defendants' AORW, which is focused on determining the flight risk factor for the age-out in question, includes a disclaimer reminding FOJCs that a lack of community ties or a fixed address are not justifications to conclude that an age-out is a flight risk.  Defs.' AORW at 3 ("Reminder: An Age-Out's lack of community ties or fixed address, either alone or in combination with the other, are not justifications to claim the Age-out poses a flight risk and cannot be released on OREC.").

Plaintiffs would like Defendants to add an additional reminder that the length of time an age-out has spent in ORR custody is also not an indication of flight risk.  Pls.' Submission at 6. Defendants oppose this modification on the grounds that such an "instruction is already contained in the agreed-upon Training Slides," and unlike the lack of community ties or fixed address factors, time in ORR custody is not otherwise part of the analysis of flight risk, as it is not included in the available checkboxes under this question (while the community ties and fixed address variables are).  Defs.' Statement at 7.  Because this omission is not directly implicated by the question, nor does it contravene the dictates of the statute or the Court's findings as to what the statute requires, the Court will defer to ICE's judgment regarding the construction of this aspect of their AORW.

ii.      Construction of Risk Factor Questions

Plaintiffs argue next that "ICE's form asks the wrong question and addresses the risk factors in a way that is inconsistent with the statute and this Court's opinion."  Pls.' Submission at 9.  They contend that the discussion of the risk factors in Defendants' AORW, i.e, the questions regarding if the age-out poses a danger to self, danger to community, or flight risk, are wrongly focused on making the FOJC reach an ultimate determination as to each factor—such as whether, in absolute terms, the factor exists or does not.  *Id*. at 9.  They argue that this is the wrong inquiry under the statute, where the focus should instead be on "the least restrictive setting available," not whether the age-out meets the risk factors.  *Id*. at 10.  They also argue that the phrasing of Defendants' AORW for this question imposes an additional burden beyond the requirements of the statute: that FOJCs show that the risk factors are not present.  *Id.*  Plaintiffs claim both of these deficiencies are a result of Defendants' question that asks the FOJC to

"[e]xplain in detail why the Age-Out is or is not" a danger to self, danger to community, or flight risk.  Defs.' AORW at 2–3.

The Court is not convinced that Defendants' phrasing of these questions violates the procedures required by Section 1232(c)(2)(B).  As the Court has noted, "[t]he first thing the statute requires of the Secretary is that he or she 'take into account' the statutory factors."  FF & CL at 176.  Before one can "take into account" or weigh the relevant factors, there necessarily must be some sort of analysis as to whether they exist or to what degree.  While, admittedly, Defendants' phrasing is somewhat absolute— "explain in detail why the age-out is or is not a danger to the community"—the Court does not conclude, as Plaintiffs do, that this somehow transforms the question into a requirement that the risk factors be shown to not exist before the FOJC can consider the least restrictive setting available.[12]  This is reinforced by the questions in Section 7 of Defendants' AORW, which ask, "taking into account the Age-Out's danger to self, danger to community, and flight risk, explain why [each placement setting] is or is not appropriate."  Defs.' AORW at 5.  This review of all available placement settings correctly puts the emphasis on the least restrictive setting available while at the same time allowing the FOJC to take into account the age-out's risk factors.  Accordingly, when viewing the different sections of Defendants' AORW together, the Court finds that the form is statutorily compliant as it provides "an individualized assessment of the proper placement for each former unaccompanied minor in light of DHS's assessment of his or her danger to self, danger to the community, and risk of flight."  FF & CL at 177 (citing MTD and Class Cert. Op. at 40).

---

[12] This kind of requirement would run afoul of Section 1232(c)(2)(B), which requires consideration of placement in the least restrictive setting available "no matter the outcome of the danger and flight evaluation . . . ."  FF & CL at 175 (concluding this is required because "the statute does not place any limits or conditions on [this 'consideration'] other than the sentence's first clause.").

iii.    Flight Risk Question

Plaintiffs also take issue with the way in which Defendants' AORW addresses the flight risk analysis, arguing that it improperly includes factors that the Court has determined are not relevant to determining flight risk, while excluding mitigating factors that should be considered. Pls.' Submission at 11–12.  The Court previously found that ICE had trained FOJCs "to consider an age-out's flight risk based on factors that are present for nearly all age-outs"—lack of "family or community ties," FF & CL at 119, ¶ 113, and lack of a "fixed address."  *Id.* at 122, ¶ 121. Plaintiffs argue that the Court concluded these factors should not be relied on, and accordingly should be excluded altogether from Defendants' AORW question assessing an age-out's flight risk.  Pls. Submission at 12.  This overstates the Court's conclusion, which is more appropriately characterized as a finding that the absence of community ties or fixed address were of limited probative value to the age-out determination, not that they should not be considered at all.  FF & CL at 119, ¶ 113.  Indeed, it would follow that the presence of these factors (even if rare) could properly be considered as mitigating evidence against an age-out posing a flight risk. Furthermore, Defendants' AORW explicitly acknowledges the Court's finding that this information has limited probative value, by providing as a "reminder" above the question a warning that "[a]n Age-Out's lack of community ties or fixed address, either alone or in combination with the other, are not justifications to claim the Age-out poses a flight risk and cannot be released on OREC."  Defs.' AORW at 3.  For both of these reasons, the inclusion of these factors does not contravene the Court's previous findings as to the procedures required under Section 1232(c)(2)(B).

Plaintiffs also raise a second critique of Defendants' construction of the Flight Risk question.  The Court has concluded that "[a]n age-out's risk of flight could also be mitigated by a

pending application or court case that could yield immigration benefits, like asylum, Special

Immigrant Juvenile Status, or family-based immigration visas."  FF & CL at 120, ¶ 116.

Defendants' AORW recognizes this factor, offering as one of the relevant factors to consider a

checkbox that reads "Petitions/Application(s) for Relief: Yes, No (includes asylum, SIJS, T/U

visa, other)."  Defs.' AORW at 3.  But Plaintiffs would prefer that the question more closely

model their proposed AORW, which asks the FOJC to provide more information on this issue,

such as the types of relief requested and current status of such request.  Pls.' AORW at 2–3.

While this information may be helpful, it is not essential for ICE's statutory compliance.

Plaintiffs' last criticism of this question concerns Defendants' failure to account for other

mitigating factors for the flight risk inquiry.  Based on the undisputed evidence at trial, the Court

concluded that release to a sponsor can mitigate flight risk, CL & FF at 120, ¶ 115, or

alternatively so too can release pursuant to ICE's ATD program or an ICE bond.  FF & CL at

121–22, ¶¶ 118–19; *id.* at 135, ¶ 164.  However, these factors do not appear as items to consider

for the question of whether the age-out poses a flight risk, though they do appear later in

Defendants' proposed AORW as part of a series of questions asking whether these placement

alternatives "[are] or [are] not appropriate."  Defs.' AORW at 5.  The Court finds that this

structure ignores key factors needed to properly consider an age-outs flight risk determination,

without which the FOJCs cannot properly complete the subsequent question that they "[e]xplain

in detail why the Age-Out is or is not a Flight Risk."  Defs. Proposed AORW at 3.  While the

Court will decline to instruct ICE how to specifically structure this question, it does need to

include a consideration of these mitigating factors previously recognized by the Court as part of the flight risk analysis.[13]

iv.     Placement Options

Plaintiffs propose three substantive modifications to the section of Defendants' AORW form that discusses an age-out's placement options. *See* Defs.' AORW at 4–5 ("Considering The Least Restrictive Setting Available). This section begins with a short explanation, informing FOJCs that they "must consider the least restrictive setting available" and that they "must provide a response for each subsection below." *Id.* at 4. Four questions follow. Each asks the FOJC, "[t]aking into account the Age-Out's danger to self, danger to community, and flight risk" to explain why each placement option—release without a sponsor, release to a sponsor, release on ICE ATD, and release on ICE bond— "is or is not appropriate." *Id.* at 5.

Plaintiffs argue first that this construction is impermissible because it does not ask whether each available placement option was "considered." Pls.' Submission at 17. The implication is that this would contravene the dictates of the statute, which requires that Defendants "consider placement in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight." 8 U.S.C.§ 1232(c)(2)(B). But the Court disagrees with Plaintiffs' assertion that because Defendants do not explicitly use the phrase "considered" in each question, they are somehow ignoring this critical part of the analysis. By requiring an explanation as to why each placement option, taking into account the risk factors, "is or is not appropriate," FOJCs are obviously considering every placement option

---

[13] It may be useful for Defendants to examine how Plaintiffs incorporated these mitigating factors within the structure of their proposed AORW. *See* Pls.' AORW at 3.

available to age-outs, and in doing so necessarily consider placement in the least restrictive setting available.  This argument is thus without merit.

Plaintiffs' second critique similarly fails to hold water.  They argue that Defendants' use of the term "appropriate" in its phrasing of these questions is an improper standard "that is not used in the statute, not defined, and . . . includes factors and considerations that go beyond those required by the statute."  Pls.' Submission at 17.  But as the Supreme Court has noted, "appropriate is the classic broad and all-encompassing term that naturally and traditionally *includes consideration of all the relevant factors*."  *Michigan v. E.P.A.*, 576 U.S. 743, 752 (2015) (internal quotations and citation omitted) (emphasis added).  This definition thus neatly falls within the terminology of the statute that ICE must "consider placement in the least restrictive setting available . . . ."  8 U.S.C. § 1232(c)(2)(B).  Furthermore, Defendants appear to draw this language from the Court's own findings, which also used this term.  *See* FF & CL at 178 ("When processing age-outs, the secretary of DHS is left greater discretion with regard to what setting is deemed appropriate, but the least restrictive setting must be *considered*, and the specified risk factors must be taken into account.") (cleaned up) (emphasis in original).  The Court concludes that this phrasing does not violate the statue or the Court's previous findings as to what the statute requires.

Plaintiffs' final criticism of this section is that Defendants' proposed AORW does not require the FOJCs to explain, if selecting a detention placement, why this placement was selected and why the FOJC concluded that it was "the least restrictive setting available."  Pls.' Submission at 18.  But as this Court has made clear on several occasions, "age-outs are not guaranteed placement in the least restrictive setting available, but only *consideration* of that setting," meaning that "FOJC's recommended setting need not be the least restrictive that was

considered."  FF & CL at 185 n.50.  Thus, while the Court agrees that requiring an explanation

justifying detention may indeed help prevent detention from becoming the default, the

explanation Plaintiffs request is not statutorily required.

v.       Plaintiffs' Other Critiques

Plaintiffs raise a number of other criticisms of Defendants' AORW form.  *See, e.g.*, Pls.'

Submission at 8, 15 (noting concern with Defendants' phrasing of questions as "likely to elicit . .

. conclusory and/or incomplete responses); *id.* at 8 (taking issue with Defendants' "convoluted

instruction[s]" for statutory risk factors); *id.* at 14–15 (arguing that more specific sponsor

information and removal of "available" qualifier would help ensure potential sponsors are

identified); *id.* at 16 (finding fault with ICE's questions eliciting sponsor information for being

both overinclusive and underinclusive).  Taken together, these criticisms form an argument that

Defendants' form could be structured differently to create more accurate or comprehensive

answers, or provide less of a burden on FOJCs.  But Plaintiffs make no specific arguments as to

how these perceived deficiencies would violate Section 1232(c)(2)(B) and rely in part on

assumptions of deficiencies that have not yet come to pass.  *See Cobell IV*, 392 F.3d at 474

(requiring remedial court action to be "anchored either in these specific [findings of unlawful

behavior] or in some future adjudicated findings").  Even if the Court generally agreed with the

merits of Plaintiffs' proposed changes, dictating modifications not explicitly required for

statutory compliance would veer into an infringement on ICE's discretion to determine how best

to comply with the statute.  And the Court must avoid "displac[ing] an agency as the actor with

primary responsibility for carrying out a statutory mandate by prescribing 'particular tasks for

[the agency] to perform based on policies developed by the district court.'"  *Cobell VII*, 455 F.3d

at 317.  This is not to say Plaintiffs are without recourse if their concerns about Defendants'

41

AORW form comes to pass.  Due to the various reporting requirements Defendants have agreed to, Plaintiffs will be able to monitor and bring to the Court's attention any such deficiency—such as if their fears of conclusory responses turn out to be well-founded.

The Court therefore will direct Defendants to make the revisions to their AORW delineated above, in light of the Court's conclusion that these issues run afoul of Section 1232(c)(2)(B) and the procedures the Court has found to be required under the statute.  These two modifications include: (1) removing the question concerning the number of days the age-out was in ORR custody, and (2) adding the identified mitigating factors to the form's discussion of the flight risk inquiry.

### 2.  Updates to ICE's National Age-Out Shelter List

Plaintiffs also request specific injunctive relief regarding ICE's maintenance of its nationwide list of organizational sponsors.  Following this Court's decision last July—which emphasized the importance of organizational sponsors in providing a less restrictive alternative to detention and a corresponding obligation that ICE officers determine what settings are "available," *see* FF & CL at 178, ICE, with Plaintiffs' input, created a nationwide list of organizational sponsors that accept age-outs, and plans to circulate this list to all ICE offices for use when making placement determinations.  The parties agree that going forward ICE will consider organizational sponsors proposed by Plaintiffs to add to the list and will update its list every six months.  *See* Defs. Opp'n at 11, 14; Pls.' Mot. at 4–5.  Plaintiffs, however, also propose that the Court impose two additional requirements on ICE, both of which are contested by Defendants.  The first requirement is that ICE provide Plaintiffs an explanation for the rejection of any organizational sponsors Plaintiffs propose (which can then be challenged with the Court), while the second requirement is that each ICE field office maintain its own, office-specific list of

organizational sponsors that will accept age-outs from that office's area of responsibility.  Defs.' Opp'n at 11–14.  Defendants argue that the first obligation is barred by the APA, contending that the statute "does not permit Plaintiffs to dictate or challenge Defendants' exercise of agency discretion," *id.* at 11–12, while they oppose the ICE office-specific list requirement as "repetitive and unnecessary."  *Id.* at 14.

The law supports Defendants' position on both issues (though for reasons that differ from the arguments they present).  As already described, when crafting injunctive relief in the APA context, the Court must endeavor to avoid involving itself in the minutiae of agency decision making, particularly when it concerns "the allocation of scarce resources" at issue here.  *Cobell VI*, 428 F.3d at 1073 (describing reasons for deference to agency decisionmakers); *see also* Defs.' Opp'n at 13 (arguing against the imposition of these requirements by contending that the required procedures would be resource intensive and unnecessary).  Given these policy concerns, the Court can prescribe specific steps for statutory compliance only where there has been both (1) a breach of "a legal duty," and (2) "the steps ordered by the court constitute[] an essential remedy."  *Cobell IV*, 392 F.3d at 476.  The Court concludes that the two additional requirements proposed by Plaintiffs fail to meet this standard.

The Court has previously explained that "[t]o consider the least restrictive setting available, the Secretary—or the ICE officers actually making the decisions—are obligated to determine what settings are 'available.'"  FF & CL at 178.  Because the statute "expressly contemplate[s]" "[p]lacement with individual or organizational sponsors," an age-out determination that does not engage with these options "is unlikely to be able to identify the least restrictive setting available."  *Id.* at 180.  The creation and dissemination of ICE's National Age-Out Shelter List is one method of compliance with this obligation, but presumably ICE could

fulfill this legal obligation through an alternative process.  In the same vein, Plaintiffs' requests

for additional office-specific lists as well as a requirement that ICE provide a justification for any

sponsors it rejects may well further ICE's statutory compliance.[14]  But the Court cannot fairly

say that the imposition of these obligations would be an "essential remedy" to cure ICE's past

noncompliance with this aspect of the statute.  *See Cobell IV*, 392 F.3d at 475–76 (striking down

requirement in injunctive order that defendants compile a list of applicable laws relevant to the

agency's duties, stating that while "[i]t may be helpful for defendants in fulfillment of their . . .

duties to compile such a list" it was not an "essential" act required to bring them into legal

compliance).  Accordingly, the Court will not impose on ICE the two additional measures related

to the upkeep of National Age-Out Shelter List requested by Plaintiffs.

However, the Court acknowledges that Plaintiffs' concerns about the maintenance of the

nationwide list are not unreasonable in light of ICE's past behavior allegedly rejecting potential

organizational sponsors without any legitimate basis or for inaccurate reasons.  *See* FF & CL at

100, ¶¶ 5–8 (describing how despite agreement from organizational sponsor La Posada

Providencia to shelter Plaintiff Sulma Hernandez, ICE sent her to a detention facility); *see also*

P.I. Op. at 9 (describing how ICE officer rejected La Posada Providencia on allegedly false

grounds that "many individuals released to the shelter abscond").  While the Court has not made

specific findings of ICE's wrongdoing in this respect, meaning imposition of injunctive relief at

---

[14] Practically, with regard to Plaintiffs' second request for office-specific lists, the Court agrees with Defendants' critique that such a list would be largely duplicative of the National Age-Out Shelter List that will be comprehensive and available to all FOJCs on ICE's internal website.  And while it is certainly true that the evidence at trial showed that field offices that maintained close working relationships with local shelters had increased shelter placements, FF & CL at 148–50, ¶¶ 215–224 (describing San Antonio's ICE field office placement success), the Court is somewhat skeptical that maintaining an office-specific list (which could be created from the already available, nationwide list) would result in this close relationship, which can be encouraged through other avenues such as training.

this time would be inappropriate, *see Cobell IV*, 392 F.3d at 474, it reminds both parties that the Court is retaining jurisdiction for a reason.  If Plaintiffs believe that ICE is rejecting sponsors in bad faith, this is the type of behavior that should be brought to the Court's attention.[15]

### 3.   Advance Notice of Revisions to Training Materials and Policy Guidance

The next area of dispute between the parties concerns Plaintiffs' contention that they should receive advance notice, and have the right to review and voice objections, to any revisions of ICE's policy guidance and training materials pertaining to Section 1232(c)(2)(B). Pls.' Proposed Final J. and Inj. at 9–10, § XII.A.  Any disputes that subsequently arise would then be resolved by the Court pursuant to a stated dispute resolution process.  *Id.*  Plaintiffs argue that these measures are necessary to prevent Defendants from adopting or revising policy guidance or training to circumvent statutory compliance.  Pls.' Mot. at 2.  Defendants respond by asserting that this is another requirement that "go[es] beyond the relief permitted under the APA[,]" and that it is generally unnecessary given that Plaintiffs could "raise their concerns with ICE at any time" or file a motion to enforce from the Court.  Defs.' Opp'n at 14.

The Court begins its consideration of this issue by recognizing that Plaintiffs' concerns about Defendants issuing non-compliant training materials or guidance is not an unreasonable worry.  As the Court has already detailed, Defendants previously continued non-compliant practices—including failures with regard to the training of ICE officers making age-out determinations and to issue proper guidance— even as this litigation progressed.  *See supra* Section III. A.1.  Plaintiffs also contend that Defendants have already deviated from the agreed-

---

[15] The Court notes that, even without a legal requirement to do so, ICE has stated that it currently provides to Plaintiffs an explanation for the rejection of any proposed sponsors.  Defs.' Opp'n at 12.  While the Court has declined at this time to impose this condition on Defendants, the Court encourages ICE to continue to voluntarily share this information with Plaintiffs as a method of maintaining certain guardrails of best practices as the new final relief is implemented.

upon training materials by including in their briefing a description of this Court's findings and accompanying statutory requirements to be attached to the revised FOJC Handbook that "differs materially" from the description the parties had previously agreed to use.  Pls.' Reply at 23–24.[16]

However, the Court will decline to enter such an intrusive obligation on Defendants at this time without a more extensive and current record of misconduct by ICE.  Such a remedy—in essence requiring an outside group to have input and approval over an agency's policymaking— would constitute a severe imposition on ICE's discretion.  The Court is heartened by the positive progress made by ICE in the past year regarding the age-out detention rate and corresponding documentation, *see* Defs.' Opp'n at 8–9; Defs.' Supp. Resp. at 3 (noting ICE released 99% of age-outs from May 1, 2020 to May 31, 2021), ECF No. 366, and is hopeful that ICE will use this opportunity to continue to make progress without the imposition of such extreme measures.  *See Cobell I*, 91 F. Supp. 2d at 54–55 (allowing agency "one last opportunity" to carry through on its legal obligations before imposing court monitor, even after committing civil contempt of court in what was characterized as "the most egregious governmental misconduct that it has ever seen."); *DL*, 194 F. Supp. 3d at 106 ("[T]he Court believes that defendants should be given another chance to bring the District into compliance with the Court's more results-oriented approach before more intrusive Court involvement . . . is determined to be necessary.").

_____

[16] There appears to be a lingering dispute—or perhaps simple misunderstanding— over the substance of Section 2.8 of the revised sections of the FOJC Handbook concerning the Statute and Age-Out placement determinations.  Plaintiffs contend that the version submitted by Defendants (ECF No. 362-1) "contains a description of this Court's findings as to what the Statute requires that differs materially from the description in the agreed training materials, which Plaintiffs understood Defendants had previously agreed to include in the revised Handbook."  Pls.' Reply at 23–24.  Given that the parties have already agreed to specific language summarizing this Court's findings for use in the training materials, *see* ECF No. 346-1 at 10, it does not understand why this language cannot simply be reproduced in the FOJC Handbook, where it will be used for a similar purpose.

Also, Plaintiffs are not left without options if ICE does indeed attempt to adopt or revise policy guidance or training to circumvent statutory compliance, as Plaintiffs fear.  This is because they retain the general authority to both "make suggestions and/or recommendations to ICE as to further steps it should take to ensure its compliance with this Order and 8 U.S.C. § 1232(c)(2)(B)" and "to raise with the Court any issues or concerns with respect to ICE's compliance with implementation of this Order after remand that Plaintiffs' counsel is not able to resolve with ICE."  Defs.' Proposed Final J. and Remand at 6.  And should Defendants fail to comply with their statutory obligations or this Court's order going forward, the Court reminds both parties that not only is ICE enjoined from committing such violations, but the Court has retained jurisdiction, and will ensure Defendants comply with their legal responsibilities.

### 4.  Reimbursement of Plaintiffs' Counsel for Monitoring and Enforcement Responsibilities

The parties final dispute concerns the provision of attorney's fees for the monitoring of future compliance with this Court's order.  Both parties agree that Plaintiffs will, in effect, serve in the place of an independent monitor to enforce compliance with the final order.  To this end, Defendants have agreed to provide Plaintiffs with monthly reports from ICE documenting its compliance with the statute.  Defs.' Proposed Final J. and Remand, at § IV.  The parties disagree, however, as to how Plaintiffs' counsel should be compensated for this role.  Plaintiffs request that their counsel be reimbursed for their routine review and monitoring of Defendants' periodic reporting and completed AORWs, with fees and expenses to be itemized and described in a quarterly statement and paid out according to the Laffey Index.  Pls.' Mot. at 3–4; *see also* Pls.' Proposed Final J. and Inj. at 8, § VIII.  Defendants respond, not by disputing the general premise that Plaintiffs deserve compensation for this responsibility, but by requesting that the specifics of Plaintiffs' fees for monitoring future compliance be "tabled" until Plaintiffs file a motion for

recovery of their *past* fees under the Equal Access to Justice Act ("EAJA"),[17] 28 U.S.C. § 2412(d)(1)(A) *et seq.*, arguing, oddly, that this issue is "unrelated to any injunction or remand that this Court may order."  Defs.' Opp'n at 14 n.7.  But by the Court's estimation, this issue is a critical piece of final relief in this case, and consequently finds it must address this issue here even without the benefit of robust briefing from Defendants.

Part of the reason why the Court finds it must specify that Plaintiffs' counsel is entitled to this compensation scheme is to allay their concerns stemming from the current Circuit divide over when post-judgment fees for monitoring are recoverable.  Some circuits have held that expenses and fees associated with monitoring are appropriate whenever plaintiffs' counsel protects "the fruits of the decree."  *Johnson v. City of Tulsa*, 489 F.3d 1089, 1108 (10th Cir. 2007) (discussing post-judgment relief in the context of a prior consent decree).  Others have held that "if [post-decree work] does not produce a judgment or order, then . . . it is not compensable."  *All. to End Repression v. City of Chicago*, 356 F.3d 767, 771 (7th Cir. 2004).  The D.C. Circuit has not yet confronted this issue.  Thus, in order to avoid any future confusion, the Court believes it wise to explicitly address this issue now.  *Johnson*, 489 F.3d at 1109 (noting that "the decree itself can spell out what efforts by plaintiffs' counsel are to be compensated . . . . [T]he amount of litigation on the subject suggests that explicit provisions in consent decrees would be a boon for all concerned (certainly the courts).").

The Final Judgment and Injunction, at the parties' agreement, vests monitoring responsibilities with Plaintiffs' counsel.  Indeed, Defendants previously opposed the appointment

---

[17] "[T]he EAJA . . . allows 'prevailing parties' to obtain expenses in litigation against the federal government unless the Government's position is substantially justified."  *Select Milk Producers, Inc. v. Johanns*, 400 F.3d 939, 941 (D.C. Cir. 2005).  "Prevailing party" is a legal term of art designating "one who has been awarded some relief by the court."  *Buckhannon Bd. and Care Home, Inc. v. W. Va. Dep't of Health and Hum. Res.*, 532 U.S. 598, 603 (2001).

of an independent monitor on the grounds that Plaintiffs' counsel could perform this role. Having received this request, it strikes the Court as unreasonable to ask Plaintiffs' counsel to perform this work without confirming that they will be adequately compensated, which appears to be the norm in this type of case.  Indeed, at least one other court in our district has concluded that under the EAJA, "[s]ervices devoted to reasonable monitoring of the court's decrees, both to insure full compliance and to ensure that the plan is indeed working . . . are compensable services." *Cobell v. Norton*, 407 F. Supp. 2d 140, 157 (D.D.C. 2005) (awarding fees for "monitoring defendants' . . . reform efforts and reviewing quarterly reports, ensuring the decision was carried out, and uncovering, documenting and presenting the various manifold misrepresentations that defendants repeatedly had made") (internal citations and quotations omitted).  The award of attorney's fees to plaintiffs' counsel for monitoring compliance with injunctions is also the norm under other statutory schemes. *See Salazar v. District of Columbia*, 560 F. Supp. 2d 13, 14 (D.D.C. 2008) (explaining that, in context of 1983 action, "[t]here is no question that . . . post-judgment monitoring is compensable."); *Inmates of D.C. Jail v. Jackson*, 158 F.3d 1357, 1359 (D.C. Cir. 1998) (awarding attorney's fees under the PLRA to plaintiffs' counsel for "hours spent monitoring the D.C. jail").

Thus, having concluded that Plaintiffs' counsel is entitled to reasonable compensation for the monitoring role that they will be undertaking, the only question that remains is that of the proper rate of compensation.  Plaintiffs have requested compensation for their monitoring duties not under the standard EAJA rate, which is set forth in 28 U.S.C. § 2412(d)(2)(A) and capped at $125 per hour (plus any cost of living or special factor adjustments), but rather under the more generous Laffey Matrix.  Pls.' Mot. at 4.  The Laffey Matrix is used in the D.C. Circuit to calculate the "reasonable" market rate of comparable lawyers in complex federal litigation.  *DL*

*v. District of Columbia*, 924 F.3d 585, 588–89 (D.C. Cir. 2019).  However, Plaintiffs have not provided the Court any examples (nor could the Court find any) of its use in this manner to govern compensation for post-judgment monitoring in a case in which the request for reasonable fees would fall under EAJA, rather than any other fee-shifting statute.  A review of the applicable law shows that the Laffey Matrix has only been applied to EAJA cases when enhanced fees—such as for bad faith—applied.  *See, e.g.*, *Cobell*, 407 F. Supp. 2d at 170.  Accordingly, absent any support for Plaintiffs' counsel's request to be compensated at the Laffey Matrix rate, the Court finds the EAJA rate to be the appropriate rate of reimbursement for Plaintiffs' counsel's work completing their monitoring duties.[18]

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Entry of Final Judgment and Permanent Injunction (ECF No. 359) is **GRANTED IN PART** and **DENIED IN PART**, while Defendants' Motion to Issue Interim Guidance (ECF No. 337) is **DENIED AS MOOT**.  An entry of final judgment and a permanent injunction consistent with this Memorandum Opinion is separately and contemporaneously issued.  **SO ORDERED.**

Dated: September 21, 2021                                    RUDOLPH CONTRERAS
                                                            United States District Judge

---

[18] The Court does note that in light of ICE's recent reports of low age-out detention rates, *see* Defs.' Supp. Resp. at 3 (noting ICE released 99% of age-outs from May 1, 2020 to May 31, 2021), extensive monitoring efforts are likely less of a necessity at present unless the factual circumstances change.  Moreover, some of these monitoring duties can be accomplished by the public interest lawyers that also represent Plaintiffs and who would not suffer the same economic opportunity costs suffered by the Kirkland & Ellis LLC firm attorneys.