IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WILMER GARCIA RAMIREZ, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> U.S. IMMIGRATION AND <br> CUSTOMS ENFORCEMENT (ICE), *et al.*, <br><br> *Defendants.* | Case No. 1:18-cv-00508-RC <br><br> Class Action |

### PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND TO ENFORCE THE COURT'S FINAL JUDGMENT AND PERMANENT INJUNCTION

Plaintiffs have learned through multiple sources that on October 1, Defendants issued "new Interim guidance from HQ [Headquarters] on Age-Out Custody Determinations" instructing Immigration and Customs Enforcement (ICE) field offices to detain all unaccompanied children (UC) who entered the United States without having been admitted (which would be most if not all UCs) on their 18th birthday when they age out of the Office of Refugee Resettlement's (ORR) custody. The guidance further instructs that UCs that age-out shall be subject to detention under 8 U.S.C. § 1225(b). The guidance declares that these teenagers may only be released under 8 U.S.C. § 1182(d)(5) "on a case-by-case basis for urgent humanitarian reasons or significant public benefit" and not pursuant to 8 U.S.C. § 1232(c)(2)(B). Class counsel is aware of at least one teenager who is scheduled to be detained by ICE tomorrow, October 4, and one other teenager who will be detained on Sunday, October 5, apparently pursuant to this new policy.

This policy is a flagrant violation of this Court's September 21, 2021 final judgment, which permanently enjoined Defendants from violating 8 U.S.C. § 1232(c)(2)(B) by failing to "consider placement [of children aging out of Office of Refugee Resettlement custody] in the least restrictive setting available" and failing to "make each age-out 'eligible for participation' in certain programs regardless of the age-out's danger to self, danger to community, or risk of flight." ECF 333 at 152; ECF 368.

In light of the imminent or ongoing violation of this Court's injunction and the irreparable harm it will inflict on class members, Plaintiffs request that the Court (a) immediately enjoin implementation of any new directive regarding age-outs, (b) enjoin Defendants from detaining any class members in an adult ICE facility in any manner that contravenes the Court's permanent injunction, (c) order ICE to immediately rescind any determinations to detain based on this directive, and (d) order ICE to immediately produce that directive, any related policies regarding that directive, and the Age-Out Review Worksheets of any class members who may have been impacted by that directive, including all AORWs issued since October 1, 2025.

Pursuant to Sections VII and IX of the Final Judgment and Permanent Injunction, Plaintiffs' counsel conferred with counsel for Defendants but were unable to resolve the dispute.[1]

## BACKGROUND

Plaintiffs filed suit in March 2018, when some ICE field offices were detaining virtually all UCs when they turned 18, notwithstanding the protections Congress provided them under 8 U.S.C. § 1232(c)(2)(B). ECF 1. The Court subsequently denied Defendants' motion to dismiss, rejecting among their many arguments a claim that some age-outs are subject to mandatory

---

[1] Plaintiffs did not provide advance notice of this motion to the Clerk pursuant to LCvR 65.1(b) for reasons discussed in counsel's supporting declaration. Decl. of Emma Winger, ¶¶ 15-19.

detention under 8 U.S.C. § 1225(b) and therefore not entitled to consideration and release under Section 1232(c)(2)(B). ECF 50, at 30-31. In the same decision the Court certified the following class:

> *All* former unaccompanied alien children who are detained or will be detained by ICE after being transferred by ORR because they have turned 18 years of age and as to whom ICE did not consider placement in the least restrictive setting available, including alternatives to detention programs, as required by 8 U.S.C. § 1232(c)(2)(B).

*Id.* at 69 (emphasis added).

Following a lengthy bench trial, the Court entered judgment in favor of Plaintiffs, finding that ICE had violated the Administrative Procedure Act (APA) by acting "in a manner that is 'arbitrary, capricious, an abuse of discretion' and—most clearly—'otherwise not in accordance with law' by failing to follow procedures made necessary by Section 1232(c)(2)(B) and to take into account the factors that the statute requires. 5 U.S.C. § 706(2)." ECF 333, at 180. The Court further found that ICE had "also 'unlawfully withheld or unreasonably delayed' required consideration of placement in the least restrictive setting available to many members of the certified class. 5 U.S.C. § 706(1)." *Id.*

On September 21, 2021, this Court permanently enjoined Defendants from violating 8 U.S.C. § 1232(c)(2)(B). ECF 368. The Court retained jurisdiction for a period of five years "to enforce and resolve any disputes." *Id.* at 7-8. During that period, Plaintiffs' counsel are entitled to receive and review all Age-Out Release Worksheets and "such other information reasonably related to ICE's compliance with" the permanent injunction. *Id.* at 7.

For the past four years, Defendants have substantially complied with the Court's order, consistently releasing over 98% of all unaccompanied children rather than detaining them in adult detention, having found that the vast majority of such young people present no flight risk or

danger and for those that did raise concerns, they could be mitigated by various alternatives to detention. Decl. of Emma Winger, ¶ 3.

That has evidently changed. As of July 2025, ICE began detaining a handful of age-out teenagers when they dutifully appeared for their first ICE check-ins—scheduled upon their release from ORR custody—mere weeks after ICE had determined that they presented neither a danger nor a flight risk and released them to sponsors, and without any apparent change in circumstances to justify their detention. Winger Decl., ¶¶ 4–5, 7, 9. It appears these detentions may be part of the new ICE and Executive Office of Immigration Review (EOIR) immigration court policies to subject all noncitizens charged under 8 U.S.C. § 1182(a)(6)(A)(i) with being present in the United States without having been admitted or paroled to mandatory detention under 8 U.S.C. § 1225(b). *See Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (BIA 2025). At this point over fifty federal courts have considered ICE and EOIR's new detention policy and consistently "concluded that the government's position belies the statutory text of the INA [Immigration and Nationality Act], canons of statutory interpretation, legislative history, and longstanding agency practice." *See, e.g.*, *Rodriguez Vasquez v. Bostock*, -- F.Supp.3d --, 2025 WL 2782499 at *1 n. 3 (W.D. Wash Sept. 30, 2025) (collecting cases). It is class counsel's understanding that none of the four young people arrested at their first check-ins have been provided with a bond hearing and at least one of these teenagers has been found by an immigration judge to be ineligible for bond under *Matter of Yajure Hurtado*. Winger Decl. ¶¶ 7, 14.

Then, beginning in October 2025, ICE apparently began implementing a new age-out detention policy. On October 1, ICE headquarters reportedly issued "new Interim guidance [] on

4

Age-Out Custody Determinations." According to an email sent by one ICE Field Office Juvenile Coordinator (FOJC) in El Paso midday on October 2:

> On 10/01/2025, the El Paso Field Office received new Interim guidance from HQ on Age-Out Custody Determinations. Regarding Detention Authority for "Applicants for Admission", effective immediately **it is the position of DHS that such aliens [i.e., UCs who turn 18] are subject to detention under INA § 235(b) and may not be released from ICE custody except by INA § 212(d)(5) parole.** Parole may be granted on a case-by-case basis for "urgent humanitarian reasons" or "significant public benefit."
>
> ELP FOJC will continue to carefully evaluate [UC] cases when making custody determinations. Once a custody determination is made and DHS/ICE decides to continue detention the Age Outs will be served an I-200 (Warrant of Arrest), camp space will be approved in one of our adult facilities, and transportation arrangements will be made by ELP FOJC for the day of Age Out. **Due to the new Age Out interim Guidance any upcoming Age Outs will remain in custody to continue their removal proceedings.**

Decl. of Imelda Maynard, ¶ 33 & Ex. C at 3 (emphasis added). Similarly, an FOJC in Pennsylvania told a case manager at an ORR-contracted shelter by phone on the afternoon of October 3 that "post-18 plans would no longer be honored and that all unaccompanied minors with approved post-18 plans would be instead placed into adult detention." Decl. of Marcy Hilty, ¶¶ 5, 14, 22, 30. Likewise, on the morning of October 3, an FOJC told a case manager in Florida "that the current administration has ordered [FOJCs] to detain all age outs moving forward." Decl. of John Barry, ¶¶ 3-5 & Attach.

On October 3, Plaintiffs' counsel received reports of numerous children in ORR custody turning 18 in the coming days whose planned release ICE has abruptly canceled based on the "new Interim guidance." Each child had a written post-18 release plan concluding that they posed no flight risk or danger to themselves or others, and identifying a sponsor, program, or facility as the least restrictive setting available. Maynard Decl. ¶¶ 8–10 (child E.G.G.L., who turns 18 tomorrow, October 4), ¶¶ 15–17 (child E.O.B.M., who turns 18 on October 9), ¶¶ 23–25

(child I.L.F.R., who turns 18 tomorrow, October 4), ¶¶ 29–30 (child W.O.B.P, who turns 18 on Sunday, October 5); Hilty Decl. ¶¶ 8-13 (child M.E.R.V., who turns 18 tomorrow, October 4), ¶¶ 16-21 (child R.I.Y.C., who turns 18 on October 7), ¶¶ 24-29 (child G.T.X, who turns 18 on October 9). In many of these cases, ICE had already approved release on recognizance to a sponsor or an identified program or facility as the least restrictive release setting available. Maynard Decl. ¶¶ 20–21 & Ex. A; Hilty Decl. ¶¶ 13, 21, 29. In the case of E.O.B.M., ICE had already served on the child an order of release of recognizance listing the future release date. Maynard Decl. ¶¶ 20–21 & Ex. A.

On October 2 and 3, counsel for all of the children described above received word that ICE had either changed its prior decision to release them on recognizance (ROR) or made a decision not to allow their release in the first instance. Maynard Decl. ¶¶ 12 (E.G.G.L. denied ROR), 22 (hours after child was served order of release on recognizance, counsel for E.O.B.M. told that he will be detained upon age-out based on a "new directive"), 27 (I.L.F.R. denied ROR), 31 (W.O.B.P. denied ROR); Hilty Decl. ¶¶ 14 (M.E.R.V. approval of ROR rescinded), 22 (R.I.Y.C. approval of ROR rescinded), 30 (G.T.X. approval of ROR rescinded). In six of the seven cases, the child's counsel received confirmation that an ICE FOJC had communicated either in writing (E.G.G.L., E.O.B.M., and W.O.B.P.), or on the phone (M.E.R.V., R.I.Y.C., and G.T.X.) that the decision to detain was based on a new policy to detain all UCs when they turn 18, regardless of flight risk, danger, or the availability of a less restrictive setting.

On Thursday, October 2 at 9:25 p.m., Plaintiffs' counsel emailed counsel for Defendants to seek to meet and confer over the apparent violations of the Final Judgment and Permanent Injunction as reported by legal services providers for children in ORR custody. Winger Decl. ¶¶ 15–16. Defendants' counsel responded at 9:19 a.m. on Friday, October 3 requesting

6

identifying information for the children. *Id.* ¶ 17. Plaintiffs' counsel provided details for E.G.G.L. and E.O.B.M. at 1:35 p.m., reiterated the request to confer, and indicated their intention to file a TRO motion to enforce the judgment. *Id.* Plaintiffs sent information for I.L.F.R. and W.O.B.P. at 5:10 p.m. and reiterated the request to confer. *Id.* Defendants' counsel responded that they had no factual updates on any of the individuals, but offered to meet. *Id.* At 7:00 p.m., Plaintiffs' and Defendants' counsel conferred. Plaintiffs reiterated that they intended to seek court intervention as early as tonight (Friday, October 3) in the absence of written assurances by 10:00 p.m. on October 3, that ICE would not detain any of the individuals or class members through such time as the parties could confer on Monday, October 6—a request that Plaintiffs' counsel confirmed by email following the call. *Id.* ¶ 18. At 10:03 p.m., Defendants' counsel indicated that they were able to reach DHS but "d[id] not have an answer at this time" to Plaintiffs' request. *Id.*

After Plaintiffs' counsel conferred with Defendants' counsel, Plaintiffs received notice on the evening of October 3 that counsel for two children with birthdays on October 4—E.G.G.L. and I.L.F.R.—had been told that despite ICE's prior decision to detain them in ICE custody tomorrow, ICE changed its decision and stated it now plans to release the children on parole. Maynard Decl. ¶¶ 14, 28.

## **LEGAL STANDARD**

"[F]ederal courts are not reduced to issuing injunctions . . . and hoping for compliance." *Hutto v. Finney*, 437 U.S. 678, 690 (1978). "The power of a federal court to protect and enforce its judgments is unquestioned." *Marshall v. Loc. Union No. 639*, 593 F.2d 1297, 1302 (D.C. Cir. 1979). As such, courts "necessarily have the power to enter 'such orders as may be necessary to enforce and effectuate their lawful orders and judgments, and to prevent them from being

7

thwarted and interfered with by force, guile, or otherwise.'" *Sec. Indus. Ass'n v. Bd. of Governors of Fed. Rsrv. Sys.*, 628 F. Supp. 1438, 1441 (D.D.C. 1986) (citation omitted); *see also Kifafi v. Hilton Hotels Ret. Plan*, 79 F. Supp. 3d 93, 100 (D.D.C. 2015). A district court should grant a motion to enforce the terms of its mandate when "a prevailing plaintiff demonstrates that a defendant has not complied with a judgment entered against it.'" *WildEarth Guardians v. Bernhardt*, No. CV 16-1724 (RC), 2019 WL 3253685, at *3 (D.D.C. July 19, 2019) (quoting *Heartland Hosp. v. Thompson,* 328 F. Supp. 2d 8, 11 (D.D.C. 2004), which notes that a motion to enforce is especially appropriate "in cases of willful or deliberate violation of a court order.").

To obtain a temporary restraining order, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014); *Am. Foreign Serv. Ass'n v. Trump*, No. 1:25-cv-352 (CJN), 2025 WL 435415, at *1 (D.D.C. Feb. 7, 2025). The standards for issuing a temporary restraining order and a preliminary injunction are "the same." *Doe v. McHenry*, No. 1:25-cv-286-RCL, 2025 WL 388218, at *2 (D.D.C. Feb. 4, 2025).

## **ARGUMENT**

### I. Plaintiffs Are Likely to Succeed on the Merits Because Defendants Are Violating This Court's Final Judgment and Permanent Injunction.

ICE's reported policy to subject all age-outs who are charged under 8 U.S.C. § 1182(a)(6)(A)(i) with being present in the United States without having been admitted (which encompasses most if not all class members) to detention under 8 U.S.C. § 1225(b) and to release them only pursuant to 8 U.S.C. § 1182(d)(5) is indisputably a flagrant violation of this Court's permanent injunction requiring ICE to consider for "all former unaccompanied children"

placement in the least restrictive setting available, including alternatives to detention, as required by 8 U.S.C. § 1232(c)(2)(B). ECF 368 at 1–2.

This Court has already considered, and rejected, ICE's new position that 8 U.S.C. § 1225(b) provides an exception to the protections in Section 1232(c)(2)(B). The Court explained:

> Nothing in the text or context supports Defendants' argument that only a subset of former unaccompanied minors who were transferred to DHS custody are entitled to consideration under 8 U.S.C. § 1232(c)(2)(B). For starters, the plain text of the statute reveals no such limitation. Under the statutory provision, "[i]f a minor described in subparagraph (A)[5] reaches 18 years of age and is transferred to the custody of the Secretary of Homeland Security, the Secretary shall consider placement in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight." 8 U.S.C. § 1232(c)(2)(B). Furthermore, "[s]uch aliens shall be eligible to participate in alternative to detention programs." *Id.* The only conditions for entitlement to "consider[ation]" are described in the first clause. When an individual meets these conditions—that is, when an individual is "a minor described in subparagraph (A)" who, upon turning 18, was transferred to DHS custody—the statute imposes on the Secretary of DHS a nondiscretionary duty to "consider" the least restrictive placement available for that individual. Thus, per the plain language of the provision, all who meet those conditions—regardless of the agency's flight risk or dangerousness determinations and irrespective of the provision under which the individual has been detained—are entitled to consideration. Full stop.

ECF 50 at 30–31. As a consequence, this Court's injunction plainly covers *all* unaccompanied children aging out of ORR custody, without exception. ECF 368 at 1–2.

ICE's reported plan to apply the standard in 8 U.S.C. § 1182(d)(5) is plainly contrary to this Court's injunction requiring application of the release standard in Section 1232(c)(2)(B). Section 1182(d)(5) permits ICE to "temporarily" parole noncitizens into the United States "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5). Moreover, it requires that the noncitizen "return to the custody from which he was paroled" when the government deems the purpose of the parole fulfilled. *Id.* By contrast, this Court's injunction requires ICE to "consider placement in the least restrictive setting available

9

after taking into account the alien's danger to self, danger to community, and risk of flight." ECF 333 at 4-5 (quoting 8 U.S.C. § 1232(c)(2)(B)). Moreover, under the injunction, all age-outs "*shall* be eligible to participate in alternatives to detention." *Id.* (emphasis added). ICE's new guidance is incompatible with this Court's judgment, injunction, and underlying rulings.[2]

## II. Class Members Will Suffer Irreparable Harm Absent a TRO.

As this Court has already found, age-outs who are detained without ICE following the requirements of Section 1232(c)(2)(B) will suffer irreparable harm; based in part on this finding, this Court issued a permanent injunction. ECF 367 at 18-21; ECF 333 at 148-49. In particular, this Court observed that "the harm detention causes to age-outs was established at trial by Plaintiffs' pediatric expert." ECF 333 at 149. "Where a plaintiff requests injunctive relief mandating that an agency comply with a process that, if completed could secure plaintiff's freedom or could alleviate harsh conditions of confinement, the harm from detention surely cannot be remediated after the fact." *Id.* at 148 (citing *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)).

Moreover, if Defendants are permitted to detain age-outs under Section 1225(b), they would not be provided bond hearings before an immigration judge. *See Yajure Hurtado*, 29 I. & N. Dec. at 229 (holding immigration judge lacked jurisdiction to hear noncitizen's request for bond). Instead, the children would only be eligible for release on parole, which is only available in circumstances much narrower than those urged by the TVPRA—"*urgent* humanitarian reasons" or "*significant* public benefit" and in the unreviewable discretion of Defendants. *See* 8

---

[2] ICE's new guidance is also contrary to the overwhelming weight of authority rejecting ICE's expansive interpretation of 8 U.S.C. § 1225(b)(2). *Rodriguez Vasquez*, 2025 WL 2782499 at *1 n. 3. But the Court need not reach that issue, since the Court has already correctly decided that the TVPRA requires special treatment for former UCs and the Court's judgment is final.

10

U.S.C. § 1182(d)(5) (emphasis added). In practice, today release on parole is all but a dead letter, as ICE's own data show a precipitous drop in release on parole since January 2025.[3]

The unaccompanied children in ORR custody described in this motion illustrate the irreparable harm at stake where ICE detains age-outs without complying with Section 1232(c)(2)(B). The children whose forthcoming planned release ICE has abruptly canceled based on the "new Interim guidance" have post-release plans that have been vetted and approved as providing the least restrictive setting available; the children have already been determined not to pose a flight risk or danger to themselves or others. Maynard Decl. ¶¶ 8–10 (child E.G.G.L. approved for release to uncle and noting stability and lack of behavioral incidents while in care), ¶¶ 15–17 (child E.O.B.M. approved for release to family friend from home country), ¶¶ 23–25 (child I.L.F.R. approved for release to father for "emotional support" and "safe, stable living environment"), ¶¶ 29–30 (child W.O.B.P. approved for release to mother and noting stability and lack of behavioral incidents while in case); Hilty Decl. ¶¶ 8-13 (child M.E.R.V. approved for release to local shelter with no risk concerns), ¶¶ 16-21 (child R.I.Y.C. approved for release to relative with no identified risks), ¶¶ 24-29 (child G.T.X. approved for release to Allegheny County Children, Youth, and Families custody with no identified risks).

---

[3] The number of noncitizens that ICE released on parole averaged 4,867 per month from October 2024 through January 2025. After dropping to 559 releases in February 2025, the monthly average for March through September 2025 was 75 people (just 1.5% the Oct-Jan. average parole releases, despite an overall increase in the number of people in ICE custody). The number of parole releases remained historically low for the month of September, totaling just 73, despite the BIA's decision in *Yajure Hurtado* early in the month that exponentially expanded the number of people considered eligible for release only on parole and not bond. *See* U.S. ICE, Detention FY 2025 YTD, Alternatives to Detention FY 2025 YTD and Facilities FY 2025 YTD, Footnotes, https://www.ice.gov/detain/detention-management (navigate to "Detention FY25" tab in spreadsheet).

Additionally, because of their age and particular circumstances, the impacted children will be highly vulnerable in adult detention. Even considering only the children described in this motion, all of whom will likely unlawfully be subjected to adult detention under the new Interim guidance, they include children who are eligible for Special Immigrant Juvenile Status (SIJS) based on having been abused, neglected, or abandoned by a parent, Maynard Decl. ¶¶ 11 (E.G.G.L. obtained predicate order from state court for SIJS), 18 (E.O.B.M. filed Form I-360 Petition for Special Immigrant Juvenile Status); and children who have been found to be victims of trafficking, Hilty Decl. ¶¶ 9 (M.E.R.V. identified by U.S. Office of Trafficking in Persons as a victim of severe form of human trafficking and likely eligible for SIJS), 25 (G.T.X. victim of labor trafficking). For children aging out of ORR custody, the "lasting harm" from unnecessary and inappropriate adult detention is clear. ECF 333, at 149.

### III. The Public Interest and the Equities Weigh in Favor of a TRO.

This Court has already concluded that the public interest and the equities favor an injunction when class members seek compliance with Congress' command to consider the least restrictive setting and make available alternatives to detention. ECF 367 at 27-30; ECF 28 at 38-40. As this Court explained, on one side of the ledger, "the Government 'cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required'" ECF 367 at 28 (quoting *R.I.L.-R*, 80 F. Supp. 3d at 191). On the other side of the ledger, "it has been well established in this Circuit that '[t]he public interest is served when administrative agencies comply with their obligations under the APA.'" *Id.* at 29; *see TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 115 (D.D.C. 2020) (same); *Huisha-Huisha v. Mayorkas*, 642 F. Supp. 3d 1, 27 (D.D.C. 2022). This is even more true when Defendants violate not only a statute but a ruling of this Court.

### IV. An Order Enforcing the Judgment Is Necessary.

An order from this Court to enforce the judgment is urgently needed to prevent grave violations of the permanent injunction and the rights of class members. Specifically, Plaintiffs request that the Court enter an order that: 1) enjoins Defendants from implementing any new directive regarding age-outs; 2) enjoins Defendants from detaining any class member in an adult ICE facility in any manner that contravenes the Permanent Injunction; 3) orders Defendants to immediately rescind any determinations to detain based on this directive; and 4) orders Defendants to immediately produce that directive, any related policies regarding that directive, and the Age-Out Review Worksheets of any class members who may have been impacted by that directive, including all AORWs issued since October 1, 2025. The individual age-outs detailed above and all other class members who will shortly reach their 18th birthdays are at imminent risk of being detained in adult ICE facilities through a sudden policy reversal that directly contravenes the binding final judgment in this case.

## CONCLUSION

The Motion for Temporary Restraining Order and to Enforce the Court's Final Judgment and Permanent Injunction should be granted.

Dated: October 4, 2025                                  Respectfully submitted,

| | |
|---|---|
| Mark Fleming<br>National Immigrant Justice Center<br>111 W. Jackson Blvd., Suite 800<br>Chicago, IL 60604<br>T: 312-660-1370<br>mfleming@immigrantjustice.org | *s/ Emma Winger*<br>Emma Winger (DC Bar No. 90010721)<br>Michelle Lapointe (DC Bar No. 90032063)<br>Rebecca Cassler (DC Bar No. 90017398)<br>Suchita Mathur (DC Bar No. 90013156)<br>American Immigration Council<br>PMB2026<br>2001 L Street, NW, Suite 500<br>Washington, DC 20036<br>Tel: (202) 507-7645<br>ewinger@immcouncil.org |

mlapointe@immcouncil.org
rcassler@immcouncil.org
smathur@immcouncil.org