IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WILMER GARCIA RAMIREZ, et al., | ) |
| | ) Case No. 1:18-cv-00508-RC |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| U.S. IMMIGRATION AND | ) |
| CUSTOMS ENFORCEMENT (ICE), et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**Declaration of Emma Winger**

I, Emma Winger, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am over 18 years old and competent to make this declaration.

2. This declaration is based on my personal knowledge, my review of government records produced in the above-captioned case, and communication with representatives and sponsors of class members.

3. I am the Deputy Legal Director at the American Immigration Council (Council). The Council, along with the National Immigrant Justice Center (NIJC), represents the Plaintiff class. In that capacity, I receive Defendants' monthly reporting, including Age-Out Review Worksheets (AORW) and supporting materials. *See* ECF 368 at 6. I also receive from Defendants a summary of the number and percent of unaccompanied children detained and released by month, with the most recent such report produced in mid-September 2025. Data received shows that for the last four years, Defendants have consistently released over 98% of all unaccompanied children rather than detaining them in adult detention.

4. On or about August 26, an NIJC client and class member was detained at his first

1

ICE check-in following release from ORR custody. Plaintiffs' class counsel intended to raise the class member with Defendants, but NIJC was able to negotiate for his release with ICE.

5. On August 27, 2025, an attorney from the Immigrant Defenders Law Center reported that her client and class member A.T-L had been detained when he reported to his first required ICE check-in on August 21, 2025. I reviewed A.T-L's AORW and confirmed that he had been initially released on his own recognizance to a sponsor "in accordance with section 236 of the Immigration and Nationality Act" on August 7, after ICE determined that he was neither a flight risk nor a danger to the community. Using the ICE detainee locator, https://locator.ice.gov/odls/#/search, I confirmed that A.T-L was in ICE custody.

6. In light of these two detentions of class members without any evident change in circumstances, on September 19, 2025, I contacted government counsel by email and requested that they investigate A.T-L's detention.

7. Using the ICE detainee locator, I also initiated a review of all recent age-outs reported by Defendants to determine whether any subsequently had been detained. Through this process I learned that class member F.L.P., who had been released on his own recognizance to a sponsor "in accordance with section 236 of the Immigration and Nationality Act" on July 3, was now in ICE detention. I, along with a Spanish-speaking paralegal in my office, called the sponsor listed in F.L.P.'s AORW, who confirmed that F.L.P. had been detained at his first ICE check-in. The sponsor also provided the name and number for F.L.P.'s attorney. I spoke to F.L.P.'s attorney, who also confirmed that the teenager was detained at his first ICE check-in and there were no change in circumstances presented by ICE justifying his detention. The attorney further confirmed that an immigration judge found that it had no jurisdiction to hear F.L.P.'s request for bond because of the Board of Immigration Appeal's (BIA) decision in *Matter of Yajure Hurtado,* 29 I.

& N. Dec. 216 (BIA 2025).

8. On September 25, 2025, I contacted government counsel by email and requested that they investigate F.L.P.'s detention.

9. On September 29, 2025, I learned from the former counsel for class member A.D. that he had been detained on July 16 at his first ICE check-in after being released on his own recognizance to an institutional sponsor. I confirmed through the ICE detainee locator that A.D. was in ICE custody. A review of his AORW confirmed that he was released to the institutional sponsor on June 19. A.D.'s former counsel confirmed that there were no change in circumstances for A.D.

10. On the evening of September 29, 2025, I contacted government counsel by email and requested that they investigate F.L.P's detention.

11. On September 30, 2025, I spoke with government counsel regarding A.T-L, F.L.P., and A.D. Government counsel did not have any information about F.L.P. and A.D. However, government counsel shared this explanation from ICE for A.T-L's arrest and detention:

> On August 21, 2025, [A.T-L] a citizen and national of [XX], presented himself at the Alternatives to Detention (ATD) office in Orlando, FL. Of note, [A.T-L] is not required to report to ICE pursuant to an ATD plan or any other non-detained reporting requirements. Further, no scheduled appointments were found in the system for this individual. When asked for the reason of his visit, [A.T-L] advised the ICE officer on duty that he was homeless, and that all he wanted to do was to go home because he did not have any relatives to help him subsist. It is further important to note that before his release, ORR placed [A.T-L] with a vetted sponsor. After appearing at the ATD office in Orlando, FL, [A.T-L] was subsequently detained and transferred to Baker County Jail. [A.T-L] is currently being prepared for voluntary departure to [XX] as he requested. Given these facts, the age-out's detention (after release) arose from changed circumstances as he has now been deemed as a flight risk.

12. ICE's explanation for A.T-L's arrest is contradicted by A.T.-L's AORW which includes an order of release on recognizance that included an obligation to report to ICE in

3

Orlando, Florida on August 21. A.T.-L's counsel subsequently confirmed that A.T.-L disputed ICE's recounting of the circumstances of his arrest and maintained that he did not request to be deported to his native country and has never agreed to voluntary departure. Notably, A.T.-L.'s primary language is Kiche, and he was not provided interpretation services at his check-in at the ATD office in Orlando.

13. I have subsequently learned through the ICE detainee locator of a fourth class member who was detained at his first ICE check-in. J.D.F-V was released to his mother and stepfather on June 7 according to his AORW. My paralegal spoke to the sponsors who reported that J.D.F-V was arrested at his first ICE check-in on July 8. They were not aware of any change in circumstances.

14. A.T-L, F.L.P., A.D., and J.D.F-V, all remain in ICE adult detention. To my knowledge, none have received bond hearings before an immigration judge.

15. On the afternoon of October 2, 2025, my colleagues and I began to receive reports that ICE was implementing several policies targeting unaccompanied children, including a policy to detain all age-outs. By the evening of October 2, we heard from several legal services providers concerned that their clients who were close to aging out in the coming days might be detained despite having vetted sponsors and post-18 plans indicating they were neither a flight risk nor a danger, including at least one young person who had been granted release on an order of recognizance and then had that order revoked. However, at that time, some legal services providers were reporting that they had not received notice of such a policy. Even as of the following day, October 3, several legal services providers in touch with my office indicated they did not understand ICE to be implementing such a policy in their area.

16. On Thursday, October 2 at 9:25 p.m., I emailed government counsel to seek to meet

4

and confer over the apparent violations of the Final Judgment and Permanent Injunction as reported by legal services providers for children in ORR custody. At 7:28 am on October 2 I called government counsel to ensure they received notice, in light of the government shutdown.

17.   Government counsel responded at 9:19 a.m. on Friday, October 3 requesting identifying information for the children. I provided details for E.G.G.L. and E.O.B.M. to Defendants' counsel at 1:35 p.m., reiterated our request to meet and confer, and indicated our intention to seek a temporary restraining order to enforce the judgment. That day, our office received additional reports from legal services providers including more concrete information about what the policy might consist of and who would be affected. By the close of business Friday, it began to appear that Defendants are instituting a nationwide policy to violate the final judgment and permanent injunction in this case. Counsel sent information for I.L.F.R. and W.O.B.P. at 5:10 p.m. and reiterated the request to confer. At 6:34 pm government counsel responded that they had no factual updates on any of the individuals, but offered to meet.

18.   At 7:00 p.m., Plaintiffs' and government counsel conferred. Plaintiffs reiterated that they intended to seek court intervention as early as tonight (Friday, October 3) in the absence of written assurances by 10:00 p.m. on October 3, that ICE would not detain any of the individuals or class members through such time as the parties could confer on Monday, October 6—a request that Plaintiffs' counsel confirmed by email following the call. At 10:03 p.m., government counsel indicated that they were able to reach DHS but "d[id] not have an answer at this time" to Plaintiffs' request.

19.   Given the speed with which the facts developed, Plaintiffs' ongoing attempts over the past 24 hours to confirm the facts about whether age-outs would be released this weekend across multiple ORR shelters and ICE field offices throughout the country, and the fact that the

government did not schedule a meet and confer with Plaintiffs' counsel until after business hours, Plaintiffs did not give the Clerk notice of a temporary restraining order pursuant to LCvR 65.1(b) during business hours.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

    Executed on October 3, 2025 at Boston, Massachusetts.

                                                  _____
                                                   Emma Winger