**NITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WILMER GARCIA RAMIREZ, et al.,   ) | |
| ) | Case No. 1:18-cv-00508-RC |
| Plaintiffs,   ) | |
| ) | Class Action |
| v.   ) | |
| ) | |
| U.S. IMMIGRATION AND   ) | |
| CUSTOMS ENFORCEMENT (ICE), et al.,   ) | |
| ) | |
| Defendants.   ) | |
| _____ ) | |

<span style="color:red">**REDACTED**</span>

**MOTION TO ENFORCE THE COURT'S FINAL JUDGMENT AND PERMANENT
INJUNCTION AND INCORPORATED MEMORANDUM OF LAW IN SUPPORT
THEREOF**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ............................................................................................................... 2

    A.   Procedural History ................................................................................................ 2

    B.   Defendants' History of Substantial Compliance ............................................... 3

    C.   The Statutory Scheme Governing Detention of Noncitizens in Immigration
         Proceedings ......................................................................................................... 4

    D.   Defendants Implement a New Policy to Detain Class Members Without Notice to the
         Court or Class Counsel, in Violation of the Permanent Injunction ................................ 6

LEGAL STANDARD ...................................................................................................... 14

ARGUMENT ................................................................................................................... 15

  I.   DEFENDANTS' OCTOBER 1, 2025 CHANGE IN POLICY VIOLATES THE
       COURT'S PERMANENT INJUNCTION. ................................................................ 15

    A.   The Permanent Injunction Requires Meaningful Consideration of the Least Restrictive
         Placement and that All Age-Outs Be Eligible for Alternatives to Detention. .............. 15

    B.   The New October 1 Policy is Inconsistent with the Injunction Because it Displaces the
         Required Statutory Standard. ................................................................................ 17

    C.   In Practice, the New Policy's Implementation Demonstrates Its Inconsistency with the
         Injunction ......................................................................................................... 21

  II.  DEFENDANTS' RE-DETENTION OF CLASS MEMBERS WITHOUT ANY
       MATERIAL CHANGE IN CIRCUMSTANCE VIOLATES THE INJUNCTION ......... 24

CONCLUSION ................................................................................................................ 26

# TABLE OF AUTHORITIES

## Cases

*Aguilar Merino v. Ripa*, 2025 WL 2941609 (S.D. Fla. Oct. 15, 2025).............................................. 5

*Garcia Cortes v. Noem*, 2025 WL 2652880 (D. Colo. Sept. 16, 2025) ........................................ 5

*Guerrero v. Orellana*, 2025 WL 2809996 (D. Mass. Oct. 3, 2025) .............................................. 5

*Heartland Hosp. v. Thompson,* 328 F. Supp. 2d 8 (D.D.C. 2004) ................................................ 14

*Hernandez Marcelo v. Trump*, 2025 WL 2741230 (S.D. Iowa Sept. 10, 2025)............................... 5

*Hernandez Nieves v. Kaiser*, 2025 WL 2533110 (N.D. Cal. Sept. 3, 2025) .................................... 5

*Hutto v. Finney*, 437 U.S. 678 (1978) ........................................................................................ 14

*J.U. v. Maldonado*, 2025 WL 2772765 (E.D.N.Y. Sept. 29, 2025).............................................. 5

*Jennings v. Rodriguez*, 583 U.S. 281 (2018)................................................................................ 4

*Kifafi v. Hilton Hotels Ret. Plan*, 79 F. Supp. 3d 93 (D.D.C. 2015) ............................................ 14

*Kostak v. Trump*, 2025 WL 2472136 (W.D. La. Aug. 27, 2025).................................................. 5

*Lopez-Campos v. Raycroft*, 2025 WL 2496379 (E.D. Mich. Aug. 29, 2025) ................................. 5

*Luna Quispe v. Crawford*, 2025 WL 2783799 (E.D. Va. Sept. 29, 2025)...................................... 5

*Marshall v. Loc. Union No. 639*, 593 F.2d 1297 (D.C. Cir. 1979)............................................... 14

*Matter of Guerra*, 24 I&N Dec. 37 (BIA 2006).......................................................................... 4

*Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998).................................................. 25

*Ochoa Ochoa v. Noem*, 2025 WL 2938779 (N.D. Ill. Oct. 16, 2025)............................................ 5

*Quarles v. United States*, 587 U.S. 645 (2019)............................................................................ 25

*R.D.T.M. v. Wofford*, No. 25-cv-1141, 2025 WL 2686866 (E.D. Cal. Sept. 18, 2025) .................. 4

*\*Ramirez v. U.S. ICE*, 310 F. Supp. 3d 7 (D.D.C. 2018) ............................................................ 2

*\*Ramirez v. U.S. ICE*, 338 F. Supp. 3d 1 (D.D.C. 2018) ........................................................ *passim*

*\*Ramirez v. U.S. ICE*, 471 F. Supp. 3d 88 (D.D.C. 2020) ...................................................... *passim*

*\*Ramirez v. U.S. ICE*, 568 F. Supp. 3d 10 (D.D.C. 2021) ......................................................... 18

*Rodriguez v. Bostock*, --- F. Supp. 3d ---,
    2025 WL 2782499 (W.D. Wash. Sept. 30, 2025)................................................................... 4

*Sec. Indus. Ass'n v. Bd. of Governors of Fed. Rsrv. Sys.*,
    628 F. Supp. 1438 (D.D.C. 1986) ....................................................................... 14, 25

*United States v. New York Tel. Co.*, 434 U.S. 159 (1977) ........................................................... 25

*WildEarth Guardians v. Bernhardt*, No. CV 16-1724 (RC),

    2019 WL 3253685 (D.D.C. July 19, 2019) ........................................................................ 14

*Zumba v. Bondi*, 2025 WL 2753496 (D.N.J. Sept. 26, 2025) ........................................................ 5

**Statutes**

5 U.S.C. § 706(1) ................................................................................................................... 3

5 U.S.C. § 706(2) ................................................................................................................... 3

8 U.S.C. § 1182(d)(5) .................................................................................................... *passim*

8 U.S.C. § 1225 ......................................................................................................................

8 U.S.C. § 1225(b)(2)(A) .................................................................................................. 4, 5, 6

8 U.S.C. § 1226(a) ....................................................................................................... 4, 5, 6, 16, 20

8 U.S.C. § 1226(a)(2)(A) ......................................................................................................... 4

8 U.S.C. § 1226(a)(2)(B) ......................................................................................................... 4

**Regulations**

8 C.F.R. § 1236.1(d)(1) ........................................................................................................... 4

8 C.F.R. § 236.1(c)(8) ............................................................................................................. 4

8 C.F.R. § 236.1(d)(1) ............................................................................................................. 4

**Other Authorities**

Congressional Research Service, *Unaccompanied Alien Children: An Overview* 1 (Sept. 4,

    2024), https://tinyurl.com/mrx9jm3h ................................................................................ 12

ICE, FY2025 ICE Statistics, https://tinyurl.com/47rypnft (last updated Sept. 25, 2025) .............. 6

Memo from Todd Lyons to All ICE Employees, "Interim Guidance," July 8, 2025, available at

    https://tinyurl.com/mrxpvc9w ........................................................................................... 5, 11

## INTRODUCTION

On October 1, 2025, without notice to the Court or class counsel, Defendants began implementing a new and unlawful policy to detain children aging out of the custody of the Office of Refugee Resettlement (ORR). This new policy led to the detention of numerous teenagers on their eighteenth birthdays, despite prior determinations under the correct statutory standard that they should be released. And even before October 1, Defendants had begun implementing a policy of unlawfully arresting and re-detaining age-out teenagers when they attended their scheduled ICE check-ins—despite a lack of materially changed circumstances. Defendants' policy and actions are in flagrant violation of this Court's September 21, 2021 final judgment, which permanently enjoined Defendants from violating 8 U.S.C. § 1232(c)(2)(B) by failing to "consider placement of each age-out in the least restrictive setting available" and failing to "make each age-out 'eligible for participation' in certain programs regardless of the age-out's danger to self, danger to community, or risk of flight." *Ramirez v. U.S. ICE*, 471 F. Supp. 3d 88, 175 (D.D.C. 2020); *judgment entered*, 568 F. Supp. 3d 10 (D.D.C. 2021).

In light of Defendants' violation of this Court's injunction and the resulting harm to class members, Plaintiffs hereby move the Court to exercise its continuing jurisdiction to (a) enjoin Defendants from implementing the October 1, 2025 policy regarding the detention of age-outs; (b) enjoin Defendants from detaining any age-outs in any manner that contravenes the Permanent Injunction, including those initially released from ORR custody, absent a material change in their circumstances; (c) order Defendants to immediately rescind any determinations to detain based on the October 1 guidance; (d) order Defendants to release all class members who have been re-detained absent materially changed circumstances, including A.T.L., F.L.P., A.D., J.D.F.V., C.M.S.D., J.N.B.S., and C.G.P.C., subject to any alternatives to detention imposed upon their

1

initial release from ORR custody; and (e) order that Defendants produce information on an ongoing basis about any age-outs who have been arrested and re-detained since July 2025 because of Defendants' change in policy.

In support of this motion, Plaintiffs rely on the incorporated memorandum of law and accompanying declarations and exhibits, as well as the declarations and exhibits attached to the concurrently filed Sealed Motion to Unseal ECF 415 and For Leave to File Unredacted Motion to Enforce Under Provisional Seal and Other Exhibits Under Seal. A proposed order is attached.

## BACKGROUND

### A. Procedural History

Plaintiffs filed this lawsuit in March 2018, challenging Immigration and Customs Enforcement's (ICE) failure to follow the Trafficking Victims Protection Reauthorization Act (TVPRA), which requires ICE to consider placement in the least restrictive setting available for 18-year-olds "aging out" of the custody of ORR. *See* ECF 1. At the time Plaintiffs filed this case, ICE was detaining 75 percent of age-outs nationally. ECF 260-1 at 33. The Court issued a preliminary injunction in April 2018, *Ramirez v. U.S. ICE*, 310 F. Supp. 3d 7 (D.D.C. 2018), and in August 2018 certified the following class:

> *All* former unaccompanied alien children who are detained or will be detained by ICE after being transferred by ORR because they have turned 18 years of age and as to whom ICE did not consider placement in the least restrictive setting available, including alternatives to detention programs, as required by 8 U.S.C. § 1232(c)(2)(B).

*Ramirez v. U.S. ICE*, 338 F. Supp. 3d 1, 50 (D.D.C. 2018) (emphasis added).

Following an eighteen-day bench trial that included 39 witnesses and 486 exhibits, the Court issued a judgment in favor of the Plaintiff Class. *Ramirez*, 471 F. Supp. 3d 88. After detailing extensive findings of fact and conclusions of law, the Court held that ICE had failed to

meet the requirements of 8 U.S.C. § 1232(c)(2)(B) and that such failures violated the Administrative Procedure Act (APA). *Id.* at 191; 5 U.S.C.§ 706(1)–(2). Specifically, ICE failed to consider the "least restrictive setting available" for each teenager aging out of ORR custody, identify alternative placements, and make each teenager eligible for alternatives to detention. *Ramirez*, 471 F. Supp. 3d at 191; *see also* § 1232(c)(2)(B). As a remedy, the Court granted a permanent injunction on September 21, 2021 along with specific enforcement mechanisms that remain in effect for five years. ECF 368.

### B. Defendants' History of Substantial Compliance

For the past four years, Defendants have substantially complied with the Court's order, consistently releasing over 98 percent of all unaccompanied children rather than detaining them in ICE custody. Exhs. A, B.[1] This results from ICE having determined that the vast majority of such young people present no flight risk or danger and for those that did raise concerns, they could be mitigated by various alternatives to detention. *See* Supp. Decl. of Emma Winger ¶ 3. Of the 695 young people who turned 18 while in ORR custody from January 2025 through September 2025, ICE only detained nine for posing either a flight risk or a danger that could not be addressed by alternatives to detention. *Id.* ICE released two teenagers on ICE orders of supervision.[2] Exh. A. All of the remaining 684 youth were released on orders of recognizance (some with alternatives to detention, but the vast majority without). *Id*. None of the nearly 700 18-year-olds were released on parole. *Id*.

---

[1] Although Defendants designated Exhibit B confidential under the Protective Order, *see* ECF 63, Defendants consented to its filing on the public docket.

[2] An order of supervision is the form of release available to noncitizens who have final removal orders but have not yet been removed. *See Ramirez*, 471 F. Supp. 3d at 104; 8 U.S.C. § 1231(a)(3); 8 C.F.R. § 241.5.

### C. The Statutory Scheme Governing Detention of Noncitizens in Immigration Proceedings

Various statutory provisions authorize the detention of noncitizens during immigration proceedings. *See Jennings v. Rodriguez*, 583 U.S. 281, 286-89 (2018). The custody of unaccompanied children is governed by 8 U.S.C. § 1232(c). *See R.D.T.M. v. Wofford*, No. 25-cv-1141, 2025 WL 2686866, at *4 (E.D. Cal. Sept. 18, 2025).

Sections 1225 and 1226 otherwise govern the detention of noncitizens in removal proceedings. For decades, Defendants have treated individuals who entered the United States without inspection as subject to discretionary detention under 8 U.S.C. § 1226(a). *See Rodriguez v. Bostock*, --- F. Supp. 3d ---, 2025 WL 2782499, at *24–26 (W.D. Wash. Sept. 30, 2025) (describing this "longstanding agency practice"). DHS has discretion to release noncitizens detained under § 1226(a) on bond (an "ICE Bond"), § 1226(a)(2)(A), or without bond on "conditional parole" (also known as "release on recognizance"), § 1226(a)(2)(B). To determine whether to release a person on recognizance or an ICE bond, the agency considers whether the noncitizen poses a danger or a flight risk. 8 C.F.R. § 236.1(c)(8). Section 1226(a) also affords noncitizens a bond hearing before an immigration judge while their removal proceedings are pending, at which the judge considers flight risk and danger. 8 C.F.R. §§ 236.1(d)(1), 1236.1(d)(1); *see also Jennings*, 583 U.S. at 306; *Matter of Guerra*, 24 I&N Dec. 37 (BIA 2006). Conversely, detention under 8 U.S.C. § 1225(b)(2)(A), which applies to certain "applicants for admission" who are "seeking admission," is often considered "mandatory detention" as it requires that noncitizens be held without the opportunity for bond or release on recognizance. *See Jennings*, 583 U.S. at 302. Instead, the only statutory avenue for release from detention under § 1225(b) is "humanitarian parole" (or, simply, "parole") under 8 U.S.C. § 1182(d)(5),

which is granted at DHS' discretion "on a case-by-case basis for urgent humanitarian reasons or

significant public benefit." *See id.* at 288.

Federal immigration agencies have recently reversed their long-settled interpretation of

§§ 1226 and 1225, concluding that § 1226 only applies to noncitizens who were previously

admitted to the United States, with § 1225(b) mandating detention for all noncitizens who are

present without having been admitted, absent parole under § 1182(d)(5). *See* Memo from Todd

Lyons to All ICE Employees, "Interim Guidance," July 8, 2025, available at

https://tinyurl.com/mrxpvc9w (hereinafter "Lyons Memo"); *Matter Yajure Hurtado*, 29 I&N

Dec. 216 (BIA 2025) (agreeing that § 1225(b)(2)(A) subjects all noncitizens who entered without

inspection to mandatory detention). This novel construction of the INA's adult detention

provisions has been almost universally rejected by scores of federal district courts across

multiple circuits.[3]

Defendants have also dramatically reduced the availability of release on parole under 8

U.S.C. § 1182(d)(5). Since January, the number of noncitizens granted parole has plummeted.

Publicly available DHS data show that grants fell to just 75 releases per month for the last seven

months ending September 30, despite a 50 percent increase in the number of people in DHS

custody. Decl. of Rebekah Wolf, ¶¶ 8–9. When compared to the average daily population of

people in DHS custody, the average number of people released on parole per month dropped

---

[3] *See, e.g.*, *Guerrero v. Orellana*, 2025 WL 2809996 (D. Mass. Oct. 3, 2025); *J.U. v. Maldonado*, 2025 WL 2772765 (E.D.N.Y. Sept. 29, 2025); *Zumba v. Bondi*, 2025 WL 2753496 (D.N.J. Sept. 26, 2025); *Luna Quispe v. Crawford*, 2025 WL 2783799 (E.D. Va. Sept. 29, 2025); *Kostak v. Trump*, 2025 WL 2472136 (W.D. La. Aug. 27, 2025); *Lopez-Campos v. Raycroft*, 2025 WL 2496379 (E.D. Mich. Aug. 29, 2025); *Ochoa Ochoa v. Noem*, 2025 WL 2938779 (N.D. Ill. Oct. 16, 2025); *Hernandez Marcelo v. Trump*, 2025 WL 2741230 (S.D. Iowa Sept. 10, 2025); *Hernandez Nieves v. Kaiser*, 2025 WL 2533110 (N.D. Cal. Sept. 3, 2025); *Garcia Cortes v. Noem*, 2025 WL 2652880 (D. Colo. Sept. 16, 2025); *Aguilar Merino v. Ripa*, 2025 WL 2941609 (S.D. Fla. Oct. 15, 2025).

from 12.4% (October 2024-January 2025) to 0.13% (March-September 2025). *Id.* ¶ 8; *see also* ICE, FY2025 ICE Statistics, https://tinyurl.com/47rypnft (last updated Sept. 25, 2025).

The government's new positions have resulted in the mandatory detention of many thousands of noncitizens who, just a few months ago, would have had the opportunity to be released and pursue their immigration proceedings while at liberty.

In this case, the Court held that the protections of the TVPRA apply to all age-outs regardless of any other statutory detention authority Defendants might assert. *Ramirez*, 338 F. Supp. 3d at 28.[4] Defendants now attempt to significantly narrow those protections, seven years after the Court denied their motion to dismiss and four years after a final judgment was entered in this case, asserting that the only avenue for release available for all age-outs is parole under § 1182(d)(5).

### D. Defendants Implement a New Policy to Detain Class Members Without Notice to the Court or Class Counsel, in Violation of the Permanent Injunction

In July 2025, ICE began re-detaining a number of age-out teenagers when they dutifully appeared for their first ICE check-ins. These check-ins—scheduled upon their release from ORR custody—occurred mere weeks after ICE had determined that the age-outs presented neither a danger nor a flight risk and released them to sponsors, and without any apparent change in circumstances to justify their re-detention. Supp. Winger Decl., ¶¶ 4–20.

---

[4] Moreover, Defendants have long taken the position that age-outs who cross between ports of entry fall under § 1226(a), not § 1225(b)(2)(A). Plaintiffs Wilmer Garcia Ramirez and Sulma Hernandez Alfaro both entered without inspection, and Defendants argued that their only authority for release was § 1226(a). *See* ECF 36 at 15 ("[I]n Wilmer and Sulma's cases, only the IJ and BIA have jurisdiction to review ICE's custody determinations under 1226(a)."); 25 ("Sulma and Wilmer would be detained under 8 U.S.C. § 1226(a) . . . ."). In moving to dismiss, Defendants argued that the availability of bond under § 1226(a) mooted Plaintiffs' claims, provided another adequate remedy at law, and was unreviewable, never contesting the applicability of § 1226(a) to age-outs. *See id.* at 36; 42-43; 47-49.

Consistent with ICE's re-detention of age-outs beginning in July, on October 1, ICE headquarters issued "new Interim guidance" impacting age-out determinations. According to an email sent by one ICE Field Office Juvenile Coordinator (FOJC) in El Paso, Texas, to the lead case manager at an ORR shelter:

> On 10/01/2025, the El Paso Field Office received new Interim guidance from HQ on Age-Out Custody Determinations. Regarding Detention Authority for "Applicants for Admission", effective immediately it is the position of DHS that such aliens are subject to detention under INA § 235(b) and may not be released from ICE custody except by INA § 212(d)(5) parole. Parole may be granted on a case-by-case basis for "urgent humanitarian reasons" or "significant public benefit."

> ELP FOJC will continue to carefully evaluate UAC cases when making custody determinations. Once a custody determination is made and DHS/ICE decides to continue detention the Age Outs will be served an I-200 (Warrant of Arrest), camp space will be approved in one of our adult facilities, and transportation arrangements will be made by ELP FOJC for the day of Age Out. **Due to the new Age Out interim Guidance any upcoming Age Outs will remain in custody to continue their removal proceedings.**

ECF 413-1 ¶ 33 & p. 22 (emphasis added). A case manager at a different shelter in El Paso also received an almost identical email from an ICE FOJC. *See id.* ¶¶ 13, 31 & p. 18. Similarly, a FOJC in Pennsylvania told a case manager at an ORR shelter by phone on October 3 that "post-18 plans would no longer be honored and that all unaccompanied minors with approved post-18 plans would be instead placed into adult detention." ECF 413-2 ¶¶ 5, 14, 22, 30. Likewise, on the morning of October 3, an FOJC told a case manager in Florida "that the current administration has ordered [FOJCs] to detain all age outs moving forward." ECF 413-3 ¶¶ 3-5 & p. 2.

On October 2 and 3, Plaintiffs' counsel received reports of several children in ORR custody turning 18 in the following days whose planned release ICE abruptly canceled based on its new policy. Each child had a written post-18 release plan concluding that they posed no flight risk or danger to themselves or others, and identifying a sponsor, program, or facility as the least restrictive setting available. ECF 413-1 ¶¶ 8–10 (child E.G.G.L., who turned 18 on October 4),

¶¶ 15–17 (child E.O.B.M., who turned 18 on October 9), ¶¶ 23–25 (child I.L.F.R., who turned 18 on October 4), ¶¶ 29–30 (child W.O.B.P, who turned 18 on October 5); ECF 413-2 ¶¶ 8-13 (child M.E.R.V., who turned 18 on October 4), ¶¶ 16-21 (child R.I.Y.C., who turned 18 on October 7), ¶¶ 24-29 (child G.T.X, who turned 18 on October 9); *see* Supp. Decl. of John Barry ¶ 3 (child C.H.V., who turned 18 on October 4). In many of these cases, ICE had already approved release on recognizance to an individual or organizational sponsor as the appropriate least restrictive placement. ECF 413-1 ¶¶ 20–21 & p.10–16; ECF 413-2 ¶¶ 13, 21, 29; Supp. Barry Decl. ¶ 3. In E.O.B.M.'s case, ICE had even already given him an order of release of recognizance listing his future release date. ECF 413-1 ¶¶ 20–21 & p. 10–16.

These reports came from legal service providers for the children described above who had learned that ICE had either changed its prior decision to release them on an order of recognizance (OREC) or decided not to allow their release in the first instance. ECF 413-1 ¶¶ 12 (E.G.G.L. denied OREC), 22 (hours after child was served OREC, counsel for E.O.B.M. told that he would instead be detained upon aging out based on a "new directive"), 27 (I.L.F.R. denied OREC), 31 (W.O.B.P. denied OREC); ECF 413-2 ¶¶ 14 (M.E.R.V. approval of OREC rescinded), 22 (R.I.Y.C. approval of OREC rescinded), 30 (G.T.X. approval of OREC rescinded); Supp. Barry Decl. ¶ 3 (C.H.V. approval of OREC rescinded). In six of the eight cases, the child's counsel received confirmation that an ICE FOJC had communicated either in writing (E.G.G.L., E.O.B.M., and W.O.B.P.), or on the phone (M.E.R.V., R.I.Y.C., and G.T.X.) that the decision to transfer to ICE custody was based on a new policy to detain all unaccompanied children when they turn 18, regardless of flight risk, danger, or the availability of a less restrictive setting.

*October 4, 2025 Temporary Restraining Order*

Upon Plaintiffs' counsel's request, counsel for both parties met and conferred on October 3. In advance, Plaintiffs' counsel provided details for E.G.G.L., E.O.B.M., I.L.F.R. and W.O.B.P. to Defendants' counsel, as children who were on the cusp of aging out and being improperly detained by ICE. Plaintiffs' counsel raised the apparent violations of the permanent injunction and indicated they intended to seek court intervention. Supp. Winger Decl. ¶¶ 22-24. After the conferral, Plaintiffs' counsel received notice on the evening of October 3 that counsel for two children aging out on October 4—E.G.G.L. and I.L.F.R.—had been told that despite ICE's prior decision to detain them, ICE had changed its decision and instead intended to release the children on parole. ECF 413-1 ¶¶ 14, 28.

In light of the imminent detention of class members, Plaintiffs' counsel filed a motion for a temporary restraining order on October 4, 2025. ECF 413. Later that day, this Court held a hearing on the motion. During the hearing, Plaintiffs' counsel provided updates regarding ICE's actions in the cases of children aging out of ORR custody that day, including that: 1) ICE had taken M.E.R.V. into custody earlier that morning, despite having been approved by a FOJC for release the prior day; 2) a teenager in Florida who had been approved by a FOJC for release the prior day was now scheduled to be detained by ICE that morning; and 3) ICE had changed its position on W.O.B.P., indicating early that morning it would grant him parole instead of detaining him. *See* Supp. Decl. of Marcy Hilty Decl. ¶¶ 5-20 (M.E.R.V.); Supp. Barry Decl. ¶¶ 3-4 (Florida case)**.**

At the hearing, Defendants' counsel acknowledged the existence of new ICE guidance on custody determinations for children aging out of ORR custody. Counsel noted that policy involved ICE applying § 1225(b) to its fullest extent and that there was no exception in that

statute for unaccompanied children, such that the only alternative to detention available for them is parole.

Immediately following the hearing, this Court granted the motion, issuing an order that enjoined Defendants from implementing any new directive regarding age-outs and detaining any class member in an adult ICE facility in any manner that contravenes the Permanent Injunction; required them to immediately rescind any detention decisions based on the new directive; and required them to produce the directive, any related policies, and the Age-Out Release Worksheets (AORW) of any class members who may have been impacted by that directive. ECF 414.

After the hearing, Plaintiffs' counsel also provided Defendants' counsel with the information for C.H.V., the teenager in Florida mentioned at the hearing, and for A.G.A., a youth apparently detained under the new policy in Arizona on October 2, 2025. *See* Supp. Winger Decl. ¶ 25.

### October 1 Guidance

After this Court ordered them to do so, Defendants' counsel filed the new ICE guidance about custody determinations under seal and provided Plaintiffs' counsel with a redacted copy on October 4, 2025. ECF 415. The document consists of a ███████████████████ ████████████████████████████████████████████████ , *id.* at 2, ████████████████████████ ███████████████████████████████████████ *id.* at 1. It instructs ████████ ██████████████████████████████████████████████████ ███████████████████████ *Id.* at 1.

First, the guidance states that ███████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████." *Id.*

Second, the guidance addresses "███████████████████████████████████."

*Id.* It instructs that if a ███████████████████████████████████

█████████████████████████████████ a ███████████████████████

████████████████████████████████ *Id.*[5] The October 1

guidance notes that "████████████████████████████████████████

████████████████████████████████████████████████████████████

███████" *Id.* The email ████████████████████████████." The guidance states that

█████████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████." *Id.* ████████████████

██████████████████████████████████████████████." *Id.*

Third, the guidance discusses "█████████████████████████████

███████████████████████ ███ █████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████." *Id.*

The October 1 policy, if permitted to go into effect, would impact virtually all class members. *See* Congressional Research Service, *Unaccompanied Alien Children: An Overview* 1 (Sept. 4, 2024), https://tinyurl.com/mrx9jm3h (observing that "[m]ost unaccompanied children are apprehended between U.S. ports of entry along the southwest border").

***Impacted Class Members***

ICE detained at least five class members under the October 1, 2025 guidance, in violation of the Final Judgment and Permanent Injunction. These include: **A.G.A**., detained on October 2; **C.H.V**. and **M.E.R.V**., detained on October 4; and **R.R.A.C**. and **S.H.G**., detained on October 1, whom Plaintiffs' counsel learned of from Defendants' counsel.[6] Supp. Winger Decl. ¶ 25. All five had been assessed to not pose a danger to themselves or others, and to not pose a risk of flight, such that release on recognizance to identified sponsors was appropriate. Exhs. J–O. And yet, ICE arrested and detained these youth on their eighteenth birthdays and only released them following this Court's order on October 4.[7]

As of October 24, class counsel had identified at least eight class members who have been arrested by ICE since July 2025 at their first check-ins or, in one case, shortly after, without any material change in their circumstances. Supp. Winger Decl. ¶¶ 4-20. Class counsel have

---

[6] On October 6, Defendants' counsel notified Plaintiffs' counsel that two additional youths—R.R.A.C. and S.H.G.—had been impacted by the new guidance and had since been released by ICE. Supp. Winger Decl. ¶ 25. Their AORWs indicate that they turned 18 on October 1, 2025. Exhs. J, K.

[7] After the hearing on October 4, Defendants' counsel informed Plaintiffs' counsel that ICE would be releasing M.E.R.V. that day. However, when M.E.R.V.'s counsel attempted to ask the ICE agent detaining and transporting M.E.R.V. where he was being taken, the ICE agent refused to answer; ICE failed to provide any information directly to his counsel despite proof of representation until shortly before he was released on the evening of October 4, ten hours after he had been detained. Supp. Hilty Decl. ¶¶ 18-29. On October 5, Defendants' counsel informed Plaintiffs' counsel that ICE had released C.H.V. and A.G.A. from its custody. Supp. Winger Decl. ¶ 25.

identified one other young person released in September and now in detention, but have not yet

been able to confirm the circumstances of his arrest. *Id.* ¶ 17, 19. Class counsel has provided the

following information to Defendants, who provided the following explanations for the arrests of

five of these class members:

- ICE released **A.T.L.** to a sponsor on August 7, Exh. C, and arrested him at his first check-in two weeks later, on August 21. Defendants confirmed that A.T.L. reported to ICE as required and was purportedly taken into custody because he "stated that he was homeless and all he wanted to do was to go home because he did not have any relatives to help him." Supp. Winger Decl. Exh. 2. A.T.L. disputes this account and asserts that he did not request to be deported. Supp. Winger Decl. ¶ 12. In fact, A.T.L. had an interview on his pending asylum application on October 23. *Id.*

- ICE released **F.L.P.** to a sponsor on July 3, Exh. D, and arrested him when he appeared for his first check-in on July 22, less than three weeks later. Defendants confirmed that F.L.P. reported as required and "was taken into custody based on current detention guidance from the field office." Supp. Winger Decl. Exh. 2.

- ICE released **A.D**. to an organizational sponsor on June 19, Exh. E, and detained him on July 16 at his first check-in. Defendants confirmed that A.D. reported as required and "was taken into custody accordance with [ERO San Antonio's] local guidance on custody redetermination." Supp. Winger Decl. Exh. 2.

- ICE released **J.D.F.V.** to a sponsor on June 7, Exh. F, and detained him on July 8 at his first check-in. Defendants confirmed that J.D.F.V. reported as required and referenced his December 2024 juvenile conviction. Supp. Winger Decl. Exh. 2. J.D.F.V.'s AORW confirms that ICE considered this misdemeanor conviction and determined that the offense did not make him a flight risk or a danger, such that even alternatives to detention were not necessary. *See* Exh. F.

- ICE released **C.M.S.D**. to a sponsor on May 30, Exh. G. She appeared for her first ICE check-in on June 30 and was scheduled for a follow-up check-in in November or December 2025. ICE arrested her while she was a passenger in a car with her siblings. Defendants did not dispute that C.M.S.D. had appeared at her check-in as required and stated that she was arrested because she was a passenger in a vehicle operated by the target of an ICE Fugitive Operations Team. Supp. Winger Decl. Exh. 2.

Class counsel demanded the release of all five of the above class members who were

detained without any relevant change in circumstances. *Id.* Defendants continue to hold these

young people in adult ICE detention.

In addition, ICE released **J.N.B.S**. to a sponsor on September 21 and detained him at his first check-in on October 20. *See* Supp. Winger Decl. ¶ 16; Exh. H. ICE released **C.G.P.C.** on September 23 and detained him at his first check-in on October 22. *See* Supp. Winger Decl. ¶ 19; Exh. P. ICE released **J.A.M.S**. on September 9 and he is now once again in ICE custody—class counsel has not yet learned the circumstances of his arrest. *See* Supp. Winger Decl. ¶ 17; Exh. I. Defendants have not yet provided information about the arrests of these three young people despite Plaintiffs' counsel's inquiries. Supp. Winger Decl. ¶ 19.

## LEGAL STANDARD

"[F]ederal courts are not reduced to issuing injunctions . . . and hoping for compliance." *Hutto v. Finney*, 437 U.S. 678, 690 (1978). "The power of a federal court to protect and enforce its judgments is unquestioned." *Marshall v. Loc. Union No. 639*, 593 F.2d 1297, 1302 (D.C. Cir. 1979). As such, courts "necessarily have the power to enter 'such orders as may be necessary to enforce and effectuate their lawful orders and judgments, and to prevent them from being thwarted and interfered with by force, guile, or otherwise.'" *Sec. Indus. Ass'n v. Bd. of Governors of Fed. Rsrv. Sys.*, 628 F. Supp. 1438, 1441 (D.D.C. 1986) (citation omitted); *see also Kifafi v. Hilton Hotels Ret. Plan*, 79 F. Supp. 3d 93, 100 (D.D.C. 2015). A district court should grant a motion to enforce the terms of its mandate when "a prevailing plaintiff demonstrates that a defendant has not complied with a judgment entered against it." *WildEarth Guardians v. Bernhardt*, No. CV 16-1724 (RC), 2019 WL 3253685, at *3 (D.D.C. July 19, 2019) (quoting *Heartland Hosp. v. Thompson,* 328 F. Supp. 2d 8, 11 (D.D.C. 2004), which notes that a motion to enforce is especially appropriate "in cases of willful or deliberate violation of a court order.").

## ARGUMENT

## I.    DEFENDANTS' OCTOBER 1, 2025 CHANGE IN POLICY VIOLATES THE COURT'S PERMANENT INJUNCTION.

### A.    The Permanent Injunction Requires Meaningful Consideration of the Least Restrictive Placement and that All Age-Outs Be Eligible for Alternatives to Detention.

The Court held that the TVPRA requires ICE to do "three things and implicitly requires a fourth" to determine a placement for a teenager aging out of ORR custody. *Ramirez*, 471 F. Supp. 3d at 181. First, ICE officers must evaluate the statutory risk factors in § 1232(c)(2)(B)—"danger to self, danger to community, and risk of flight." *Id.* They must then identify the least restrictive setting available for a particular teenager, which "implicitly requires that officers be aware of what settings are available, and that they take affirmative steps to identify available settings when they are not self-evident." *Id.* at 182. Finally, they must "make a variety of detention alternatives available for age-outs." *Id.*

To remedy ICE's systemic failure to comply with § 1232(c)(2)(B), the Court mandated several actions. *See* ECF 368. The injunction requires ICE officers to document their decisions on the AORW and utilize a nationwide list of shelters when an age-out cannot be released to an individual sponsor. *Id.* at 3–4. The injunction further mandates training using agreed-upon materials that emphasize: (1) that "FOJCs should <u>not</u> make custody decisions for Age-Outs in the same way that custody decisions are made for adults" *See* ICE PowerPoint Training, ECF 346-1 at 12; 2) that "FOJCs must take affirmative steps to identify and consider available individual and organizational sponsors and shelters for the Age-Out" *id.* at 15; and (3) where release to a sponsor alone does not mitigate flight risk, "alternatives to detention MUST BE CONSIDERED," including release on bond or enrollment in ICE's Alternative to Detention program, *id.* at 36, 38; *see also* ICE, Guidance on Age-Out Custody Determination Process, ECF

340-4 ("Remember ALL Age-Outs are eligible for release on ICE Bond" and ATD). In sum, the injunction requires ICE to comply with the TVPRA by making custody determinations after considering the statutory factors at § 1232(c)(2)(B) and affirmatively considering a variety of placements; this process is distinct from ICE's general detention procedure for adults under 8 U.S.C. §§ 1225 and 1226.

Additionally, in the course of the litigation, this Court considered, and rejected, ICE's position that 8 U.S.C. § 1225(b) provides an exception to the protections in § 1232(c)(2)(B). In their motion to dismiss, Defendants argued that Plaintiff Ana, who arrived in the United States at a port of entry (but not Wilmer or Sulma, who entered without inspection) was subject to mandatory detention under § 1225(b) and therefore not entitled to consideration under the TVPRA. ECF 36 at 20-22. In rejecting this argument, the Court explained:

> Nothing in the text or context supports Defendants' argument that only a subset of former unaccompanied minors who were transferred to DHS custody are entitled to consideration under 8 U.S.C. § 1232(c)(2)(B). For starters, the plain text of the statute reveals no such limitation. Under the statutory provision, "[i]f a minor described in subparagraph (A) reaches 18 years of age and is transferred to the custody of the Secretary of Homeland Security, the Secretary *shall* consider placement in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight." 8 U.S.C. § 1232(c)(2)(B). Furthermore, "[s]uch aliens shall be eligible to participate in alternative to detention programs." *Id.* The only conditions for entitlement to "consider[ation]" are described in the first clause. When an individual meets these conditions—that is, when an individual is "a minor described in subparagraph (A)" who, upon turning 18, was transferred to DHS custody—the statute imposes on the Secretary of DHS a nondiscretionary duty to "consider" the least restrictive placement available for that individual. Thus, per the plain language of the provision, all who meet those conditions—regardless of the agency's flight risk or dangerousness determinations and irrespective of the provision under which the individual has been detained—are entitled to consideration. Full stop.

*Ramirez*, 338 F. Supp. 3d at 28.

The Court further observed that "Ana *was* in fact considered for placement in a less restrictive setting" and would have been released to a sponsor had ORR identified a suitable one.

*See id.* at 29 n.7 (citing ECF 31-2). The Court consequently concluded that, regardless of the underlying detention authority, all age-outs can and should be considered for the least restrictive placement available and made eligible for alternatives to detention. *Ramirez*, 338 F. Supp. 3d at 28. This Court's Final Judgment and Permanent Injunction plainly covers *all* unaccompanied children aging out of ORR custody, without exception. ECF 368 at 1–2.

### B. The New October 1 Policy is Inconsistent with the Injunction Because it Displaces the Required Statutory Standard.

Defendants' new policy for custody determinations for age-outs violates this Court's Final Judgment and Permanent Injunction, and the clear instructions of § 1232(c)(2)(B). It imposes an entirely distinct standard for release—one applicable only to certain adult noncitizens in detention—on ICE's decision-making process for age-outs. *Cf.* ECF 346-1 at 12; ECF 340-4. The guidance functionally nullifies the TVPRA's requirement that class members be considered for the least restrictive placement. It further invalidates the statutory standard of consideration of danger to self and the community, risk of flight, and eligibility for alternatives to detention. *See Ramirez*, 471 F. Supp. at 175. Instead, the October 1 policy requires that class members be detained under § 1225(b) and "███████████" if they meet the parole standard under § 1182(d)(5). ECF 415 at 1. Thus, ███████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████ *Id.*

Under this new regimen, ███████████████████████████████

██████████████████████████████████████████

██████████████████████████████████." *Id.*;

§ 1182(d)(5)(A) (listing the standard and providing that parole is temporary such that "when the

purposes of such parole shall [] have been served the [noncitizen] shall forthwith return or be returned to the custody from which he was paroled"). But § 1232(c)(2)(B) neither incorporates § 1182(d)(5) nor allows for such a heightened, temporally-limited and discretionary pathway for release from custody. Instead, as this Court found, all age-outs "shall" be eligible for "a continuum of alternatives to detention" based on the noncitizen's "need for supervision"—not based on whether their release presents humanitarian reasons or public benefit. 471 F. Supp. at 175 (quoting § 1232(c)(2)(B)). And ICE simply does "not have discretion to decline to take those factors into account." *Id.* at 186; *accord Ramirez v. U.S. ICE*, 568 F. Supp. 3d 10, 24 (D.D.C. 2021).

Defendants' unsuccessful attempt to frame the October 1 policy as technically in compliance with this Court's injunction underscores its illegality. ███████████████ ████████████████████████████████████████████████████. ECF 415 at 1. But, under the new guidance and in contravention of § 1232(c)(2)(B) and the permanent injunction, ████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ████████████████. *See id.* ██████████████████████████ ████████████████████████████████████████. 471 F. Supp. 3d at 186. Defendants' approach in the October 1 guidance, however, █████████████ ████████████████████████████████████████ to meet their statutory obligations. *See, e.g., id.* at 105-106, 142, 185 & n.49; *see also Ramirez*, 568 F. Supp. 3d at 26 ("ICE responded [to the preliminary injunction] only by developing a new 'AORW' documentation system, not by reexamining the substance of its actual decision-making process.

But . . . it is ICE's decision-making processes that are the problem, not just its officers' documentation of their decisions.") (internal citations omitted).

███████████████████████████████████████████████████████

████████████████████████). ECF 415 at 1. ████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████." *Id.* In other words, this decision-making process renders the consideration of enumerated factors under § 1232(c)(2)(B) entirely inconsequential.[8] While the process concludes that where "████████████████████████████████

████████████████████████████████," *id.*, █████████████████

███████████████ Crucially, ███████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████ In essence, ████████████████████████████████████," akin to the decision-making process this Court has already rejected—███████████████

██████████████████████████████████████████████████████████.

*See Ramirez*, 471 F. Supp. 2d at 126, 128, 175-76 (rejecting ICE's practice of considering the least restrictive placement and alternatives to detention *only* for those class members who were not considered a flight risk or danger); *Ramirez*, 338 F. Supp. 3d at 28-29 (same).

At the very minimum, it is plain under this Court's injunction that the October 1 policy cannot be applied to class members like Wilmer and Sulma who entered the United States

---

[8] ████████████████████████████████████████████████████ are the cases of unaccompanied children whom ICE determines should be placed in adult detention based on the § 1232(c)(2)(B) factors–approximately one to two percent of age-outs during the last four years. *See* Section B, *supra*.

without inspection. Throughout this entire litigation, Defendants maintained that these class members are eligible for the full range of release mechanisms that would be available under § 1226(a)(1). *See, e.g.*, ECF 31 at 8 ("ICE took Wilmer into custody under 8 U.S.C. § 1226(a)(1), which authorizes ICE to detain an [sic] noncitizen in removal proceedings. Under 8 U.S.C. § 1226(a)(2), ICE may release the noncitizen detained under 1226(a)(1) on bond or conditional parole."); *id.* at 10 (same for Sulma); ECF 36 at 21-22 (discussing Defendants' discretionary authority under § 1226). Defendants invoked their discretionary detention authority under § 1226 in their motion to dismiss and claimed that Plaintiffs' eligibility for a bond hearing before an immigration judge was an adequate alternative remedy sufficient to defeat their APA claim. ECF 36 at 26-27, 47-49.

At trial, Defendants presented witnesses and evidence showing that all age-outs are eligible for release on recognizance, orders of supervision, release to both an individual and an organizational sponsor, bond, conditional parole, and a range of alternatives to detention—contrary to their current position that the only mechanism for release is § 1182(d)(5) parole. *See* 471 F. Supp. 3d at 103-04 (citing testimony of, *inter alia*, Mellissa Harper, Linda Hyde, and Eric Carbonneau).

As a result, the Court entered findings of fact that all age-outs are eligible for the full range of placement alternatives. *See id.* And the Court entered conclusions of law that Defendants erred when they failed to make age-outs eligible for these alternatives to detention and failed to consider the least restrictive placement within these alternatives. *See id.* at 175 (holding it "contrary to the statute for ICE to engage in what Plaintiffs have called 'sequential decisionmaking,'" and failing to consider alternatives to detention for a subset of class members). Finally, the Court permanently enjoined Defendants from doing so. ECF 368 at 2. To

enforce that injunction, the Court required Defendants to train FOJCs using agreed-upon training materials, ECF 368 at 4-5, which instruct that "alternatives to detention MUST BE CONSIDERED," including release on bond or enrollment in ICE's alternatives to detention. *See* ECF 346-1 at 36; *see also* ECF 340-4 ("Remember ALL Age-Outs are eligible for release on ICE Bond" and ATD). Defendants cannot avoid the requirements of this Court's judgment and permanent injunction—and render the Court's findings regarding release options meaningless for essentially the entire class—by proposing a novel (and incorrect) construction of their statutory authority seven years too late.

### C.  In Practice, the New Policy's Implementation Demonstrates Its Inconsistency with the Injunction.

In addition to the direct facial conflict between ICE's new policy and the injunction, the policy's implementation makes clear that despite the theoretical availability of release on parole, the new policy is, effectively, a universal no-release policy. Such a categorical policy to detain is plainly inconsistent with § 1232(c)(2)(B)'s requirement that a custody determination be made in each case, and that ICE make that determination based on "the [noncitizen]'s need for supervision," in light of an "individualized assessment" of risk of flight and danger. *Ramirez*, 338 F. Supp. 3d at 33.

Most tellingly, ICE officers notified shelters and legal service providers on October 2 and 3 that children aging out of ORR custody would remain detained across the board based on the new guidance. For example, an ICE FOJC in El Paso wrote in an email that "Due to the new Age Out interim Guidance *any upcoming Age Outs* will remain in custody to continue their removal proceedings." ECF 413-1 ¶ 33 & 22 (emphasis added); *see also* Supp. Hilty Decl. ¶ 10 (reporting a shelter case manager told one teenager's attorney that "the FOJC had explained that post-18 release plans of several of our clients . . . would no longer be honored" and instead they would be

placed in adult detention on their 18th birthday); ECF 413-3 ¶ 3 & p.2 (reporting a shelter case manager told an attorney that the FOJC had contacted her to say that "the Trump Administration is ordering FOJCs to detain all children who turn 18 years old in the Shelter [and that] the FOJC knows that these actions are in violation of a standing court order protecting children turning 18 in the shelters"); Supp. Barry Decl. ¶ 3 (reporting that an FOJC approved C.H.V.'s release at approximately 5pm on October 3 and at 9pm switched course and determined that he would be detained).

The fact that the young people discussed above who aged out in the first days of October had written post-18 release plans concluding that they posed no flight risk or danger to themselves or others, and identifying an individual or organizational sponsor as the least restrictive setting available, further demonstrates that the new guidance impermissibly results in detention per se, not an individualized determination. After the new guidance went into effect, these teenagers were detained on their birthdays or told they would not be released on their upcoming birthdays, regardless of their release plans, some of which ICE had previously approved. ECF 413-1 ¶¶ 8–13 (E.G.G.L.), 15–22 (E.O.B.M.), 23–27 (I.L.F.R.), 29–32 (W.O.B.P.); ECF 413-2 ¶¶ 8-15 (M.E.R.V.), 16–23 (R.I.Y.C.), 24–31 (G.T.X.); Supp. Barry Decl. ¶¶ 3-4 (C.H.V.); Supp. Winger Decl. ¶ 25 (A.G.A., R.R.A.C., S.H.G.). ICE's detention decisions in these cases are thus conclusive evidence that the October 1 policy is irreconcilable with this Court's injunction and the TVPRA's statutory standard.

Any seeming incongruence between ICE's new policy (purporting to present release on parole as a viable option) and the implementation of that policy (resulting in ICE deciding to

detain all age-outs[9]) is attributable to a broader DHS policy effectively ending the use of parole as a release mechanism from ICE custody. Wolf Decl., ¶¶ 4–5, 7; *see* Section C**,** *supra*. While DHS has not formally announced such a blanket policy, ICE statements and evidence produced in other litigation evince the existence of an agency policy prohibiting ICE officers from granting release on parole. For example, at an evidentiary hearing on August 1, 2025, an ICE officer testified:

> Q: "Are you aware of a policy of the Government that no paroles be granted?"
> A: "Yes, sir."
> Q: "What's the policy?"
> A: "As of right now, we were told that we would not be granted [*sic*] paroles."

*Arostegui-Maldonado v. Baltazar*, 2025 WL 2280357, at *11 (D. Colo. Aug. 8, 2025). Similarly, in June, a memo was distributed to all ICE field offices stating that "ERO field offices no longer have the option to discretionarily release [noncitizens]." Wolf Decl., ¶ 6 & Exh. 2 at 2.

In other cases, ICE personnel have also communicated the existence of a categorical no-parole policy as the basis for denying release on parole. Wolf Decl. ¶ 5. For example, one ICE Supervisory Detention and Deportation Officer explained in an email:

> As per the January 20, 2025, Executive Order 14165-Securing Our Borders issued by the president, Sec.2(c) it requires the Secretary of Homeland Security to detain, to the fullest extent permitted by law, individuals apprehended for immigration law violations until their removal from the United States.
>
> Given the current policies in place, the Department of Homeland Security is not granting release on one's own recognizance, parole, nor are we authorized to issue bond releases. I understand that not all individuals in our custody pose a danger to the community and may not have any prior criminal history. However, please be advised that the policies governing these matters are beyond our control and discretion.

---

[9] While ICE eventually indicated it would release E.G.G.L., I.L.F.R., and W.O.B.P. on parole before the TRO was entered on October 4, they only did so after Plaintiffs' counsel flagged their cases and specifically requested that Defendants release them. *See supra* at 9–10.

Wolf Decl. Exh. 1.

Publicly available DHS data also reflects this precipitous drop in the use of parole. Wolf Decl. ¶¶ 8–9; *see supra* at 6. Given that release on parole has ground to a halt based on a high-level directive to that effect, the availability, on paper, of release on parole for unaccompanied children turning 18 is all but meaningless. The legality of DHS's decision to end parole is not before this Court. But it is clear that the availability of parole as the only release option for children aging out of ORR custody—as contemplated by the October 1 guidance—does not save that guidance from violating the Court's Final Judgment and Permanent Injunction and the TVPRA.

## II.    DEFENDANTS' RE-DETENTION OF CLASS MEMBERS WITHOUT ANY MATERIAL CHANGE IN CIRCUMSTANCE VIOLATES THE INJUNCTION

ICE's re-arrest and continued detention of class members initially released from ORR custody without any material change in their circumstances similarly violates this Court's orders and the TVPRA. ICE appears to be implementing an unlawful policy under which it detains age-outs recently released on their own recognizance when they appear for their first scheduled ICE check-in (or in one case, at a vehicle stop soon after they appeared as required)—absent any relevant change in the teenager's circumstances. *See supra* at 4-5, 11-12**.** If ICE is allowed to make the custody determination required by § 1232(c)(2)(B) but then, without any valid justification, simply detain those young people shortly after their release, the agency will have created a workaround that effectively eliminates the protections Congress intended for this vulnerable population and circumvents this Court's injunction.

As this Court has explained, with § 1232(c)(2)(B), Congress required a custody determination that would protect former unaccompanied children after they turned 18. *See Ramirez*, 471 F. Supp. 3d at 93 ("[O]f course, children do not stay children forever. Congress

24

accounted for that fact of life, extending certain protections to newly adult immigrants who were formerly in the care and custody of HHS."). Section 1232(c)(2)(B) mandates certain considerations before an ultimate "placement" decision is made. That placement must have some meaningful and lasting consequence. Otherwise, the agency could thwart the purpose of the statute by engaging in that consideration, releasing the young person, and then arresting the child the next day. The statute should not be interpreted to permit such an absurd result, "defy[ing] common sense [and] defeat[ing] Congress' stated objective" to protect these young people. *Quarles v. United States*, 587 U.S. 645, 654 (2019) ("We should not lightly conclude that Congress enacted a self-defeating statute."); *see also Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998) (recognizing "the long-standing rule that a statute should not be construed to produce an absurd result"). Re-detaining class members when they dutifully report to their first ICE check-ins absent materially changed circumstances similarly circumvents this Court's injunction enforcing § 1232(c)(2)(B)—something Defendants must not be permitted to do. *See United States v. New York Tel. Co.*, 434 U.S. 159, 172 (1977) (recognizing the power of federal courts to "effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction"); *Sec. Indus. Ass'n*, 628 F. Supp. at 1441 (courts have the power to prevent their orders from being thwarted).

In the cases of A.T.L., F.L.P., A.D., J.D.F.V., C.M.S.D., J.N.B.S., and C.G.P.C., ICE detained them less than two months (in a few cases, less than three weeks) after finding that each was neither a flight risk nor a danger to themselves or their community. *See* Exhs. C–H, P. ICE made these new custody re-determinations not because there were meaningfully changed circumstances that impacted any teenager's flight risk or dangerousness, or any other new, individualized facts that could be a legitimate basis for their arrest. *See* Supp. Winger Decl. Exhs.

1, 2. To the contrary, and as Defendants concede, each young person dutifully reported to ICE as required. *See id.*

ICE justifies the detention of F.L.P. and A.D. based solely on unidentified local "policies." Supp. Winger Decl. Exh. 2 at 1, 3. For J.D.F.V., the only fact Defendants point to— his misdemeanor juvenile offense—predates his aging out and was considered by ICE at the time of his initial release. *Id.* For A.T.L., even accepting Defendants' version of the facts, A.T.L. demonstrated that he reports when so ordered and is willing to cooperate with his removal if necessary. *Id.* As to C.M.S.D., that she was a passenger in a car with an ICE target is simply not relevant to her own custody status. *Id.* at 1-2, 3-4. And Defendants have not yet provided any explanation for J.N.B.S.'s or C.G.P.C.'s arrests. *See* Supp. Winger Decl. ¶¶ 16, 19. For each of these class members, the custody determination required under the TVPRA and the Court's injunction had virtually no effect—each 18-year-old was free for only a handful of weeks.

Given Defendants' new policy to violate the TVPRA and circumvent the Permanent Injunction in this case, it is virtually inevitable that ICE will detain more age-outs in violation of the Court's final judgment and injunction, absent this Court's intervention.

## CONCLUSION

Five years ago, this Court carefully chronicled Defendants' systemic failures to follow § 1232(c)(2)(B)'s commands to consider the least restrictive setting available and to make alternatives to detention available to children aging out of ORR custody. *See* 471 F. Supp. 3d 88. Despite that order and the permanent injunction that followed, Defendants are once again violating their statutory obligations by enacting a new policy that ignores the requirements of § 1232(c)(2)(B). Accordingly, and as fully set forth in the attached proposed order, Plaintiffs ask the Court to enforce the permanent injunction by enjoining Defendants from implementing the

October 1, 2025 policy and from detaining any age-outs in any manner that contravenes the Permanent Injunction, including those initially released from ORR custody, absent a material change in their circumstances; by ordering Defendants to rescind any detention decisions based on the October 1 guidance and to release all class members who have been re-detained absent materially changed circumstances, including A.T.L., F.L.P., A.D., J.D.F.V., C.M.S.D., J.N.B.S. and C.G.P.C., subject to any alternatives to detention required upon their initial release from ORR custody; and by ordering Defendants to produce information on an ongoing basis about any age-outs who have been arrested and re-detained since July 2025 because of Defendants' change in policy.

Dated: October 27, 2025

Respectfully submitted,

*s/ Suchita Mathur*

Mark Fleming*
National Immigrant Justice Center
111 W. Jackson Blvd., Suite 800
Chicago, IL 60604
T: 312-660-1370
mfleming@immigrantjustice.org

Katherine Melloy Goettel*
University of Iowa College of Law
Clinical Law Programs
380 Boyd Law Building
Iowa City, IA 52242-1113
Tel: (319) 335-9023
kate-goettel@uiowa.edu

*Admitted Pro Hac Vice*

Suchita Mathur (DC Bar No. 90013156)
Emma Winger (DC Bar No. 90010721)
Rebecca Cassler (DC Bar No. 90017398)
Michelle Lapointe (DC Bar No. 90032063)
American Immigration Council
PMB2026
2001 L Street, NW, Suite 500
Washington, DC 20036
Tel: (202) 507-7645
smathur@immcouncil.org
ewinger@immcouncil.org
rcassler@immcouncil.org
mlapointe@immcouncil.org