**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WILMER GARCIA RAMIREZ, et al., | ) |
| Plaintiffs, | ) Case No. 1:18-cv-00508-RC |
| v. | ) |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT (ICE), et al., | ) |
| Defendants. | ) |

**Supplemental Declaration of Marcy Hilty**

I, Marcy Hilty, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am over 18 years old and competent to make this declaration.

2. This declaration is based on my personal knowledge and my review of our organization's records regarding the client detailed below.

3. I am an Immigration Attorney at Jewish Family and Community Services (JFCS) in Pittsburgh, Pennsylvania. JFCS is an organization that is contracted by the Acacia Center for Justice to provide pro bono representation to unaccompanied minors who are or formerly were within the custody of the Office of Refugee Resettlement (ORR) and who reside within western Pennsylvania.

4. Prior to October 3, 2025, JFCS had several clients who are unaccompanied children and were turning 18 in the coming days (which we refer to as "aging out"). We had established post-18 release plans with Immigration and Customs Enforcement's (ICE) Field Office Juvenile Coordinator (FOJC) for these children, none of which involved transfer to ICE custody.

5.  I am submitting this declaration to detail the case of our client M.E.R.V.,[1] whom ICE detained on the morning of October 4, 2025, despite the post-18 plan[2] recommending release. ICE only released M.E.R.V. from custody after this Court issued a Temporary Restraining Order later that day.

6.  A post-18 plan was submitted to the FOJC on Thursday, October 2, 2025 for M.E.R.V., who was going to turn 18 on October 4, 2025, with an intended placement at Covenant House, a shelter for unhoused youth in Philadelphia, Pennsylvania.

7.  The Plan stated: "Reason this placement services the child's best interests: Safe placement for the minor after 18."

8.  The post-18 plan further stated: "An assessment whether the youth is a danger to self, the community, or risk of flight: An assessment was completed and no risk concerns identified."

9.  The FOJC approved this plan via email on Friday, October 3, 2025 at 9:57 a.m. As per the email, "… DHS approves the Post-18. We will plan on a 9:00 AM release tomorrow morning on recognizance."

10. On October 3, 2025, at around 4:00 p.m, JFCS received a phone call from the lead case manager at one of our shelters, Holy Family Institute. This individual told the undersigned attorney that the FOJC had explained that post-18 release plans of several of our clients, including M.E.R.V., would no longer be honored. Specifically, ICE intended to take M.E.R.V. and place him into adult detention the next day when he turned 18, along with other minors who reached

---

[1] I am using initials rather than my client's full name to protect their privacy, particularly given their young age.
[2] Any and all documents, text messages, emails, etc. referenced in this declaration have been retained and can be provided to the Court and Defendants, if necessary.

their 18th birthday while still in an ORR shelter.

11. Shortly thereafter, around 5:00 p.m. on October 3, I sent copies of proof of my legal representation of M.E.R.V. (L-3, E-28, and G-28) to the FOJC, the Federal Field Specialist (FFS), and the ICE Outreach email address.

12. Around 7:00 p.m., the child advocates at the Young Center for Immigrant and Children's Rights provided a Best Interest Determination (BID) letter to the FOJC, asking ICE to follow the ruling in the herein case by ensuring M.E.R.V.'s post-18 plan was followed, releasing him to the least restrictive setting.

13. On the morning of October 4, 2025, my supervisor of JCFS, Sarah Hough, as well as representatives from the Young Center, attempted to reach out to the FOJC, but did not get any immediate response.

14. At around 9:00 a.m. that same day, the staff at Holy Family Institute in Pittsburgh, Pennsylvania, put me on speakerphone on a call with the ICE agent sent to pick up M.E.R.V.

15. I explained to the ICE agent over the telephone that first, there was an existing injunction preventing ICE from taking M.E.R.V. into adult custody given his post-18 release plan, but also that an enforcement hearing on the issue was imminent and that the court would likely uphold and support the position that it would be illegal to take M.E.R.V to adult detention.

16. The ICE agent responded, "I do not care. No matter what you tell me, I am going to take the kid."

17. The undersigned could hear that the staff at Holy Family Institute attempted to have the ICE agent look at a copy of the Motion for TRO, but she refused to review it.

18. I pleaded with the ICE agent, explaining that as attorney of record, they at least

had to inform me of where they were taking my client.  The ICE agent refused to provide any additional information, again stating that she "did not care" about any paperwork that we wanted her to look at (in this case, the proof of representation, including an L-3, E-28, and G-28 forms). The ICE agent went so far as to claim that she did not know where M.E.R.V. was being taken, although it was clear that she was the one who was going to transport M.E.R.V.

19. When I asked the ICE agent to identify herself, she refused to do so.

20. Approximately ten to fifteen minutes later, the staff at Holy Family Institute informed me that M.E.R.V. had been patted down, shackled, chained, and taken into ICE custody.

21. At no point during this process did ICE provide any documentation that stated M.E.R.V. was being taken into custody, why he was being taken into custody, or where he was being taken.

22. At some point in the morning, the FOJC did respond to my supervisor.  He explained that ICE Pittsburgh had no control over the matter and was ordered to take the actions that they did by their higher-ups. He promised he would try his best to honor our request to try and keep M.E.R.V. in Pennsylvania, but did not provide any details as to exactly where M.E.R.V. was being taken.

23. A hearing in the *Garcia Ramirez* case was held at 11:00 a.m. and by 12:00 p.m., the TRO was granted.

24. Shortly after 12:00 p.m., we sent a copy of the TRO to the FOJC via both text message and email.  At around 12:30 p.m., my supervisor, Sarah Hough, received a text message response from the FOJC that simply stated he would "process appropriately" the information about the Court's TRO.

25. At around 4:30 p.m., I was notified by counsel for Plaintiffs in the herein lawsuit that the government informed them that M.E.R.V. would be released shortly and that ERO would communicate his status to me. At this point in time, JFCS had not had any additional communication from the FOJC, nor had I, M.E.R.V.'s attorney of record, been informed of his whereabouts.

26. At 6:00 p.m., neither I, nor anyone at the Young Center or JFCS had heard from the FOJC or anyone else at ICE concerning M.E.R.V.

27. Around 6:20 p.m., a gentleman named Mike, who we believe was an on-call ICE employee at the Pittsburgh office not otherwise involved in the events described herein, called my supervisor and explained that M.E.R.V. would be returned to the ICE office in Pittsburgh by 6:30 p.m.

28. At around 7:00 p.m., M.E.R.V. finally was given back his cell phone and contacted the undersigned concerning his whereabouts.  M.E.R.V. was then provided paperwork showing that he was released on his own recognizance.

29. To be clear, during this ten-hour long ordeal, at no point did anyone from the government communicate with M.E.R.V.'s counsel of record as to his whereabouts or his potential release.

30. M.E.R.V. has been identified by the U.S. Office of Trafficking in Persons (OTIP), which is part of the Administration for Children & Families within the U.S. Department of Health & Human Services, as a victim of a severe form of human trafficking, and has received an interim assistance letter. However, his full OTIP eligibility has not been approved yet. As such, JCFS is not yet in possession of a copy of that letter. He is also likely eligible for Special Immigrant Juvenile Status, as a child who has been abused, abandoned, or neglected by a parent.

31.     After his release from ICE custody, M.E.R.V. has been living at Covenant House in Philadelphia, as per his post-18 plan. I have been in touch with M.E.R.V., and it is clear that this ordeal traumatized him to a great extent.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on October 21, 2025 in Pittsburgh, Pennsylvania.

_____
Marcy Hilty, Esq.