**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| WILMER GARCIA RAMIREZ, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 18-508 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 417, 431, 434 |
| | : | | |
| U.S. IMMIGRATION AND CUSTOMS | : | | |
| ENFORCEMENT, *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

**GRANTING PLAINTIFFS' MOTION TO ENFORCE THE FINAL JUDGMENT AND PERMANENT INJUNCTION; GRANTING PLAINTIFFS' MOTIONS FOR LEAVE TO FILE DOCUMENTS UNDER SEAL**

## I. INTRODUCTION

In 2018, Plaintiffs—immigrant teenagers who entered the United States as unaccompanied alien children ("UACs")—brought this class action against the U.S. Immigration and Customs Enforcement ("ICE"), the Acting Director of ICE, the Department of Homeland Security ("DHS"), and the Secretary of Homeland Security (collectively, "Defendants"). Plaintiffs alleged that Defendants had violated the Administrative Procedure Act ("APA") in connection with ICE's processing of eighteen-year-olds who came to the United States as UACs (known as "age-outs"). After a four-week bench trial, the Court found that ICE had violated the APA by failing to follow procedures made necessary by 8 U.S.C. § 1232(c)(2)(B), and for refusing to take actions it was required to take under that statute. Section 1232(c)(2)(B) requires ICE to "consider plac[ing]" age-outs in ICE custody "in the least restrictive setting available after taking into account" certain risk factors and to make them "eligible to participate in alternative to detention programs." In 2021, this Court entered a final judgment and issued a

permanent injunction requiring Defendants to comply with their statutory obligations under Section 1232(c)(2)(B).

Now, four years later, Plaintiffs move this Court to enforce that final judgment and permanent injunction. Plaintiffs allege that, on October 1, 2025, Defendants implemented a new policy for ICE's processing of age-outs, namely, a new decision-making process for age-out custody determinations. Plaintiffs claim that this policy fails to afford age-outs with the protections they are entitled to under Section 1232(c)(2)(B). Plaintiffs further allege that Defendants, in violation of Section 1232(c)(2)(B), have been re-arresting and detaining age-outs after ICE initially releases them, despite no material change in the age-outs' circumstances indicating they pose a danger or flight risk that would justify detention.

Upon careful consideration, the Court finds that Defendants' policy and re-arrest conduct violates their obligation to comply with Section 1232(c)(2)(B) when making age-out custody determinations. Accordingly, the Court grants Plaintiffs' motion and enjoins the policy's implementation and Defendants' re-arrest conduct.

## II.  BACKGROUND

The Court presumes the parties' familiarity with this Court's prior opinions, the relevant legal framework, the underlying facts, and the procedural history of this case. The Court thus provides a high-level summary. Then, the Court describes in greater detail the factual and procedural background concerning Plaintiffs' Motion to Enforce the Judgment and Permanent Injunction.

### A.  Legal Framework

When minors lacking immigration status arrive in the United States without parents or other guardians, they are designated as "unaccompanied alien child[ren]" and are placed in the

2

custody of the Department of Health and Human Services ("HHS"), Office of Refugee

Resettlement ( "ORR"). 6 U.S.C. § 279(a)–(b)(1)(A), (g)(2); 8 U.S.C. § 1232(b)(3). If they are

still in custody on their eighteenth birthday, the now-adult immigrants "age out" of HHS and

ORR custody and are transferred to DHS custody—that is to say, ICE custody.[1] Immigrants who

undergo this transfer from ORR to ICE custody are referred to by the parties as "age-outs."

Section 1232(c)(2)(B) affords age-outs certain protections upon their transfer to ICE custody.

Section 1232(c)(2)(B) reads as follows:

> If [an unaccompanied alien child in the custody of the Secretary of HHS] reaches
> 18 years of age and is transferred to the custody of the Secretary of Homeland
> Security, the Secretary [of DHS] shall consider placement in the least restrictive
> setting available after taking into account the alien's danger to self, danger to the
> community, and risk of flight. Such aliens shall be eligible to participate in
> alternative to detention programs, utilizing a continuum of alternatives based on
> the alien's need for supervision, which may include placement of the alien with an
> individual or an organizational sponsor, or in a supervised group home.

8 U.S.C. § 1232(c)(2)(B). Section 1232(c)(2)(B) thus requires that when ICE receives custody of

an age-out it "consider placement in the least restrictive setting available after taking into

account the alien's danger to self, danger to the community, and risk of flight" and it make age-

outs "eligible to participate in alternative to detention programs, utilizing a continuum of

alternatives based on the alien's need for supervision." *Id.*

### B. Prior Proceedings

#### 1. Pre-Trial Proceedings

Plaintiffs filed this lawsuit on March 5, 2018. Compl., ECF No. 1. Plaintiffs were three

immigrant teenagers who had previously been held in ORR custody as UACs. *See* Mem. Op.

Denying Defs.' Mot. Dismiss and Granting Pls.' Mot. for Class Cert. ("MTD and Class Cert.

---

[1] Most immigration enforcement functions in the United States are carried out by DHS, in
which ICE is housed. *See* 6 U.S.C. §§ 111, 251, 291.

Mem. Op.") at 3, ECF No. 50 (citing Am. Compl. ¶¶ 1, 33, 46, 61, ECF No. 21). Each turned eighteen, was transferred to ICE custody, and was placed in an adult detention facility, purportedly without receiving the statutorily mandated consideration of less restrictive placement options. *Id.* (citing Am. Compl. ¶¶ 1, 4, 13–15).

The Amended Complaint alleged that ICE's handling of age-outs violated the APA in two ways. Count One alleged a violation of Section 706(2), which provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be" among other things "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2); Am. Compl. ¶¶ 98–106. Count Two alleged a violation of Section 706(1) which provides that a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1); Am. Compl. ¶¶ 107–11. The two counts focused on the same conduct. Count One alleged that ICE's lack of compliance with Section 1232(c)(2)(B) made its detention of age-outs arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See* Am. Compl. ¶¶ 98–106. Count Two alleged that ICE's failure to take required action under Section 1232(c)(2)(B) amounted to the unlawful withholding of required agency actions. *See id.* ¶¶ 107–11. In short, Plaintiffs claimed that ICE automatically placed many age-outs in adult detention settings without giving less-restrictive settings the consideration required.

Defendants moved to dismiss, arguing that Plaintiffs lacked standing to bring their claims, that their claims were moot, that ICE's relevant actions were not reviewable under the APA, and that Plaintiffs failed to state claims upon which relief could be granted. MTD and Class Cert. Mem. Op. at 18. The Court disagreed and denied the motion to dismiss. *Id.*

Among the Court's conclusions in that Opinion was that "Section 1232(c)(2)(B) does not limit 'consider[ation]' or 'eligib[ility] to participate in alternative to detention programs' to those who DHS has determined pose no risk of flight." *Id.* at 40 (alterations in original). In other words, Section 1232(c)(2)(B)'s entitlements "extend[] to all former unaccompanied minors" in ICE custody. *Id.* at 32–33. And DHS and ICE must account for an age-out's flight risk, danger to self, and danger to community and then "consider placement in the least restrictive setting available" no matter what the level of flight risk or danger has been assessed to be. *Id.* at 31 (quoting 8 U.S.C. § 1232(c)(2)(B)). "[T]he statute calls for an individualized assessment of the proper placement for each former unaccompanied minor in light of DHS's assessment of his or her danger to self, danger to the community, and risk of flight." *Id.* at 40. The Court also explained that "the authority under which individuals are detained are [im]material to whether Defendants must comply with 8 U.S.C. § 1232(c)(2)(B)" because "the obligation to place former unaccompanied minors consistent with 8 U.S.C. § 1232(c)(2)(B) arises upon their transfer to DHS custody and does not turn on the statutory authority under which a particular former unaccompanied minor is detained." *Id.* at 62.

In the same opinion that denied Defendants' motion to dismiss, the Court granted Plaintiffs' motion for class certification, allowing Plaintiffs to proceed on behalf of a class defined as:

> All former unaccompanied alien children who are detained or will be detained by ICE after being transferred by ORR because they have turned 18 years of age and as to whom ICE did not consider placement in the least restrictive setting available, including alternatives to detention programs, as required by 8 U.S.C. § 1232(c)(2)(B).

MTD and Class Cert Mem. Op. at 56–57.

The case then proceeded to discovery. After the close of discovery, Defendants moved for partial summary judgment, which the Court denied. Defs.' Mot. Partial Summ. J., ECF No. 209; Order Denying Mot. for Partial Summ. J. ("MSJ Order"), ECF No. 240. There was a genuine dispute concerning "whether ICE Officers in the field [were] indeed considering the least restrictive setting available." MSJ Order at 2. This issue had to be resolved at trial.

       2.  Bench Trial and the Court's Findings of Fact and Conclusions of Law

The Court conducted a bench trial over the course of eighteen days between December 2, 2019, and January 15, 2020. *See* Findings of Fact and Conclusions of Law ("FF & CL") at 8, ECF No. 333. "Plaintiffs presented testimony from twenty-three witnesses at trial, calling some to the stand for live testimony and reading deposition testimony into the record for others." *Id.* "They also provided the Court with designated deposition testimony from a number of additional witnesses." *Id.* "Defendants called fourteen witnesses, some of whom had also been presented, in one form or another, by Plaintiffs." *Id.* " Both parties introduced a substantial volume of exhibits and designated significant deposition testimony for the Court's consideration." *Id.*

On July 2, 2020, following the trial, the Court issued its Findings of Fact and Conclusions of Law Concerning Liability in this case. The Court found Defendants liable for failing to follow the requirements of Section 1232(c)(2)(B) and found in Plaintiffs' favor with regard to both counts of their Amended Complaint. *See id.* at 1–3. In particular, the Court found that Defendants acted in a manner that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in violation of 5 U.S.C. § 706(2), when they failed to make age-out custody determinations that consider placement in the least restrictive setting after taking into account the factors identified in the statute. *See id.* at 164. The Court also found that by this same conduct, Defendants "failed to take a discrete agency action that [the agency] is required to

take," in violation of 5 U.S.C. § 706(1). *See id.* (alteration in original). The Court explained that

considering placement in the least restrictive setting available "necessarily requires making an

inquiry aimed at determining what settings are available and which of these is the least

restrictive," and the evidence and testimony in this case demonstrated that "ICE officers are

consistently failing to take either of these steps." *Id.* at 179. Specifically, "[t]heir training [did]

not emphasize the proper considerations or decisionmaking processes and, in fact, g[ave]

instructions that are contrary to the statute." *Id.* "Field officers [were] left with nearly unbridled

discretion to make age-out custody determinations however they would like, and this discretion

[was] exercised in ways that [did] not comply with the agency's statutory obligations." *Id.*

at 179–80. Plaintiffs subsequently moved for the entry of a final judgment and a permanent

injunction. ECF No. 359.

### 3.  Final Judgment and Permanent Injunction

On September 21, 2021, the Court entered final judgment against Defendants and issued

a permanent injunction. *See* Mem. Op. and Order Granting in Part and Denying in Part Pls.' Mot.

for Entry of Final J. and Permanent Inj. ("Final J. and Permanent Inj. Mem. Op."), ECF No. 367.

Defendants had opposed an injunction on the grounds that it would "place[] unnecessary burdens

on Defendants and improperly vitiate[] Defendants' discretion." Defs.' Opp'n to Pls.' Proposed

Permanent Inj. at 1, ECF No. 362. As the Court explained, however, "this is not a standard APA

case concerning a rulemaking or adjudication that occurred within the scope of ICE's expertise,

but rather a suit challenging ICE's basic 'failure to comply with a statutory obligation on a

widespread basis.'" Final J. and Permanent Inj. Mem. Op. at 11. The bench trial had "brought to

light disturbing and pervasive lapses in ICE's statutory compliance." *Id.* The Court held that

because an injunction could be issued under such circumstances, when an agency's statutory

duties are at issue and an agency is found to have breached those duties, "tailored injunctive relief . . . is both within [the Court's] authority and necessary for [it] to ensure effective and lasting compliance with Section 1232(c)(2)(B)." *Id.* at 14. Moreover, ICE had exhibited a pattern "of agency recalcitrance and resistance to the fulfillment of its legal duties," a finding that strongly supported the imposition of injunctive relief. *Id.* at 16 (citation modified).

In light of these considerations, the Court permanently enjoined Defendants from violating Section 1232(c)(2)(B). *See generally id.*; Final J. and Permanent Inj., ECF No. 368. The Court also ordered Defendants to comply with a specified list of actions intended to prevent Defendants' further violations of, and help ensure their compliance with, Section 1232(c)(2)(B). Final J. and Permanent Inj. at 3–7. Finally, the Court retained jurisdiction for five years to enforce and resolve any disputes concerning the terms of, and Defendants' compliance with, the Court's Order or with Section 1232(c)(2)(B). *Id.* at 7–8.

On January 7, 2022, Defendants appealed the Court's final judgment and permanent injunction to the D.C. Circuit. Notice of Appeal to D.C. Cir., ECF No. 383. Thereafter, on September 13, 2022, Defendants voluntarily dismissed their appeal. Mandate as to Appeal to D.C. Cir., ECF No. 404.

### C.  Current Proceedings

1.  Defendants' Change in Their Detention Policy

*a.  July 2025 Interim Guidance Regarding Detention Authority for Applicants for Admission*

In July 2025, ICE issued interim guidance concerning its detention authority for "applicants for admission," defined as "an alien present in the United States who has not been admitted or who arrives in the United States, whether or not at a designated port of arrival." Sealed Doc. at 3, ECF No. 415 (citing 8 U.S.C. § 1225(a)(1)). This interim guidance was

"intended to ensure immediate and consistent application of [DHS's] legal interpretation while additional operational guidance [was] developed." *Id.* According to ICE, the government "ha[d] revisited its legal position on detention and release authorities." *Id.* And according to DHS, "[8 U.S.C. § 1225], rather than [8 U.S.C. § 1226], is the applicable immigration detention authority for all applicants for admission." *Id.* As a result, ICE's position is that "such aliens are subject to detention under [8 U.S.C. § 1225(b)] and may not be released from ICE custody except by [8 U.S.C. § 1182(d)(5)] parole." *Id.* Moreover, "[f]or custody purposes, these aliens are now treated in the same manner that 'arriving aliens' have historically been treated." *Id.* at 4.

### b.  October 1, 2025 Policy: Age-Out Custody Determinations

On October 1, 2025, ICE issued an "Updated Procedure for Custody Determinations of Age-Out Cases," which became effective immediately. *Id.* at 1. The policy "outlines the updated process for handling custody determinations" for UACs "who reach their 18th birthday while in the custody of the [ORR], commonly referred to as 'age-outs.'" *Id.* The policy is divided into sections titled: (1) "Age-Out Review Worksheet (AORW) Completion"; (2) "Parole Review for Non-Detention Recommendations"; and (3) "Custody Transfer." *Id.*

The first section, "Age-Out Review Worksheet (AORW) Completion," notes that ICE personnel "will continue to review and complete the Age-Out Review Worksheet (AORW)."[2] *Id.* It further states that "[t]his review must be conducted based on the statutory factors outlined in 8 U.S.C. § 1232 . . . and the requirements established in the *Garcia-Ramirez* Permanent Injunction." *Id.* The section concludes that "[t]he current AORW procedure remains unchanged." *Id.*

---

[2] For each age-out that ICE processes, ICE fills out an AORW form, a standardized worksheet that is designed to document ICE's decision-making process. *See generally* FF & CL at 26–34. ICE personnel use the AORW forms to document their considerations when making age-out placements. *See id.*

The second section, "Parole Review for Non-Detention Recommendations," instructs that "[i]f the AORW recommends a custody option other than detention"—such as an Order of Release on Recognizance ("OREC"), Alternative to Detention ("ATD") programs, or Bond— ICE personnel "must conduct a parole review in accordance with the *Interim Guidance Regarding Detention Authority for Applicants for Admission*." *Id.* And under that guidance, "such individuals are subject to detention under [8 U.S.C. § 1225(b)] and may only be released from ICE custody through parole under [8 U.S.C. § 1182(d)(5)]." *Id.* The policy explains that "[p]arole may be granted on a case-by-case basis for 'urgent humanitarian reasons' or 'significant public benefit.'" *Id.* The policy further explains that "[i]f parole criteria are not met" ICE personnel "must then consider placement in the next available least restrictive setting." *Id.*

The third and final section, "Custody Transfer," explains that the policy's "updated procedure ensures compliance with statutory requirements while maintaining ICE's detention authority and discretion under the Immigration and Nationality Act (INA)." *Id.* And "to ensure proper implementation," ICE personnel "must familiarize themselves with the attached guidance," the July 2025 *Interim Guidance Regarding Detention Authority for Applicants for Admission. Id.*

### 2.  Plaintiffs' Motion for a Temporary Restraining Order

On October 4, 2025, Plaintiffs filed a motion for a temporary restraining order ("TRO") seeking to enforce the Court's Final Judgment and Permanent Injunction. Pls.' Emergency Mot. for TRO ("TRO Mot."), ECF No. 413. Plaintiffs alleged that on October 1, 2025, Defendants issued new, interim guidance concerning age-out custody determinations. *Id.* at 1. According to Plaintiffs, that new guidance required ICE to detain age-outs under 8 U.S.C. § 1225(b), and to release them only if they qualified for parole pursuant to 8 U.S.C. § 1182(d)(5) "on a case-by-

case basis for urgent humanitarian reasons or significant public benefit." *Id.* Plaintiffs alleged

that such a policy contravened the Permanent Injunction's requirement that ICE consider

placement in the least restrictive setting available, including alternatives to detention, for all age-

outs as required by Section 1232(c)(2)(B). *Id.* at 8–9. That same day, the Court held a hearing

concerning Plaintiffs' TRO motion. Min. Entry (Oct. 4, 2025). Defendants maintained that

Section 1225(b) was being applied "to the fullest extent" and "to all aliens who are applicants for

admission," including age-outs, as "there are no exceptions in that statute for unaccompanied

alien children" unless they qualify for parole. TRO Hr'g Tr. at 6:21–7:4 (Oct. 4, 2025).

The Court granted Plaintiffs' motion and issued a TRO to preserve the status quo,

enjoining Defendants from implementing any new directives regarding age-outs and detaining

any class member in an adult ICE facility in any manner that contravened the Permanent

Injunction. Order Granting Pls.' TRO Mot., ECF No. 414. The Court further ordered that

Defendants immediately rescind any determinations to detain based on the October 1, 2025

directive and immediately produce the directive, any related policies regarding that directive, and

the AORWs of any class members who may have been impacted by that directive. *Id.* Pursuant

to the Court's Order, Defendants produced the directive, the October 1, 2025 policy Plaintiffs

referred to in their TRO. *See* Sealed Doc., ECF No. 415. As a result of the TRO, Defendants

released several age-outs from custody. *See infra* pp. 12–14.

   3.  Plaintiffs' Motion to Enforce the Final Judgment and Permanent injunction

On October 27, 2025, after the Court issued the TRO against Defendants, Plaintiffs filed

their Motion to Enforce the Court's Final Judgment and Permanent Injunction. Pls' Mot. to

Enforce Final J. and Permanent Inj. ("Pls.' Mot."), ECF No. 419.[3] Plaintiffs claim that Defendants' new custody-determination policy for age-outs violates the requirements of Section 1232(c)(2)(B) and this Court's prior Order. *See generally id.* Specifically, Plaintiffs contend that the policy fails to make all age-outs eligible for alternative detention programs and fails to produce age-out placements based on the risk-factor analysis required under the statute. *Id.* at 15–24. Plaintiffs further claim that Defendants' practice of re-arresting and detaining age-outs shortly after their initial release, absent a material change in their circumstances, violates Section 1232(c)(2)(B). *Id.* at 24–26. Defendants oppose the motion. Defs.' Resp. in Opp'n to Pls.' Mot. to Enforce Final J. and Permanent Inj. ("Defs.' Opp'n"), ECF No. 427. The Court held a hearing on the motion on December 8, 2025. Min. Entry (Dec. 8, 2025).

### 4.  Impacted Class Members

Plaintiffs allege that Defendants' new policy concerning age-out custody determinations and ICE's practice of re-arresting and detaining age-outs has harmed over 25 class members.

#### a.  *Age-Outs Whose Release ICE Had Approved but Subsequently Revoked*

Plaintiffs have identified 11 age-outs whose release ICE initially approved but later revoked. Each age-out had a "post-18 plan"[4] indicating that the age-out posed no flight risk or a danger to themselves or others, such that their release was appropriate. ICE initially approved their release but later revoked the release, following the October 1, 2025 issuance of ICE's new

---

[3] Pursuant to the protective order governing this case, ECF No. 63, Plaintiffs seek leave to file under seal exhibits in support of their Motion to Enforce the Final Judgment and Permanent Injunction, *see* Pls.' Mots. for Leave to File Docs. Under Seal, ECF Nos. 431, 434. The Court grants such leave.

[4] ORR caseworkers prepare "post-18 plans" for UACs in ORR custody who are approaching their eighteenth birthday. These plans outline and facilitate the UAC's release and typically assess whether the UAC is a flight risk or a danger to themselves or others, identify appropriate placement options (such as the names and addresses of potential sponsors), and identify any special needs the UAC may have.

policy. *See* Maynard Decl. ¶¶ 5, 33, ECF No. 413-1; *id.* Ex. C. According to Plaintiffs, this new policy prohibited release on parole for unaccompanied minors who turn 18 years old except for "urgent humanitarian reasons" or "significant public benefit." *Id.* ¶ 33; *id.* Ex. C.

- For four of these age-outs, ICE reinstated their release approval prior to, or on, their 18th birthday, leading up to or shortly after the Court's TRO: (1) **E.G.G.L.**, Maynard Decl. ¶ 14; (2) **E.O.B.M.**, *id.* ¶ 22; (3) **I.L.F.R.**, *id.* ¶ 28; and (4) **W.O.B.P.**, Pls.' Mot. at 9.

- For five of these age-outs, ICE detained them but later released them, leading up to or shortly after the Court's TRO: (5) **M.E.R.V.**, Suppl. Hilty Decl. ¶¶ 20, 28, ECF No. 417-3; (6) **C.H.V.**, Suppl. Barry Decl. ¶¶ 3–4, ECF No. 417-4; (7) **A.G.A.**, Suppl. Winger Decl. ¶ 25, ECF No. 419-2; (8) **R.R.A.C.**, *id.*; and (9) **S.H.G**, *id.*

- For two of these age-outs, ICE detained them, and they are presumably still in detention: (10) **R.I.Y.C.**, Hilty Decl. ¶¶ 21–23, ECF No. 413-2; and (11) **G.T.X.**, *id.* ¶¶ 29–31.

### b. *Age-Outs Who ICE Released, Re-Arrested, and Detained*

Plaintiffs have identified 15 age-outs who ICE released upon their transfer from ORR and who ICE later re-arrested and detained following their release. Each age-out had been assessed not to pose a danger to themselves or others, such that the age-out's release was appropriate. *See* Pls.' Mot. Exs. C–I, P, ECF Nos. 419-4 to 419-10, 419-17; Pls.' Mot. to File Docs. Under Seal Exs. Q–V, ECF Nos. 431-1 to 431-6; Pls.' Second Notice Re: Class Members ("Pls.' 2d Notice") Ex. W, ECF No. 434-1. None of the age-outs experienced a material change in their circumstances that would have warranted their re-arrest and detention. *See* Suppl. Winger Decl. ¶19; *id.* Ex. 2; 2d Suppl. Winger Decl. ¶¶ 4–8, ECF No. 430. Most of these age-outs remain in detention.

These age-outs are: (1) **A.T.L.**, Pls.' Mot. Ex. C, at 7; Suppl. Winger Decl. Ex. 2; (2) **F.L.P.**, Pls.' Mot. Ex. D, at 14; Suppl. Winger Decl. Ex. 2; (3) **A.D.**, Pls.' Mot. Ex. E, at 5; Suppl. Winger Decl. Ex. 2; (4) **J.D.F.V.**, Pls.' Mot. Ex. F, at 5; Suppl. Winger Decl. Ex. 2; (5) **C.M.S.D.**, Pls.' Mot. Ex. G, at 5; Suppl. Winger Decl. Ex. 2; (6) **J.N.B.S.**, Pls.' Mot. Ex. H, at 5; Suppl. Winger Decl. ¶ 16; (7) **J.A.M.S.**, Pls.' Mot. Ex. I, at 5; Suppl. Winger Decl. ¶ 17; (8) **C.G.P.C.**, Pls.' Mot. Ex. P, at 5; Suppl. Winger Decl. ¶ 19; (9) **C.R.R.**, 2d Suppl. Winger Decl. ¶ 4.; (10) **O.L.M.**, *id.* ¶ 5; (11) **D.S.M.**, *id.* ¶ 6; (12) **J.E.O.**, *id.* ¶ 7; (13) **V.J.R.**, *id.* ¶ 8; (14) **K.D.B**., *id.* ¶ 9; and (15) **D.M.G.**, Pls.' 2d Notice Ex. W.[5]

### III.  LEGAL STANDARD

"District courts have the authority to enforce the terms of their mandates." *Flaherty v. Pritzker*, 17 F. Supp. 3d 52, 55 (D.D.C. 2014). That authority is grounded in "the interest of the judicial branch in seeing that an unambiguous mandate is not blatantly disregarded by parties to a court proceeding." *Int'l Ladies' Garment Workers' Union v. Donovan*, 733 F.2d 920, 922 (D.C. Cir. 1984). Part and parcel with that authority "is the power to construe and interpret the language of the judgment." *Heartland Hosp. v. Thompson*, 328 F. Supp. 2d 8, 11–12 (D.D.C. 2004). And a motion to enforce is "the usual method for requesting a court to interpret its own judgment" and to compel compliance, if necessary, in light of that interpretation. *Id.* at 11.

A court "should grant a motion to enforce if a 'prevailing plaintiff demonstrates that a defendant has not complied with a judgment entered against it.'" *Sierra Club v. McCarthy*, 61 F. Supp. 3d 35, 39 (D.D.C. 2014) (quoting *Heartland Hosp.*, 328 F. Supp. 2d at 11). In determining compliance with an order, the Court is guided not only by the text of that order but also by its

---

[5] According to Plaintiffs, J.D.F.V. and J.N.B.S. have likely been deported, as they can no longer be found in the ICE Detainee Locator. Pls.' Reply Mem. in Supp. of Mot. to Enforce Final J. and Permanent Inj. ("Pls.' Reply") at 13 n.7, ECF No. 429. C.G.P.C. was released on October 31, 2025, and C.R.R. has taken voluntary departure to get out of adult detention. *Id.* at 13 & n.7.

related opinions. *See City of Cleveland v. Fed. Power Comm'n*, 561 F.2d 344, 346–47 (D.C. Cir. 1977). That said, "[s]uccess on a motion to enforce a judgment gets a plaintiff only 'the relief to which [the plaintiff] is entitled under [its] original action and the judgment entered therein.'" *Heartland Reg'l Med. Ctr. v. Leavitt*, 415 F.3d 24, 29 (D.C. Cir. 2005) (second and third alterations in original) (quoting *Watkins v. Washington*, 511 F.2d 404, 406 (D.C. Cir. 1975)).

## IV. ANALYSIS

Through their motion, Plaintiffs seek to enforce the Court's Final Judgment and Permanent Injunction, which bars Defendants from making age-out placement decisions that violate Section 1232(c)(2)(B). Plaintiffs argue that Defendants' new policy for age-out custody determinations denies age-outs the statutory protections to which they are entitled. In particular, Plaintiffs contend that the policy does not make all age-outs eligible for alternative detention programs, and that its decision-making process produces placement outcomes that do not result from the risk-factor analysis required by Section 1232(c)(2)(B). Plaintiffs further assert that Defendants' practice of re-arresting and detaining age-outs after their initial release—without any material change in circumstances—also violates Section 1232(c)(2)(B). Finally, Plaintiffs argue that, given Defendants' unlawful policy and practices, the Court has the authority to enjoin Defendants from implementing them. The Court agrees. For the reasons explained below, the Court grants Plaintiffs' Motion to Enforce the Final Judgment and Permanent Injunction.

### A. The October 1, 2025 Policy Violates Section 1232(c)(2)(B).

Plaintiffs argue that Defendants' new policy governing custody determinations for age-outs violates Section 1232(c)(2)(B) as well as this Court's Final Judgment and Permanent Injunction. Pls.' Mot. at 17. On October 1, 2025, ICE implemented a new decision-making process for age-out custody determinations (the "October 1 Policy" or the "Policy"). The Policy

reflects a shift in Defendants' interpretation of their authority to detain "applicants for admission" under Section 1225(b). *See generally* Sealed Doc.

Historically, Defendants treated noncitizens arrested while residing in the United States—including those who entered without inspection—as detained under Section 1226(a), making them subject to "discretionary detention." *See Rodriguez v. Bostock*, No. 3:25-cv-5240, 2025 WL 2782499, at *25 (W.D. Wash. Sep. 30, 2025) (describing Defendants' longstanding practice). Under Defendants' new interpretation, however, noncitizens arrested within the United States and charged with inadmissibility are now considered "applicants for admission" under Section 1225(b). *See Merino v. Ripa*, No. 25-cv-23845, 2025 WL 2941609, at *3 (S.D. Fla. Oct. 15, 2025) (discussing Defendants' new interpretation). As a result, they are subject to "mandatory detention" and must be detained. 8 U.S.C. § 1225(b)(2)(A).

This shift expands the category of noncitizens who ICE considers subject to mandatory detention. Individuals detained under Section 1225(b) are generally not entitled to the due process protections available under Section 1226(a) and may be released only on parole. *See id.* §§ 1225(b)(2)(A), 1226(a)(1)–(2); *see also Johnson v. Guzman Chavez*, 594 U.S. 523, 527–29 (2021). To grant parole, ICE must determine that release would provide a "significant public benefit" or is justified for "urgent humanitarian reasons." 8 U.S.C. § 1182(d)(5)(A). Under the October 1 Policy, ICE now classifies all age-outs as detainable under Section 1225(b). *See* Sealed Doc. at 1.

Before turning to the merits of Plaintiffs' challenges to the October 1 Policy, the Court addresses a preliminary matter. The parties devote attention to Defendants' recent change in position regarding which noncitizens qualify as "applicants for admission" and are therefore subject to mandatory detention under Section 1225(b). *See, e.g.*, Pls.' Reply at 9–12; Defs.'

Opp'n at 15–18. They also discuss several cases in which federal courts have considered and rejected this new interpretation. *See* Pls.' Reply at 10; Defs.' Opp'n at 15–18.

Although Defendants' revised interpretation of Section 1225(b) prompted the adoption of the October 1 Policy, that interpretation itself is not before this Court. In other words, this dispute does not require the Court to decide which noncitizens are properly subject to mandatory detention under Section 1225(b), and neither party asks the Court to resolve that issue. Nor is it necessary to do so. As the Court previously held, Defendants' obligation to comply with Section 1232(c)(2)(B) "arises upon [an age-out's] transfer to DHS custody and does not turn on the statutory authority under which a particular former unaccompanied minor is detained." MTD and Class Cert. Mem. Op. at 62; *see also id.* at 30–33 (rejecting Defendants' argument that such a reading "would conflict with the broad discretionary authority Congress granted to the agency to determine whether to detain or to release an alien during removal proceedings"). All age-outs—regardless of the detention authority under which they are detained—must receive the protections guaranteed by Section 1232(c)(2)(B).[6] *Id.* at 61–64; *id.* at 33 ("[T]hat an agency has broad authority in a realm does not give it license to ignore Congress's specific directions or restrictions on its authority."). The dispute here instead concerns whether the October 1 Policy, which establishes ICE's new procedures for age-out custody determinations, provides those statutory protections.

With that settled, the Court turns to the merits. Plaintiffs contend that the October 1 Policy violates Section 1232(c)(2)(B) and this Court's Final Judgment and Permanent Injunction

---

[6] At this stage in the litigation, the parties are bound by this Court's prior decisions. *Kimberlin v. Quinlan*, 199 F.3d 496, 500 (D.C. Cir. 1999) ("[A] 'legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time.'" (quoting *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 350 (D.C. Cir. 1987)).

because the Policy impermissibly limits eligibility to participate in alternative to detention programs to a subset of age-outs. Pls.' Mot. at 17–18; Pls.' Reply at 1–4. Plaintiffs further assert that the October 1 Policy leads to age-out placements that do not result from the risk-factor analysis that Section 1232(c)(2)(B) requires. The Court agrees.

Section 1232(c)(2)(B) affords age-outs certain protections upon their transfer from ORR to ICE. Per the Court's prior opinions, what these protections entail is now well-established and familiar to the parties. Under Section 1232(c)(2)(B), if a UAC in HHS custody "reaches 18 years of age and is transferred to the custody of the Secretary of Homeland Security, the Secretary *shall* consider placement in the least restrictive setting available after taking into account the alien's danger to self, danger to the community, and risk of flight." 8 U.S.C. § 1232(c)(2)(B) (emphasis added); *see also id.* § 1232(c)(2)(A); FF & CL at 151–52. And "[s]uch aliens," that is, all age-outs, "*shall* be eligible to participate in alternative to detention programs, utilizing a continuum of alternatives based on the alien's need for supervision." 8 U.S.C. § 1232(c)(2)(B) (emphasis added); *see also* FF & CL at 151–52.

As this Court previously explained, "per the plain language of the provision, for each and every age-out, DHS must (1) take into account the statutory factors, (2) do so as it considers placing the age-out in the least restrictive setting available, and (3) make the age-out eligible for the identified alternative to detention options." FF & CL at 152. These protections "extend[] to *all* former unaccompanied minors" who have been transferred to DHS custody, MTD and Class Cert. Mem. Op. at 32 (emphasis added), and "do[] not turn on the statutory authority under which a particular former unaccompanied minor is detained," *id.* at 62. In other words, regardless of whether an age-out is detained under Section 1225(b) or Section 1226(a), that age-out must be afforded Section 1232(c)(2)(B)'s protections. See *id.* at 31 ("[P]er the plain language of the

provision, all [age-outs]—regardless of the agency's flight risk or dangerousness determinations and irrespective of the provision under which the individual has been detained—are entitled to consideration. Full stop."). Therefore, the October 1 Policy will comply with the requirements of Section 1232(c)(2)(B) if it affords age-outs these statutory protections. As explained below, however, the Policy fails to afford the protections owed to all age-outs.

1.  The Policy Fails to Make All Age-Outs Eligible for Alternative Detention Programs.

First, the Court agrees with Plaintiffs that the October 1 Policy fails to make all age-outs eligible for alternative detention programs. As noted above, Section 1232(c)(2)(B) requires that Defendants make *all* age-outs eligible for such programs. *See also* MTD and Class Cert. Mem. Op. at 30 (holding that "[n]othing in the text or context supports Defendants' argument that only a subset of former unaccompanied minors who were transferred to DHS custody" are entitled to the protections afforded by Section 1232(c)(2)(B)).

According to Defendants, the October 1 Policy consists of three steps. *See* Defs.' Opp'n at 13. Step one requires ICE to continue to review and complete the AORW form for each age-out. Sealed Doc. at 1. And such review must "be conducted based on the statutory factors outlined in 8 U.S.C. § 1232 . . . and the requirements established in the *Garcia-Ramirez* Permanent Injunction." *Id.* According to the Policy, "[t]he current AORW procedure remains unchanged." *Id.*

Step two "imposes," what Defendants call, an "additional requirement[]." Defs.' Opp'n at 10, 13, 15.  ICE must conduct a "parole review" if "the AORW recommends a custody option other than detention." Sealed Doc. at 1; Defs.' Opp'n at 13. This is so, says the Policy, because "such individuals"—age-outs—"are subject to detention under [8 U.S.C. § 1225(b)] and may only be released from ICE custody through parole under [8 U.S.C. § 1182(d)(5)]." Sealed Doc. at

1. And parole may only be granted on a "case-by-case basis" for "urgent humanitarian reasons" or "significant public benefit." *Id.* The Policy thus instructs ICE to "evaluate whether the specific circumstances of the [age-out] meet the statutory criteria for parole." *Id.*

Step three requires ICE to "consider placement in the next available least restrictive setting," if the release of an age-out does not meet the parole criteria. *Id.* And according to Defendants, the next and only available "least restrictive setting" in such a scenario is the age-out's detention in an adult facility. *See* Defs.' Opp'n at 13. It is only if ICE determines that an age-out is eligible for parole (for "urgent humanitarian reasons" or "significant public benefit") that Defendants then "make a variety of detention alternatives available for age-outs," including "release on parole to a sponsor." *Id.*

Therefore, the October 1 Policy is premised on age-outs having only one alternative to detention: parole. And an age-out's eligibility for parole is based on whether the age-out's "specific circumstances" warrant release for "urgent humanitarian reasons" or serve a "significant public benefit." *See id.*; Sealed Doc. at 1.

This decision-making process, however, contravenes Section 1232(c)(2)(B). Nothing in the text limits the entitlement to be "eligible to participate in alternative to detention programs" to age-outs whose circumstances warrant parole release, that is, for "urgent humanitarian reasons" or "significant public benefit." *See* 8 U.S.C. § 1232(c)(2)(B); *id.* § 1182(d)(5)(A). As previously explained, per the plain meaning of Section 1232(c)(2)(B), "*all* former unaccompanied minors who have been transferred to the custody of DHS," "shall be eligible to participate in alternative to detention programs." MTD and Class Cert. Mem. Op. at 31–32 (quoting 8 U.S.C. § 1232(c)(2)(B)). And eligibility is not limited "to some never-mentioned subset of that group." *Id.* at 32.

That the parole factors ("urgent humanitarian reasons" or "significant public benefit") do not appear in the statute's text is significant: Courts "do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and [courts'] reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest." *Jama v. ICE*, 543 U.S. 335, 341 (2005). Courts thus "resist reading words or elements into a statute that do not appear on its face." *Dean v. United States*, 556 U.S. 568, 572 (2009) (quoting *Bates v. United States*, 522 U.S. 23, 29 (1997)).

Elsewhere within Section 1232, Congress expressly references other statutory provisions of the Immigration Nationality Act ("INA"), indicating that Congress knew how to incorporate other provisions when it so intended. *See, e.g.*, 8 U.S.C. § 1232(c)(2)(A) (permitting placement of child trafficking victims in an Unaccompanied Refugee Minor program pursuant to INA § 412(d), 8 U.S.C. § 1522(d)); *id.* § 1232(c)(5) (requiring the agency to strive to ensure, consistent with INA § 292, 8 U.S.C. § 1362, that unaccompanied children have counsel); *id.* § 1232(a)(5)(D) (requiring placement of unaccompanied children not from contiguous countries in full removal proceedings pursuant to INA § 240, 8 U.S.C. § 1229a).

Thus, if Congress had wanted an age-out's eligibility to participate in alternative detention programs to turn on the parole factors contained in Section 1182(d)(5)(A), it knew how to require such. *See Pugin v. Garland*, 599 U.S. 600, 608 (2023) (making this same point when interpreting another section of the INA in which "Congress cross-referenced numerous other statutes"). But no such cross-reference to Section 1182(d)(5)(A) exists in Section 1232(c)(2)(B). The Court thus declines to read any such limitation into the statute. In short, by limiting the eligibility to participate in alternative to detention programs to age-outs whose circumstances

warrant parole release (for "urgent humanitarian reasons" or "significant public benefit"), the October 1 Policy contravenes Section 1232(c)(2)(B).

 2. The Policy Produces Non-Compliant Placement Decisions for Most Age-Outs.

 Second, the Court further agrees with Plaintiffs that the October 1 Policy's decision-making process leads to age-out placements that do not result from the risk-factor analysis that Section 1232(c)(2)(B) requires. Pls.' Reply at 3–5. Rather, for most age-outs, the placement decision is based on ICE's parole determination—not whether the age-out is a danger to self, danger to the community, or a flight risk. *Id.* Section 1232(c)(2)(B) requires that these risk factors bear on the age-out's placement. FF & CL at 156, 178–79. The October 1 Policy, however, eliminates—or at least subordinates—the relevance of these risk factors. This is evident from Defendants' revocation of age-outs' post-18 plans even when Defendants had already determined those individuals posed no risk and had available sponsors.

 As this Court has outlined before, Section 1232(c)(2)(B) "calls for an individualized assessment of the proper placement for each former unaccompanied minor in light of DHS's assessment of his or her danger to self, danger to the community, and risk of flight." MTD and Class Cert Mem. Op. at 40. And ICE "must treat the risk factors as relevant variables" when "determin[ing] a placement, [which is] the outcome of the decisionmaking process for each age-out." FF & CL at 156. In other words, under Section 1232(c)(2)(B), "the age-out's placement is a potential output of this decisionmaking process, while the factors are characteristics of the input (the age-out)." *Id.* Therefore, when a custody determination is made pursuant to a process that renders the risk factors irrelevant to the age-out's placement, that determination violates Section 1232(c)(2)(B). *See id.* ("[T]he 'consider[ation of] placement in the least restrictive setting

available' must bear some relation to the risk factors that have been 'take[n] into account.'"
(second and third alterations in original)).

For age-outs whose risk factors indicate that they pose no risk of flight or a danger but
who are ineligible for parole, the October 1 Policy produces non-compliant custody
determinations. Under the Policy, even if an age-out is found at "step one" to merit release based
on ICE's assessment of the risk factors, the age-out will still be detained *unless* the additional
parole factors under Section 1182(d)(5) also support release. Sealed Doc. at 1. In those
situations, the detention decision is no longer driven by the risk factors; instead, it turns on the
parole determination, which ICE evaluates separately after it analyzes the age-out's risk factors.
*See id.* Stated differently, the parole factors are outcome determinative.

Plaintiffs present evidence showing that age-outs who pose no flight risk or danger
receive custody determinations under the Policy that do not comply with Section 1232(c)(2)(B).
Shortly after Defendants implemented the Policy, ICE revoked the planned release of numerous
UACs in ORR custody who were nearing their eighteenth birthdays, despite prior assessments
finding that they posed no flight risk or danger and had sponsors ready to receive them. *See, e.g.*,
Maynard Decl. ¶¶ 12, 22, 27, 31 (revoking planned releases for class members E.G.G.L,
E.O.B.M., I.L.F.R., and W.O.B.P.); Suppl. Hilty Decl. ¶¶ 6, 20 (detaining class member
M.E.R.V. despite his approval for release); Hilty Decl. ¶¶ 22, 30 (revoking planned releases for
class members R.I.Y.C. and G.T.X.); Suppl. Barry Decl. ¶¶ 3–4 (revoking planned release for
class member C.H.V.); Suppl. Winger Decl. ¶¶ 25 (revoking planned releases for class members
A.G.A., R.R.A.C., and S.H.G.).[7] Despite these risk-factor assessments, ICE nonetheless decided

---

[7] Leading up to or shortly after this Court's TRO, ICE reinstated release approvals for
certain age-outs and released others from detention. *See* Maynard Decl. ¶¶ 14, 22, 28; Pls.' Mot.

to detain all the age-outs. In many instances, ICE explicitly acknowledged—either orally or in writing—that its decision to detain was based on a new requirement that age-outs be detained unless they warrant parole release. *See, e.g.*, Maynard Decl. ¶¶ 13–14; *id.* Ex. C (email from ICE notifying an ORR shelter on October 2, 2025, that "age-out" aliens are "subject to detention . . . and may not be released from custody" except by parole "granted on a case-by-case basis for 'urgent humanitarian reasons' or 'significant public benefit'").

Under the Policy, it is only when an age-out's risk factors support detention (i.e., the age-out poses a risk of flight or danger) that ICE's detention decision complies with Section 1232(c)(2)(B). But for the majority of age-outs, ICE has historically deemed release to be the appropriate placement. For the past four years, before the Policy was implemented, ICE's risk-factor assessments under Section 1232(c)(2)(B) resulted in the release of approximately 98% of age-outs upon their transfer from ORR. Winger Decl. ¶ 3, ECF No. 413-4. This history suggests that, for most age-outs, the Section 1232(c)(2)(B) risk-factor assessments would ordinarily support release. Indeed, as noted here, none of the class-member age-outs were found to pose a flight risk or a danger to themselves or others; each was therefore deemed suitable for release, and sponsors were available to receive them. *See* Pls. Mot. Exs. C–V (AORWs for identified Plaintiff class members).

This evidence thus indicates that Defendants are indeed treating factors besides the Section 1232(c)(2)(B) risk factors (i.e., the parole factors under Section 1182(d)(5)(A)) as conclusive in age-out placement decisions. As a result, the risk factors ICE is required to consider appear to have little, if any, bearing on the placement decision for the overwhelming majority of age-outs, contrary to the statute's mandate. *See* FF & CL at 156.

---

at 9; Suppl. Hilty Decl. ¶ 28; Suppl. Barry Decl. ¶ 4; Suppl. Winger Decl. ¶ 25. Other age-outs presumably remain in ICE custody. *See* Hilty Decl. ¶¶ 23, 31.

3.  Defendants' Arguments in Support of the Policy Are Unavailing.

The Court is unpersuaded by the various arguments Defendants assert in support of the Policy. For instance, Defendants argue that the Policy merely reflects "Defendants' awareness that § 1232(c)(2)(B) and 8 U.S.C. § 1225(b)(2)(A) must work in concert." Defs.' Opp'n at 1. Defendants, however, overlook the "basic principle of statutory construction that a specific statute . . . controls over a general provision . . . particularly when the two are interrelated and closely positioned." *HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981) (per curiam); *Busic v. United States*, 446 U.S. 398, 406 (1980) ("[A] more specific statute will be given precedence over a more general one, regardless of their temporal sequence."). This "general/specific canon" serves to prevent a specific provision from being rendered meaningless by a broader one, as courts must read statutes to give effect to each. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645–46 (2012); *see also Halverson v. Slater*, 129 F.3d 180, 185 (D.C. Cir. 1997) (providing that courts must read statutes to give effect to each and avoid interpretations that render other provisions meaningless or futile). Because Section 1232(c)(2)(B) is a "specific provision applying to a very specific situation," *see Morton v. Mancari*, 417 U.S. 535, 550–51 (1974), it governs the custody of age-outs and overrides Section 1225(b), the more general provision.[8]

---

[8] The INA (including Section 1225(b)) generally governs the custody of noncitizens pending their applicable immigration proceedings. *See* 8 U.S.C. §§ 1225, 1226; *Jennings v. Rodriguez*, 583 U.S. 281, 287–89, 297 (2018). Through the Violence Against Women Reauthorization Act of 2013, Congress added Section 1232(c)(2)(B) to address the custody of former UACs who are transferred to ICE upon their eighteenth birthday. 8 U.S.C. § 1232(c)(2)(B); Pub. L. No. 113-4, § 1261, 127 Stat. 54, 156 (Mar. 7, 2013). Thus, Section 1232(c)(2)(B) is a "specific provision applying to a very specific situation." *See Morton*, 417 U.S. at 550–51; *see also RadLAX Gateway Hotel*, 566 U.S. at 645 (instructing that the "general/specific canon" is especially applicable where "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions" (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 519 (1996) (Thomas, J., dissenting))).

The October 1 Policy, however, turns this canon on its head. The Policy structures the custody-determination process such that the Section 1232(c)(2)(B) risk-factor analysis occurs at "step one." *See* Sealed Doc. at 1. And as explained above, the parole determination at "step two" displaces that statutorily required risk-factor analysis. *See supra* pp. 23–24. This sequencing results in the general provision, Section 1225(b), swallowing and rendering meaningless the specific provision, Section 1232(c)(2)(B), running afoul of the general/specific canon. As a result, the Policy fails to give Section 1232(c)(2)(B) full effect, as Congress intended. *See Halverson*, 129 F.3d at 185 (requiring courts to read statutes "to give effect to each" because "Congress cannot be presumed to do a futile thing"); *RCA Glob. Commc'ns, Inc. v. FCC*, 758 F.2d 722, 733 (D.C. Cir. 1985) (rejecting an interpretation that "would deprive [the provision] of all substantive effect, a result self evidently contrary to Congress' intent").

Even if the statutes must be harmonized, as Defendants suggest, the Policy would still need to give effect to each provision. *See Halverson*, 129 F.3d at 185; *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 698–99 (D.C. Cir. 2014) ("[I]t is our duty to harmonize the provisions and render each effective."). To achieve this, the parole determination would need to occur first, at "step one." If that analysis concludes that detention is appropriate (because release is neither warranted for urgent humanitarian reasons nor serves a significant public benefit), Defendants then at "step two" would need to conduct the Section 1232(c)(2)(B) risk-factor analysis (considering placement in the least restrictive setting available after accounting for the age-out's risk factors). Only this sequence allows Sections 1225(b) and 1232(c)(2)(B) to coexist while still giving Section 1232(c)(2)(B) its full effect, that is, ensuring that the statute's risk factors meaningfully bear on the age-out's placement. *See supra* pp. 22–24; FF & CL at 156. Thus, even if Defendants are correct that the statutes must be read together, the current Policy (requiring the

26

parole determination to follow the risk-factor analysis) is nonetheless inconsistent with such a premise.

Defendants' other arguments fare no better. Defendants contend that Plaintiffs' claims are premised on seeking a specific outcome in an age-out's custody determination, to which they are not entitled. Defs.' Opp'n at 13–15 ("Plaintiffs' argument . . . confuses not obtaining a desired result (release) with the requirements of 8 U.S.C. § 1232(c)(2)(B)."). Plaintiffs, however, do not seek that age-outs be released. Rather, they seek that age-outs be eligible for alternative detention programs and not have their eligibility and placement be based on extra-statutory factors. Pls.' Reply at 4. Although Section 1232(c)(2)(B) does not guarantee any age-out's placement in an alternative detention option, the statute *does* require that *all* age-outs be made eligible for such options and that ICE view the risk factors as "relevant variables" in making placement decisions. *See* FF & CL at 156; MTD and Class Cert. Mem. Op. at 30. As this Court has told Defendants before, Defendants "conflat[e] plaintiffs' interest in the opportunity to be considered for a type of relief with a demand for that relief." MTD and Class Cert. Mem. Op. at 34. As before, Defendants here "get no points for raising a straw man then knocking it down." *Id.*

Defendants also attempt to cabin the Court's prior rulings, stating that "[n]either § 1232(c)(2)(B) nor the Permanent Injunction mandate anything beyond following a 'certain process, which requires proper consideration of certain factors and of certain alternatives.'" Defs.' Opp'n at 14 (quoting Final J. and Permanent Inj. Mem. Op. at 20). But, as noted above, Section 1232(c)(2)(B) requires Defendants to do more than just procedurally analyze the risk factors; the factors must substantively bear on the age-out's placement. FF & CL at 156. And if the risk factors are giving way to other extra-statutory considerations, a decision based largely on those other considerations violates the statute. *See supra* pp. 22–23.

Defendants further contend that they have undertaken the process required under Section 1232(c)(2)(B), as evidenced by "step one" in the October 1 Policy requiring ICE to assess the age-out's risk factors and continue filling out AORWs for each age-out. Defs.' Opp'n at 14–15. But this Court has repeatedly explained that "[t]he AORWs fail to establish that proper consideration was given." FF & CL at 169. Indeed, the underlying litigation revealed various flaws with ICE's documentation of age-out custody determinations. For example, "so many [AORWs] were produced and edited after the fact by [ICE] officers other than the ones who actually made the decisions," and ICE had processed over three hundred age-outs "without having AORWs filled out at all during the time period when ICE was attempting to document its decisions." *Id.* Therefore, the AORWs alone "do not prove ICE's compliance with the statute." *Id.*

In sum, the October 1 Policy violates Section 1232(c)(2)(B) for two independent reasons. First, the policy fails to make all age-outs eligible to participate in alternative detention programs. Instead, the Policy limits eligibility to those age-outs whose circumstances warrant release for urgent humanitarian reasons or significant public benefit. Second, the October 1 Policy's decision-making process largely leads to age-out placements which do not result from the risk-factor analysis that Section 1232(c)(2)(B) requires. For most age-outs, the placement decision is based on ICE's parole determination—not whether the age-out is a danger to self, danger to the community, or a flight risk. The Policy thus contravenes the Permanent Injunction requiring Defendants to make age-out placement decisions consistent with Section 1232(c)(2)(B).[9]

---

[9] Because the Court has found that the Policy violates Section 1232(c)(2)(B) for the reasons explained above, the Court need not determine whether the Policy is, in fact, a "no-release policy" as Plaintiffs assert. *See* Pls.' Reply at 6–8. In other words, the Court does not find

**B. ICE's Re-arrest and Detention of Age-Outs After Their Release, Absent a Material Change in Their Circumstances, Violates Section 1232(c)(2)(B).**

Plaintiffs further allege that ICE has re-arrested and detained class-member age-outs shortly after ICE initially released them upon their transfer from ORR, despite no material change in the age-outs' circumstances. Pls.' Mot. at 12–13, 24–25. Plaintiffs provide 15 examples of class members who were re-arrested and detained shortly after their release. *See* Suppl. Winger Decl. ¶¶ 18–19; *id.* Ex. 2; 2d Suppl. Winger Decl. ¶¶ 4–9; Pls.' 2d Notice, ECF No. 433. ICE detained many class members at their follow-up check-in with ICE, which was a condition of the age-outs' release.[10] Pls.' Mot. at 25–26. Plaintiffs ask this Court to enjoin Defendants from re-arresting and detaining age-outs after Defendants initially released them, absent a material change in their circumstances, as such conduct violates Section 1232(c)(2)(B) and the Permanent Injunction. *Id.* at 26–27.

Defendants, on the other hand, contend that such age-outs are no longer class members and are subject to detention "like any other adult alien." Defs.' Opp'n at 20. According to Defendants, "once a former UAC receives a custody determination as an age-out and is released from immigration custody, he or she is not a class member." *Id.* at 20. Defendants thus characterize Plaintiffs' claim as seeking additional Court intervention beyond the scope of Section 1232(c)(2)(B) and the Permanent Injunction, reaching "a population [the injunction] never intended to cover." *Id.* at 20, 23. None of Defendants' arguments holds water.

This Court has previously explained that "[t]he statute does not place any time limits on ICE's duties under the statute, either on the front end or the back end." FF & CL at 162. This is

___

that "the functional availability of parole as a real option for release from detention is determinative to the outcome of [Plaintiffs'] motion," and thus, no discovery on this issue is necessary. *See id.* at 7 n.4.

[10] Additionally, A.T.L. went to his first ICE check-in following age-out release because he "did not want to hurt [his] immigration case." A.T.L. Decl. ¶ 4, ECF No. 425.

because "Section 1232(c)(2)(B) provides that '[i]f a [UAC] reaches 18 years of age,' the Secretary's obligations are triggered." *Id.* (alterations in original). Thus, "[o]n the back end . . . the statute does not require 'periodic re-assessment' of a decision once it has been made." *Id.* "But ICE is not relieved of its obligation to follow [Section 1232(c)(2)(B)] at the end of the day on the age-out's eighteenth birthday." *Id.* Indeed, the underlying trial revealed that a "number of ICE field offices view[ed] their obligations with regard to age-outs as limited to only the day the age-out turns eighteen." *Id.* As explained, however, such a temporal limitation was unsupported by the statute's text. *Id.* Therefore, "[i]f an age-out is detained without proper consideration of alternatives, that age-out is owed a compliant decision." *Id.* "This is not re-assessment [of the initial age-out placement], but simply the proper assessment that was required in the first place." *Id.*

These principles apply with equal force here. To reiterate, "[i]f an age-out is detained without proper consideration of alternatives, that age-out is owed a compliant decision." *Id.* And if ICE nullifies a compliant placement decision by making a subsequent, non-compliant placement decision, it is as if the age-out never received "the proper assessment that was required in the first place." *Id.* Defendants would have this Court sever the statutory entitlements afforded to age-outs at the point at which age-outs are given their initial placement (upon turning eighteen). But such an assertion is inconsistent with the language of the statute; nothing in the statute expressly limits the entitlement of a compliant decision to the time the age-out's initial placement occurs. *See id.*; 8 U.S.C. § 1232(c)(2)(B).

Not only is Defendants' theory unsupported by the text, but "to follow [Defendants'] reading" of Section 1232(c)(2)(B) "would open a loophole allowing easy evasion of the statutory provision's basic purposes," and "[s]uch an interpretation is neither persuasive nor reasonable."

*Cnty. of Maui v. Haw. Wildlife Fund*, 590 U.S. 165, 180 (2020); *Quarles v. United States*, 587 U.S. 645, 654 (2019) (instructing that courts "should not lightly conclude that Congress enacted a self-defeating statute"). And "statutes [must] be construed to avoid unreasonable and absurd results." *In re Nofziger*, 925 F.2d 428, 434 (D.C. Cir. 1991); *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982) ("[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."). Moreover, construing Section 1232(c)(2)(B) to permit Defendants to unilaterally limit Congress's protections for age-outs to mere days is precisely the kind of "absurd result" that must be avoided when interpreting a statute. *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998) (defining a result as absurd when, "considered in the particular statutory context," it is "contrary to common sense" or "inconsistent with the clear intentions of the statute's drafters"). The Court thus declines to read any such limitation into Section 1232(c)(2)(B) that would lead to such absurd results. In short, age-outs who have been re-arrested and detained without the consideration required by Section 1232(c)(2)(B) are class members.

Notably, Defendants do not dispute Plaintiffs' allegations concerning the re-arrest and detention of age-outs despite no material changes in the age-outs' circumstances. Instead, Defendants characterize Plaintiffs' emphasis on an age-out's lack of change in circumstances as irrelevant and a "red herring." Defs.' Opp'n. at 23. To the contrary, such allegations do support Plaintiffs' assertion that Defendants have essentially crafted a workaround that eliminates the protections that Congress intended age-outs in ICE custody to receive.[11] *See* Pls.' Mot. at 24.

---

[11] The requirement for a "material change in circumstances" is not a novel standard. As explained in another detention context, "when ICE has previously released a noncitizen after determining they are not a flight risk or danger to the community, the BIA has limited this

Certainly, the Court finds problematic the consequences that would flow if the Court were to accept Defendants' position.

Allowing Defendants to continue course would, in effect, allow Defendants to thwart the Court's scrutiny (and Congress's intent) by complying with Section 1232(c)(2)(B) one day— considering an age-out for placement in the least restrictive setting and thereby removing the age-out from the class—only to claw back that consideration the next day (despite no material change in the age-out's circumstances), ensuring that the age-out can no longer be considered a class member while also being deprived of the consideration they were owed under the statute. The Court finds this position untenable. Such conduct would interfere with the administration of justice, vitiating the relief the Permanent Injunction was meant to provide. And the Court has the power to enjoin conduct that would frustrate this Court's prior orders. *See Flaherty*, 17 F. Supp. 3d at 55.

Contrary to Defendants' assertions, Plaintiffs are not claiming an entitlement to the protections afforded by Section 1232(c)(2)(B) "indefinitely." *See* Defs.' Opp'n at 28–29. The relief Plaintiffs seek is narrow: Plaintiffs seek to enjoin Defendants from re-arresting and detaining age-outs after their initial release, "absent a material change in their circumstances indicating they are now a flight risk or danger to the community." *See* Pls.' Proposed Order, ECF No. 429-1. As Plaintiffs note, a sufficient change in an age-out's circumstances could warrant re-arrest and detention while in ICE's legal custody. *See* Pls.' Reply at 19 ("Once ICE's determinations about [the risk factors] in an individual case have meaningfully changed, the

---

revocation authority such that, in practice, the DHS re-arrests non-citizens only after a material change in circumstances. This standard prevents arbitrary revocations and ensures that detention decisions rest on individualized assessments of changed circumstances rather than categorical assumptions." *Ledesma Gonzalez v. Bostock*, No. 2:25-cv-01404, 2025 WL 2841574, at *5 (W.D. Wash. Oct. 7, 2025) (citation modified).

analysis about the appropriate placement can also change."). But ICE cannot re-arrest and detain without affording age-outs the protection due under Section 1232(c)(2)(B) merely because some short time has passed since that protection was afforded. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 485 (2001) (ruling that an agency "may not construe the statute in a way that completely nullifies textually applicable provisions meant to limit its discretion"). Defendants overlook that the act of detaining or releasing an age-out serves to place the age-out in a suitable setting pending the outcome of their immigration proceedings. *See, e.g.*, *Jennings*, 583 U.S. at 287–88; *id.* at 296 ("[W]e hold that, subject only to express exceptions, §§ 1225(b) and 1226(c) authorize detention *until the end of applicable proceedings*." (emphasis added)). Thus, the protections Section 1232(c)(2)(B) affords age-outs remain in effect until the age-out's immigration proceedings conclude.

Defendants cite cases in which other federal courts have held that former unaccompanied children were not entitled to be considered for placement in the least restrictive setting under Section 1232(c)(2)(B) after being re-arrested and detained. *See* Defs.' Opp'n at 24 (citing *Mendez Ramirez v. Decker*, 612 F. Supp. 3d 200 (S.D.N.Y. 2020); *Jose L.P. v. Whitaker*, 431 F. Supp. 3d 540 (D.N.J. 2019)). But these cases are inapposite.

In each case, the court determined that the petitioner had lost their UAC status as a child because each had been released to the custody of a parent in the United States before turning eighteen and no longer met the statute's definition of an "unaccompanied alien child." *See Mendez Ramirez*, 612 F. Supp. 3d at 210–11; *Jose L.P.*, 431 F. Supp. 3d at 547–48 (same); *see also* 6 U.S.C. § 279(g)(2) (defining an "unaccompanied alien child" as one who (1) has no lawful immigration status, (2) is less than 18 years old, and (3) who either has no parent or guardian in the United States or no parent or guardian in the United States who is available to provide care

and physical custody). And in each case, the petitioner was re-arrested and detained pursuant to a material change in their relevant circumstances. *See Mendez Ramirez*, 612 F. Supp. 3d at 207–08 (petitioner re-arrested and detained a year after his release because he failed to appear for his removal proceedings and was ordered removed *in abstentia*); *Jose L.P.*, 431 F. Supp. 3d at 542 (petitioner re-arrested and detained over three years after his release after failing to appear in court and joining a gang).

Here, on the other hand, the age-outs retained their UAC status until their transfer to ICE, when they "aged out." And none had a material change in their circumstances that would indicate that their re-arrest and detention was necessary due to a risk of flight or danger to themselves or the community. *See* Suppl. Winger Decl. ¶ 19; *id.* Ex. 2 (confirming ICE provided no explanation for the re-detention of F.L.P., A.D., J.N.B.S., and J.A.M.S.); 2d Suppl. Winger Decl. ¶¶ 4–8 (same for C.R.R., O.L.M., D.S.M., J.E.O., and V.J.R.); Pls.' 2d Notice Ex. W (same for D.M.G.). In fact, it was while *complying* with the conditions of their release that class members were arrested.[12] *See* Suppl. Winger Decl. ¶¶ 16; *id.* Ex. 2 (explaining that class members were re-detained during a required check-in with ICE following their age-out release); 2d Suppl. Winger Decl. ¶¶ 4–8 (same); Pls.' 2d Notice (same). Thus, Defendants' reliance on those cases is misplaced. Defendants' practice of re-arresting and detaining age-outs absent a material change in their circumstances therefore thwarts the protections Congress provided and contravenes the Permanent Injunction requiring Defendants to make age-out placement decisions consistent with Section 1232(c)(2)(B).

---

[12] Even where Defendants justify the re-detention of a class member, that justification is either disputed by the class member himself, *see* A.T.L. Decl. ¶ 5, or was already noted in the class member's AORW approving release, *see* Pls.' Mot. Ex. F, at 4 (finding J.D.F.V. "is not a danger to himself, the community, and is not considered a flight risk" despite noting a prior misdemeanor conviction).

**C.  This Court Has the Authority to Issue Injunctive Relief to Ensure Defendants' Compliance with Section 1232(c)(2)(B) and This Court's Prior Order.**

This Court has the authority to issue orders to ensure Defendants' compliance with Section 1232(c)(2)(B) and the Permanent Injunction. It is well established that "a court's powers to enforce its own injunction by issuing additional orders is broad, particularly where," as here, "the enjoined party has not fully complied with the court's earlier orders." *Nat'l L. Ctr. on Homelessness & Poverty v. U.S. Veterans Admin.*, 98 F. Supp. 2d 25, 26–27 (D.D.C. 2000) (citation modified); *Int'l Ladies' Garment Workers' Union*, 733 F.2d at 922 (explaining that enforcement of a court's mandate "is particularly appropriate in a case . . . where an administrative agency plainly neglects the terms of [the] mandate").

This Court's Final Judgment and Permanent Injunction required ICE to "make all Age-Out placement determinations in accordance with the findings and conclusions set forth in the Court's July 2, 2020 Decision." Final J. and Perm. Inj. Order at 3. The Court also retained jurisdiction to enforce Defendants' compliance with Section 1232(c)(2)(B) for five years after entering final judgment against them. *Id.* at 7–8. And as explained above, this Court finds that Defendants' practices and age-out custody-determination process (as outlined in the October 1 Policy) fail to result in age-out placement determinations that comply with Section 1232(c)(2)(B) and this Court's prior decisions. As a result, class member age-outs have not "'received all relief required' by the Court's earlier order." *WildEarth Guardians v. Bernhardt*, No. 16-cv-1724, 2019 WL 3253685, at *3 (D.D.C. July 19, 2019) (quoting *Heartland Hosp.*, 328 F. Supp. 2d at 11). Therefore, the Court has "the authority to enforce the terms of [its] mandate[]," *see id.* (alterations in original) (quoting *Flaherty*, 17 F. Supp. 3d at 55), including by enjoining Defendants from making non-compliant age-out placements.

Defendants resist this straight-forward conclusion. Defendants contend that their determination, that UACs and age-outs are subject to mandatory detention under Section 1225(b), is beyond this Court's jurisdiction. Defs.' Opp'n at 29. They further contend that the relief Plaintiffs seek would enjoin or restrain Defendants' operation of Section 1225 on a class-wide basis. *Id.* And Section 1252(f)(1), Defendants argue, deprives this Court of the authority to issue such relief.[13] *Id.* These arguments are unavailing.

First, the Court has already explained in this opinion that Defendants' recent interpretation of who it deems detainable under Section 1225(b) is not the subject of this litigation. *See supra* p. 17. The Court does not address that issue here. Second, Plaintiffs seek only to enforce this Court's Final Judgment and Permanent Injunction and ensure Defendants' compliance with Section 1232(c)(2)(B). *See, e.g.*, Pls.' Mot. at 1; *see also* Final J. and Permanent Inj. Mem. Op. at 29 ("But Plaintiffs only ask, and the Court has only ordered, that Defendants comply with the statutory directives laid out by Congress. It is the legislature, not the Courts, that established the requirements of Section 1232(c)(2)(B) . . . .").

Moreover, Section 1252(f)(1) only applies to orders concerning certain specified statutory provisions—none of which include Section 1232(c)(2)(B), the basis for the relief Plaintiffs seek. 8 U.S.C. § 1252(f)(1). And "a court may enjoin the unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 553 n.4

---

[13] Section 1252(f) places certain limits on injunctive relief in cases concerning certain statutory provisions of immigration law. *See generally* 8 U.S.C. § 1252(f). Specifically, Section 1252(f)(1) provides: "Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." *Id.* § 1252(f)(1).

(2022) (distinguishing the circumstances in *Gonzales v. Dep't of Homeland Sec.*, 508 F.3d 1227, 1232–34 (9th Cir. 2007)); *Refugee & Immigrant Ctr. for Educ. & Legal Servs. v. Noem*, 793 F. Supp. 3d 19, 107 (D.D.C. 2025) ("To the extent the relief that Plaintiffs seek—enjoining implementation of the Proclamation—might have downstream effects on removal proceedings, those effects are merely incidental to Plaintiffs' permissible challenges to the Proclamation and guidance, and such 'collateral effect[s]' do not trigger § 1252(f)(1)." (alteration in original) (quoting *Aleman Gonzalez*, 596 U.S. at 553 n.4)); *L.G.M.L. v. Noem*, No. 25-cv-2942, 2025 WL 2671690, at *11 n.6 (D.D.C. Sep. 18, 2025) (concluding that Section 1252(f)(1) does not preclude class-wide injunctive relief affecting Section 1232).

Third, at this stage in the litigation, after voluntarily dismissing their appeal of the Final Judgment and Permanent Injunction, Defendants have waived any argument that this Court lacks authority to order Defendants' compliance with Section 1232(c)(2)(B).[14] *See Wood v. Milyard*, 566 U.S. 463, 474 (2012); *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1112 (D.C. Cir. 2019) ("[I]t would be an abuse of discretion for a court to override a defendant's deliberate waiver of a defense."). Finally, that Defendants may have revised their own interpretation of their authority to detain under Section 1225(b) does not shield them from complying with Section 1232(c)(2)(B). *See* MTD and Class Cert. Mem. Op. at 33 ("[T]hat an agency has broad authority in a realm does not give it license to ignore Congress's specific directions or restrictions on its authority.").

It bears repeating why the Permanent Injunction was needed in the first place. As the Court explained in its prior opinion, "the bench trial brought to light disturbing and pervasive

---

[14] Moreover, this Court has already considered and rejected Defendants' arguments that other provisions of immigration law, including Section 1252(f), deprive this Court of the authority to review and enforce Defendants' compliance with Section 1232(c)(2)(B). *See* MTD and Class Cert. Mem. Op. at 68–69.

lapses in ICE's statutory compliance." Final J. and Perm. Inj Mem. Op. at 11. For instance,
"Field officers [were] left with nearly unbridled discretion to make age-out custody
determinations however they would like, and this discretion [was] exercised in ways that [did]
not comply with the agency's statutory obligations." *Id.* at 3 (quoting FF & CL at 179–80). The
Court held that because an injunction could be issued under such circumstances, when an
agency's statutory duties were at issue and an agency was specifically found to have breached
those duties, "tailored injunctive relief . . . is both within its authority and necessary for the Court
to ensure effective and lasting compliance with Section 1232(c)(2)(B)." *Id.* at 14.

The Court also explained that "Defendants' actions throughout this litigation further
reinforce[d] the necessity of injunctive relief," as such relief is "particularly justified when the
government has had 'repeated opportunities to remedy' violations and where the history of
litigation has been extensive." *Id.* (quoting *Hutto v. Finney*, 437 U.S. 678, 687 (1978)). For
example, the Court had been troubled by ICE's attempts to circumvent "its newly instituted
reporting requirement by completing many AORW forms *after* custody determinations had
actually been made, often times even having officers who were entirely uninvolved in the
original custody determination complete and sign off on the documentation." *Id.* at 16. ICE also
eventually admitted that "contrary to its representations to the Court, it had failed to document a
significant portion of age-outs on AORW forms and had misrepresented these statistics." *Id.* ICE
had thus exhibited a pattern "of agency recalcitrance and resistance to the fulfillment of its legal
duties," a finding that strongly supported the imposition of injunctive relief. *Id.* (quoting *Cobell
v. Norton*, 240 F.3d 1081, 1109 (D.C. Cir. 2001)). In light of these considerations, among others,
the Court permanently enjoined Defendants from violating Section 1232(c)(2)(B) and instituted

several safeguards to facilitate that compliance. *See* Final J. and Permanent Inj. To the extent

Defendants disagreed with that injunction, they abandoned their appeal to challenge it.

Injunctive relief here is as necessary now as it was then: to ensure Defendants'

meaningful compliance with Section 1232(c)(2)(B). As explained above, the October 1 Policy

has led, and would continue to lead, to non-compliant age-out placements, depriving age-outs of

the protections Section 1232(c)(2)(B) affords. *See supra* pp. 19–24. And Plaintiffs have

documented instances, many of which Defendants do not dispute, of Defendants re-arresting and

detaining age-outs shortly after their initial release, conduct that appears to serve the purpose of

circumventing this Court's scrutiny. *See* Suppl. Winger Decl. ¶ 19; *id.* Ex. 2; 2d Suppl. Winger

Decl. ¶¶ 4–9.

In addition to Defendants' non-compliant conduct, the Court is concerned that

Defendants have not been transparent about the existence and implementation of the October 1

Policy to begin with. *See, e.g.*, Hilty Decl. ¶¶ 14, 22, 30 (notifying the ORR shelter for class

members M.E.R.V., R.I.Y.C., and G.T.X. that their post-18 plan would no longer be honored the

same day the plans were approved by ICE without explanation). Defendants implemented the

October 1 Policy without first notifying class counsel, without informing the legal service

providers of age-outs, and without alerting the sponsors who were prepared to receive those age-

outs upon their transfer to ICE. Suppl. Winger Decl. ¶ 21–24. And it was not until this Court

ordered that the October 1 Policy be produced—due to Plaintiffs' TRO motion—that Defendants

provided a copy of the Policy for Plaintiffs and the Court to review. TRO Hr'g Tr. 7:18–23

(Court: "[I]s the new [Policy] available for the Court to review?" Defendants' Counsel:

"I . . . was advised I was not authorized to share at this time, but obviously you could order me to

do so. So that's where I'm at.").

Defendants' rapid implementation of the Policy—without advance notice and without any meaningful explanation for abruptly reversing course or canceling age-outs' post-18 plans—suggests an effort to obscure or downplay the Policy's existence. *See Bowen v. City of New York*, 476 U.S. 467, 475 (1986) (discussing the application of a "clandestine," internal policy by the Secretary of HHS in adjudicating Social Security Act claims). As recently noted in a similar case against Defendants concerning unaccompanied children in HHS custody, "Defendants' conduct [does not] inspire confidence that they themselves are convinced they have the authority to proceed as they would like." *L.G.M.L.*, 2025 WL 2671690, at *15; *see id.* ("If their statutory authority is so 'unambiguous,' why exercise it in the middle of the night on a holiday weekend with nothing but a late-night (or early-morning) notice to the children's caretakers and advocates?" (citation omitted)).

In sum, to enforce the Permanent Injunction and ensure Defendants' compliance with Section 1232(c)(2)(B), the Court concludes that is has the authority to enjoin Defendants from implementing the Policy and from re-arresting and detaining age-outs absent a material change in their circumstances. Because Defendants' policy and practices have violated the Permanent Injunction, as outlined above, the Court grants Plaintiffs' motion.

## V.  CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Enforce the Final Judgment and Permanent Injunction (ECF No. 417) is **GRANTED**; and Plaintiffs' Motions for Leave to File Documents under Seal (ECF Nos. 431 and 434) are **GRANTED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  December 12, 2025                                        RUDOLPH CONTRERAS
                                                                United States District Judge