**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| WILMER GARCIA RAMIREZ, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Civil Action No.: 18-508 (RC) |
| | : | |
| v. | : | Re Document Nos.: 471, 472 |
| | : | |
| U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT, *et. al.*, | : | |
| | : | |
| Defendants. | : | |

# MEMORANDUM OPINION

## GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO MODIFY THE COURT'S MONITORING AND ENFORCEMENT ORDER; GRANTING PLAINTIFFS' UNOPPOSED MOTION TO SEAL

## I. INTRODUCTION

In 2021, following a four-week bench trial, the Court issued a Permanent Injunction requiring Defendants—U.S. Immigration and Customs Enforcement ("ICE"), the Acting Director of ICE, the Department of Homeland Security ("DHS"), and the Secretary of Homeland Security—to comply with their statutory obligations under 8 U.S.C. § 1232(c)(2)(B). The injunction followed the Court's finding that ICE had violated the Administrative Procedure Act in its treatment of eighteen-year-olds who had entered the United States as unaccompanied alien children (known as "age-outs"). Section 1232(c)(2)(B) requires ICE to "consider plac[ing]" age-outs in the "least restrictive setting available after taking into account" specified risk factors and to make them "eligible to participate in alternative to detention programs." 8 U.S.C. § 1232(c)(2)(B). The Court found that ICE had failed to follow the procedures necessary to carry out those statutory requirements and had refused to take actions that the statute required.

The Court retained jurisdiction for five years and established supervisory mechanisms to ensure Defendants' continued compliance. That period of supervision is now nearing its end. The Court's jurisdiction and the supervisory mechanisms established by the Permanent Injunction are set to expire on September 21, 2026. Yet, since December 2025, the Court has found Defendants in violation of the Permanent Injunction and subsequent enforcement orders on three separate occasions.

Plaintiffs therefore move under Federal Rule of Civil Procedure 60(b)(5) to extend the Court's jurisdiction and supervisory mechanisms for an additional three years. They contend that Defendants' repeated violations constitute a significant change in circumstances warranting continued oversight and that a three-year extension is suitably tailored to address that change and effectuate the purpose of the Permanent Injunction. The Court agrees that continued oversight is necessary. However, the Court concludes that the most appropriate approach is to assess the need for continued Court oversight in reasonable incremental periods. The Court thus grants a two-year extension.

## II. BACKGROUND[1]

In 2021, the Court entered Final Judgment and issued a Permanent Injunction enjoining Defendants from violating 8 U.S.C. § 1232(c)(2)(B), requiring ICE to provide age-outs the individualized consideration required by the statute. *See* Mem. Op. & Order Granting in Part and Den. in Part Pls.' Mot. Entry Final J. & Perm. Inj. ("Final J. & Perm. Inj. Mem. Op."), ECF No.

[1] This matter arises from the Court's ongoing supervision and enforcement of its prior orders governing the detention and release of former unaccompanied children ("age-outs") under 8 U.S.C. § 1232(c)(2)(B). This case has a complex factual and procedural history that has been recounted in several of this Court's prior opinions in this matter. The Court therefore presumes familiarity with those prior opinions and recounts here only the facts, allegations, and procedural history relevant to the present motion.

367. The Court also imposed several supervisory mechanisms to ensure Defendants' continued compliance and retained jurisdiction over the case for five years following entry of the Final Judgment. *See* Final J. & Perm. Inj. Order, ECF No. 368. Those mechanisms include, among other things, requirements that Defendants: make age-out placement determinations in accordance with the Court's decision and agreed-upon training materials; maintain and share a nationwide list of organizational sponsors accepting age-outs; timely complete and preserve worksheets and supporting documentation for each custody determination; provide specified training and update relevant guidance; and provide Plaintiffs with monthly reports containing information and documentation concerning all age-outs. *Id.* §§ I–VI. The Order also authorizes Plaintiffs' counsel to monitor Defendants' compliance through those reports and other reasonably related information and to raise compliance concerns with the Court. *Id.* § VII. The Court's jurisdiction and these supervisory mechanisms are set to expire on September 21, 2026. *See* Final J. & Perm. Inj. Mem. Op.at 31.

For approximately four years following the Permanent Injunction's issuance, Defendants remained in compliance with the Court's final judgment and injunction order. *See* Mem. Op. Granting Pls.' Mot. Enforce Final J. & Perm. Inj. ("December 2025 Mem. Op.") at 2, 24, ECF No. 436. That changed in 2025. Since December 2025, and based on conduct dating back to July 2025, the Court has found Defendants in violation of the Permanent Injunction and subsequent enforcement orders on three separate occasions. *See id.* at 8; Mem. Op. Granting in Part and Den. in Part Pls.' Mot. Clarify & Enforce ("June 2026 Mem. Op.") at 12, ECF No. 456; Mem. Op. Granting Pls.' Mot. Enforce ("July 2026 Mem. Op.") at 2, ECF No. 469. Thus, after approximately four years of compliance, the final year of the Court's five-year supervisory period has been marked by repeated findings of noncompliance.

Before the expiration of the Court's jurisdiction, Plaintiffs moved under Federal Rule of Civil Procedure 60(b)(5) to modify the Final Judgment and Permanent Injunction order and extend the Court's jurisdiction and corresponding oversight mechanisms for an additional three years.[2] *See* Pls.' Mot. Modify Ct.'s Monitoring & Enforcement Order ("Pls.' Mot.") at 1, ECF No. 471. Plaintiffs contend that Defendants' substantial noncompliance constitutes a significant change in circumstances warranting continued oversight and that a three-year extension is suitably tailored to ensure lasting compliance with § 1232(c)(2)(B), consistent with the purpose of the Permanent Injunction. *Id.* at 16–20.

Defendants respond that 8 U.S.C. § 1252(f)(1) deprives the Court of jurisdiction to grant the requested relief. Defs.' Resp. Opp'n Pls.' Mot. Modify ("Defs.' Opp'n") at 7–9, ECF No. 475. They also dispute that their recent noncompliance constitutes a significant change in circumstances, emphasizing that they remained in compliance for four of the five years following entry of the Permanent Injunction. *Id.* at 10–12. Finally, Defendants contend that a three-year extension is not suitably tailored to the circumstances and would instead be punitive; at most, they maintain, any extension should be tied to the duration of time during which violations occurred. *Id.* at 12–15.

## III. LEGAL STANDARD

Under Federal Rule of Civil Procedure 60(b)(5), courts may modify an injunction where prospective application is "no longer equitable." *Gov't of Province of Manitoba v. Zinke*, 849 F.3d 1111, 1117 (D.C. Cir. 2017). The party seeking modification bears the burden of showing "a significant change in circumstances" warranting revision. *Id.* (quoting *Rufo v. Inmates of*

[2] Pursuant to the protective order governing this case, ECF No. 63, Plaintiffs seek leave to file under seal exhibits in support of their motion, *see* Pls.' Unopposed Mot. Seal, ECF No. 472. The Court grants such leave.

*Suffolk Cty. Jail*, 502 U.S. 367, 383 (1992)); *see Horne v. Flores*, 557 U.S. 433, 447 (2009). A significant change may be shown by a change in factual conditions or law, and modification is appropriate when continued enforcement would be detrimental to the public interest. *Manitoba*, 849 F.3d at 1117 (first citing *Rufo*, 502 U.S. at 384; then *Horne*, 557 U.S. at 453). Once that threshold is met, "a court abuses its discretion when it refuses to modify an injunction" in light of the changed circumstances. *Id.* (quoting *Horne*, 557 U.S. at 447); *see Agostini v. Felton*, 521 U.S. 203, 215 (1997). The proposed modification, moreover, must be "suitably tailored to the changed circumstance." *Id.* (quoting *Rufo*, 502 U.S. at 383).

## IV. ANALYSIS

The Court has retained jurisdiction over this case for five years and imposed supervisory mechanisms to ensure Defendants' compliance with the Permanent Injunction. Plaintiffs now ask the Court to extend that oversight for an additional three years based on Defendants' recent violations of the Permanent Injunction and the Court's enforcement orders. Pls.' Mot. at 1. Defendants oppose the requested extension. They raise both a Section 1252(f)(1) objection to the Court's authority to grant the requested relief and objections to the need for continued oversight. Defs.' Opp'n at 1–3. The Court addresses those issues in turn. It first considers Defendants' challenge under Section 1252(f)(1). It then considers whether the circumstances warrant extending the Permanent Injunction and, if so, whether the requested three-year extension is appropriately tailored.

**A. Section 1252(f)(1)**

Defendants assert that Section 1252(f)(1) deprives this Court of the authority to enjoin them from continuing to violate Section 1232(c)(2)(B) on a class-wide basis.[3] *Id.* at 7–9. According to Defendants, extending the Permanent Injunction would "restrain" the "operation" of a provision covered by Section 1252(f)(1): 8 U.S.C. § 1225. *Id.* at 7–8. Defendants have raised this challenge to the Court's authority to issue injunctive relief multiple times throughout this litigation. *See* Mem. Op. Den. Defs.' Mot. Dismiss & Granting Pls.' Mot. for Class Cert. ("MTD & Class Cert. Mem. Op.") at 68–69, ECF No. 50; December 2025 Mem. Op. at 36–37. The Court has rejected it before, and it does so again. The D.C. Circuit's recent decision in *Refugee & Immigrant Center for Education. & Legal Services v. Mullin*, 174 F.4th 81 (D.C. Cir. 2026) ("*RAICES"*) confirms the Court's prior conclusion that Section 1252(f)(1) does not bar the relief Plaintiffs seek. *See* 174 F.4th at 118. Moreover, even if Section 1252(f)(1) otherwise applied, Defendants waived that objection by voluntarily dismissing their appeal of the Final Judgment and Permanent Injunction order. *See* U.S. Ct. App. Mandate ("Cir.'s Mandate"), ECF No. 404.

As this Court previously held, Section 1252(f)(1) does not bar injunctive relief merely because that relief may affect how Defendants implement Section 1225(b). December 2025 Mem. Op. at 35–37. Section 1232(c)(2)(B), the provision with which Defendants have been ordered to comply, is not among the provisions subject to Section 1252(f)(1).[4] And the Supreme

---

[3] Section 1252(f) places certain limits on injunctive relief in cases concerning certain statutory provisions of immigration law. *See* 8 U.S.C. § 1252(f). Specifically, Section 1252(f)(1) provides: "Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of [the Immigration and Nationality Act] . . . other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated." *Id.*

[4] Defendants do not argue that Section 1232(c)(2)(B) is a provision covered by Section 1252(f)(1). *See* Defs.' Opp'n at 7–9. Nor could they. As this Court previously explained, Section

Court has rejected the notion that Section 1252(f)(1) prohibits an injunction merely because it has "downstream effects on the detention of unlawful immigrants," *Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1, 56 (D.D.C. 2025). Rather, "a court may enjoin the unlawful operation of a provision *that is not specified in § 1252(f)(1)* even if that injunction has some collateral effect on the operation of a covered provision." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 553 n.4 (2022) (emphasis in original).

The D.C. Circuit recently confirmed the same principle in *RAICES*. *See* 174 F.4th at 118–19. There, the court held that § 1252(f)(1) did not bar an injunction requiring the Government to comply with a non-covered statutory provision when carrying out removals, even if it had some indirect effect on the government's adherence of a covered statute:

> [W]e [are not] persuaded by the Government's argument that the injunction violates Section 1252(f)(1) because it could have the indirect effect of compelling the Executive to adhere to the INA's exclusive removal procedures, 8 U.S.C. §§ 1229a and 1225(b)(1), both of which are codified in Part IV of the INA. The injunction does not mandate removals; it requires only that if the Executive removes foreign individuals, it does so consistent with statutory and regulatory provisions that govern asylum and withholding of removal—neither of which are in Part IV of the INA.

*Id.* at 118.

So too here. The Permanent Injunction does not concern the operation of Section 1225(b). It requires only that Defendants make an age-out placement decision consistent with Section 1232(c)(2)(B), which is not a provision covered by Section 1252(f)(1). Final J. & Perm.

---

1232(c)(2)(B) is not a covered provision. *See* December 2025 Mem. Op. at 36–37 (citing *L.G.M.L. v. Noem*, No. 25-cv-2942, 2025 WL 2671690 (D.D.C. Sept. 18, 2025)). Section 1232(c)(2)(B) was enacted as an amendment to the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), not the Immigration and Nationality Act ("INA"), Part IV of which is the subject of Section 1252(f)(1). *See* Violence Against Women Reauthorization Act of 2013, Pub. L. No. 113-4, § 1261, 127 Stat. 54, 156 (amending § 235(c)(2) of the TVPRA, as codified at 8 U.S.C. § 1232(c)(2)(B)); *see also* L.G.M.L., 2025 WL 2671690, at *123 n.6 ("[Section] 1252(f)(1) [does] not preclude class-wide injunctive relief affecting § 1232.").

Inj. Mem. Op. at 30–31. Any effect on Defendants' implementation of Section 1225(b) is therefore indirect and collateral. As in *RAICES*, that incidental effect does not transform an injunction enforcing a non-covered statutory provision into one that "enjoin[s] or restrain[s] . . . the operation" of a provision covered by Section 1252(f)(1). *See RAICES*, 174 F.4th at 117–19.

In any event, Defendants have waived any claim that Section 1252(f)(1) deprives this Court of authority to enjoin violations of Section 1232(c)(2)(B) or enforce the Permanent Injunction on a class-wide basis. *See* Cir.'s Mandate (granting voluntary dismissal). Defendants raised the same Section 1252(f)(1) objection in opposing class certification in 2018, arguing that the requested class-wide injunction would "enjoin the operation of § 1232(c)(2)(B) and other detention provisions, including § 1225(b)." Defs.' Opp. Class Cert. at 22–24, ECF No. 31. The Court has rejected that argument, explaining that the relevant statute against which the injunction would run was Section 1232(c)(2)(B), not the other detention provisions identified by Defendants. December 2025 Mem. Op. at 36. Defendants nonetheless voluntarily dismissed their appeal of the Court's Final Judgment and Permanent Injunction order as part of a settlement resolving a dispute over attorneys' fees. *See* Cir.'s Mandate (dismissing appeal); Settlement Agreement at 3–5, ECF Nos. 402-1 (memorializing Defendants' agreement to dismiss their appeal and resolving attorneys' fees). Having raised the objection, litigated it before this Court, and then abandoned their appeal, Defendants cannot now invoke the same objection to defeat continued enforcement of the Permanent Injunction.

Defendants respond that Section 1252(f)(1) is a "jurisdictional provision" that is not "waivable." Defs.' Opp'n at 9. But Section 1252(f)(1)'s use of the term "jurisdiction" does not itself establish that the provision deprives a court of subject-matter jurisdiction. The Seventh Circuit recently considered and rejected the same argument in *Castanon-Nava v. U.S.*

*Department of Homeland Security*, 175 F.4th 828 (7th Cir. 2026), in the context of a challenge to an extension of a consent decree. The court held that an objection under Section 1252(f)(1) *is* waivable because the provision limits a court's authority to grant certain injunctive relief; it does not deprive the court of subject-matter jurisdiction. *Id.* at 837–38. Relying on *Biden v. Texas*, 597 U.S. 785 (2022), the court explained that, although Section 1252(f)(1) uses the term "jurisdiction," it does not restrict a federal court's power to hear or adjudicate a case. *See* *Castanon-Nava*, 175 F.4th at 837. Rather, it "is nothing more or less than a limit on *injunctive relief*." *Id.* (emphasis in original) (quoting *Biden*, 597 U.S. at 801). The court further analogized Section 1252(f)(1) to equitable-jurisdiction doctrines, which likewise constrain a court's remedial authority but are subject to waiver. *Id*. at 837–838. Because Defendants there had repeatedly raised the Section 1252(f)(1) objection before entering into a consent decree, but then abandoned that objection to obtain the benefits of settlement, the court concluded that they had intentionally relinquished a known right and therefore waived the defense. *Id.* at 837–38.

The Court finds *Castanon-Nava*'s reasoning persuasive and applicable here.[5] As in *Castanon-Nava*, Defendants here raised their Section 1252(f)(1) objection before this Court, litigated it, and then voluntarily abandoned their appeal as part of a settlement agreement. *See* MTD & Class Cert. Mem. Op. at 68–69; Cir.'s Mandate; Settlement Agreement, at 3–5. And Defendants did so after the Supreme Court had decided *Aleman Gonzalez*, which clarified the scope of Section 1252(f)(1). *See supra* p.7. Thus, when Defendants chose to abandon their appeal, they did so with the benefit of the very Supreme Court precedent on which they now cite in support of their objection. *See* Defs.' Opp'n at 7–8. Having raised the defense, litigated it

[5] This Court is not the first to find so. *See J.O.P. v. U.S. Dep't of Homeland Sec.*, No. CV SAG-19-01944, 2026 WL 1469149, at *12 (D. Md. May 26, 2026) (finding Defendants' Section 1252(f)(1) challenge had been waived per *Castanon-Nava*).

before this Court, and then voluntarily relinquished it, Defendants cannot now revive the same objection to defeat continued enforcement of the Permanent Injunction. As the Seventh Circuit explained, a party that "abandoned the argument" to "obtain the benefits of settlement" thereby "waiv[ed] it." *Castanon-Nava*, 175 F.4th at 837. And "[i]t would be an abuse of discretion for a court to override a defendant's deliberate waiver of a defense." *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1100, 1112 (D.C. Cir. 2019) (first citing *Wood v. Milyard*, 566 U.S. 463, 472–73 (2012); then *Day v. McDonough*, 547 U.S. 198, 210 n.11 (2006)). Thus, whether considered on the merits or in light of Defendants' deliberate waiver, Section 1252(f)(1) does not preclude the Court from enforcing or extending the Permanent Injunction.

### B. Modifying The Court's Monitoring and Enforcement Order

Having concluded that Section 1252(f)(1) does not preclude enforcement or extension of the Permanent Injunction, the Court must next determine whether an extension is warranted. The Court concludes that it is. Defendants' recent and repeated violations of the Permanent Injunction and the Court's enforcement orders constitute a significant change in circumstances warranting continued oversight. And, given the nature and timing of those violations, allowing the Court's jurisdiction and existing oversight mechanisms to expire would be detrimental to the public interest. The Court therefore considers whether Plaintiffs' requested three-year extension is suitably tailored to those changed circumstances. Although Plaintiffs emphasize that three years is less than the original five-year period of oversight, the Court concludes that the circumstances presented here warrant an incremental approach. The Court will therefore extend its jurisdiction and the existing oversight mechanisms for two years. Should Defendants' noncompliance continue during that period, and should continued oversight remain necessary to protect the public interest, Plaintiffs may seek a further extension as appropriate.

1. Plaintiffs Have Established Significant Changed Circumstances.

Plaintiffs first assert that a significant change in factual circumstances warrants extending the Court's oversight based on Defendants' recent and repeated violations of the Permanent Injunction. Pls.' Mot. at 1. Certainly, "[t]he failure of substantial compliance with the terms of a [court's order] can qualify as a significant change in circumstances that would justify [its] temporal extension." *Lab./Cmty. Strategy Ctr. v. L.A. Cnty. Metro. Transp. Auth.*, 564 F.3d 1115, 1120–21 (9th Cir. 2009); *see also Holland v. N.J. Dep't of Corr.*, 246 F.3d 267, 284 (3d Cir. 2001) (recognizing that courts have extended a decree when "one party was in substantial non-compliance with the decree"). Defendants respond that they have remained in substantial compliance because they complied with the Permanent Injunction for the first four years of its existence. The Court disagrees.

The Court recognizes Defendants' initial compliance. But the Court cannot ignore that, within a matter of months, it has found on three separate occasions that Defendants violated the Permanent Injunction and subsequent enforcement orders by detaining age-outs without undertaking the decision-making process required by Section 1232(c)(2)(B) and failing to comply with the injunctions' oversight requirements. *See* December 2025 Mem. Op. at 2; June 2026 Mem. Op. at 11–12; July 2026 Mem. Op. at 2. The timing of those violations is particularly significant. The Court's most recent findings have occurred in the final months before the expiration of the Court's jurisdiction and the supervisory mechanisms established to ensure compliance.

Although the Court has addressed Defendants' violations in prior opinions, the nature and progression of those violations bear directly on whether circumstances have significantly

changed since entry of the Permanent Injunction and whether continued oversight remains necessary. The Court therefore briefly recounts its three prior rulings.

*a. Court's December 2025 Order*

In December 2025, the Court first enforced the Permanent Injunction after Defendants adopted a new policy governing the custody and release of age-outs transferred from HHS to ICE custody upon turning eighteen. *See* December 2025 Mem. Op. at 2. Under the new policy, individuals who otherwise would have been eligible for a less restrictive placement were subjected to a separate parole review, under which release depended on a showing of "urgent humanitarian reasons" or "significant public benefit." *Id.* at 19–20. The Court held that the policy violated the Permanent Injunction because it effectively displaced the statutory criteria governing the placement of age-outs and made the availability of a less restrictive setting turn on additional criteria not contained in Section 1232(c)(2)(B). *See id.* at 21–28.

The Court was also troubled by the manner in which the Government implemented the policy. ICE put the policy into effect without notifying class counsel, the legal-service providers representing affected age-outs, or the sponsors prepared to receive them; abruptly cancelled previously approved post-18 release plans, in some instances without explanation; and initially withheld the policy from Plaintiffs, requiring the Court to order its production after Plaintiffs sought emergency relief. *Id.* at 39–40. The Court found that the Government's "rapid implementation" of the policy "without advance notice and without any meaningful explanation" suggested "an effort to obscure or downplay the Policy's existence." *Id.* at 40. (citing *Bowen v. City of New York*, 476 U.S. 467, 475 (1986)).[6]

---

[6] The Court's citation to *Bowen* reflected the significance of Defendants' failure to provide advance notice of the policy or even recognize its existence. As the Supreme Court explained in *Bowen*, "the Government's secretive conduct" can "prevent[] plaintiffs from

Defendants also engaged in a separate practice of clawing back releases that had already occurred. They re-arrested and detained individuals shortly after releasing them, even though there had been no material change in circumstances warranting their re-arrest. *Id.* at 31–34. The Court found that conduct inconsistent with the Permanent Injunction. *Id.* at 34. Allowing the Government to release an age-out pursuant to the required process under Section 1232(c)(2)(B), only to promptly re-arrest that individual without a material change in circumstances, would permit Defendants to undo the very protection the statute was meant to provide. *Id.* at 32. The practice was particularly significant because it operated as a mechanism for circumventing the Permanent Injunction. *Id*. The Government could provide the release to which an individual was entitled under the statute, then take that protection back almost immediately. *Id.* at 32, 34. The Court characterized this as a "workaround" that allowed the Government to "thwart the Court's scrutiny (and Congress's intent)." *Id.* at 31.

Thus, the Court's concern was not merely that the Government made individual placement decisions that violated the Permanent Injunction; it was also troubled by conduct that functionally defeated the statutory and judicial protections the Permanent Injunction was designed to secure. *Id.* at 32. The Court therefore enforced the Permanent Injunction, concluding that the Government could not evade its requirements through either the new policy or the subsequent re-arrests. *Id.* at 39–40.

---

knowing of a violation of their rights." 476 U.S. at 481. Here, Defendants' lack of transparency made the policy—and the resulting violations—more difficult for Plaintiffs to identify and challenge, despite Plaintiffs functioning as the Court-appointed monitors. *See* December 2025 Mem. Op at. 39–40.

*b. Court's June 2026 Order*

Shortly after the Court issued its December 2025 Order, Plaintiffs moved in March 2026 to enforce the Permanent Injunction and the Court's prior order. *See* June 2026 Mem. Op. at 2. In June 2026, the Court again found that Defendants had violated the Permanent Injunction. *See, e.g.*, *id.* at 12.

ICE had rearrested individuals previously released based on purportedly "materially changed circumstances," including traffic violations, chance encounters with law enforcement, and failures to update an address. *Id.* at 5–7. But ICE often failed to explain how those circumstances demonstrated that the particular age-out had become a danger to the community or a flight risk—the very considerations the statute required ICE to make. *Id.* at 12–16. The Court therefore found that ICE appeared to be applying the Permanent Injunction in a manner the Court had not intended, using relatively minor or unrelated events to undo prior release determinations. *Id*. at 15–16. ICE then compounded that noncompliance by delaying the release of age-outs whom it had itself determined should be released, in some cases for *weeks*. *Id.* at 9 (noting that Defendants delayed the release of an age-out whom they themselves determined was releasable after five-and-a-half weeks of detention). The Court rejected the notion that such delays were consistent with its orders or Section 1232(c)(2)(B), emphasizing that all court orders, including its directives to release improperly detained individuals, require prompt compliance. *Id.* at 21–24.

The Court further found that Defendants' conduct frustrated the oversight mechanisms established by the Permanent Injunction. Plaintiffs' counsel were responsible for monitoring ICE's compliance with Section 1232(c)(2)(B), a role the Government had agreed Plaintiffs could perform in lieu of an independent monitor. *Id.* at 16–17. Yet, when Plaintiffs sought to determine

whether ICE's rearrests complied with the Permanent Injunction, Defendants provided only abbreviated spreadsheet descriptions of the purported changed circumstances. *Id.* at 18. When those descriptions did not appear to indicate a material change, Defendants resisted producing the underlying records on which their decisions were based. *Id.* at 16–21. The Court found that this resistance and ultimate failure to disclose the records impeded Plaintiffs' meaningful monitoring, particularly given Defendants' history of noncompliance and prior lack of transparency. *Id.* at 18–21. Thus, Defendants were not merely failing to comply with the substantive statutory requirements governing rearrest and release; their conduct also impeded the very mechanism the Court had established—and the Government had accepted—for detecting and addressing such noncompliance. *See id.*

Moreover, the Court was troubled by Defendants' belated assertion that a writ of habeas corpus was the exclusive vehicle through which class members could obtain relief—an argument Defendants had never advanced during the prior eight years of litigation. *Id*. 24–25. Defendants' new position was also inconsistent with the position they had taken just months earlier in a different case, *Singh v. Noem*, No. 2:26-CV-00402-TLF, 2026 WL 696835 (W.D. Wash. Mar. 12, 2026), where they argued that, because an age-out was a *Garcia Ramirez* class member, his custody challenge was "governed by the class-wide remedial framework" established in this case. *Id.* at 24–25 & n.9. Although the *Singh* court ultimately rejected the Government's reliance on this class action because the petitioner's constitutional due-process claim there differed from the claims here, Defendants' inconsistent positions raised serious judicial-estoppel concerns; Defendants could not invoke the class framework when convenient and disavow it when not. *Id.* at 24–25 n.9.

*c. Court's July 2026 Order*

In July 2026, the Court was required to enforce the Permanent Injunction for a third time, mere weeks after its June 2026 Order. The July 2026 Order concerned the rearrest and continued detention of two age-outs, H.M.A. and Y.Z.P. At that point, both had been detained for nearly seven months. July 2026 Mem. Op. at 3. In both cases, the Court found that ICE had relied on certain facts as categorical indicators of flight risk or dangerousness rather than assessing whether, in the particular circumstances of the individual, those events actually supported rearrest and detention. *E.g.*, *id.* at 7–8. And for each age-out, Defendants relied on additional post-hoc rationalizations supplied only when the contemporaneous justification for the detention decisions was challenged by Plaintiffs. *Id.* at 8–9, 12–13.

For H.M.A., ICE relied on a missed check-in and alleged violations of his release conditions as evidence of flight risk. *Id.* at 8. But the Court found that ICE had failed to account for circumstances bearing directly on that risk. H.M.A. had complied with his prior check-ins and, critically, had appeared for his removal hearing after the missed appointment. *Id.* at 6–8. The problem, therefore, was not simply that ICE failed to consider one additional fact. ICE effectively treated the missed check-in as sufficient evidence of flight risk without undertaking the individualized assessment necessary to determine whether that event actually demonstrated that H.M.A. was likely to abscond. *Id.* at 8. The Court concluded that ICE had failed to consider an important aspect of the flight-risk inquiry and that the resulting detention decision was therefore arbitrary and capricious. *Id.* Defendants also attempted to justify H.M.A.'s detention based on his alleged failure to obtain a passport, which they contended violated his conditions of release. *Id.* at 8–11. But that rationale was not invoked when H.M.A. was rearrested and detained; the contemporaneous record identified only his missed ICE check-in as the basis for

detention. *Id.* at 9. Notably, Defendants had not provided Plaintiffs with a copy of the purported conditions of release on which they relied, despite the Court's prior June 2026 Order requiring Defendants to produce such records. *Id.* at 9 n.3. Thus, Defendants supplied a new justification for H.M.A.'s detention seven months after the fact, while failing to produce to Plaintiffs the underlying release conditions they invoked to support it.

The same categorical approach appeared in ICE's treatment of Y.Z.P. ICE relied on the existence of a misdemeanor conviction to conclude that Y.Z.P. posed a danger to the community, without adequately considering the circumstances underlying the offense, its nature or severity, or whether it demonstrated any continuing danger. *Id.* at 11–14. The conviction thus functioned as a categorical proxy for dangerousness rather than as one factor to be assessed in light of the individual's actual circumstances. *See id.* at 11–12. ICE also attempted to supply the missing individualized analysis through a declaration prepared nearly seven months after Y.Z.P.'s detention, which the Court rejected as a post hoc rationalization. *Id.* at 12. And although ICE invoked a missed check-in as additional evidence of flight risk, that rationale had not been relied upon when Y.Z.P. was rearrested. *Id.* at 15. Even considering it, the Court found that ICE failed to account for Y.Z.P.'s prior compliance with check-ins, fixed residence, employment, community ties, and other circumstances bearing directly on whether he was likely to appear for future proceedings. *Id.* at 15–16.

* * *

Viewed together, these three rulings establish a significant change in circumstances under either of two independent grounds: Defendants' recent conduct constitutes substantial noncompliance with the Permanent Injunction; and even assuming Defendants' approximately four years of prior compliance could preclude a finding of substantial noncompliance, the

circumstances now confronting the Court make it detrimental to the public interest to allow the existing permanent injunction order and its supervisory mechanisms to expire without modification.

First, Defendants' recent conduct constitutes substantial noncompliance. Assessing substantial compliance is not an exercise in arithmetic. Rather, courts must take a "holistic view of all the available information" and "do more than simply count the number of technical deviations from the [court's order]." *Lab./Cmty. Strategy Ctr.*, 564 F.3d at 1122; *see also R.C. ex rel. the Ala. Disabilities Advoc., Program v. Walley*, 475 F. Supp. 2d 1118, 1138 (M.D. Ala. 2007) ("It would be superficial . . . to predicate a finding [of substantial compliance] on a pure percentage basis, i.e., to say that a compliance ratio of . . . 70 percent either does or does not equate substantial compliance"), *aff'd sub nom. R.C. ex rel. Ala. Disabilities Advoc. Project v. Walley*, 270 F. App'x 989 (11th Cir. 2008); *Joseph A. by Wolfe v. N.M. Dep't of Hum. Servs.*, 69 F.3d 1081, 1085 (10th Cir. 1995) ("The phrase 'substantial compliance' is not susceptible of a mathematically precise definition."). "[S]ubstantiality must depend on the circumstances of each case, including the nature of the interest at stake and the degree to which noncompliance affects that interest." *Joseph A. by Wolfe*, 69 F.3d at 1085 (citation modified) (quoting *Fortin v. Comm'r of the Dep't of Mass. Pub. Welfare*, 692 F.2d 790, 795 (1st Cir. 1982)). The relevant question is therefore not simply whether Defendants can point to a longer period of compliance than noncompliance, but what their recent conduct, considered as a whole, reveals about their present compliance with the Permanent Injunction.

Here, the Court's recent rulings reveal a pattern of noncompliance substantial in both nature and scope. Within approximately seven months, the Court has found a multitude of violations, most involving the core substantive obligation imposed by the Permanent

Injunction—that is, Defendants' obligation to make the individualized risk assessment mandated by Section 1232(c)(2)(B) before making an age-out detention determination. Defendants' violations have not been confined to isolated errors in individual cases. They have included categorical rather than individualized assessments, attempts to justify and supply deficient reasoning after the fact, and failures to provide information necessary for Plaintiffs to perform their Court-authorized monitoring function. The recent record thus reflects recurring deficiencies in both Defendants' substantive decision-making and their compliance with the oversight mechanisms the Permanent Injunction established.

That pattern is significant for another reason. Defendants' violations cannot reasonably be attributed to uncertainty about their legal obligations. The governing standards are neither novel nor unclear. As the Court previously and repeatedly explained, when it ordered Defendants to cease rearresting and detaining age-outs absent "materially changed circumstances," it "did not create a novel standard from whole cloth." June 2026 Mem. Op. at 12; *see also* December 2025 Mem. Op. at 31–32 n.11. Rather, the Court applied a well-established standard requiring an individualized determination that circumstances have materially changed such that an individual presents a flight risk or danger. *See* June 2026 Mem. Op. at 13; *see also* December 2025 Mem. Op. at 31–32 n.11. Such a standard "ensures that detention decision[s] rest[] on individualized assessments of changed circumstances rather than categorical assumptions." June 2026 Mem. Op. at 13 (quoting *Ledesma Gonzalez v. Bostock*, 808 F. Supp. 3d 1189, 1200 (W.D. Wash. 2025)); *see also* December 2025 Mem. Op. at 31–32 n.11 (same). The Court has repeatedly explained those requirements to Defendants, and Defendants operated under them for approximately four years previously. The recent violations therefore cannot readily be ascribed to a lack of notice or uncertainty as to how to comply with the statute or the Permanent

Injunction. Instead, they represent a stark and sudden change in Defendants' practices, indicating that Defendants have reverted to the same "agency recalcitrance and resistance to the fulfillment of its legal duties" that the Court observed when it issued the Permanent Injunction. Final J. & Perm. Inj. Mem. Op. at 16 (quoting *Cobell v. Norton*, 240 F.3d 1081, 1109 (D.C. Cir. 2001); *see also Manitoba*, 849 F.3d at 1121 ("[T]he significant change in factual conditions inquiry should include whether the risks that led to injunctive relief have been 'ameliorated, if not eliminated, as a result of changed circumstances.'" (quoting *Petties ex rel. Martin v. D.C.*, 662 F.3d 564, 571 (D.C. Cir. 2011))).

These violations also go to the heart of the Permanent Injunction. Section 1232(c)(2)(B) requires individualized consideration before an age-out may be detained, and the Permanent Injunction was designed to ensure that Defendants actually perform that individualized inquiry. The Court's recent rulings demonstrate that Defendants have repeatedly failed to do so. Defendants' recent conduct therefore raises concerns not merely about a multitude of deficient custody decisions, but about whether the institutional practices necessary to sustain compliance remain in place. Viewed as a whole, the Court finds that this recent pattern, evidencing an apparently deliberate and sharp divergence from past compliance, constitutes substantial noncompliance sufficient to establish a significant change in circumstances.

Second, even assuming *arguendo* that Defendants' four years of prior compliance could preclude a finding of substantial noncompliance, allowing judicial oversight to expire would be detrimental to the public interest. A modification may nevertheless be warranted where "the enforcement of [the court order] without modification would be detrimental to the public interest." *Rufo*, 502 U.S. at 384. That principle is particularly pertinent here because the recent violations have occurred on the threshold of the expiration of the Court's five-year period of

supervision. Therefore, the Court must determine whether, in light of the circumstances it is now confronting, it would be detrimental to the public interest to allow the existing Final Judgment and Permanent Injunction order and its supervisory mechanisms to expire without modification. On this record, it would.

Again, the Court has found a multitude of violations of the Permanent Injunction and its subsequent enforcement orders on three occasions within approximately seven months, with the most recent occurring just two months before the Court's jurisdiction and the associated monitoring mechanisms are set to expire. *See supra* pp. 12–17. Allowing the Court's supervision to expire at this juncture would produce a particularly troubling result. The mechanisms established to ensure compliance would terminate at precisely the moment that the Court's recent enforcement proceedings have revealed recurring departures from the core requirements those mechanisms were designed to secure. Indeed, those proceedings demonstrate that the supervisory mechanisms are performing precisely the function for which they were established. They have brought to light recurring violations that otherwise might not have been detected or remedied. The Court cannot reasonably conclude that the public interest would be served by allowing those mechanisms to expire while Defendants' noncompliance is ongoing and their future compliance with the statutory requirements remains in serious doubt.

The public interest is especially implicated here not only because "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations," *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citation modified) (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)), but also because the violations implicate the physical liberty of young adults. Expert testimony at trial established that needless "detention, particularly in adult settings" of youth

ages 15 to 24—such as the class members here—causes "physical[] and psychological harm[]" that "threatens both their short- and long-term health and well-being." Final J. & Perm. Inj. Mem. Op. at 18–19. When Defendants violate Section 1232(c)(2)(B) by detaining age-outs without undertaking the decision-making process the statute requires, a young adult's health and well-being is therefore directly implicated. The Court has had to intervene to order the release of a number of age-outs whose detention was inconsistent with the requirements of Section 1232(c)(2)(B). The harm at issue is therefore not merely theoretical. Under these circumstances, it would be detrimental to the public interest to allow the Court's oversight to lapse while Defendants' noncompliance remains ongoing and their future compliance with those requirements remains highly doubtful. *See Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, No. C14-1178 MJP, 2016 WL 4533611, at *4 (W.D. Wash. Feb. 8, 2016) ("[T]he public interest is best served by extending the compliance deadline while also increasing the Court's supervision and the authority of the Court Monitor . . . because Defendants have demonstrated that they are unable to protect the rights of class members when left to determine their own priorities . . . .").

Accordingly, whether because Defendants' recent conduct constitutes substantial noncompliance or because allowing judicial oversight and the oversight mechanisms to expire under these circumstances would be detrimental to the public interest, the Court finds that circumstances have significantly changed since entry of the Permanent Injunction. Defendants' recent conduct represents a significant and deliberate departure from their prior course of compliance, and its recurrence immediately before the expiration of judicial supervision makes it inappropriate to allow the existing injunction to expire without modification. The Court therefore finds that continued judicial oversight is warranted.

2. A Two-Year Extension Is Suitably Tailored.

Having found that circumstances have changed such that continued judicial oversight is warranted, the Court must determine whether the requested modification is "suitably tailored to the changed circumstances." *Rufo*, 502 U.S. at 391. The modification must be "tailored to resolve the problems created by [that] change." *Id.* And, in the case of an injunction, courts must also consider "whether the requested modification effectuates or thwarts the purpose behind the injunction." *Sierra Club v. U.S. Army Corps of Eng'rs*, 732 F.2d 253, 257 (2d Cir. 1984) (citing *Chrysler Corp. v. United States*, 316 U.S. 556, 562 (1942)).

The recent violations reveal a problem that the requested modification must address. That Defendants maintained compliance for approximately four years under the Permanent Injunction suggests that the practices necessary to comply with Section 1232(c)(2)(B) were, at one point, in place and could operate effectively. The recent violations therefore cast doubt on whether those practices have remained sufficiently institutionalized to sustain the agency's compliance without judicial oversight. *Cf. Consumer Advisory Bd. v. Harvey*, 697 F. Supp. 2d 131, 136 (D. Me. 2010) ("Defendants have exhibited a demonstrable commitment to achieving compliance with the Decree . . . bolster[ing] the Court's belief that the mechanisms currently in place to assure compliance will not be immediately dismantled once the Decree is terminated."). The Court cannot yet determine whether the recent regression reflects an erosion of previously established practices or demonstrates that those practices were not sufficiently institutionalized to endure. At the same time, the record does not establish that the regression is necessarily permanent.

The Court's approximately eight years of experience with this litigation further informs that assessment. As courts have recognized in institutional-reform cases, as here, such experience gives a district court "an intimate understanding of the workings of an institution" and the

changes necessary to achieve the goals of its orders. *Navarro-Ayala v. Hernandez-Colon*, 951 F.2d 1325, 1338 (1st Cir. 1991); *see also Ruiz v. Lynaugh*, 811 F.2d 856, 861 (5th Cir. 1987) (recognizing the district court's "personal knowledge, experience, and insight" into "the parties' intentions, performances, and capabilities"). That experience makes the nature of the recent regression particularly significant. The conduct now before the Court bears important similarities to the conduct the Court observed before entering the Permanent Injunction, when it found a pattern of "agency recalcitrance and resistance to the fulfillment of its legal duties." Final J. & Perm. Inj. Mem. Op. at 15 (citation omitted). The recent violations likewise include departures from required decision-making processes, post-hoc efforts to justify deficient decisions, and failures to provide information necessary to assess compliance. These similarities suggest that Defendants may have returned to their pre-injunction practices. At a minimum, they raise sufficient doubt as to whether compliance can once again be achieved and once achieved, become self-sustaining without continued judicial oversight.

That uncertainty counsels in favor of an incremental approach to continued oversight. The purpose of extending the Permanent Injunction is not to impose prolonged judicial supervision for its own sake, but to determine whether Defendants can restore the practices necessary for compliance and sustain them over time. *See Horne*, 557 U.S. at 450. Again, the Court has substantial reason to question whether Defendants will be able to do so without continued oversight. It may ultimately prove that long-term supervision will be necessary, but the Court need not determine that now, before gaining additional information about Defendants' ability to restore and sustain compliance in the near term. An incremental approach instead permits the Court to assess Defendants' conduct over a defined period and, based on that

experience, determine whether compliance has become sufficiently durable to ultimately end supervision or whether a longer period extension is indeed warranted.

On the present record, two years provides an appropriate next period for that assessment. It gives Defendants a meaningful opportunity to demonstrate that the recent regression has been corrected and that the agency practices necessary for compliance have been established and remain effective. *See E.E.O.C. v. Joe's Stone Crab, Inc.*, 15 F. Supp. 2d 1364, 1376 (S.D. Fla. 1998) (ordering injunctive relief for a period "of sufficient duration to allow remedial measures to take root"); *In re Mex. Money Transfer Litig. (W. Union & Valuta)*, 164 F. Supp. 2d 1002, 1030 (N.D. Ill. 2000) (ordering injunctive relief for "a period long enough to generate permanent change in Defendants' business practices"), *aff'd sub nom. In re Mex. Money Transfer Litig.*, 267 F.3d 743 (7th Cir. 2001). It also gives the Court sufficient time to determine whether any renewed compliance is sustained rather than merely temporary.

A shorter, one-year period would not provide sufficient time to make that determination. The violations underlying the Court's recent enforcement orders illustrate why. For instance, ICE's unlawful rearrest and revocation practices began in July 2025 but were not uncovered until October 2025, after reports from affected individuals and others prompted further investigation by Plaintiffs. *See* December 2025 Mem. Op at 8–14, 39; Decl. of Emma Winger ("Winger Decl.") ¶¶ 9, 13–15, ECF No. 413-4. Detecting those practices required Plaintiffs to gather information from age-outs, sponsors, legal service providers, and others; review records and reporting materials; investigate individual cases; and seek information from Defendants.[7] *See*

[7] As this Court has previously recognized, Defendants have not always been forthcoming with information necessary to assess their compliance, at times withholding information until ordered to produce it and resisting Plaintiffs' efforts to obtain relevant records. *See e.g.*, July 2026 Mem. Op. at 9 n.3; June 2026 Mem. Op. at 16–20; December 2025 Mem. Op. at 39–40. The Court has also noted previously that Defendants do not notify age-outs of the basis for their

*e.g.*, Winger Decl. ¶¶ 3–19 (describing Plaintiffs' investigation through review of Defendants' Age-Out Review Worksheets and other records, ICE's detainee locator, and information obtained from affected age-outs, sponsors, attorneys, and legal service providers, as well as repeated requests to Defendants for information and investigation); 2d Supp. Winger Decl. ¶¶ 3–10, ECF No. 430 (describing Plaintiffs' subsequent investigation, which identified five additional class members who had been rearrested after release and required further review of ICE records, interviews with affected individuals and sponsors, and inquiries to Defendants). Thus, months passed between the onset of the challenged practices and Plaintiffs' ability to identify the departures from the Permanent Injunction, investigate their scope, and bring them to the Court's attention.

If similar departures occur in the future, they may likewise not be immediately apparent. Plaintiffs may similarly need months to identify violations, investigate the underlying circumstances, and obtain the information necessary to determine whether Defendants have complied with the Permanent Injunction and bring such conduct to this Court's attention. A one-year extension could very well expire before Plaintiffs have had a meaningful opportunity to determine whether Defendants have restored compliance. The Court, in turn, would potentially be required to assess the durability of Defendants' compliance without having had sufficient time for the monitoring mechanisms to reveal any potential pattern of non-compliance rather than minor, errant mistakes. A two-year period provides sufficient time for that process to unfold and for the Court to make a meaningful assessment of whether Defendants have restored and can sustain compliance.

---

rearrest and detention or inform them of the Court's December 2025 Order. *See* June 2026 Mem. Op. at 19.

And the existing monitoring mechanisms make that two-year period of observation meaningful. They permit Plaintiffs to continue to assess Defendants' compliance over time and bring material departures to the Court's attention without requiring the Court to oversee individual custody decisions. The recent use of those mechanisms has demonstrated their continuing utility. Plaintiffs' monitoring has brought to light noncompliant conduct that Defendants' own processes did not prevent. Preserving those mechanisms during the two-year period therefore allows Plaintiffs to observe Defendants' implementation of the Permanent Injunction across multiple reporting and monitoring cycles, identify and investigate potential departures as they arise, and assess whether compliance is occurring in practice and remains effective over time, rather than relying solely on Defendants' representations or assurances.

This approach "effectuates" the purpose of the Permanent Injunction. *See Sierra Club*, 732 F.2d at 257. The injunction was designed to secure "effective and lasting compliance with Section 1232(c)(2)(B)." Final J. & Perm. Inj. Mem. Op. at 14. Its purpose was therefore not simply to correct individual violations, but to ensure that Defendants developed practices capable of sustaining compliance. The recent regression makes it premature to conclude that this objective has been achieved. At the same time, the record does not establish that the regression is necessarily permanent. A defined period of continued oversight permits the Court to determine whether Defendants' compliance has become sufficiently durable to fulfill the injunction's purpose. *See Horne*, 557 U.S. at 450 ("[A] critical question in this Rule 60(b)(5) inquiry is whether the objective of the District Court's [order] . . . has been achieved. If a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper." (citation modified)). Should Defendants' noncompliance continue during that period,

or should the circumstances otherwise demonstrate that continued oversight remains necessary to protect the public interest, Plaintiffs may seek a further extension.

Defendants raise several objections. None are persuasive. First, the Court is not persuaded by Defendants' assurance that continued oversight is unnecessary because they will remain bound by the Permanent Injunction after the monitoring period expires. While Defendants will, of course, remain legally obligated to comply with Section 1232(c)(2)(B), they have not demonstrated that they can sustain compliance without the oversight mechanisms the Court previously found necessary. The Court therefore cannot assume that the practices supporting Defendants' prior compliance have become sufficiently entrenched when recent enforcement proceedings have revealed a return to deficiencies that, in material respects, resemble those that originally necessitated judicial supervision. A two-year extension gives Defendants an opportunity to demonstrate sustained compliance.

Second, the Court rejects Defendants' contention that any extension should correspond to the approximately one-year period during which the recent violations occurred. That approach measures the duration of the violations rather than the period reasonably necessary to address the problem they reveal. *Rufo*, 502 U.S. at 391 (explaining that a modification must be "tailored to resolve the problems created by the change in circumstances"). The Court needs a sufficient period to determine whether the practices necessary for compliance have been restored and whether renewed compliance will persist. *See Horne*, 557 U.S. at 450. A one-year extension would be insufficient time to make that determination. As explained above, the recent violations demonstrate that noncompliance with the Permanent Injunction may be difficult to detect promptly, often taking months for patterns of conduct to emerge and be investigated. Thus, the

period between the occurrence of noncompliant conduct and its discovery may itself consume a substantial portion of a one-year extension.

Nor do the cases Defendants cite establish that the duration of the violations is the appropriate measure here. *See* Defs.' Opp'n at 12–13 (citing cases in which a court extended a consent decree for the duration of the noncompliance). Those cases concern consent decrees, which are fundamentally different from the Permanent Injunction here. A consent decree embodies the parties' agreement and thus implicates the court's obligation, when modifying it, to preserve the parties' bargain. *See Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 519, 522 (1986); *see also Pigford v. Veneman*, 292 F.3d 918, 927 (D.C. Cir. 2002). This case, by contrast, involves a permanent injunction entered after a finding of liability following trial. The Court imposed oversight mechanisms to address ICE's adjudicated failure to comply with Section 1232(c)(2)(B) and to ensure compliance going forward. Thus, the Court must determine how long judicial oversight is reasonably necessary to effectuate the purpose of the injunction. *See Sierra Club*, 732 F.2d at 257. That inquiry turns on the circumstances that necessitated the relief, including the nature of the original violations, the history of judicial supervision, and the similarity between Defendants' recent regression and the deficiencies that originally prompted judicial intervention—not simply the duration of the noncompliance.

Third, the Court rejects Defendants' suggestion that the requested extension is punitive. It is not. The extension is prospective, serving the remedial purpose of determining whether Defendants can sustain compliance with Section 1232(c)(2)(B). *See United States v. Alisal Water Corp.*, 431 F.3d 643, 656 (9th Cir. 2005). The Court is not extending judicial oversight as punishment for past violations; it is preserving the existing monitoring mechanisms for a defined

period so that Defendants can demonstrate that the recent regression has been corrected and that compliance can be maintained.

Plaintiffs' observations concerning the consequences of detention likewise do not transform the extension into a punitive measure. Those consequences are relevant because they underscore the importance of ensuring compliance with the statutory requirements at issue. Section 1232(c)(2)(B) governs decisions that concern the detention or release of young adults who initially came to the United States as children without a parent or guardian available to care for them. Such decisions thus implicate the physical liberty of a subset of young adult immigrants who Congress determined warrant special protection. *See* December 2025 Mem. Op. at 2–3. As the Court previously found, detention, particularly in adult settings, can cause physical and psychological harm that threatens young adults' short- and long-term well-being. Final J. & Perm. Inj. Mem. Op. at 18–19. And the Court has had to intervene repeatedly to order the release of age-outs whose detention was inconsistent with the statute. These consequences reinforce the public interest in ensuring that Defendants' compliance is substantive and lasting. They therefore support, rather than undermine, the remedial character of the requested extension.

Finally, the Court is mindful of Defendants' contention that any extension is unduly burdensome and delays the full return of ordinary administrative authority to the Government. Defendants emphasize that the Permanent Injunction imposes obligations concerning training, documentation, reporting, and Plaintiffs' monitoring. They further invoke the principle that, in institutional-reform cases, federal courts must ensure that authority is "returned promptly to the [Government] and its officials." *Horne*, 557 U.S. at 450.

The Court agrees that judicial oversight should not continue after it is no longer necessary. But that principle does not require the Court to terminate oversight before the record

supports doing so. In entering the Permanent Injunction, the Court was attentive to the need to minimize intrusion into Defendants' discretion in determining the "precise route they take" to fulfill their statutory obligations, declining to impose the more intrusive supervisory measures proposed by Plaintiffs. Final J. & Perm. Inj. Mem. Op. at 32 (quoting *Cobell*, 240 F.3d at 1106; *see also id.* at 30–31, 46. As previously explained, the monitoring mechanisms preserve Defendants' discretion while providing the limited oversight necessary to ensure that it is exercised in accordance with the statute.

The Court likewise "ma[de] clear" that Defendants could seek relief from continued oversight upon demonstrating adequate compliance. See Final J. & Perm. Inj. Mem. Op at 31 n.11. Defendants did not do so during the approximately four years in which they operated under the monitoring requirements, nor did they seek modification on the ground that those requirements were unworkable or unduly burdensome. Only after Plaintiffs' monitoring uncovered significant noncompliance did Defendants begin to emphasize the burden associated with those mechanisms, particularly the need to produce the records upon which they relied to rearrest and detain age-outs. *See* June 2026 Mem. Op. at 5, 11, 16, 19. But "[g]iven Defendants' prior violations of the Permanent Injunction and the transparency concerns that have arisen throughout this litigation, the need for meaningful oversight outweighs any incidental administrative burden associated with producing records already in Defendants' possession." *Id.* at 20. Notably, the monitoring mechanisms have served the function for which they were imposed. They have enabled Plaintiffs to identify material departures from the Permanent Injunction, reduced uncertainty concerning Defendants' compliance, and facilitated the Court's ability to address those departures. The record therefore does not support concluding that these

mechanisms have outlived their usefulness; to the contrary, their continued operation remains necessary to ensure that Defendants remain in compliance with the Permanent Injunction.

The Court therefore does not regard the extension as an open-ended continuation of judicial supervision, as Defendants suggest. Instead, it is a defined period directed toward a specific remedial objective: ensuring that Defendants comply with their legal obligation under Section 1232(c)(2)(B) and ensuring that they can sustain that compliance without the oversight mechanisms that the Court previously found necessary.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion to Modify the Court's Monitoring and Enforcement Order (ECF No. 471) is **GRANTED IN PART** and **DENIED IN PART**, and Plaintiffs' Unopposed Motion to Seal (ECF No. 472) is **GRANTED**. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: September 15, 2026

RUDOLPH CONTRERAS
United States District Judge